## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## AMARILLO DIVISION

| | | |
|---|---|---|
| JOHN JENSEN; JEREMY NEUSCH; DAVID LYNN SMITH; HOT SHOTS CUSTOM LLC; TEXAS STATE RIFLE ASSOCIATION; FPC ACTION FOUNDATION; and CITIZENS COMMITTEE FOR THE RIGHT TO KEEP AND BEAR ARMS, | § § § § § § § | |
| *Plaintiffs*, | § § | No. 2:25-cv-00223 |
| v. | § § | **ORAL ARGUMENT REQUESTED** |
| BUREAU OF ALCOHOL, TOBACCO, FIREARMS AND EXPLOSIVES; DANIEL P. DRISCOLL, in his official capacity as Acting Director of the Bureau of Alcohol Tobacco, Firearms and Explosives; UNITED STATES DEPARTMENT OF JUSTICE; and PAMELA J. BONDI, in her official capacity as Attorney General of the United States, | § § § § § § § | |
| *Defendants*. | § § § | |

## MEMORANDUM OF LAW IN SUPPORT OF
## PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

**TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ............................................................................................. iii

INTRODUCTION ............................................................................................................. 1

BACKGROUND ............................................................................................................... 3

I.  The Constitution .......................................................................................................... 3

    A.  The Taxing Clause. ............................................................................................ 3

    B.  The Commerce Clause. ...................................................................................... 3

    C.  The Necessary and Proper Clause ..................................................................... 4

    D.  The Second Amendment. ................................................................................... 4

II.  The National Firearms Act. ......................................................................................... 4

    A.  The Untaxed Firearms ....................................................................................... 4

    B.  The Challenged NFA Provisions. ...................................................................... 5

III.  The One Big Beautiful Bill Act. ................................................................................. 7

IV.  The Challenged NFA Provisions Injure Plaintiffs ...................................................... 7

    A.  Individual Plaintiffs and Hot Shots Custom LLC. ............................................. 8

    B.  Organizational Plaintiffs. ................................................................................. 14

LEGAL STANDARD ..................................................................................................... 15

ARGUMENT .................................................................................................................. 15

I.  The NFA's Regulation of Untaxed "Firearms" Exceeds Congress's Constitutional
    Authority. .................................................................................................................. 15

    A.  The NFA's Regulation of Untaxed "Firearms" Exceeds Congress's Taxing
        Power .............................................................................................................. 15

    B.  The NFA's Regulation of Untaxed "Firearms" Cannot Be Justified as an
        Exercise of Any Other of Congress's Enumerated Powers ............................... 18

    C.  The NFA's Regulation of Untaxed "Firearms" Exceeds Congress's Commerce
        Clause Powers. ................................................................................................ 20

        1.  The NFA's Regulation of Untaxed "Firearms" Cannot Be Justified as a
            Regulation of the Channels or Instrumentalities of Interstate
            Commerce. ............................................................................................... 21

        2.  The NFA's Regulation of Untaxed "Firearms" Cannot Be Justified as
            a Regulation of Activities that Substantially Affect Interstate
            Commerce. ............................................................................................... 21

            i.  The Challenged NFA Provisions Were Not Enacted with the
                Purpose of Regulating Interstate Commerce. .............................. 21

i

|  |  | ii. | The Challenged NFA Provisions Are Not Part of a Comprehensive Regulation of Quintessentially Economic Activity. | 23 |

II. The NFA's Regulation of Suppressors and Short-Barreled Rifles Violates the Second Amendment. ...................................................................................................26

    A.    Suppressors and Short-Barreled Rifles Are Covered by the Second Amendment's Plain Text. ...........................................................................27

    B.    Suppressors and Short-Barreled Rifles Are Not "Dangerous and Unusual" Weapons and There Is No Historical Tradition of Requiring the Registration of Protected Arms. ...............................................................................28

        1.    Suppressors and Short-Barreled Rifles Are in Common Use. ..................31

        2.    Suppressors and Short-Barreled Rifles Are Not "Dangerous." .................34

        3.    There Is No Historical Tradition Supporting the NFA's Regulatory Scheme for Protected Arms. ...............................................................40

        4.    The Fifth Circuit's Opinion in *United States v. Peterson* Does Not Require a Different Result. .............................................................42

III. Plaintiffs Are Entitled to a Permanent Injunction of the Challenged NFA Provisions. ......42

    A.    Plaintiffs Satisfy the Permanent Injunction Factors. ..............................................43

    B.    The Scope of Relief. ...........................................................................................44

CONCLUSION ...................................................................................................................44

## TABLE OF AUTHORITIES

**Cases**                                                                                          **Page(s)**

*Airlines for Am. v. Dep't of Transp.*,
    110 F.4th 672 (5th Cir. 2024) ...........................................................................44

*Bevis v. City of Naperville*,
    85 F.4th 1175 (7th Cir. 2023) ...........................................................................30

*BST Holdings, LLC v. OSHA*,
    17 F.4th 604 (5th Cir. 2021) .......................................................................43, 44

*Caetano v. Massachusetts*,
    577 U.S. 411 (2016) ...........................................................28, 29, 30, 31

*California v. Texas*,
    593 U.S. 659 (2021) ...........................................................................................3

*Child Labor Tax Case*,
    259 U.S. 20 (1922) ...........................................................................................24

*Consumers' Rsch. v. FCC*,
    109 F.4th 743 (5th Cir. 2024) ...........................................................................14

*Consumers' Rsch. v. FCC*,
    145 S. Ct. 2482 (2025) ......................................................................................14

*Contender Farms, LLP v. Dep't of Agric.*,
    779 F.3d 258 (5th Cir. 2015) .............................................................................13

*Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*,
    528 U.S. 167 (2000) .........................................................................................13

*District of Columbia v. Heller*,
    554 U.S. 570 (2008) ..........................................27, 28, 29, 30, 31, 41, 42

*eBay Inc. v. MercExchange, L.L.C.*,
    547 U.S. 388 (2006) .........................................................................................43

*Elrod v. Burns*,
    427 U.S. 347 (1976) ....................................................................................43, 44

*Fla. Prepaid Postsecondary Educ. Expense Bd. v. Coll. Sav. Bank*,
    527 U.S. 627 (1999) ....................................................................................19, 20

*Fyock v. Sunnyvale*,
    779 F.3d 991 (9th Cir. 2015) .............................................................................30

*Gonzales v. Raich*,
    545 U.S. 1 (2005) .............................................................................................23

*Hanson v. District of Columbia*,
    120 F.4th 223 (D.C. Cir. 2024) .........................................................................29

*Haynes v. United States*,
    390 U.S. 85 (1968) ..................................................................................1, 16, 19

*Healthy Vision Ass'n v. Abbott,*
  138 F.4th 385 (5th Cir. 2025) ............................................................8

*Heller v. District of Columbia,*
  670 F.3d 1244 (D.C. Cir. 2011) .......................................................42

*Hobby Distillers Ass'n v. Alcohol & Tobacco Tax & Trade Bureau,*
  740 F. Supp. 3d 509 (N.D. Tex. 2024) ..............................15, 25, 26, 43, 44

*Hunt v. Wash. State Apple Advert. Comm'n,*
  432 U.S. 333 (1977) .....................................................................15

*Ill. Ass'n of Firearms Retailers v. City of Chicago,*
  961 F. Supp. 2d 928 (N.D. Ill. 2014) ...............................................13

*Kinsella v. United States ex rel. Singleton,*
  361 U.S. 234 (1960) .......................................................................4

*Kole v. Village of Norridge,*
  2017 WL5128989 (N.D. Ill. Oct. 27, 2017) .......................................14

*Mock v. Garland,*
  75 F.4th 563 (5th Cir. 2023) ................................................4, 5, 6, 7

*N.Y. State Rifle & Pistol Ass'n v. Bruen,*
  597 U.S. 1 (2022) .......................2, 4, 26, 27, 28, 29, 30, 31, 41

*NFIB v. Sebelius,*
  567 U.S. 519 (2012) ...............................................3, 4, 16, 17, 19

*Nken v. Holder,*
  556 U.S. 418 (2009) .....................................................................43

*NRA v. ATF,*
  700 F.3d 185 (5th Cir. 2012) ..........................................................13

*Polymer80, Inc. v. Garland,*
  2023 WL 3605430 (N.D. Tex. Mar. 19, 2023) ...................................20

*Reese v. ATF,*
  127 F.4th 583 (5th Cir. 2025) .........................................................14

*Rest. L. Ctr. v. Dep't of Lab.,*
  66 F.4th 593 (5th Cir. 2023) ...........................................................44

*Sonzinsky v. United States,*
  300 U.S. 506 (1937) ..........................................................1, 16, 19, 24

*Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.,*
  600 U.S. 181 (2023) ..................................................................14, 15

*Texas v. ATF,*
  700 F. Supp. 3d 556 (S.D. Tex. 2023) ..............................................45

*Texas v. United States,*
  945 F.3d 355 (5th Cir. 2019) .......................................................3, 18

*United States v. Ardoin,*
   19 F.3d 177 (5th Cir. 1994) ............................................................................18, 26

*United States v. Bird,*
   124 F.3d 667 (5th Cir. 1997) ....................................................................19, 21, 22

*United States v. Cox,*
   906 F.3d 1170 (10th Cir. 2018) ...................................................5, 6, 17, 18, 24

*United States v. Giannini,*
   455 F.2d 147 (9th Cir. 1972) ...............................................................................20

*United States v. Hall,*
   171 F.3d 1133 (8th Cir. 1999) ........................................................................7, 23

*United States v. Hicks,*
   649 F. Supp. 3d 357, 360 (W.D. Tex. 2023) .....................................................14

*United States v. Hicks,*
   2025 WL 2058762 (5th Cir. July 23, 2025) .......................................................14

*United States v. Kagama,*
   118 U.S. 375 (1886) .............................................................................................23

*United States v. Kebodeaux,*
   570 U.S. 387 (2013) .......................................................................................21, 22

*United States v. Kebodeaux,*
   687 F.3d 232 (5th Cir. 2012) ....................................................21, 22, 23, 24

*United States v. Lopez,*
   514 U.S. 549 (1995) ...................................................................................3, 21, 23

*United States v. Miller,*
   307 U.S. 174 (1939) .............................................................................................42

*United States v. Morrison,*
   529 U.S. 598 (2000) ...............................................................................................3

*United States v. Parker,*
   960 F.2d 498 (5th Cir. 1992) ...............................................................................19

*United States v. Peterson,*
   150 F.4th 644 (5th Cir. 2025) .......................................................................42, 43

*United States v. Ross,*
   458 F.2d 1144 (5th Cir. 1972) ...................................................................7, 16, 19

*Uzuegbunam v. Preczewski,*
   592 U.S. 279 (2021) .............................................................................................13

*Vote.Org v. Callanen,*
   89 F.4th 459 (5th Cir. 2023) ................................................................................14

*Wages & White Lion Invs., LLC v. FDA,*
   16 F.4th 1130 (5th Cir. 2021) ..............................................................................44

**Statutes, Rules, & Regulations**

18 U.S.C.
  § 921(a)(3) ....................................................................................41
  § 921(a)(25) ....................................................................................5
  § 922(t) ....................................................................................41
  § 3571(b)(3) ....................................................................................6, 7
  § 3571(c)(3) ....................................................................................6, 7

26 U.S.C.
  § 5811 ....................................................................................9, 20, 33, 34
  § 5812 ....................................................................................6, 9, 33, 34
  § 5812(b) ....................................................................................6
  § 5821 ....................................................................................9, 20, 33, 34
  § 5822 ....................................................................................6, 9, 33, 34
  § 5841 ....................................................................................9, 33, 34
  § 5841(a) ....................................................................................6
  § 5841(e) ....................................................................................6
  § 5842(b) ....................................................................................6
  § 5845(a) ....................................................................................4
  § 5845(a)(1) ....................................................................................5
  § 5845(a)(2) ....................................................................................5
  § 5845(a)(3) ....................................................................................5
  § 5845(a)(4) ....................................................................................5
  § 5845(a)(5) ....................................................................................5
  § 5845(a)(7) ....................................................................................5
  § 5845(e) ....................................................................................5
  § 5861 ....................................................................................6, 7, 11, 12, 13
  § 5861(b) ....................................................................................6
  § 5861(c) ....................................................................................6
  § 5861(d) ....................................................................................6, 41
  § 5861(e) ....................................................................................6
  § 5861(f) ....................................................................................6
  § 5861(i) ....................................................................................6
  § 5861(j) ....................................................................................6
  § 5871 ....................................................................................6, 7, 11, 12, 13
  § 5872 ....................................................................................6, 7

27 C.F.R.
  § 479.62 ....................................................................................9, 33, 34
  § 479.62(a) ....................................................................................6
  § 479.62(b) ....................................................................................6
  § 479.62(d) ....................................................................................6
  § 479.84 ....................................................................................9, 33, 34
  § 479.84(a) ....................................................................................6
  § 479.84(b) ....................................................................................6
  § 479.84(c) ....................................................................................6
  § 479.84(d) ....................................................................................6

FED. R. CIV. P.
    56(a) ............................................................................................................15

Factoring Criteria for Firearms with Attached "Stabilizing Braces," 88 Fed. Reg. 6478 (Jan. 31, 2023) ...................................................................................................10, 11

Gun Control Act of 1968 ("GCA"), Pub. L. No. 90-618, 82 Stat. 1213 .......................................20

One Big Beautiful Bill Act ("BBB"), Pub. L. No. 119-21, 139 Stat. 72 (2025).......................1, 17

The National Firearms Act of 1934 ("NFA"), Pub. L. No. 73-474, 48 Stat. 1236 ..................1, 20

## Constitutional Provisions

U.S. CONST.
    art. I, § 8, cl. 1 ....................................................................................................1, 3, 16
    art. I, § 8, cl. 3 ...............................................................................................................3
    art. I, § 8, cl. 18 ............................................................................................................4
    amend. II .......................................................................................................4, 27, 28

## Other Authorities

JAMES B. ABBOTT, TEX. OFF. ATT'Y GEN., USE OF FIREARM SUPPRESSORS BY LAW ENFORCEMENT TO PREVENT HEARING LOSS (2024), https://perma.cc/FF96-5Q9J ............36

AMERICAN SUPPRESSOR ASSOCIATION, *The American Suppressor Association (ASA)* (YouTube, Nov. 26, 2014), https://perma.cc/7D6W-DRNS .............................................35

SCOTT E. BRUECK ET AL., NAT'L INST. FOR OCCUPATIONAL SAFETY & HEALTH, CTRS. FOR DISEASE CONTROL & PREVENTION, HHE REP. NO. 2013-0124-3208, MEASUREMENT OF EXPOSURE TO IMPULSIVE NOISE AT INDOOR & OUTDOOR FIRING RANGES DURING TACTICAL TRAINING EXERCISES (2014), https://perma.cc/UQF7-DH5Q..................................................................................35, 36

BUREAU OF ALCOHOL, TOBACCO, FIREARMS & EXPLOSIVES, FIREARMS COMMERCE IN THE UNITED STATES: ANNUAL STATISTICAL UPDATE 2021 (2021), https://perma.cc/4WAF-QGPQ.......................................................................32, 34

BUREAU OF ALCOHOL, TOBACCO, FIREARMS & EXPLOSIVES, FIREARMS COMMERCE IN THE UNITED STATES: STATISTICAL UPDATE 2024 (2024), https://perma.cc/DJC5-VBJZ...............................................................32, 33, 34

BUREAU OF ALCOHOL, TOBACCO, FIREARMS & EXPLOSIVES, OMB NO. 1140-0014, FORM 1 (5320.1): APPLICATION TO MAKE AND REGISTER A FIREARM (2022), https://perma.cc/RZ5B-5Q5Y ......................................................................10

BUREAU OF ALCOHOL, TOBACCO, FIREARMS & EXPLOSIVES, OMB NO. 1140-0014, FORM 4 (5320.4): APPLICATION FOR TAX PAID TRANSFER AND REGISTRATION OF FIREARM (2023), https://perma.cc/963W-KTYE.....................................................................10

LILIA CHEN & SCOTT E. BRUECK, NAT'L INST. FOR OCCUPATIONAL SAFETY & HEALTH, CTRS. FOR DISEASE CONTROL & PREVENTION, HHE REP. NO. 2011-0069-3140, NOISE AND LEAD EXPOSURES AT AN OUTDOOR FIRING RANGE – CALIFORNIA (2011), https://perma.cc/8C62-Z42R .......................................................................35, 36

Paul A. Clark, *Criminal Use of Firearm Silencers*, 8 W. CRIM. REV. 44 (2007)..........................38

*Current Processing Times*, BUREAU OF ALCOHOL, TOBACCO, FIREARMS & EXPLOSIVES, https://perma.cc/XNZ7-UZUR ................................................................10

*Do Suppressors Reduce Recoil?*, SILENCER SHOP (Apr. 2, 2024), https://perma.cc/9H6M-A8LU ................................................................37

William English, *2021 National Firearms Survey: Updated Analysis Including Types of Firearms Owned,* GEO. UNIV. RSCH. PAPER NO. 4109494 (May 13, 2022), https://perma.cc/XMB6-GBC9 ................................................................33

BRIAN J. FLIGOR, BETTER HEARING INST., PREVENTION OF HEARING LOSS FROM NOISE (2011), https://perma.cc/NAZ3-VL46 ................................................................38, 39

Gov't's Suppl. Resp. to Def.'s Pet. for Reh'g En Banc, *United States v. Peterson*, No. 24-30043 (5th Cir. May 29, 2025), ECF No. 135 ....................................27, 28, 38, 39

Joseph G.S. Greenlee, *The Tradition of Short-Barreled Rifle Use & Regulation in America*, 25 WYO. L. REV. 111 (2025) ................................................................33, 34, 39, 40, 41

Stephen P. Halbrook, *Firearm Sound Moderators: Issues of Criminalization and the Second Amendment*, 46 CUMB. L. REV. 33 (2016) ................................................................35, 37

STEPHEN P. HALBROOK, GUN CONTROL IN THE THIRD REICH: DISARMING THE JEWS AND "ENEMIES OF THE STATE" (2013) ................................................................42

Stephen P. Halbrook, *The Power to Tax, the Second Amendment, and the Search for Which "'Gangster' Weapons" to Tax*, 25 WYO. L. REV. 149 (2025)....................4, 5, 39, 40

Glenn Kessler, *Are Firearms with a Silencer 'Quiet'?*, WASH. POST (Mar. 20, 2017), https://perma.cc/9M7S-NFYH ................................................................37

David Kopel, *The Hearing Protection Act and 'Silencers'*, VOLOKH CONSPIRACY (June 19, 2017), https://perma.cc/C5FU-T6U8 ................................................................37

Letter from Amyn Amlani, President, Acad. of Drs. of Audiology, and Stephanie Czuhajewski, Exec. Dir., Acad. of Drs. of Audiology, to Rep. Ben Cline (Jan. 15, 2025), https://perma.cc/758Z-95JC ................................................................35, 36

HIRAM PERCY MAXIM, EXPERIENCES WITH THE MAXIM SILENCER (1915), https://perma.cc/WY37-3YE2 ................................................................32, 37

*Military-Grade Protection*, HEARING HEALTH FOUND., https://perma.cc/U369-7C2N ................36

MODERN SPORTING RIFLE: COMPREHENSIVE CONSUMER REPORT, NAT'L SHOOTING SPORTS FOUND. (July 14, 2022), https://perma.cc/GT6M-C97D ................................................................33

NAT'L SHOOTING SPORTS FOUND., SUPPRESSOR OWNER STUDY (2025), https://perma.cc/HV5A-7APV ................................................................32

*National Firearms Act: Hearings Before the H. Comm. on Ways & Means on H.R. 9066*, 73d Cong., 2d Sess. 8 (1934) ................................................................16, 17, 20, 40

Joanna Putman, *Wash. PD Equips Entire Department with Silencers from Silencer Central*, POLICE1 (May 15, 2024), https://perma.cc/MD4N-8S79................................................................36

Silent Firearm, U.S. Patent No. 958,935 (filed Nov. 30, 1908), https://perma.cc/5TPE-PSZ7.....32

Max Slowik, *Teddy Roosevelt's Suppressed 1894 Winchester*, GUNS.COM (May 18, 2012),
https://perma.cc/3G38-C5XQ ........................................................................... 32

Ron Spomer, *Short Rifle Barrel Performance Advantages*, RON SPOMER OUTDOORS,
https://perma.cc/3PXD-4F4P ............................................................................ 34

Michael Stewart et al., *NHCA Position Statement: Recreational Firearm Noise*,
NAT'L HEARING CONSERVATION ASS'N (Mar. 16, 2017),
https://perma.cc/RB6V-V7JV ........................................................................... 35

Michael Stewart et al., *Risks Faced by Recreational Firearm Users*, AUDIOLOGY TODAY,
Mar.–Apr. 2011, https://perma.cc/QS93-AVV8 ......................................... 36, 37

*Suppressors for Hearing Preservation*, AM. ACAD. OTOLARYNGOLOGY-HEAD & NECK
SURGERY (Nov. 18, 2024), https://perma.cc/X4AK-4DZZ ................................ 35

RONALD TURK, BUREAU OF ALCOHOL, TOBACCO, FIREARMS & EXPLOSIVES, OPTIONS TO
REDUCE OR MODIFY FIREARMS REGULATIONS (2017),
https://perma.cc/H52G-BJCT ........................................................................... 38

Eugene Volokh, *Implementing the Right to Keep and Bear Arms for Self Defense:
An Analytical Framework and a Research Agenda*,
56 UCLA L. REV. 1443 (2009) ........................................................................ 30

*Why SBRs Are Becoming Popular for Home Defense*, SUMMERLIN ARMORY (Feb. 4, 2025),
https://perma.cc/Z2XN-SJHF ........................................................................... 34

JAMES D. WRIGHT & PETER H. ROSSI, ARMED AND CONSIDERED DANGEROUS (2d ed. 2008) ...... 40

## INTRODUCTION

The National Firearms Act of 1934 ("NFA"), Pub. L. No. 73-474, 48 Stat. 1236 (codified as amended at 26 U.S.C. §§ 5801–5872), established a $200 tax (when adopted, approximately $5000 in today's dollars) on, among other things, the making and transfer of certain classes of firearms, as well as a registration regime meant to facilitate enforcement of the tax. Congress passed the NFA explicitly premised on its enumerated power to "lay and collect Taxes," U.S. Const. art. I, § 8, cl. 1, and the Supreme Court upheld provisions of the NFA on that basis, holding that the NFA was "only a taxing measure" and that the registration provisions were "obviously supportable as in aid of a revenue purpose," *Sonzinsky v. United States*, 300 U.S. 506, 513 (1937). Indeed, the Court has described the NFA as "an interrelated statutory system *for the taxation* of certain classes of firearms." *Haynes v. United States*, 390 U.S. 85, 87 (1968) (emphasis added). That constitutional basis, however, has recently been eliminated with respect to the making, transferring, and receiving of several items that are defined as "firearms" by the NFA, including suppressors, short-barreled rifles, and short-barreled shotguns because, under the One Big Beautiful Bill Act ("BBB"), Pub. L. No. 119-21, 139 Stat. 72 (2025), Congress eliminated the making and transfer taxes on those items. Consequently, without a tax as a foundation, the NFA's registration provisions as applied to non-taxed NFA firearms are neither a tax themselves nor necessary and proper to levying a tax and are, therefore, unjustifiable as an exercise of Congress's taxing power.

That the NFA can no longer be justified as an exercise of Congress's taxing power and is thus unconstitutional should be the end of this matter. Congress passed the NFA specifically based on its taxing power and the courts have understood the NFA and upheld it on that basis. This Court should not supply a justification for the law that Congress itself considered and rejected—namely,

1

the Commerce Clause. But even if this Court could analyze the NFA as a purported exercise of Congress's Commerce Clause powers, the Court should determine that the NFA is not constitutional on that basis either. The NFA is plainly not a regulation of the channels of interstate commerce or the instrumentalities of interstate commerce, and it is not a regulation of *intra*state commerce with substantial effects on *inter*state commerce.

Wholly apart from the NFA's constitutional infirmity in the above respect, the NFA's restrictions also constitute an unconstitutional regulatory scheme as pertains to suppressors and short-barreled rifles under the Second Amendment. Under *New York State Rifle & Pistol Association v. Bruen*, 597 U.S. 1 (2022), the Second Amendment presumptively protects the People's right to keep and bear all arms. If an item qualifies as an "arm," the Second Amendment applies to it, and the government bears the burden of proving, at a minimum, that there is a historical tradition of regulating arms to support the challenged regulatory scheme. Because suppressors and short-barreled rifles are neither dangerous nor unusual, and because there is no tradition of requiring the registration and attendant regulation of protected arms, the NFA's regulatory scheme is unconstitutional under the Second Amendment with respect to suppressors and short-barreled rifles.

Accordingly, the Court should determine that the NFA's registration scheme as concerns non-taxed "firearms" exceeds Congress's constitutional authority and grant Plaintiffs' motion for summary judgment against Defendants Bureau of Alcohol, Tobacco, Firearms & Explosives ("ATF"), Daniel P. Driscoll, in his official capacity as Acting Director of ATF, United States Department of Justice ("DOJ"), and Pamela J. Bondi, in her official capacity as Attorney General of the United States (together, "Defendants").

2

## BACKGROUND

### I.    The Constitution.

"Every law enacted by Congress must be based on one or more of its powers enumerated in the Constitution." *United States v. Morrison*, 529 U.S. 598, 607 (2000).

#### A.    The Taxing Clause.

Congress has the power to "lay and collect Taxes, Duties, Imposts and Excises, to pay the Debts and provide for the common Defence and general Welfare of the United States." U.S. CONST. art. I, § 8, cl. 1. The "essential feature of any tax" is that it "produces at least some revenue for the Government." *NFIB v. Sebelius*, 567 U.S. 519, 564 (2012). Axiomatically, absent a tax, Congress cannot enact a statute under its taxing power. *See, e.g.*, *Texas v. United States*, 945 F.3d 355, 390 (5th Cir. 2019), *rev'd on other grounds*, *California v. Texas*, 593 U.S. 659 (2021).

#### B.    The Commerce Clause.

Under the Constitution's Commerce Clause, Congress has the authority "[t]o regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes." U.S. CONST. art. I, § 8, cl. 3. Beginning with *United States v. Lopez*, 514 U.S. 549, 557 (1995), the Supreme Court reinvigorated the limits on Congress's Commerce Clause powers, clarifying that the power "may not be extended so as to embrace effects upon interstate commerce so indirect and remote that to embrace them, in view of our complex society, would effectually obliterate the distinction between what is national and what is local." *See also Morrison*, 529 U.S. at 598. Congress cannot use the Commerce Clause to exercise "the police power, which the Founders denied the National Government and reposed in the States." *Id.* at 618 & n.8.

**C.    The Necessary and Proper Clause.**

The Necessary and Proper Clause empowers Congress to "make all Laws which shall be necessary and proper for carrying into Execution" its enumerated powers. U.S. CONST. art. I, § 8, cl. 18. It is "not itself a grant of power," *Kinsella v. United States ex rel. Singleton*, 361 U.S. 234, 247 (1960), but instead gives Congress "authority to enact provisions incidental to [an] enumerated power, and conducive to its beneficial exercise," *Sebelius*, 529 U.S. at 559 (cleaned up).

**D.    The Second Amendment.**

The Second Amendment to the United States Constitution guarantees "the right of the people to keep and bear Arms." U.S. CONST. amend. II. In *Bruen*, the Supreme Court stated the test for Second Amendment challenges: "When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." 597 U.S. at 24.

**II.    The National Firearms Act.**

**A.    The Untaxed Firearms.**

The National Firearms Act of 1934, as amended, regulates specifically enumerated "firearms." 26 U.S.C. § 5845(a). "'Firearms' is a term of art—one that is both highly under- and over-inclusive (as compared to the word's ordinary meaning today)." *Mock v. Garland*, 75 F.4th 563, 567 (5th Cir. 2023). "For instance, the NFA's definition of 'firearm' does not include pistols—but it does include both 'silencer[s]' and 'poison gas.'" *Id.* This definition resulted from Congress's attempt to regulate "gangster weapons," and it is the result of congressional debate and compromise. Stephen P. Halbrook, *The Power to Tax, the Second Amendment, and the Search for*

*Which "'Gangster' Weapons" to Tax*, 25 Wyo. L. Rev. 149, 153, 166–74 (2025) [hereinafter *The Power to Tax*].

As relevant to this case, the following items are included in the NFA's definition of "firearms":

- <u>Suppressors</u>, referred to as "silencer[s]" in the NFA, defined as "any device for silencing, muffling, or diminishing the report of a portable firearm, including any combination of parts, designed or redesigned, and intended for use in assembling or fabricating a firearm silencer or firearm muffler, and any part intended only for use in such assembly or fabrication." 26 U.S.C. § 5845(a)(7); 18 U.S.C. § 921(a)(25).

- <u>Short-barreled rifles</u>, defined as (1) "a rifle having a barrel or barrels of less than 16 inches in length" or (2) "a weapon made from a rifle if such weapon as modified has an overall length of less than 26 inches or a barrel or barrels of less than 16 inches in length." 26 U.S.C. § 5845(a)(3)–(4).

- <u>Short-barreled shotguns</u>, defined as (1) "a shotgun having a barrel or barrels of less than 18 inches in length" or (2) "a weapon made from a shotgun if such weapon as modified has an overall length of less than 26 inches or a barrel or barrels of less than 18 inches in length." 26 U.S.C. § 5845(a)(1)–(2).

- <u>Any other weapons</u>, defined as "any weapon or device capable of being concealed on the person from which a shot can be discharged through the energy of an explosive, a pistol or revolver having a barrel with a smooth bore designed or redesigned to fire a fixed shotgun shell, weapons with combination shotgun and rifle barrels 12 inches or more, less than 18 inches in length, from which only a single discharge can be made from either barrel without manual reloading, and shall include any such weapon which may be readily restored to fire. Such term shall not include a pistol or a revolver having a rifled bore, or rifled bores, or weapons designed, made, or intended to be fired from the shoulder and not capable of firing fixed ammunition." 26 U.S.C. § 5845(a)(5), (e).

**B.    The Challenged NFA Provisions.**

Congress designed the NFA as "a taxing scheme," *United States v. Cox*, 906 F.3d 1170, 1179 (10th Cir. 2018), "explicitly intended to tax [its covered] weapons out of existence," *Mock*, 75 F.4th at 569. "But the NFA does more than lay taxes." *Cox*, 906 F.3d at 1179. "To carry out the

taxing scheme," *id.*, it imposes "stringent restrictions and requirements" on various actions concerning its covered firearms, *Mock*, 75 F.4th at 569.

The NFA and its implementing regulations impose the following requirements challenged in this case:

- Possession. "A person" cannot "receive" or "possess[ ] a firearm" unless it is properly "registered" with ATF and the person "retain[s] proof of registration." 26 U.S.C. §§ 5841(e), 5812(b), 5861(b)–(d); *see also id.* § 5861(j).

- Transfer. "A firearm shall not be transferred" absent a "written application" to the ATF that identifies the "transferee" and provides "his fingerprints and his photograph" and any other information the ATF may require "by regulations." 26 U.S.C. §§ 5812, 5861(e); *see also* 27 C.F.R. § 479.84(a)–(b), (d). "[A]ll transferees" must notify "the chief law enforcement officer of the locality in which the transferee . . . is located" of the transfer. 27 C.F.R. § 479.84(c).

- Making. "Each . . . maker shall register" with the ATF "each firearm he . . . makes," 26 U.S.C. § 5841(a)–(c), using a "written application" to the ATF that includes "his fingerprints and his photograph" and other information the ATF may require "by regulations," *id.* § 5822; *see also* 27 C.F.R. § 479.62(a)–(b), (d); 26 U.S.C. § 5861(f). The maker must also notify "the chief law enforcement officer of the locality" in which he "is located." 27 C.F.R. § 479.84(c); 26 U.S.C. § 5861(f).

- Marking. "[A]nyone making a firearm shall identify each firearm, other than a destructive device, . . . made by a serial number . . . , the name of the . . . maker, and such other identification as the Secretary may by regulations prescribe." 26 U.S.C. § 5841(a). "Any person who possesses a firearm, other than a destructive device, which does not bear the serial number and other information required by subsection (a) . . . shall identify the firearm with a serial number assigned by the Secretary and any other information the Secretary may by regulations prescribe." *Id.* § 5842(b). It is unlawful for "any person" "to receive or possess a firearm which is not identified by a serial number" as the NFA requires. *Id.* § 5861(i).

"[T]h[e]se statutory restrictions have teeth" and carry "severe consequences." *Mock*, 75 F.4th at 570. The NFA imposes severe penalties on any person who transfers, receives, or even possesses a covered firearm in violation of its requirements, including imprisonment up to 10 years, fines up to $250,000 for individuals and $500,000 for organizations, and seizure and

forfeiture of the firearms at issue. 26 U.S.C. §§ 5861, 5871–5872; 18 U.S.C. § 3571(b)(3), (c)(3). "As failure to comply can also be a felony, a violation may also lead to a lifetime ban on firearms ownership." *Mock*, 75 F.4th at 571 (citing 18 U.S.C. § 922(g)(1)).

Congress did not limit any of these NFA provisions to interstate commerce. They apply to all covered firearms regardless of whether those firearms traveled in interstate commerce. It therefore applies equally to a firearm an individual makes in that person's home, a purely *intra*state activity, and a firearm made by a national company and shipped to a customer across state lines, an *inter*state activity. *See, e.g.*, *United States v. Hall*, 171 F.3d 1133, 1138 (8th Cir. 1999) (determining that NFA constitutionally applied, under Congress's taxing power, to possession of an unregistered suppressor even absent "a direct connection between interstate commerce and the alleged silencer").

### III.    The One Big Beautiful Bill Act.

The BBB, signed into law by the President on July 4, 2025, eliminated the making and transfer taxes on suppressors, short-barreled rifles, short-barreled shotguns, and NFA-defined "any other weapons," while leaving the registration requirements intact. In other words, individuals no longer have to pay taxes for making and transferring most firearms under the NFA, but the firearms are still required to be registered and are subject to the "web of regulation" that was designed to "aid[ ] enforcement" of the NFA's (now-extinct) tax. *United States v. Ross*, 458 F.2d 1144, 1145 (5th Cir. 1972). The ATF continues to enforce the NFA's registration requirements.

### IV.    The Challenged NFA Provisions Injure Plaintiffs.

Plaintiffs challenge the NFA's possession, transfer, and making requirements, which injure all Plaintiffs. *See Healthy Vision Ass'n v. Abbott*, 138 F.4th 385, 400 (5th Cir. 2025) (explaining that only "one plaintiff" needs "standing" for purposes of Article III of the Constitution).

A.      **Individual Plaintiffs and Hot Shots Custom LLC.**

Plaintiffs John Jensen, Jeremy Neusch, and David Lynn Smith (together, "Individual Plaintiffs") are firearms owners. Jensen Decl. ¶ 2 [App.001]; Neusch Decl. ¶ 2 [App.005]; Smith Decl. ¶ 2 [App.009].

Plaintiff Hot Shots Custom LLC is a limited liability corporation that is a federally licensed firearms dealer under the Gun Control Act and is licensed to sell NFA items under the NFA. Hot Shots Custom Decl. ¶ 3 [App.012]. In addition to its custom gunsmithing services and sales of non-NFA firearms, Hot Shots Custom sells NFA firearms, including suppressors, short-barreled rifles, and short-barreled shotguns. Hot Shots Custom Decl. ¶ 4 [App.013]. Hot Shots Custom incurs significant regulatory costs to comply with the NFA's registration requirements in selling these firearms. Hot Shots Custom Decl. ¶ 5 [App.013]. For example, the NFA imposes burdensome recordkeeping requirements on Hot Shots Custom to sell NFA-covered firearms. *Id.* In addition, Hot Shots Custom has lost sales because of the NFA's registration requirements. Hot Shots Custom Decl. ¶ 6 [App.013]. Prospective and repeat customers have declined to purchase NFA firearms because the NFA requires them to submit personally identifying information to the federal government and go through the intrusive, time-consuming registration process. *Id.* These sales to prospective and repeat customers would have occurred but for the NFA's registration scheme. *Id.* Consequently, Hot Shots Custom loses potential customers and business revenue because of the NFA's registration requirements. *Id.* If it were not a violation of federal law to do so, Hot Shots Custom would sell suppressors, short-barreled rifles, and short-barreled shotguns without complying with the challenged NFA provisions. *Id.*

Individual Plaintiffs and Hot Shots Custom's customers value their personal privacy and do not want the federal government to obtain identifying information about their personally owned

8

firearms, including information such as their names, home addresses, photographs, dates of birth, demographic information, fingerprints, and a detailed description of their firearms, including their quantity and physical locations. Jensen Decl. ¶ 3 [App.001–02]; Neusch Decl. ¶ 3 [App.005–06]; Smith Decl. ¶ 3 [App.009–10]; *see* Hot Shots Custom Decl. ¶ 6 [App.013]. Federal law, however, currently requires that Individual Plaintiffs and Hot Shots Custom's customers provide all of this intrusive personally identifying information to the federal government for them legally to make, transfer, or receive items defined and regulated as "firearms" under the NFA through its registration requirements. *See* 26 U.S.C. §§ 5811, 5812, 5821, 5822, 5841; 27 C.F.R. §§ 479.62, 479.84. Individual Plaintiffs and Hot Shots Custom's customers object to this burdensome registration requirement, which forces them to provide information to the federal government similar to that obtained from an individual arrested and charged with a crime. Jensen Decl. ¶ 4 [App.002]; Neusch Decl. ¶ 4 [App.006]; Smith Decl. ¶ 4 [App.010]; *see* Hot Shots Custom Decl. ¶ 6 [App.013]. For these reasons, Hot Shots Custom's customers have declined to purchase NFA firearms from the business, thereby causing Hot Shots Custom to lose business revenue. *See* Hot Shots Custom Decl. ¶ 6 [App.013].

Complying with the NFA's byzantine registration requirements as a precondition to lawfully making, transferring, or receiving the covered firearms imposes a significant regulatory burden on firearm owners such as Individual Plaintiffs and on NFA special occupational taxpayers like Hot Shots Custom. Jensen Decl. ¶ 5 [App.002]; Neusch Decl. ¶ 5 [App.006]; Smith Decl. ¶ 5 [App.010]; Hot Shots Custom Decl. ¶ 5 [App.013]. For example, to register a firearm regulated by the NFA, Individual Plaintiffs must spend time completing the application forms issued by the ATF and then wait for the ATF to issue an approval determination, enter their registration information, and authorize their possession of the firearm. *See* BUREAU OF ALCOHOL, TOBACCO, FIREARMS &

EXPLOSIVES, OMB NO. 1140-0014, FORM 1 (5320.1): APPLICATION TO MAKE AND REGISTER A FIREARM (2022), https://perma.cc/RZ5B-5Q5Y [App.119–31]; BUREAU OF ALCOHOL, TOBACCO, FIREARMS & EXPLOSIVES, OMB NO. 1140-0014, FORM 4 (5320.4): APPLICATION FOR TAX PAID TRANSFER AND REGISTRATION OF FIREARM (2023), https://perma.cc/963W-KTYE [App.132–44]. This registration process burdens Hot Shots Custom as well. To sell firearms regulated by the NFA, Hot Shots Custom must either assist its customers with the registration forms or complete them on the customers' behalf and must keep extensive records on each NFA firearm sale. *See* Hot Shots Custom Decl. ¶ 5 [App.013].

Collecting the information required by these forms and completing them can take significant time, and Individual Plaintiffs and Hot Shots Custom must then wait what could be months for the ATF to enter their or the customers' registration information and issue an approval determination. *See Current Processing Times*, BUREAU OF ALCOHOL, TOBACCO, FIREARMS & EXPLOSIVES, https://perma.cc/XNZ7-UZUR [App.177–78]. Indeed, it took nearly six months for ATF to approve Jensen's first suppressor purchase and about seven months for ATF to approve Neusch's first suppressor purchase. Jensen Decl. ¶ 6 [App.002]; Neusch Decl. ¶ 6 [App.006]. The ATF itself has acknowledged the burdens that the NFA's registration regime imposes on lawful firearms owners, publicly stating that "registering firearms . . . under the NFA will impose a time burden." Factoring Criteria for Firearms with Attached "Stabilizing Braces," 88 Fed. Reg. 6478, 6563 (Jan. 31, 2023) (to be codified at 27 C.F.R. pts. 478, 479).

To comply with the NFA's requirements, Individual Plaintiffs must also incur costs arising from providing their fingerprints and photographs with each NFA registration application. Jensen and Neusch have in fact incurred these time and monetary costs in the past from registering suppressors with the ATF. Jensen Decl. ¶ 7 [App.003]; Neusch Decl. ¶ 7 [App.007].

Given the BBB's reduction of the NFA's excise tax for the majority of covered firearms to $0, Individual Plaintiffs plan to take a number of actions with respect to NFA-covered firearms.

Jensen wants to acquire an additional suppressor for his firearms but has declined to do so because of the challenged NFA provisions. Jensen Decl. ¶ 9 [App.003]. He wants to use suppressors with his firearms because he has firearms-related hearing loss that he wants to prevent from worsening and because he has a spinal cord–related injury and suppressors reduce recoil, thereby making it safer for him to shoot. *Id.* Jensen also wants to reconfigure a pistol that he currently lawfully owns into a short-barreled rifle because it would make it easier for him to safely operate with his handicap. Jensen Decl. ¶ 10 [App.003]. Finally, Jensen wants to transfer a suppressor that he lawfully owns to his adult son (who is lawfully able to own firearms) without complying with the NFA's transfer provisions. Jensen Decl. ¶ 11 [App.003]. Jensen would take all of these actions within 30 days of the effective date of the $0 tax if it were not a violation of federal law to do so without complying with the challenged NFA provisions. Jensen Decl. ¶ 12 [App.003]. Were Jensen to take these actions without complying with those provisions, he would face arrest, prosecution, and imprisonment for felony violations of federal law. *See* 26 U.S.C. §§ 5861, 5871. Consequently, Jensen will not purchase his desired suppressor, reconfigure any of his pistols, or transfer a suppressor to his son when the $0 tax becomes effective unless it would not be a violation of federal law for him to do so without complying with the NFA's registration provisions. Jensen Decl. ¶ 12 [App.003].

Neusch wants to acquire short-barreled rifles, short-barreled shotguns, and additional suppressors but has declined to do so because of the challenged NFA provisions. Neusch Decl. ¶ 9 [App.007]. He wants to use the suppressors with his firearms because he, like Jensen, has firearms-related hearing loss that he wants to prevent from worsening. *Id.* Neusch also wants to make his

own suppressors and to reconfigure a pistol that he currently lawfully owns into a short-barreled rifle. Neusch Decl. ¶ 10 [App.007]. Finally, Neusch wants to transfer a suppressor that he is in the process of lawfully acquiring to his father (who is lawfully able to own firearms) without complying with the NFA's transfer provisions. Neusch Decl. ¶ 11 [App.007]. Neusch would take all of these actions within 30 days of the effective date of the $0 tax if it were not a violation of federal law to do so without complying with the challenged NFA provisions. Neusch Decl. ¶ 12 [App.007]. Were Neusch to take these actions without complying with those provisions, he would face arrest, prosecution, and imprisonment for felony violations of federal law. *See* 26 U.S.C. §§ 5861, 5871. Consequently, Neusch will not purchase his desired suppressors, short-barreled rifles, or short-barreled shotguns, make his desired suppressors, reconfigure any of his pistols, or transfer a suppressor to his father when the $0 tax becomes effective unless it would not be a violation of federal law for him to do so without complying with the NFA's registration provisions. Neusch Decl. ¶ 12 [App.007].

Smith wants to acquire suppressors for his firearms but has declined to do so because of the challenged NFA provisions. Smith Decl. ¶ 9 [App.011]. He wants to use suppressors with his firearms because he, like Jensen and Neusch, has firearms-related hearing loss that he wants to prevent from worsening. *Id.* Smith also wants to reconfigure pistols that he currently lawfully owns into short-barreled rifles. Smith Decl. ¶ 10 [App.011]. He would acquire at least one suppressor and reconfigure at least one pistol within 30 days of the effective date of the $0 tax if it were not a violation of federal law to do so without complying with the challenged NFA provisions. Smith Decl. ¶ 11 [App.011]. Were Smith to acquire a suppressor or reconfigure one of his pistols without complying with those provisions, he would face arrest, prosecution, and imprisonment for felony violations of federal law. *See* 26 U.S.C. §§ 5861, 5871. Consequently, Smith will not purchase his

desired suppressors or reconfigure any of his pistols when the $0 tax becomes effective unless it would not be a violation of federal law for him to do so without complying with the NFA's registration provisions. Smith Decl. ¶ 11 [App.011].

The challenged NFA provisions injure Individual Plaintiffs and Hot Shots Custom because they are the direct object of the challenged NFA provisions, *Contender Farms, LLP v. Dep't of Agric.*, 779 F.3d 258, 264 (5th Cir. 2015); the provisions subject them to burdens that prevent them from engaging in lawful activities that they wish to engage in, *see, e.g.*, *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 181–83 (2000); and the provisions burden the exercise of their constitutional rights in violation of the Second Amendment and Congress's lack of enumerated authority, *Uzuegbunam v. Preczewski*, 592 U.S. 279, 293 (2021). These injuries are "fairly traceable to the challenged federal laws, and holding the laws unconstitutional would redress the injury." *NRA v. ATF*, 700 F.3d 185, 192 n.5 (5th Cir. 2012).

For Hot Shots Custom specifically, it is additionally injured because it is the object of the challenged NFA requirements and expends time and effort to comply with those provisions. *See* Hot Shots Custom Decl. ¶ 5 [App.013]. It has also suffered a constitutional injury. *See, e.g.*, *Ill. Ass'n of Firearms Retailers v. City of Chicago*, 961 F. Supp. 2d 928, 937 (N.D. Ill. 2014). In addition, Hot Shots Custom is injured because the challenged NFA provisions deter customers from purchasing products from it, Hot Shots Custom Decl. ¶ 6 [App.013], and thus cause "a classic pocketbook injury." *Consumers' Rsch. v. FCC*, 109 F.4th 743, 753 (5th Cir. 2024), *rev'd on other grounds*, 145 S. Ct. 2482 (2025). And because the challenged NFA provisions regulate Hot Shots Custom's customers, *see* Hot Shots Custom Decl. ¶ 6 [App.013], it also asserts an Article III injury on behalf of those customers, *see, e.g.*, *Vote.Org v. Callanen*, 89 F.4th 459, 472 (5th Cir. 2023) ("Vendors are routinely accorded standing to assert the constitutional rights of customers and

13

prospective customers"); *Reese v. ATF*, 127 F.4th 583, 590 (5th Cir. 2025) ("the right to 'keep and bear arms' surely implies the right to purchase them"); *United States v. Hicks*, 649 F. Supp. 3d 357, 360 (W.D. Tex. 2023) ("[A]ccording to the Government, Congress could throttle gun ownership without implicating Second Amendment scrutiny by just banning the buying and selling of firearms. What a marvelous, Second Amendment loophole!"), *rev'd on other grounds*, 2025 WL 2058762 (5th Cir. July 23, 2025); *Kole v. Village of Norridge*, 2017 WL 5128989, at *10 (N.D. Ill. Oct. 27, 2017) ("The founding-era sources cited by plaintiffs are more relevant. *E.g.*, Thomas Jefferson, 6 Writings 252-53 (P. Ford ed. 1895) ('Our citizens have always been free to make, vend, and export arms.')."). All of these injuries are traceable to the challenged NFA provisions and would be redressed by the relief requested in this suit. *See* Hot Shots Custom Decl. ¶ 6 [App.013].

### B. Organizational Plaintiffs.

Plaintiffs Texas State Rifle Association, FPC Action Foundation, and Citizens Committee For The Right To Keep And Bear Arms (together, "Organizational Plaintiffs") are organizations that bring this suit on behalf of their members. Each organization has associational standing. *See, e.g., Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 199 (2023). Each organization counts as members persons and/or businesses that "have standing to sue in their own right," including Individual Plaintiffs and Hot Shots Custom, who are members. *Id.*; *see* TSRA Decl. ¶ 4, 6 [App.014–15]; FPCAF Decl. ¶ 5–6 [App.017]; CCRKBA Decl. ¶ 5–6 [App.019]. The interests these organizations "seek[ ] to protect" in this litigation "are germane to [their] purpose[s]"—defending their members from unlawful firearms restrictions. *SFFA*, 600 U.S. at 199; *see* TSRA Decl. ¶ 5 [App.015]; FPCAF Decl. ¶ 3–4 [App.016–17]; CCRKBA Decl. ¶ 4 [App.019]. And neither the claims asserted nor the relief requested by the organizations require

the participation of individual members because plaintiffs "seek[ ] a declaration, injunction, or some other form of prospective relief" which "if granted, will inure to the benefit of th[eir] members." *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977).

## LEGAL STANDARD

Summary judgment is appropriate when the moving party "shows that there is no genuine dispute as to any material fact" and "is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). There are no factual issues at stake in this case. Consequently, "the determinative inquiry is which Party is entitled to judgment as a matter of law." *Hobby Distillers Ass'n v. Alcohol & Tobacco Tax & Trade Bureau*, 740 F. Supp. 3d 509, 517 (N.D. Tex. 2024).

## ARGUMENT

**I.    The NFA's Regulation of Untaxed "Firearms" Exceeds Congress's Constitutional Authority.**

The NFA's regulation of untaxed firearms is unconstitutional because it exceeds Congress's constitutional authority on two separate, independent grounds. First, the NFA's regulation of *untaxed* firearms is unconstitutional under Congress's taxing power. That should be the end of this case. Congress passed the NFA explicitly premised on its taxing power, and under binding Fifth Circuit precedent, this Court cannot justify the NFA on a different constitutional ground.

Second, even if the Court entertains Defendants' potential argument that the NFA is justifiable as an exercise of Congress's Commerce Clause powers, it should reject that argument because the NFA does not fall under any of the three categories of permissible Commerce Clause legislation.

### A.    The NFA's Regulation of Untaxed "Firearms" Exceeds Congress's Taxing Power.

Congress passed the NFA in 1934 specifically premised on its enumerated power to "lay and collect Taxes." U.S. CONST. art. I, § 8, cl. 1. The Supreme Court upheld the NFA's occupational

tax on dealers against constitutional challenge in 1937, holding that the NFA was "only a taxing measure," and thus lawful pursuant to Congress's taxing power, and that the registration provisions were "obviously supportable as in aid of a revenue purpose." *Sonzinsky*, 300 U.S. at 513; *see also Sebelius*, 567 U.S. at 567; *Cox*, 906 F.3d at 1181 ("*Sebelius* reaffirmed the NFA's constitutional legitimacy, touting the statute's 'obviously regulatory' tax on sawed-off shotguns."); *Ross*, 458 F.2d at 1145 (explaining that "making possession of an unregistered weapon unlawful is part of the web of regulation aiding enforcement of the [NFA's] transfer tax"). The Supreme Court has consistently described the NFA as a taxing measure, explaining that it establishes "an interrelated statutory system for the taxation of certain classes of firearms," *Haynes*, 390 U.S. at 87, and that it "operates as a tax" and is "productive of some revenue," *Sonzinsky*, 300 U.S. 514.

Indeed, Congress's deliberations on the bill that would become the NFA were entirely focused on its nature as a tax. Attorney General Homer Cummings, the initial lead spokesman for the bill, explained that Congress has "no inherent police powers to go into certain localities and deal with local crime," but that "[i]t is only when we can reach those things under . . . the power of taxation, that we can act." *National Firearms Act: Hearings Before the H. Comm. on Ways & Means on H.R. 9066*, 73d Cong., 2d Sess. 8 (1934) (statement of Homer Cummings, Att'y Gen. of the United States) [hereinafter *National Firearms Act Hearings*]. Congress also knew that it lacked affirmative authority under the Commerce Clause to reach intrastate firearms activities. When the Attorney General was asked if the challenged provisions could reach an intrastate firearm transfer under the Commerce Clause, he responded: "we would get that person, if he is a criminal, under the taxing provision," because "we have no inherent police powers to go into certain localities and deal with local crime." *Id.* at 8, 23–24. Attorney General Cummings further explained that "[i]f [Congress] made a statute absolutely forbidding any human being to have a machine gun, you

16

might say there is some constitutional question involved. But when you say '[w]e will tax the machine gun' . . . you are easily within the law." *Id.* at 19. Assistant Attorney General Joseph Keenan explained during the same hearing that the proposed law "follows the theory of taxation all the way through," and that the reason the Attorney General's office did not propose a bill that simply banned these weapons was that Congress does not have "the power to do that under the Constitution of the United States." *Id.* at 86, 100 (statement of Joseph B. Keenan, Asst. Att'y Gen. of the United States). And in responding to objections from an industry witness, a Representative explained that "[i]f you take away the tax feature entirely, this bill goes out of the picture." *Id.* at 157 (statement of Rep. Samuel B. Hill).

But on July 4, 2025, the President signed into law the BBB, which set to $0.00 the NFA's former $200 making and transfer tax on all NFA-defined "firearms" except for machineguns and "destructive device[s]." BBB § 70436. The NFA as applied to non-taxed firearms, therefore, cannot be deemed a tax. After all, the essential feature of any tax is that it raises some revenue, and a $0.00 "tax" raises no revenue. *Sebelius*, 567 U.S. at 564. But the NFA's registration scheme, even as applied to untaxed firearms, was not changed and will remain in effect despite the fact that the constitutional foundation on which the NFA was based has disappeared. Because "*Sonzinsky* had upheld the NFA's registration requirements as 'solely in aid of collecting the tax,'" when the BBB "end[ed] the . . . taxation" of most NFA firearms, it thereby "also removed 'the constitutional base for those requirements—*i.e.*, the power to tax.'" *Cox*, 906 F.3d at 1182; *see also Texas*, 945 F.3d at 389–90 (holding that the Affordable Care Act's "individual mandate" could no longer be constitutional according to the Supreme Court's saving interpretation when, under a new statute, "the shared responsibility payment amount," *i.e.*, the "tax," was "set at zero"). Consequently, the NFA's registration regime is unmoored from any congressionally imposed tax, it therefore cannot

17

be "necessary and proper" to the laying and collection of that nonexistent tax, and is thus unconstitutional.

The Fifth Circuit's opinion in *United States v. Ardoin*, 19 F.3d 177 (5th Cir. 1994), is not to the contrary. In *Ardoin*, the Fifth Circuit, in rejecting a constitutional challenge to the requirement that "machineguns" manufactured after May 19, 1986, be registered pursuant to the NFA because the ATF refused to accept applications to register or to pay the tax on those firearms, reasoned that "[t]he NFA can be upheld on the preserved, but unused, power to tax." *Id.* at 180. But unlike in *Ardoin*, where Congress did not zero out the tax on machineguns in the NFA, but left the tax unchanged, declared machineguns manufactured post-1986 illegal to own, and stopped accepting registrations for those weapons, here, Congress has set the tax on the "firearms" at issue to $0.00, so the taxing power is not "preserved, but unused," but entirely unexercised. *See Texas*, 945 F.3d at 391 (distinguishing *Ardoin* on a similar basis).

**B.    The NFA's Regulation of Untaxed "Firearms" Cannot Be Justified as an Exercise of Any Other of Congress's Enumerated Powers.**

That the NFA's regulation regime as applied to non-taxed "firearms" cannot be justified as an exercise of Congress's taxing power should be the end of this case because both the Supreme Court and Congress itself have made clear that the NFA is solely an exercise of Congress's taxing power.

*First*, the Supreme Court upheld certain portions of the NFA from constitutional challenge based on it being an exercise of Congress's taxing power and has described the NFA as "an interrelated statutory system for the taxation of certain classes of firearms." *Haynes*, 390 U.S. at 87. Even recent cases, with the benefit of the modern understanding of the Commerce Clause, have reiterated that the NFA rests on "the taxing power." *Sebelius*, 567 U.S. at 567; *Haynes*, 390 U.S. at 98 ("we have repeatedly indicated" that "the registration requirement is a valid exercise of the

18

taxing powers"). What is more, the Supreme Court in *Sonzinsky* explicitly refused "to ascribe to Congress an attempt, under the guise of taxation, to exercise another power denied by the Federal Constitution." 300 U.S. at 514. The Fifth Circuit has described "the constitutional bedrock" of the NFA as "the power to tax." *Ross*, 458 F.2d at 1145 n.3; *United States v. Parker*, 960 F.2d 498, 500 (5th Cir. 1992).

*Second*, Congress itself has never justified the NFA as anything but an exercise of its taxing power. Congress passed the NFA explicitly premised on its taxing power and disclaimed the notion that the NFA was an exercise of its Commerce Clause powers during consideration of the bill. Where Congress is "explicit about invoking its authority under" specific constitutional provisions, it "precludes consideration of" other constitutional provisions "as a basis for the" statute. *Fla. Prepaid Postsecondary Educ. Expense Bd. v. Coll. Sav. Bank*, 527 U.S. 627, 642 n.7 (1999); *see also United States v. Bird*, 124 F.3d 667, 682 n.15 (5th Cir. 1997). And Congress has been explicit about invoking its authority under the taxing power for the NFA, as evidenced by the NFA's text, legislative history, and comparison with other firearms-related laws.

For text, the NFA's introductory preamble specifies that it is an act "to tax the sale or other disposal of" "certain firearms and machineguns." Pub. L. No. 73-474, 48 Stat. 1236. Section 3, which is codified in the Internal Revenue Code, provided that "[t]here shall be levied, collected, and paid upon firearms transferred in the continental United States a tax at the rate of $200 for each firearm." *Id.* § 3(a), 48 Stat. at 1237; 26 U.S.C. §§ 5811, 5821.

For legislative history, as already explained, Congress explicitly premised its enactment of the NFA on its taxing power. There was an extended discussion of the proper tax rate and "estimate[s] of the revenue" that would be raised. *National Firearms Act Hearings*, 73d Cong., 2d

Sess. 11–12. Congress's clear intent with the NFA was to impose a tax, not to exercise its Commerce Clause powers.

For comparison with other firearms-related laws, the Gun Control Act of 1968 ("GCA"), Pub. L. No. 90-618, 82 Stat. 1213 (codified as amended in scattered sections of 18 and 26 U.S.C.), is Congress's regulation of commerce in firearms, *see, e.g.*, *Polymer80, Inc. v. Garland*, 2023 WL 3605430, at *1 (N.D. Tex. Mar. 19, 2023), *not* the NFA. The fact that Congress enacted a separate statute explicitly to regulate commerce in firearms is further support for the conclusion that the NFA is solely a taxing measure.

Accordingly, Congress's explicit invocation of the taxing power to justify the NFA "precludes consideration of" any other enumerated power as the Act's basis. *Fla. Prepaid*, 527 U.S. at 642 n.7 (1999); *accord United States v. Giannini*, 455 F.2d 147, 148 (9th Cir. 1972) (holding that challenged NFA provisions "say[ ] nothing about interstate commerce" and courts should "not ascribe to Congress an intent to exercise its power under the commerce clause when it has invoked the taxing power").

### C.    The NFA's Regulation of Untaxed "Firearms" Exceeds Congress's Commerce Clause Powers.

Defendants may nevertheless argue that the NFA is a constitutional exercise of Congress's Commerce Clause powers. Even if the Court considers this argument, it should reject it.

Congress's authority under the Commerce Clause is limited to regulating interstate commerce. The Supreme Court has identified three categories of permissible Commerce Clause regulation: (1) the channels of interstate commerce; (2) the instrumentalities of interstate commerce; and (3) activities that substantially affect interstate commerce. *Lopez*, 514 U.S. at 559. The NFA does not fit into any of these categories.

**1.    The NFA's Regulation of Untaxed "Firearms" Cannot Be Justified as a Regulation of the Channels or Instrumentalities of Interstate Commerce.**

The first two categories of Commerce Clause authority "may be quickly disposed of." *See id.* The NFA "is not a regulation of the use of the channels of interstate commerce, nor is it an attempt to prohibit the interstate transportation of a commodity through the channels of commerce; nor can [the NFA] be justified as a regulation by which Congress has sought to protect an instrumentality of interstate commerce or a thing in interstate commerce." *Id.* The intrastate possession, making, and transfer of NFA firearms, which the NFA regulates, are neither channels nor instrumentalities of interstate commerce.

**2.    The NFA's Regulation of Untaxed "Firearms" Cannot Be Justified as a Regulation of Activities that Substantially Affect Interstate Commerce.**

The challenged NFA provisions cannot be justified as regulation of intrastate commerce that substantially affects interstate commerce. First, the NFA was not enacted with "the purpose" of regulating interstate commerce. *See Bird*, 124 F.3d 667. Second, the NFA is not "part of a comprehensive regulation of 'quintessentially economic' activity." *United States v. Kebodeaux*, 687 F.3d 232, 251–52 (5th Cir. 2012) (en banc), *rev'd on other grounds*, 570 U.S. 387 (2013).

**i.    The Challenged NFA Provisions Were Not Enacted with the Purpose of Regulating Interstate Commerce.**

In *Bird*, the Fifth Circuit explained that "when Congress is regulating *inter*state commercial activity, its reason for doing so is immaterial," but where Congress regulates "purely *intra*state, noncommercial activity because of its *substantial affect* on interstate commerce, the purpose must in fact be to regulate interstate commerce." 124 F.3d at 682 n.15 (emphasis in original). That is because, the court explained, "[t]he regulation of intrastate commerce *per se*, and for its own sake, and not as a means of regulating or affecting interstate commerce, is not an 'end

. . . within the scope of the constitution.'" *Id.* If a court were to attribute to Congress a different end, *i.e.*, a different "motive and purpose," it would intrude upon "matters for the legislative judgment . . . over which the courts are given no control." *Id.* Thus, "it would be a perversion of congressional authority to uphold as constitutional a federal statute that purported to be an exercise of Commerce Clause power but was for the sole purpose of reaching intrastate activity without regard to whether or how that activity would actually affect interstate commerce." *Id.*

The intrastate possession, making, and transfer of NFA firearms are non-commercial activities—the NFA applies to, for example, Individual Plaintiffs converting their lawfully owned pistols into short-barreled rifles by simply swapping out the existing barrel for a longer barrel or Jensen and Neusch gifting one of their lawfully owned suppressors to a family member—so Congress's purpose in enacting the NFA must have been to regulate interstate commerce if the NFA is to be constitutional on this basis. But Congress's purpose in enacting the NFA was manifestly *not* to regulate interstate commerce. As explained above, Congress passed the NFA explicitly as a tax. During discussions on the bill, the bill's primary sponsor and other members of Congress expressly disclaimed that Congress would even have the power to enact the NFA under the Commerce Clause.

Indeed, Congress made no "findings regarding the effects upon interstate commerce of gun possession," transfer, or making. *See Lopez*, 514 U.S. at 562. The NFA does not itself contain, nor does the NFA's legislative history contain, any findings concerning the effect of the possession, making, and transfer of firearms without registration on interstate commerce, and for good reason. Proponents of the bill expressly disclaimed an intent to regulate interstate commerce through the NFA during debate. In *Hall*, the Eighth Circuit analyzed the NFA's legislative history and identified

22

"no findings" "with respect to the effect on interstate commerce of . . . intrastate activity" related to NFA firearms. 171 F.3d at 1139–40.

The NFA also does not contain a "jurisdictional element which would ensure, through case-by-case inquiry that the firearm possession in question affects interstate commerce." *Lopez*, 514 U.S. at 561; *see Hall*, 171 F.3d at 1138–39. It applies to all covered firearms regardless of whether they traveled in interstate commerce. It therefore applies equally to a firearm an individual makes in that person's home and a firearm made by a national company and shipped to a customer across state lines. *United States v. Kagama*, 118 U.S. 375, 378–79 (1886) (rejecting argument "that the statute under consideration is a regulation of commerce" where it criminalized actions "without any reference to their relation to any kind of commerce").

Accordingly, because the NFA was not enacted with the purpose of regulating interstate commerce, this Court should not supply that justification to the law.

> ### ii. The Challenged NFA Provisions Are Not Part of a Comprehensive Regulation of Quintessentially Economic Activity.

In *Gonzales v. Raich*, 545 U.S. 1 (2005), the Supreme Court upheld the marijuana-possession provisions of the Controlled Substances Act as a regulation of intrastate commerce that substantially affects interstate commerce on the ground that those provisions were "part of a comprehensive regulation of 'quintessentially economic' activity." *Kebodeaux*, 687 F.3d at 251–52. The NFA is not itself, nor is it a part of, a *comprehensive regulation* of quintessentially economic activity, so it cannot be upheld on this basis.

The NFA is not a comprehensive regulatory scheme of commerce in the firearms it covers or the market for those firearms. The Supreme Court upheld portions of the NFA under Congress's taxing power, describing the NFA as "only a taxing measure" and justifying the registration provisions as "in aid of a revenue purpose." *Sonzinsky*, 300 U.S. at 513. In other words, the

challenged provisions were justified as ancillary to the tax and had no regulatory independence. *See id.* (explaining that the NFA "contains no regulation other than mere registration provisions, which are obviously supportable as in aid of a revenue purpose"); *Cox*, 906 F.3d at 1182 (recognizing that *Sonzinsky* "had upheld the NFA's registration requirements as solely in aid of collecting the tax" (internal quotation marks omitted)). Defendants should not be heard to argue that the NFA is a comprehensive regulatory scheme under the Commerce Clause when the NFA has been justified as an exercise of the taxing power by both Congress and the Supreme Court. As explained above, it is the GCA, not the NFA, that regulates commerce in firearms, and the GCA will continue to do so—both interstate and intrastate—were the NFA to be declared unconstitutional as exceeding Congress's powers. Moreover, even if Congress had desired to comprehensively regulate commerce in firearms through the NFA, the Supreme Court has held that Congress cannot use its taxing power as a sham disguise for comprehensive regulation. *See, e.g.*, *Child Labor Tax Case*, 259 U.S. 20, 36–38 (1922) (declaring unconstitutional a "Child Labor Tax" by determining that it was a substantive penalty for violating a regulation, not a tax, despite Congress's use of the "tax" label).

This Court's recent decision in *Hobby Distillers Association v. Alcohol & Tobacco Tax & Trade Bureau* is instructive. In *Hobby Distillers*, plaintiffs challenged a federal law that regulated the "production of distilled spirits." 740 F. Supp. 3d at 517. The government defended the law, in part, on the ground that the Commerce Clause justified the law because distilling spirits at home for personal consumption is a commercial activity that substantially affects interstate commerce in the aggregate. *Id.* at 530–31. The court rejected this argument, determining that while the Act was a statutory scheme that governed "commerce" on its face—*i.e.*, "the interstate spirits market"— the scheme was not "the *comprehensive* kind that justifies Congressional regulation of local

behavior like in *Wickard* and *Raich*." *Id.* at 532–33 (emphasis in original). The court explained that to satisfy that comprehensiveness requirement, the larger statutory scheme must "directly regulate the supply and demand of" the market, "make Congress a production manager over each distillery to inflate prices," or effect "a federal directive to either promote or eliminate a national marketplace." *Id.* at 533. Congress's regulation of spirits did not satisfy this requirement because it left "many aspects of the alcohol industry . . . untouched," including the amount of spirits that a distillery was allowed to be produce or how much market share a producer may obtain. *Id.*

Here, like the law at issue in *Hobby Distillers*, the NFA is not a *comprehensive* regulation of quintessentially economic activity because it is not part of a comprehensive regulation of firearms. The statute does "not mandate the quantity of" firearms a company may "produce" or sell. *Id.* It simply imposes registration procedures on an otherwise unfettered market. It "does not influence how much market share" companies dealing in NFA firearms "may obtain." *Id.* "It is silent on a [gun]'s design and aesthetics absent a required" serial number. *Id.* There is no federal mandate to "promote or eliminate a national marketplace for" NFA firearms. *Id.* Under the NFA's registration scheme, "[t]here is simply no similar degree of control over the production, distribution, and consumption of [NFA firearms] as there was for wheat in *Wickard* or controlled substances in *Raich*." *Id.* (internal quotation marks omitted).

*    *    *

The Fifth Circuit's decision in *Ardoin*, 19 F.3d 177, is not to the contrary. The court's statement about the NFA being a constitutional exercise of Congress's power to regulate interstate commerce is dicta, since the explanation was unnecessary to the outcome of the case. *See id.* at 180. The court had already determined that the NFA was a constitutional exercise of Congress's taxing power and engaged in no detailed analysis similar to the above. Moreover, *Ardoin* predated

25

the Supreme Court's opinion in *Lopez*, which reinvigorated the limits on the Commerce Clause, and this Court must therefore apply *Lopez* and the other intervening Commerce Clause precedents.

## II.    The NFA's Regulation of Suppressors and Short-Barreled Rifles Violates the Second Amendment.

Wholly apart from the NFA's constitutional infirmity in the above respects, the NFA's restrictions also constitute an unconstitutional regulatory scheme as pertains to suppressors and short-barreled rifles under the Second Amendment. Under *New York State Rifle & Pistol Association v. Bruen*, 597 U.S. 1 (2022), the Second Amendment presumptively protects the People's right to keep and bear all arms. If an item qualifies as an "arm," the Second Amendment applies to it, and the government bears the burden of proving, at a minimum, that there is a historical tradition of regulating arms to support the challenged regulatory scheme. Because suppressors and short-barreled rifles are neither dangerous nor unusual, and because there is no tradition of requiring the registration and attendant regulation of protected arms, the NFA's regulatory scheme is unconstitutional under the Second Amendment with respect to suppressors and short-barreled rifles.

The Second Amendment to the United States Constitution guarantees "the right of the people to keep and bear Arms." U.S. CONST. amend. II. Under this constitutional provision, the law-abiding citizens of this Nation are guaranteed the fundamental right to keep and bear arms for defense of self and family and for all other lawful pursuits.

In *Bruen*, the Supreme Court stated the test for Second Amendment challenges: "When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." 597 U.S. at 24. The plain text of the Second Amendment "extends, prima facie, to all instruments that constitute bearable

26

arms, even those that were not in existence at the time of the founding." *Id.* at 28 (quoting *District of Columbia v. Heller*, 554 U.S. 570, 582 (2008)). The Supreme Court has defined "arms" under the Second Amendment broadly with a "general definition" that includes all "modern instruments that facilitate armed self-defense." *Id.*

Despite this constitutional guarantee, Congress has enacted, and Defendants enforce, an unconstitutional regulation of suppressors and short-barreled rifles.

**A.    Suppressors and Short-Barreled Rifles Are Covered by the Second Amendment's Plain Text.**

The NFA's regulation of suppressors and short-barreled rifles implicates the Second Amendment's plain text. Short-barreled rifles plainly are arms under the plain text of the Second Amendment. So are suppressors: by regulating suppressors, the NFA effectively regulates *suppressed firearms*, and suppressed firearms are "arms." Alternatively, suppressors facilitate armed self-defense by enhancing the effectiveness of firearms for self-defense and mitigating the hearing risks associated with using firearms. Indeed, there is no dispute among the parties on this point: the government agrees that suppressors are protected by the text of the Second Amendment. *See* Defs.' Answer to Pls.' Compl. ¶¶ 48–50, *Brown v. ATF*, No. 4:25-cv-01162 (E.D. Mo. Oct. 10, 2025), ECF No. 19 [App.489]; Gov't's Suppl. Resp. to Def.'s Pet. for Reh'g En Banc at 1, *United States v. Peterson*, No. 24-30043 (5th Cir. May 29, 2025), ECF No. 135 [hereinafter Gov't *Peterson* Br.] ("In the view of the United States, the Second Amendment protects firearm accessories and components such as suppressors.") [App.253]; *see also id.* at 2–5 [App.254–57].

Therefore, by forcing Plaintiffs (and their members) to comply with the NFA to possess suppressors and short-barreled rifles, Defendants have burdened the right to "keep and bear Arms" within the meaning of the Second Amendment's text. U.S. CONST. amend. II.

**B.    Suppressors and Short-Barreled Rifles Are Not "Dangerous and Unusual" Weapons and There Is No Historical Tradition of Requiring the Registration of Protected Arms.**

Because the NFA's regulation of suppressors and short-barreled rifles burdens Plaintiffs' Second Amendment rights, "[t]o justify its regulation, the government . . . must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation." *Bruen*, 597 U.S. at 17.

Defendants cannot demonstrate any such thing. *Heller* and *Bruen* have provided the sole historical tradition that can remove an arm from the Second Amendment's protective scope—the tradition of restricting the use of dangerous and unusual weapons. *Heller*, 554 U.S. at 627; *Bruen*, 597 U.S. at 46–48. To be banned, a firearm must be "*both* dangerous *and* unusual." *Caetano v. Massachusetts*, 577 U.S. 411, 417 (2016) (Alito, J., concurring in the judgment) (emphases in original).

This conjunctive nature of the dangerous and unusual test follows directly from *Heller*. In that case, the Supreme Court determined that handguns are in common use and then noted that protection for commonly used weapons was "fairly supported by the historical tradition of prohibiting the carrying of 'dangerous and unusual weapons.'" *Heller*, 554 U.S. at 627. In addition to using the word "and," the Court did not undertake a separate analysis of whether modern handguns were "dangerous" under the "historical tradition" described. *Id.* Indeed, the Supreme Court has repeatedly held that firearms in common use—and thus, not unusual—are protected without any analysis of danger, *see id.*; *Bruen*, 597 U.S. at 32, 47. To be sure, the alleged "danger" of handguns was extensively briefed and highlighted by one dissenting opinion, which argued that they were "particularly dangerous." *See Heller*, 554 U.S. at 711 (Breyer, J., dissenting). But despite the fact that the Court was told handguns were used in an "extraordinary percentage of this country's well-publicized shootings, including the large majority of mass shootings," *Heller* still

28

stopped the analysis upon concluding they were in common use. *Hanson v. District of Columbia*, 120 F.4th 223, 272 (D.C. Cir. 2024) (Walker, J., dissenting). *Bruen* also acknowledged the government's argument "that handguns" may have been "considered 'dangerous and unusual' during the colonial period" and concluded that, even if true, the point was now irrelevant because "they . . . are unquestionably in common use today." 597 U.S. at 47; *see also Caetano*, 577 U.S. at 418 (Alito, J., concurring in the judgment) ("[T]he relative dangerousness of a weapon is irrelevant when the weapon belongs to a class of arms commonly used for lawful purposes."). The direct contrast between dangerousness and common use demonstrates that alleged dangerousness standing alone cannot be a basis for restricting a common type of arm.

And in *Caetano* the Court summarily vacated a determination of the Massachusetts Supreme Judicial Court that stun guns were unprotected on the basis of that the Massachusetts court had erred in determining that stun guns are "unusual." *See* 577 U.S. at 411–12; *see also id.* at 420 (Alito, J., concurring in judgment) (explaining that "the pertinent Second Amendment inquiry is whether stun guns are commonly possessed by law-abiding citizens for lawful purposes *today*"). The Massachusetts court had also found that stun guns were dangerous, but the Supreme Court vacated without addressing that finding. Thus, as Justice Alito observed in concurrence, the Court's per curiam opinion "recognize[d]" that the dangerous and unusual test is a "conjunctive" one. *Id.* at 417.

In any event, even if dangerousness were an independent basis for restricting arms, that would not materially change the test. That is because the question would be dangerous *compared to what*. All weapons, including firearms, are "dangerous" in the abstract. They expel projectiles at extremely fast speeds with the purpose of causing harm to the target. The definition that is more consistent with Supreme Court precedent is a comparative one. *Heller* and *Bruen* contrasted

"dangerous and unusual weapons" with weapons in "common use." *Heller*, 554 U.S. at 627; *Bruen*, 597 U.S. at 47–48. The natural inference one draws from *Heller* and *Bruen* juxtaposing these categories is that "dangerous" means "dangerous when compared to commonly used weapons" (as it must be when talking about weapons). *See Bevis v. City of Naperville*, 85 F.4th 1175, 1201 n.12 (7th Cir. 2023). An arm therefore is sufficiently "dangerous" to be restricted only if it is dangerous in some distinct way that a commonly used arm is not. *See id.* at 1215 n.10 (Brennan, J., dissenting); *see also* Eugene Volokh, *Implementing the Right to Keep and Bear Arms for Self Defense: An Analytical Framework and a Research Agenda*, 56 UCLA L. REV. 1443, 1481–82 (2009). Or, as the Ninth Circuit has formulated, whether it has "uniquely dangerous propensities" that distinguish it from common arms. *Fyock v. Sunnyvale*, 779 F.3d 991, 997 (9th Cir. 2015), *abrogated on other grounds by Bruen*, 597 U.S. 1.

      The "unusual" requirement of the Supreme Court's dangerous-and-unusual test has been more explicitly fleshed out. As *Bruen* confirmed, the question courts must ask is whether ownership of the arm is "highly unusual in society at large." 597 U.S. at 47 (quoting *Heller*, 554 U.S. at 627); *see also Heller*, 554 U.S. at 627 (assuming that "sophisticated arms that are highly unusual in society at large" would not be protected). The "society" the Court is referring to is our modern one, as the Supreme Court has rejected the idea that the inquiry is pegged to "the time of the Second Amendment's enactment." *Caetano*, 577 U.S. at 412 (per curiam) (quotation marks omitted). What matters is whether the arm is "highly unusual in society" today, not whether it was in 1791 or 1868. This accords with how other rights work. *See Heller*, 554 U.S. at 582 (citing *Reno v. ACLU,* 521 U.S. 844, 849 (1997), and *Kyllo v. United States,* 533 U.S. 27, 35–36 (2001)). The principle behind the right still applies to new technologies, whether it be the internet or thermal cameras.

In short, the Supreme Court has held that only arms that are uniquely dangerous and uncommon in society at large may be banned consistent with the Second Amendment. And under *Bruen*, if a firearm cannot be banned, because it is not *both* dangerous *and* unusual, it can be regulated only if there is a historical tradition of doing so.

Suppressors and short-barreled rifles are neither dangerous nor unusual. Arms that are in common use, like those equipped with suppressors and short-barreled rifles, cannot be unusual. Nor are suppressors and short-barreled rifles dangerous. Suppressors increase the safety of a firearm and have been deemed necessary to the safest use of a firearm. Short-barreled rifles are simply a middle-ground between pistols and longer-barreled rifles: they are more accurate yet less concealable than a pistol, but less accurate yet more concealable than a longer-barreled rifle. Nor is there a historical tradition that supports the NFA's comprehensive registration scheme for protected arms.

### 1. Suppressors and Short-Barreled Rifles Are in Common Use.

***Suppressors.*** Suppressors have been broadly permitted and commonly used for over one hundred years. In 1908, Hiram Percy Maxim applied to patent a device that could be attached to a firearm to reduce gunshot noise. He dubbed his invention a "silencer." Silent Firearm, U.S. Patent No. 958,935 (filed Nov. 30, 1908), https://perma.cc/5TPE-PSZ7 [App.419–22]. Several years later, Maxim explained that he invented the device to reduce sound disturbance caused by firearms. Hiram Percy Maxim, Experiences with the Maxim Silencer 2–4 (1915), https://perma.cc/WY37-3YE2 [hereinafter Maxim] [App.278–80]. President Theodore Roosevelt possessed a suppressor, the Maxim Silencer. Max Slowik, *Teddy Roosevelt's Suppressed 1894 Winchester*, Guns.com (May 18, 2012), https://perma.cc/3G38-C5XQ [App.423–25].

The common use of suppressors has continued into the modern day. Millions of suppressors are owned by Americans, in steadily increasing numbers. As of May 2021, Americans had registered nearly 2.7 million suppressors with the ATF. *See* BUREAU OF ALCOHOL, TOBACCO, FIREARMS & EXPLOSIVES, FIREARMS COMMERCE IN THE UNITED STATES: ANNUAL STATISTICAL UPDATE 2021, at 16 (2021), https://perma.cc/4WAF-QGPQ [hereinafter ATF STATISTICAL UPDATE 2021] [App.088]. As of May 2024, ATF reported over 3.5 million registered suppressors. *See* BUREAU OF ALCOHOL, TOBACCO, FIREARMS & EXPLOSIVES, FIREARMS COMMERCE IN THE UNITED STATES: STATISTICAL UPDATE 2024, at 12 (2024), https://perma.cc/DJC5-VBJZ [hereinafter ATF STATISTICAL UPDATE 2024] [App.112]. More recent ATF data indicates that by the end of 2024 there were approximately 4.5 million registered suppressors. *See* NAT'L SHOOTING SPORTS FOUND., SUPPRESSOR OWNER STUDY 7 (2025), https://perma.cc/HV5A-7APV [App.393]. And as of October 14, 2025, there were approximately 4.82 million non-government registered suppressors (approximately 4.96 million registered suppressors total). Varone Decl. Ex. A [App.022–23].

Suppressors are widely permitted throughout the United States. Forty-two states permit their citizens to possess and use suppressors. And the NFA allows individuals to make, transfer, or receive suppressors, subject to its registration requirements. *See* 26 U.S.C. §§ 5811, 5812, 5821, 5822, 5841; 27 C.F.R. §§ 479.62, 479.84.

**_Short-Barreled Rifles._** From the battle for independence through westward expansion and continuing to the present, the rifle has been a quintessential American firearm. Rifles are indisputably in common use in the United States today. Americans use rifles for, among other lawful purposes, hunting, recreational target shooting, and self-defense. *See* MODERN SPORTING RIFLE: COMPREHENSIVE CONSUMER REPORT 40–51, NAT'L SHOOTING SPORTS FOUND. (July 14,

32

2022), https://perma.cc/GT6M-C97D [App.345–56]. According to one national survey, as of mid-2021, Americans owned over 146 million rifles. William English, *2021 National Firearms Survey: Updated Analysis Including Types of Firearms Owned* at 20, GEO. UNIV. RSCH. PAPER NO. 4109494 (May 13, 2022), https://perma.cc/XMB6-GBC9 [App.210]. From 2013 to 2023, there were millions of rifles manufactured each year, with over 3.1 million manufactured in 2023 alone. ATF STATISTICAL UPDATE 2024, at 1 [App.073]. Short-barreled rifles, as their name implies, are just rifles with a shorter barrel, and their commonality should therefore be analyzed the same as rifles generally. *See* Joseph G.S. Greenlee, *The Tradition of Short-Barreled Rifle Use & Regulation in America*, 25 WYO. L. REV. 111, 147 (2025) [hereinafter *The Tradition of Short-Barreled Rifle Use*].

Even if the Court analyzes short-barreled rifles' commonality distinct from rifles generally, short-barreled rifles themselves are also in common use in the United States and have been since the Colonial Era. *See id.* at 113–28, 141–42. Like rifles generally, Americans use short-barreled rifles for many lawful purposes, including hunting and self-defense. *See, e.g.*, Ron Spomer, *Short Rifle Barrel Performance Advantages*, RON SPOMER OUTDOORS, https://perma.cc/3PXD-4F4P (last visited Oct. 22, 2025) [App.426–34]; *Why SBRs Are Becoming Popular for Home Defense*, SUMMERLIN ARMORY (Feb. 4, 2025), https://perma.cc/Z2XN-SJHF [App.475]. As of May 2021, there were 532,725 short-barreled rifles registered with the ATF. *See* ATF STATISTICAL UPDATE 2021, at 16 [App.088]. As of May 2024, the ATF reported that number had increased to 870,286. *See* ATF STATISTICAL UPDATE 2024, at 12 [App.112]. As of October 14, 2025, there were approximately 820,000 non-government registered short-barreled rifles (approximately 1.2 million registered short-barreled rifles total). Varone Decl. Ex. A [App.022–23].

33

Short-barreled rifles are also widely permitted throughout the United States. Forty-five states permit their citizens to possess and use short-barreled rifles. And the NFA allows individuals to make, transfer, or receive short-barreled rifles, subject to its registration requirements. *See* 26 U.S.C. §§ 5811, 5812, 5821, 5822, 5841; 27 C.F.R. §§ 479.62, 479.84.

### 2.    Suppressors and Short-Barreled Rifles Are Not "Dangerous."

**<u>Suppressors.</u>** A suppressor is a safe, effective, and commonly used device that decreases the noise level of a gunshot. Suppressors improve the experience and use of firearms. They decrease the risk of permanent hearing damage, help protect the hearing of hunters and those nearby, reduce noise pollution from firearm discharge, make firearms training safer and more effective, increase the accuracy and ease of use of firearms by reducing felt recoil and shot flinch, and improve the effectiveness of firearms for self-defense and defense of the home. Contrary to representations in movies and television, suppressors do not reduce all sound from a gunshot and are rarely used by criminals.

While suppressors are sometimes referred to as "silencers," suppressors do not silence firearms. "[T]he term 'silencer' is a misnomer, in that—despite movie fantasies—a noise suppressor reduces decibels, but does not actually 'silence' the discharge of a firearm." Stephen P. Halbrook, *Firearm Sound Moderators: Issues of Criminalization and the Second Amendment*, 46 CUMB. L. REV. 33, 36 (2016) [hereinafter *Firearm Sound Moderators*]; *see also* AMERICAN SUPPRESSOR ASSOCIATION, *The American Suppressor Association (ASA)* (YouTube, Nov. 26, 2014), https://perma.cc/7D6W-DRNS (demonstrating the use of suppressors and their decibel level reduction). The sound from a suppressed firearm "may be muffled or diminished," but "it can still be heard" easily. *Firearm Sound Moderators*, at 36. Indeed, suppressed firearms are still quite loud.

34

Suppressors have many common, legal uses. Firearm suppressors are commonly used for lawful purposes and very infrequently used for criminal activity. Although not required under the Second Amendment, suppressors *increase* the safety of firearm use.

First, suppressors are commonly used for hearing protection. Suppressors are one of the best and most effective forms of hearing protection for firearms use. The American Academy of Otolaryngology-Head and Neck Surgery, the National Hearing Conservation Association Task Force on Prevention of Noise-Induced Hearing Loss from Firearm Noise, the Centers for Disease Control and Prevention, and the Academy of Doctors of Audiology have all recommended the use of suppressors for hearing protection. *See Suppressors for Hearing Preservation*, AM. ACAD. OTOLARYNGOLOGY-HEAD & NECK SURGERY (Nov. 18, 2024), https://perma.cc/X4AK-4DZZ [App.460–63]; Michael Stewart et al., *NHCA Position Statement: Recreational Firearm Noise*, NAT'L HEARING CONSERVATION ASS'N (Mar. 16, 2017), https://perma.cc/RB6V-V7JV [App.435–44]; LILIA CHEN & SCOTT E. BRUECK, NAT'L INST. FOR OCCUPATIONAL SAFETY & HEALTH, CTRS. FOR DISEASE CONTROL & PREVENTION, HHE REP. NO. 2011-0069-3140, NOISE AND LEAD EXPOSURES AT AN OUTDOOR FIRING RANGE – CALIFORNIA 5 (2011), https://perma.cc/8C62-Z42R [App.155]; SCOTT E. BRUECK ET AL., NAT'L INST. FOR OCCUPATIONAL SAFETY & HEALTH, CTRS. FOR DISEASE CONTROL & PREVENTION, HHE REP. NO. 2013-0124-3208, MEASUREMENT OF EXPOSURE TO IMPULSIVE NOISE AT INDOOR & OUTDOOR FIRING RANGES DURING TACTICAL TRAINING EXERCISES 14 (2014), https://perma.cc/UQF7-DH5Q [App.059]; Letter from Amyn Amlani, President, Acad. of Drs. of Audiology, and Stephanie Czuhajewski, Exec. Dir., Acad. of Drs. of Audiology, to Rep. Ben Cline (Jan. 15, 2025), https://perma.cc/758Z-95JC [App.276]. Because suppressors are one of the most effective hearing protection tools, police departments routinely purchase them to "[r]educ[e] potential hearing loss of officers and the public during

shooting events." Joanna Putman, *Wash. PD Equips Entire Department with Silencers from Silencer Central*, POLICE1 (May 15, 2024), https://perma.cc/MD4N-8S79 [App.418]. As the Law Enforcement Management Institute of Texas concluded, "[t]o help prevent permanent hearing loss to law enforcement officers, agencies should utilize firearm sound suppressors." JAMES B. ABBOTT, TEX. OFF. ATT'Y GEN., USE OF FIREARM SUPPRESSORS BY LAW ENFORCEMENT TO PREVENT HEARING LOSS 9 (2024), https://perma.cc/FF96-5Q9J [App.035]. Likewise, "[i]n 2017 the U.S. Marines began using suppressors on service weapons" to reduce gunshot-related hearing loss. *Military-Grade Protection*, HEARING HEALTH FOUND., https://perma.cc/U369-7C2N [App.304].

This widespread support makes sense. Without the use of suppressors, "[t]he level of impulse noise generated by almost all firearms exceeds the 140 dB peak [sound pressure level] limit recommended by [OSHA] and [NIOSH]." Michael Stewart et al., *Risks Faced by Recreational Firearm Users*, AUDIOLOGY TODAY, Mar.–Apr. 2011, at 38, 40, https://perma.cc/QS93-AVV8 [App.445, 447]. Consequently, "it is not surprising that recreational firearm noise exposure is one of the leading causes of [noise induced hearing loss] in America today." *Id.* at 40 [App.447]. With a suppressor, however, the sound of a firearm can fall within safer levels. For example, the sound of a Smith & Wesson 9mm pistol with a suppressor can be as low as 127–130 decibels. David Kopel, *The Hearing Protection Act and 'Silencers,'* VOLOKH CONSPIRACY (June 19, 2017), https://perma.cc/C5FU-T6U8 [App.272]. An AR-15 rifle with a suppressor, meanwhile, makes a noise around 132 decibels. Glenn Kessler, *Are Firearms with a Silencer 'Quiet'?*, WASH. POST (Mar. 20, 2017), https://perma.cc/9M7S-NFYH [App.267].

Second, suppressors are commonly used as a public courtesy to prevent noise pollution from lawful target shooting in neighborhoods and communities. Although suppressors do not

silence gunshots, they reduce the decibel level of gunshots. In fact, this was the reason suppressors were invented. MAXIM, at 2–4 [App.278–80].

Third, suppressors are commonly used to make firearm training safer and to improve the accuracy of firearms. Suppressors reduce recoil, allowing for greater control of a firearm and improved accuracy. *See Do Suppressors Reduce Recoil?*, SILENCER SHOP (Apr. 2, 2024), https://perma.cc/9H6M-A8LU [App.179–90]. Further, using suppressors in conjunction with earmuffs or ear plugs (or in place of earmuffs or ear plugs, in instances where traditional hearing protection is not commonly used, such as self-defense or hunting) increases a firearm user's ability to hear commands and warnings, which improves the safe use of firearms at ranges and elsewhere. *See Firearm Sound Moderators*, at 34.

Fourth, suppressors are commonly used to make self-defense and defense of the home safer and more effective. If an individual must use a firearm for self-defense, suppressors reduce recoil and shot flinch, improving the accuracy of a shot. The individual may not have earmuffs or ear plugs at his or her disposal. Accordingly, a suppressor already affixed to the barrel of the firearm allows the individual to exercise self-defense or defense of the home while dramatically reducing the risk of permanent hearing loss. Further, the individual retains the ability to effectively communicate with other household members and hear outside noise or signals, which may aid in coordinating self-defense activities or contacting law enforcement.

The government agrees that suppressors "have several benefits to persons in exercising their Second Amendment rights" and "facilitate the constitutional right to keep and bear arms," including "limit[ing] the noise caused by firearms," "improv[ing] accuracy and aid[ing] in target re-acquisition by reducing recoil and muzzle rise," and "aid[ing] in target shooting." Gov't *Peterson* Br. at 4–5 [App.256–57].

Although not relevant to the constitutional inquiry, by contrast, suppressors are almost never used for criminal purposes. "Overall numbers certainly suggest that silencers are a very minor law enforcement problem." Paul A. Clark, *Criminal Use of Firearm Silencers*, 8 W. CRIM. REV. 44, 51 (2007). One study estimated the number of suppressor-related prosecutions to be just 30 to 40 cases per year out of a total of 75,000 to 80,000 federal criminal prosecutions. *Id.* And that number includes prosecutions for mere possession of the suppressor itself "where no other crime was committed." *Id.* In 2017, ATF Associate Deputy Director Ronald B. Turk confirmed that suppressors "are very rarely used in criminal shootings." RONALD TURK, BUREAU OF ALCOHOL, TOBACCO, FIREARMS & EXPLOSIVES, OPTIONS TO REDUCE OR MODIFY FIREARMS REGULATIONS 6–7 (2017), https://perma.cc/H52G-BJCT [App.469–70].

The fact that suppressors are very rarely used for criminal purposes makes sense, as suppressors are not of much use to criminals. After all, suppressed gunshots are by no means "silent." For example, the 127 decibels generated by a suppressed 9mm pistol are comparable to a firecracker or an ambulance siren. BRIAN J. FLIGOR, BETTER HEARING INST., PREVENTION OF HEARING LOSS FROM NOISE 8 (2011), https://perma.cc/NAZ3-VL46 [App.244]. Accordingly, criminals who shoot suppressed weapons can still be easily heard. Suppressors can reduce or prevent hearing damage but do not silence criminal activity.

The government also agrees that suppressors' "beneficial use is overwhelming in relation to their criminal use." Gov't *Peterson* Br. at 7 [App.259].

Although the transferring of suppressors has been regulated under the NFA's onerous registration scheme since 1934, the legislative history of the NFA does not demonstrate that Congress viewed suppressors as a dangerous or unusual weapon. The inclusion of all suppressors appears to be an accident. The original draft of the bill only regulated suppressors for firearms that

38

were "capable of being concealed on the person." *The Power to Tax*, 25 WYO. L. REV. at 173. This made sense because concealed weapons themselves were included in the draft bill at that point in the drafting process. *Id.* Yet, without explanation, a future draft of the NFA that *removed* traditional handguns from its scope nevertheless *expanded* the class of covered suppressors from those suited for concealable weapons to all suppressors. *Id.*

    ***Short-Barreled Rifles.*** For short-barreled rifles, there is nothing about a short-barreled rifle that makes it more dangerous than other protected arms. A short-barreled rifle is simply an intermediate-size firearm that is more accurate, although less portable, than a handgun. A short-barreled rifle is also more portable, although somewhat less accurate, than a rifle with a longer barrel. Nor is there anything inherently dangerous about short-barreled rifles, *i.e.*, rifles with barrels under 16 inches in length. *See id.*. at 181; *The Tradition of Short-Barreled Rifle Use*, 25 WYO. L. REV. at 141.

    Again, although irrelevant to this Court's constitutional inquiry, statistical surveys demonstrate that short-barreled rifles are rarely used by criminals. *See The Tradition of Short-Barreled Rifle Use*, 25 WYO. L. REV. at 141. For example, a survey conducted by the National Institute for Justice found that only seven of the 157 firearm criminals that they interviewed had used a short-barreled rifle. JAMES D. WRIGHT & PETER H. ROSSI, ARMED AND CONSIDERED DANGEROUS 95 tbl. 4.6 (2d ed. 2008) [App.480]. That number is lower than pistols, sawed-off shotguns, regular shotguns, and regular rifles. *Id.* [App.480].

    The legislative history of the NFA itself demonstrates that Congress did not even view short-barreled rifles as particularly dangerous. *See The Tradition of Short-Barreled Rifle Use*, 25 WYO. L. REV. at 130–36. The bill that became the NFA did not originally restrict possession of short-barreled rifles. But without any mention of the barrel length of rifles in the statute,

Representative Harold Knutson of Minnesota was concerned that the category of "any other firearm capable of being concealed on the person" could be interpreted to include some hunting rifles. *National Firearms Act Hearings*, 73d Cong., 2d Sess. 13 (statement of Rep. Harold Knutson). His constituents would not stand for a steep tax on popular hunting rifles. *Id.* Thus, Knutson suggested putting in an express minimum barrel length for rifles to ensure rifles with longer barrels would not be taxed. *See The Power to Tax*, 25 Wyo. L. Rev. at 169. The NFA's application to short-barreled rifles was thus a historical accident and not a necessary measure to keep arms away from criminals. Indeed, "no one mentioned a short-barreled rifle having any criminal use" during the Senate hearings after the tax on short-barrel rifles was added to the bill. *Id.* at 170.

### 3.    There Is No Historical Tradition Supporting the NFA's Regulatory Scheme for Protected Arms.

Because suppressors and short-barreled rifles are not dangerous and unusual weapons, they are protected by the Second Amendment. And there is no historical tradition that would support the NFA's registration scheme for suppressors, short-barreled rifles, or any other protected arm.

Defendants bear the burden of identifying a "well-established and representative historical analogue." *Bruen*, 597 U.S. at 30 (emphasis omitted). To determine whether the modern regulation and the historical analogue are "relevantly similar," the Court looks to the "how and why" of the two regulations. *Id.* at 29. Defendants will be unable to carry their burden because there is no historical tradition of requiring the registration of protected arms at all, much less punishing the failure to do so with hefty criminal penalties. *See The Tradition of Short-Barreled Rifle Use*, 25 Wyo. L. Rev. at 140–47. Here, there can be no serious claim that registration with the government, complete with fingerprinting, photo submission, potentially multi-month approval delays, and

felony criminal penalties for noncompliance, *see* 26 U.S.C. § 5861(d), form part of any relevant historical tradition. The Founders did not require registration of privately owned arms.

There can be little doubt that had King George III sought to require the colonists to register all of their firearms with the crown, it would have "provoked polemical reactions by Americans invoking their rights as Englishmen to keep arms." *Heller*, 554 U.S. at 594. While the Supreme Court has posited that licensing regimes may be "designed to ensure only that those bearing arms in the jurisdiction are, in fact, law-abiding, responsible citizens," *Bruen*, 597 U.S. at 38 n.9 (internal quotation marks omitted), registration is wholly unnecessary for that purpose. Indeed, even if the NFA were held unconstitutional as applied to suppressors and short-barreled rifles, commercial suppressor and short-barreled rifle sales would still be subject to the background check requirements of the Gun Control Act. *See* 18 U.S.C. §§ 921(a)(3), 922(t). What registration does do is allow a government to track who has arms and, therefore, registration can facilitate efforts by a government to disarm the populace. *See generally* STEPHEN P. HALBROOK, GUN CONTROL IN THE THIRD REICH: DISARMING THE JEWS AND "ENEMIES OF THE STATE" (2013). It is thus unsurprising that registration requirements "are often seen as half-a-loaf measures aimed at deterring gun ownership." *Heller v. District of Columbia*, 670 F.3d 1244, 1291 (D.C. Cir. 2011) (Kavanaugh, J., dissenting) ("*Heller II*").

Supreme Court precedent also cuts against the constitutionality of requiring registration of protected arms. In *United States v. Miller*, 307 U.S. 174, 178 (1939), the Court affirmed a prosecution for possessing an unregistered short-barreled shotgun because the Court was not presented with "any evidence tending to show" that short-barreled shotguns were protected and declined to take judicial notice that they were. But "if registration could be required for all guns, the Court could have just said so and ended its analysis; there would have been no need to go to

41

the trouble of considering whether the gun in question was the kind protected under the Second Amendment." *Heller II*, 670 F.3d at 1294 (Kavanaugh, J., dissenting). And in *Heller*, the Supreme Court suggested that the NFA's "restrictions on machineguns … might be unconstitutional" if machineguns were protected arms. 554 U.S. at 624.

Accordingly, because suppressors and short-barreled rifles are neither dangerous nor unusual, and there is no historical tradition of requiring the registration of protected arms, the NFA's registration scheme as pertains to suppressors and short-barreled rifles is unconstitutional under the Second Amendment.

### 4. The Fifth Circuit's Opinion in *United States v. Peterson* Does Not Require a Different Result.

In *United States v. Peterson*, 150 F.4th 644, 647 (5th Cir. 2025), the Fifth Circuit rejected a Second Amendment challenge to the NFA's application to suppressors. But it did so by construing the NFA as a "shall-issue licensing regime" based at least in part on an alleged "conce[ssion] at oral argument." And because it construed the NFA as a shall-issue licensing regime, the Fifth Circuit applied a "presumption of constitutionality" to the NFA under *Bruen*'s footnote nine. But Plaintiffs here make no such concession, so the Court should analyze Plaintiffs' Second Amendment arguments on their own merits.

To the extent the Court deems *Peterson* controlling, Plaintiffs maintain that *Peterson* was wrongly decided and preserve the argument for the purposes of appeal. In addition, an en banc petition in *Peterson* remains pending.

## III. Plaintiffs Are Entitled to a Permanent Injunction of the Challenged NFA Provisions.

Along with declaring the challenged NFA provisions unconstitutional, the Court should enjoin Defendants from enforcing them against Plaintiffs, Plaintiffs' customers, and Plaintiffs'

members, as applicable. *See, e.g.*, *Hobby Distillers*, 740 F. Supp. 3d at 534–36 (granting permanent injunction against enforcement of unconstitutional statutory provisions).

### A.      Plaintiffs Satisfy the Permanent Injunction Factors.

A permanent injunction is warranted where a plaintiff shows "(1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006). The third and fourth factors "merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009). Plaintiffs satisfy all the factors.

Plaintiffs have suffered irreparable harm in three ways. First, "[t]he loss of" constitutional "freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality op.); *BST Holdings, LLC v. OSHA*, 17 F.4th 604, 618 (5th Cir. 2021). Continued enforcement of the unconstitutional NFA provisions against Plaintiffs deprives them of both their right to be free from "enforcement of a federal law that congress had no power to enact" and their Second Amendment rights. *See Hobby Distillers*, 740 F. Supp. 3d at 535; *see also BST Holdings*, 17 F.4th at 617–18 (finding "irreparable harm" from "loss of constitutional freedoms" after determining regulation "likely exceed[ed] the federal government's authority under the Commerce Clause"). Second, Plaintiffs will incur "nonrecoverable compliance costs" absent an injunction because they will be forced to spend time and money to comply with the unconstitutional registration requirements. *See Airlines for Am. v. Dep't of Transp.*, 110 F.4th 672, 677 (5th Cir. 2024). Third, Hot Shots Custom will incur "economic costs" in the form of lost

profits that "cannot be recovered in the ordinary course of litigation." *Rest. L. Ctr. v. Dep't of Lab.*, 66 F.4th 593, 597 (5th Cir. 2023) (internal quotation marks omitted).

Plaintiffs' injuries cannot be remedied at law through monetary damages or other relief. There is "no adequate monetary standard" to redress Plaintiffs' damages from having their constitutional rights violated. *Hobby Distillers*, 740 F. Supp. 3d at 535. Plaintiffs' compliance costs and lost profits similarly lack a legal remedy because the Government has "sovereign immunity for any monetary damages," *Wages & White Lion Invs., LLC v. FDA*, 16 F.4th 1130, 1142 (5th Cir. 2021), and are thus "unrecoverable," *id.*; *Airlines for Am.*, 110 F.4th at 677; *Rest. L. Ctr.*, 66 F.4th at 597.

The balance of the equities and the public interest also weigh in favor of a permanent injunction. The government has no legitimate interest in enforcing an unconstitutional law. *BST Holdings*, 17 F.4th at 618. And there is "generally no public interest in the perpetuation of unlawful [government] action." *Airlines for Am.*, 110 F.4th at 677.

## B.    The Scope of Relief.

The permanent injunction should cover (i) each of the Plaintiffs; (ii) Hot Shots Customs' customers; and (iii) the Organizational Plaintiffs' individual and business members (and their customers). *See Texas v. ATF*, 700 F. Supp. 3d 556, 573 (S.D. Tex. 2023). The injunction should extend throughout the United States, and it should apply to both current members and customers and individuals who become members and customers in the future.

## CONCLUSION

Plaintiffs respectfully request that the Court grant Plaintiffs' motion for summary judgment on Count One, enter a declaratory judgment that the challenged NFA provisions and attendant regulations are unconstitutional and unenforceable as applied to the non-taxed firearms, and

permanently enjoin Defendants from enforcing those provisions and regulations to the extent set forth above. Plaintiffs also request that the Court grant Plaintiffs' motion for summary judgment on Count Two, enter a declaratory judgment that the challenged NFA provisions and attendant regulations are unconstitutional and unenforceable as to suppressors and short-barreled rifles under the Second Amendment, and permanently enjoin Defendants from enforcing those provisions and regulations to the extent set forth above.


Dated: November 12, 2025                    Respectfully Submitted,


                                            /s/ David H. Thompson
R. Brent Cooper                             David H. Thompson*
Texas Bar No. 04783250                      Peter A. Patterson*
COOPER & SCULLY, P.C.                       Nicholas A. Varone*
900 Jackson Street, Suite 100               COOPER & KIRK, PLLC
Dallas, Texas 75202                         1523 New Hampshire Avenue, N.W.
Telephone: (214) 712-9500                   Washington, DC 20036
Telecopy: (214) 712-9540                    Tel: (202) 220-9600
brent.cooper@cooperscully.com               dthompson@cooperkirk.com
                                            ppatterson@cooperkirk.com
                                            nvarone@cooperkirk.com

                                            *Admitted *pro hac vice*

                                            *Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I certify that a true and accurate copy of the foregoing document was mailed by United States Postal Service first-class mail, postage pre-paid, to the following non-ECF participants on November 12, 2025:

Bureau of Alcohol, Tobacco, Firearms and Explosives
99 New York Ave., Northeast
Washington, DC 20002

Daniel P. Driscoll
Acting Director
Bureau of Alcohol, Tobacco, Firearms and Explosives
99 New York Avenue, Northeast
Washington, DC 20002

Pamela J. Bondi
Attorney General of the United States
U.S. Department of Justice
950 Pennsylvania Ave, Northwest
Washington, DC 20530

United States Department of Justice
950 Pennsylvania Avenue, Northwest
Washington, DC 20530

Nancy Larson, Acting United States Attorney
ATTN: Civil Process Clerk
United States Attorney's Office, Northern District of Texas
500 S. Taylor Street, Suite LB238
Amarillo, TX 79101

/s/ David H. Thompson
David H. Thompson
COOPER & KIRK, PLLC

46