# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
### AMARILLO DIVISION

**FILED**

**December 10, 2025**

KAREN MITCHELL

CLERK, U.S. DISTRICT COURT

JOHN JENSEN; JEREMY NEUSCH; DAVID LYNN SMITH; HOT SHOTS CUSTOM LLC; TEXAS STATE RIFLE ASSOCIATION; FPC ACTION FOUNDATION; and CITIZENS COMMITTEE FOR THE RIGHT TO KEEP AND BEAR ARMS,

§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§

*Plaintiffs*,

v.

BUREAU OF ALCOHOL, TOBACCO, FIREARMS AND EXPLOSIVES; DANIEL P. DRISCOLL, in his official capacity as Acting Director of the Bureau of Alcohol Tobacco, Firearms and Explosives; UNITED STATES DEPARTMENT OF JUSTICE; and PAMELA J. BONDI, in her official capacity as Attorney General of the United States,

*Defendants*.

No. 2:25-cv-00223

**ORAL ARGUMENT REQUESTED**

## AMENDED MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

**TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES.................................................................................................. iii

LIVE PLEADINGS AND SUBJECT-MATTER JURISDICTION.................................................1

INTRODUCTION ..............................................................................................................1

BACKGROUND ................................................................................................................3

I.  The Constitution.................................................................................................3

    A.  The Taxing Clause. ..................................................................................3

    B.  The Commerce Clause..............................................................................4

    C.  The Necessary and Proper Clause..............................................................4

    D.  The Second Amendment. ..........................................................................4

II.  The National Firearms Act...................................................................................5

    A.  The Untaxed Firearms..............................................................................5

    B.  The Challenged NFA Provisions.................................................................6

III.  The One Big Beautiful Bill Act. ...........................................................................8

IV.  The Challenged NFA Provisions Injure Plaintiffs....................................................8

    A.  Individual Plaintiffs and Hot Shots Custom LLC...........................................8

    B.  Organizational Plaintiffs. .......................................................................15

LEGAL STANDARD .......................................................................................................15

ARGUMENT ..................................................................................................................16

I.  The NFA's Regulation of Untaxed "Firearms" Exceeds Congress's Constitutional Authority. ........................................................................................................16

    A.  The NFA's Regulation of Untaxed "Firearms" Exceeds Congress's Taxing Power.................................................................................................16

    B.  The NFA's Regulation of Untaxed "Firearms" Cannot Be Justified as an Exercise of Any Other of Congress's Enumerated Powers...............................19

    C.  The NFA's Regulation of Untaxed "Firearms" Exceeds Congress's Commerce Clause Powers......................................................................................21

        1.  The NFA's Regulation of Untaxed "Firearms" Cannot Be Justified as a Regulation of the Channels or Instrumentalities of Interstate Commerce..................................................................................21

        2.  The NFA's Regulation of Untaxed "Firearms" Cannot Be Justified as a Regulation of Activities that Substantially Affect Interstate Commerce..................................................................................22

    i. The Challenged NFA Provisions Were Not Enacted with the Purpose of Regulating Interstate Commerce. ..............................22

    ii. The Challenged NFA Provisions Are Not Part of a Comprehensive Regulation of Quintessentially Economic Activity. ......................................................................................24

II. The NFA's Regulation of Suppressors and Short-Barreled Rifles Violates the Second Amendment. ..................................................................................................26

  A. Suppressors and Short-Barreled Rifles Are Covered by the Second Amendment's Plain Text. ....................................................................27

  B. Suppressors and Short-Barreled Rifles Are Not "Dangerous and Unusual" Weapons and There Is No Historical Tradition of Requiring the Registration of Protected Arms. ..........................................................28

    1. Suppressors and Short-Barreled Rifles Are in Common Use. ...................32

    2. Suppressors and Short-Barreled Rifles Are Not "Dangerous." ................34

    3. There Is No Historical Tradition Supporting the NFA's Regulatory Scheme for Protected Arms. ......................................................41

    4. The Fifth Circuit's Opinion in *United States v. Peterson* Does Not Require a Different Result. ....................................................................42

III. Plaintiffs Are Entitled to a Permanent Injunction of the Challenged NFA Provisions. .....43

  A. Plaintiffs Satisfy the Permanent Injunction Factors...............................................43

  B. The Scope of Relief. ...............................................................................................45

CONCLUSION...................................................................................................................................45

## TABLE OF AUTHORITIES

**Cases**                                                                                                                                        **Page(s)**

*Airlines for Am. v. Dep't of Transp.*,
110 F.4th 672 (5th Cir. 2024) .................................................................................................44

*Bevis v. City of Naperville*,
85 F.4th 1175 (7th Cir. 2023) ..............................................................................................30

*BST Holdings, LLC v. OSHA*,
17 F.4th 604 (5th Cir. 2021) .................................................................................................44

*Caetano v. Massachusetts*,
577 U.S. 411 (2016) ..........................................................................................28, 29, 30, 31

*California v. Texas*,
593 U.S. 659 (2021) .................................................................................................................4

*Child Labor Tax Case*,
259 U.S. 20 (1922) ................................................................................................................25

*CIC Servs., LLC v. IRS*,
593 U.S. 209 (2021) .................................................................................................................1

*Consumers' Rsch. v. FCC*,
109 F.4th 743 (5th Cir. 2024) ...............................................................................................14

*Consumers' Rsch. v. FCC*,
145 S. Ct. 2482 (2025) ..........................................................................................................14

*Contender Farms, LLP v. Dep't of Agric.*,
779 F.3d 258 (5th Cir. 2015) ................................................................................................13

*District of Columbia v. Heller*,
554 U.S. 570 (2008) ............................................................27, 28, 29, 30, 31, 41, 42

*eBay Inc. v. MercExchange, L.L.C.*,
547 U.S. 388 (2006) ..............................................................................................................43

*Elrod v. Burns*,
427 U.S. 347 (1976) ........................................................................................................43, 44

*Fla. Prepaid Postsecondary Educ. Expense Bd. v. Coll. Sav. Bank*,
527 U.S. 627 (1999) ........................................................................................................20, 21

*Free Enter. Fund v. PCAOB*,
561 U.S. 477 (2010) .................................................................................................................1

*Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*,
528 U.S. 167 (2000) ..............................................................................................................13

*Fyock v. Sunnyvale*,
779 F.3d 991 (9th Cir. 2015) ................................................................................................30

*Gonzales v. Raich*,
545 U.S. 1 (2005) ..................................................................................................................24

*Hanson v. District of Columbia*,
   120 F.4th 223 (D.C. Cir. 2024) ............................................................29

*Haynes v. United States*,
   390 U.S. 85 (1968)...........................................................................2, 17, 19

*Healthy Vision Ass'n v. Abbott*,
   138 F.4th 385 (5th Cir. 2025)......................................................................8

*Heller v. District of Columbia*,
   670 F.3d 1244 (D.C. Cir. 2011)..................................................................42

*Hobby Distillers Ass'n v. Alcohol & Tobacco Tax & Trade Bureau*,
   740 F. Supp. 3d 509 (N.D. Tex. 2024) ................................15, 16, 25, 26, 43, 44

*Hunt v. Wash. State Apple Advert. Comm'n*,
   432 U.S. 333 (1977)...................................................................................15

*Ill. Ass'n of Firearms Retailers v. City of Chicago*,
   961 F. Supp. 2d 928 (N.D. Ill. 2014) .........................................................14

*Kinsella v. United States ex rel. Singleton*,
   361 U.S. 234 (1960).....................................................................................4

*Kole v. Village of Norridge*,
   2017 WL 5128989 (N.D. Ill. Oct. 27, 2017).............................................14, 15

*Mock v. Garland*,
   75 F.4th 563 (5th Cir. 2023).................................................................5, 6, 7

*N.Y. State Rifle & Pistol Ass'n v. Bruen*,
   597 U.S. 1 (2022).........................................3, 5, 26, 27, 28, 29, 30, 31, 41

*NFIB v. Sebelius*,
   567 U.S. 519 (2012)...............................................................3, 4, 16, 18, 19

*Nken v. Holder*,
   556 U.S. 418 (2009).................................................................................43

*NRA v. ATF*,
   700 F.3d 185 (5th Cir. 2012).....................................................................14

*Polymer80, Inc. v. Garland*,
   2023 WL 3605430 (N.D. Tex. Mar. 19, 2023)............................................20

*Reese v. ATF*,
   127 F.4th 583 (5th Cir. 2025).....................................................................14

*Rest. L. Ctr. v. Dep't of Lab.*,
   66 F.4th 593 (5th Cir. 2023).......................................................................44

*Sonzinsky v. United States*,
   300 U.S. 506 (1937)..................................................................2, 16, 17, 19, 24

*Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*,
   600 U.S. 181 (2023)...................................................................................15

*Texas v. ATF*,
　700 F. Supp. 3d 556 (S.D. Tex. 2023)................................................................................45

*Texas v. United States*,
　945 F.3d 355 (5th Cir. 2019) ...........................................................................4, 18, 19

*United States v. Ardoin*,
　19 F.3d 177 (5th Cir. 1994) ........................................................................................18, 26

*United States v. Bird*,
　124 F.3d 667 (5th Cir. 1997) .......................................................................................20, 22

*United States v. Cox*,
　906 F.3d 1170 (10th Cir. 2018) ...........................................................6, 16, 18, 24

*United States v. Giannini*,
　455 F.2d 147 (9th Cir. 1972) ...........................................................................................21

*United States v. Hall*,
　171 F.3d 1133 (8th Cir. 1999) ................................................................................7, 8, 23

*United States v. Hicks*,
　649 F. Supp. 3d 357 (W.D. Tex. 2023)...........................................................................14

*United States v. Hicks*,
　2025 WL 2058762 (5th Cir. July 23, 2025) ...............................................................14, 15

*United States v. Kagama*,
　118 U.S. 375 (1886).........................................................................................................23

*United States v. Kebodeaux*,
　570 U.S. 387 (2013).........................................................................................................22

*United States v. Kebodeaux*,
　687 F.3d 232 (5th Cir. 2012) .......................................................................................22, 24

*United States v. Lopez*,
　514 U.S. 549 (1995).................................................................................................4, 21, 23

*United States v. Miller*,
　307 U.S. 174 (1939).........................................................................................................42

*United States v. Morrison*,
　529 U.S. 598 (2000).....................................................................................................3, 4

*United States v. Parker*,
　960 F.2d 498 (5th Cir. 1992) ...........................................................................................19

*United States v. Peterson*,
　150 F.4th 644 (5th Cir. 2025)......................................................................................42, 43

*United States v. Ross*,
　458 F.2d 1144 (5th Cir. 1972) ..................................................................................8, 16, 19

*Uzuegbunam v. Preczewski*,
　592 U.S. 279 (2021).........................................................................................................14

v

*Vote.Org v. Callanen,*
    89 F.4th 459 (5th Cir. 2023)............................................................................14

*Wages & White Lion Invs., LLC v. FDA,*
    16 F.4th 1130 (5th Cir. 2021)..........................................................................44

**Statutes, Rules, & Regulations**

18 U.S.C.
    § 921(a)(3) .....................................................................................................41
    § 921(a)(25) .....................................................................................................5
    § 922(t).............................................................................................................41
    § 3571(b)(3) .......................................................................................................7
    § 3571(c)(3) .......................................................................................................7

26 U.S.C.
    § 5811............................................................................................9, 20, 33, 34
    § 5812..............................................................................................6, 9, 33, 34
    § 5812(b)............................................................................................................6
    § 5821............................................................................................9, 20, 33, 34
    § 5822..............................................................................................6, 9, 33, 34
    § 5841...................................................................................................9, 33, 34
    § 5841(a) ............................................................................................................7
    § 5841(b) ............................................................................................................7
    § 5841(c) ............................................................................................................7
    § 5841(e) ............................................................................................................6
    § 5842(b) ............................................................................................................7
    § 5845(a) ............................................................................................................5
    § 5845(a)(1) .......................................................................................................6
    § 5845(a)(2) .......................................................................................................6
    § 5845(a)(3) .......................................................................................................5
    § 5845(a)(4) .......................................................................................................5
    § 5845(a)(5) .......................................................................................................6
    § 5845(a)(7) .......................................................................................................5
    § 5845(e) ............................................................................................................6
    § 5861......................................................................................................7, 12, 13
    § 5861(b)............................................................................................................6
    § 5861(c)............................................................................................................6
    § 5861(d)......................................................................................................6, 41
    § 5861(e)............................................................................................................6
    § 5861(f).............................................................................................................7
    § 5861(i).............................................................................................................7
    § 5861(j).............................................................................................................6
    § 5871......................................................................................................7, 12, 13
    § 5872..........................................................................................................1, 7
    § 7421(a)...........................................................................................................1

27 C.F.R.
§ 479.62.................................................................................................................9, 33, 34
§ 479.62(a) ....................................................................................................................7
§ 479.62(b) ....................................................................................................................7
§ 479.62(d) ....................................................................................................................7
§ 479.84.................................................................................................................9, 33, 34
§ 479.84(a) ....................................................................................................................6
§ 479.84(b) ....................................................................................................................6
§ 479.84(c) ..................................................................................................................6, 7
§ 479.84(d) ....................................................................................................................6

FED. R. CIV. P. 56(a) ...........................................................................................................15

Factoring Criteria for Firearms with Attached "Stabilizing Braces,"
88 Fed. Reg. 6478 (Jan. 31, 2023) .............................................................................11

Gun Control Act of 1968 ("GCA"), Pub. L. No. 90-618, 82 Stat. 1213 .....................................20

One Big Beautiful Bill Act ("BBB"), Pub. L. No. 119-21, 139 Stat. 72 (2025).........................2, 18

The National Firearms Act of 1934 ("NFA"), Pub. L. No. 73-474, 48 Stat. 1236 ...................1, 20

**Constitutional Provisions**

U.S. CONST.
art. I, § 8, cl. 1 ......................................................................................................1, 3, 16
art. I, § 8, cl. 3 ...............................................................................................................4
art. I, § 8, cl. 18 .............................................................................................................4
amend. II ................................................................................................................4, 27, 28

**Other Authorities**

JAMES B. ABBOTT, TEX. OFF. ATT'Y GEN., USE OF FIREARM SUPPRESSORS BY LAW
ENFORCEMENT TO PREVENT HEARING LOSS (2024), https://perma.cc/FF96-5Q9J ............36

AMERICAN SUPPRESSOR ASSOCIATION, *The American Suppressor Association (ASA)*
(YouTube, Nov. 26, 2014), https://perma.cc/7D6W-DRNS ............................................35

SCOTT E. BRUECK ET AL., NAT'L INST. FOR OCCUPATIONAL SAFETY & HEALTH, CTRS.
FOR DISEASE CONTROL & PREVENTION, HHE REP. NO. 2013-0124-3208,
MEASUREMENT OF EXPOSURE TO IMPULSIVE NOISE AT INDOOR & OUTDOOR
FIRING RANGES DURING TACTICAL TRAINING EXERCISES (2014),
https://perma.cc/UQF7-DH5Q............................................................................................36

BUREAU OF ALCOHOL, TOBACCO, FIREARMS & EXPLOSIVES, FIREARMS COMMERCE IN
THE UNITED STATES: ANNUAL STATISTICAL UPDATE 2021 (2021),
https://perma.cc/4WAF-QGPQ....................................................................................32, 34

BUREAU OF ALCOHOL, TOBACCO, FIREARMS & EXPLOSIVES, FIREARMS COMMERCE IN
THE UNITED STATES: STATISTICAL UPDATE 2024 (2024),
https://perma.cc/DJC5-VBJZ.................................................................................32, 33, 34

BUREAU OF ALCOHOL, TOBACCO, FIREARMS & EXPLOSIVES, OMB NO. 1140-0014, FORM 1 (5320.1): APPLICATION TO MAKE AND REGISTER A FIREARM (2022), https://perma.cc/RZ5B-5Q5Y ..............................................................................10

BUREAU OF ALCOHOL, TOBACCO, FIREARMS & EXPLOSIVES, OMB NO. 1140-0014, FORM 4 (5320.4): APPLICATION FOR TAX PAID TRANSFER AND REGISTRATION OF FIREARM (2023), https://perma.cc/963W-KTYE..............................................................10

LILIA CHEN & SCOTT E. BRUECK, NAT'L INST. FOR OCCUPATIONAL SAFETY & HEALTH, CTRS. FOR DISEASE CONTROL & PREVENTION, HHE REP. NO. 2011-0069-3140, NOISE AND LEAD EXPOSURES AT AN OUTDOOR FIRING RANGE – CALIFORNIA (2011), https://perma.cc/8C62-Z42R ...........................................................36

Paul A. Clark, *Criminal Use of Firearm Silencers*, 8 W. CRIM. REV. 44 (2007)...........................38

*Current Processing Times*, BUREAU OF ALCOHOL, TOBACCO, FIREARMS & EXPLOSIVES, https://perma.cc/XNZ7-UZUR ...........................................................................11

*Do Suppressors Reduce Recoil?*, SILENCER SHOP (Apr. 2, 2024), https://perma.cc/9H6M-A8LU ...........................................................................37

William English, *2021 National Firearms Survey: Updated Analysis Including Types of Firearms Owned,* GEO. UNIV. RSCH. PAPER NO. 4109494 (May 13, 2022), https://perma.cc/XMB6-GBC9 ...........................................................................33

BRIAN J. FLIGOR, BETTER HEARING INST., PREVENTION OF HEARING LOSS FROM NOISE (2011), https://perma.cc/NAZ3-VL46 ...........................................................39

Gov't's Suppl. Resp. to Def.'s Pet. for Reh'g En Banc, *United States v. Peterson*, No. 24-30043 (5th Cir. May 29, 2025), ECF No. 135 ...........................................28, 38, 39

Joseph G.S. Greenlee, *The Tradition of Short-Barreled Rifle Use & Regulation in America*, 25 WYO. L. REV. 111 (2025) ...................................................33, 34, 39, 40, 41

Stephen P. Halbrook, *Firearm Sound Moderators: Issues of Criminalization and the Second Amendment*, 46 CUMB. L. REV. 33 (2016).......................................................35, 37

STEPHEN P. HALBROOK, GUN CONTROL IN THE THIRD REICH: DISARMING THE JEWS AND "ENEMIES OF THE STATE" (2013)...........................................................................42

Stephen P. Halbrook, *The Power to Tax, the Second Amendment, and the Search for Which "'Gangster' Weapons" to Tax*, 25 WYO. L. REV. 149 (2025).......................5, 39, 40

Glenn Kessler, *Are Firearms with a Silencer 'Quiet'?*, WASH. POST (Mar. 20, 2017), https://perma.cc/9M7S-NFYH...........................................................................37

David Kopel, *The Hearing Protection Act and 'Silencers'*, VOLOKH CONSPIRACY (June 19, 2017), https://perma.cc/C5FU-T6U8 .........................................................37

Letter from Amyn Amlani, President, Acad. of Drs. of Audiology, and Stephanie Czuhajewski, Exec. Dir., Acad. of Drs. of Audiology, to Rep. Ben Cline (Jan. 15, 2025), https://perma.cc/758Z-95JC...................................................................36

HIRAM PERCY MAXIM, EXPERIENCES WITH THE MAXIM SILENCER (1915), https://perma.cc/WY37-3YE2 .......................................................................32, 37

*Military-Grade Protection*, HEARING HEALTH FOUND., https://perma.cc/U369-7C2N ................36

MODERN SPORTING RIFLE: COMPREHENSIVE CONSUMER REPORT, NAT'L SHOOTING SPORTS
    FOUND. (July 14, 2022), https://perma.cc/GT6M-C97D ....................................33

NAT'L SHOOTING SPORTS FOUND., SUPPRESSOR OWNER STUDY (2025),
    https://perma.cc/HV5A-7APV.......................................................32

*National Firearms Act: Hearings Before the H. Comm. on Ways & Means on H.R.
    9066*, 73d Cong., 2d Sess. 8 (1934) ..............................................16, 17, 20, 40

Joanna Putman, *Wash. PD Equips Entire Department with Silencers from Silencer Central*,
    POLICE1 (May 15, 2024), https://perma.cc/MD4N-8S79...................................36

Silent Firearm, U.S. Patent No. 958,935 (filed Nov. 30, 1908), https://perma.cc/5TPE-PSZ7.....32

Max Slowik, *Teddy Roosevelt's Suppressed 1894 Winchester*, GUNS.COM (May 18, 2012),
    https://perma.cc/3G38-C5XQ ......................................................32

Ron Spomer, *Short Rifle Barrel Performance Advantages*, RON SPOMER OUTDOORS,
    https://perma.cc/3PXD-4F4P ......................................................34

Michael Stewart et al., *NHCA Position Statement: Recreational Firearm Noise*,
    NAT'L HEARING CONSERVATION ASS'N (Mar. 16, 2017),
    https://perma.cc/RB6V-V7JV ...................................................35, 36

Michael Stewart et al., *Risks Faced by Recreational Firearm Users*, AUDIOLOGY TODAY,
    Mar.–Apr. 2011, https://perma.cc/QS93-AVV8.......................................36, 37

*Suppressors for Hearing Preservation*, AM. ACAD. OTOLARYNGOLOGY-HEAD & NECK
    SURGERY (Nov. 18, 2024), https://perma.cc/X4AK-4DZZ ..............................35

RONALD TURK, BUREAU OF ALCOHOL, TOBACCO, FIREARMS & EXPLOSIVES, OPTIONS TO
    REDUCE OR MODIFY FIREARMS REGULATIONS (2017),
    https://perma.cc/H52G-BJCT ......................................................38

Eugene Volokh, *Implementing the Right to Keep and Bear Arms for Self Defense:
    An Analytical Framework and a Research Agenda*,
    56 UCLA L. REV. 1443 (2009) ....................................................30

*Why SBRs Are Becoming Popular for Home Defense*, SUMMERLIN ARMORY (Feb. 4, 2025),
    https://perma.cc/Z2XN-SJHF ......................................................34

JAMES D. WRIGHT & PETER H. ROSSI, ARMED AND CONSIDERED DANGEROUS (2d ed. 2008) ......40

Defs.' Answer to Pls.' Compl., *Brown v. ATF*,
    No. 4:25-cv-1162 (E.D. Mo. Oct. 17, 2025), ECF No. 19................................28

**LIVE PLEADINGS AND SUBJECT-MATTER JURISDICTION**

Plaintiffs John Jensen, Jeremy Neusch, David Lynn Smith, Hot Shots Custom LLC, Texas State Rifle Association, FPC Action Foundation, and Citizens Committee For The Right To Keep And Bear Arms have one live pleading in this case: their Complaint for Declaratory and Injunctive Relief (Oct. 9, 2025), ECF No. 1.

This Court has subject-matter jurisdiction over all claims for relief pursuant to 28 U.S.C. § 1331 because Plaintiffs' claims arise under the laws of the United States. Plaintiffs seek equitable relief to prevent federal officers and entities from acting unconstitutionally. *See Free Enter. Fund v. PCAOB*, 561 U.S. 477, 491 n.2 (2010). This Court has jurisdiction to grant the declaratory relief sought, pursuant to 28 U.S.C. § 2201, and additional relief pursuant to 28 U.S.C. §§ 2202, 2412. The Anti-Injunction Act, 26 U.S.C. § 7421, does not bar this suit because it challenges the NFA only with respect to untaxed items. Furthermore, and accordingly, it seeks not to restrain the collection or assessment of any tax but instead to restrain information-gathering and other requirements that previously were meant to support the now-defunct tax regime. The suit therefore is not brought "for the purpose of restraining the assessment or collection of any tax." 26 U.S.C. § 7421(a); *see also CIC Servs., LLC v. IRS*, 593 U.S. 209, 211 (2021).

**INTRODUCTION**

The National Firearms Act of 1934 ("NFA"), Pub. L. No. 73-474, 48 Stat. 1236 (codified as amended at 26 U.S.C. §§ 5801–5872), established a $200 tax (when adopted, approximately $5000 in today's dollars) on, among other things, the making and transfer of certain classes of firearms, as well as a registration regime meant to facilitate enforcement of the tax. Congress passed the NFA explicitly premised on its enumerated power to "lay and collect Taxes," U.S. CONST. art. I, § 8, cl. 1, and the Supreme Court upheld provisions of the NFA on that basis, holding

1

that the NFA was "only a taxing measure" and that the registration provisions were "obviously supportable as in aid of a revenue purpose," *Sonzinsky v. United States*, 300 U.S. 506, 513 (1937). Indeed, the Court has described the NFA as "an interrelated statutory system *for the taxation* of certain classes of firearms." *Haynes v. United States*, 390 U.S. 85, 87 (1968) (emphasis added). That constitutional basis, however, has recently been eliminated with respect to the making, transferring, and receiving of several items that are defined as "firearms" by the NFA, including suppressors, short-barreled rifles, and short-barreled shotguns because, under the One Big Beautiful Bill Act ("BBB"), Pub. L. No. 119-21, 139 Stat. 72 (2025), Congress eliminated the making and transfer taxes on those items. Consequently, without a tax as a foundation, the NFA's registration provisions as applied to non-taxed NFA firearms are neither a tax themselves nor necessary and proper to levying a tax and are, therefore, unjustifiable as an exercise of Congress's taxing power.

That the NFA can no longer be justified as an exercise of Congress's taxing power and is thus unconstitutional should be the end of this matter. Congress passed the NFA specifically based on its taxing power and the courts have understood the NFA and upheld it on that basis. This Court should not supply a justification for the law that Congress itself considered and rejected—namely, the Commerce Clause. But even if this Court could analyze the NFA as a purported exercise of Congress's Commerce Clause powers, the Court should determine that the NFA is not constitutional on that basis either. The NFA is plainly not a regulation of the channels of interstate commerce or the instrumentalities of interstate commerce, and it is not a regulation of *intra*state commerce with substantial effects on *inter*state commerce.

Wholly apart from the NFA's constitutional infirmity in the above respect, the NFA's restrictions also constitute an unconstitutional regulatory scheme as pertains to suppressors and

short-barreled rifles under the Second Amendment. Under *New York State Rifle & Pistol Association v. Bruen*, 597 U.S. 1 (2022), the Second Amendment presumptively protects the People's right to keep and bear all arms. If an item qualifies as an "arm," the Second Amendment applies to it, and the government bears the burden of proving, at a minimum, that there is a historical tradition of regulating arms to support the challenged regulatory scheme. Because suppressors and short-barreled rifles are neither dangerous nor unusual, and because there is no tradition of requiring the registration and attendant regulation of protected arms, the NFA's regulatory scheme is unconstitutional under the Second Amendment with respect to suppressors and short-barreled rifles.

Accordingly, the Court should determine that the NFA's registration scheme as concerns non-taxed "firearms" exceeds Congress's constitutional authority and grant Plaintiffs' motion for summary judgment against Defendants Bureau of Alcohol, Tobacco, Firearms & Explosives ("ATF"), Daniel P. Driscoll, in his official capacity as Acting Director of ATF, United States Department of Justice ("DOJ"), and Pamela J. Bondi, in her official capacity as Attorney General of the United States (together, "Defendants").

## BACKGROUND

### I.    The Constitution.

"Every law enacted by Congress must be based on one or more of its powers enumerated in the Constitution." *United States v. Morrison*, 529 U.S. 598, 607 (2000).

### A.    The Taxing Clause.

Congress has the power to "lay and collect Taxes, Duties, Imposts and Excises, to pay the Debts and provide for the common Defence and general Welfare of the United States." U.S. CONST. art. I, § 8, cl. 1. The "essential feature of any tax" is that it "produces at least some revenue for the

Government." *NFIB v. Sebelius*, 567 U.S. 519, 564 (2012). Axiomatically, absent a tax, Congress cannot enact a statute under its taxing power. *See, e.g.*, *Texas v. United States*, 945 F.3d 355, 390 (5th Cir. 2019), *rev'd on other grounds*, *California v. Texas*, 593 U.S. 659 (2021).

### B.     The Commerce Clause.

Under the Constitution's Commerce Clause, Congress has the authority "[t]o regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes." U.S. CONST. art. I, § 8, cl. 3. Beginning with *United States v. Lopez*, 514 U.S. 549, 557 (1995), the Supreme Court reinvigorated the limits on Congress's Commerce Clause powers, clarifying that the power "may not be extended so as to embrace effects upon interstate commerce so indirect and remote that to embrace them, in view of our complex society, would effectually obliterate the distinction between what is national and what is local." *See also Morrison*, 529 U.S. at 598. Congress cannot use the Commerce Clause to exercise "the police power, which the Founders denied the National Government and reposed in the States." *Id.* at 618 & n.8.

### C.     The Necessary and Proper Clause.

The Necessary and Proper Clause empowers Congress to "make all Laws which shall be necessary and proper for carrying into Execution" its enumerated powers. U.S. CONST. art. I, § 8, cl. 18. It is "not itself a grant of power," *Kinsella v. United States ex rel. Singleton*, 361 U.S. 234, 247 (1960), but instead gives Congress "authority to enact provisions incidental to [an] enumerated power, and conducive to its beneficial exercise," *Sebelius*, 529 U.S. at 559 (cleaned up).

### D.     The Second Amendment.

The Second Amendment to the United States Constitution guarantees "the right of the people to keep and bear Arms." U.S. CONST. amend. II. In *Bruen*, the Supreme Court stated the test for Second Amendment challenges: "When the Second Amendment's plain text covers an

individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." 597 U.S. at 24.

## II.     The National Firearms Act.

### A.     The Untaxed Firearms.

The National Firearms Act of 1934, as amended, regulates specifically enumerated "firearms." 26 U.S.C. § 5845(a). "'Firearms' is a term of art—one that is both highly under- and over-inclusive (as compared to the word's ordinary meaning today)." *Mock v. Garland*, 75 F.4th 563, 567 (5th Cir. 2023). "For instance, the NFA's definition of 'firearm' does not include pistols—but it does include both 'silencer[s]' and 'poison gas.'" *Id.* This definition resulted from Congress's attempt to regulate "gangster weapons," and it is the result of congressional debate and compromise. Stephen P. Halbrook, *The Power to Tax, the Second Amendment, and the Search for Which "'Gangster' Weapons" to Tax*, 25 WYO. L. REV. 149, 153, 166–74 (2025) [hereinafter *The Power to Tax*].

As relevant to this case, the following items are included in the NFA's definition of "firearms":

- Suppressors, referred to as "silencer[s]" in the NFA, defined as "any device for silencing, muffling, or diminishing the report of a portable firearm, including any combination of parts, designed or redesigned, and intended for use in assembling or fabricating a firearm silencer or firearm muffler, and any part intended only for use in such assembly or fabrication." 26 U.S.C. § 5845(a)(7); 18 U.S.C. § 921(a)(25).

- Short-barreled rifles, defined as (1) "a rifle having a barrel or barrels of less than 16 inches in length" or (2) "a weapon made from a rifle if such weapon as modified has an overall length of less than 26 inches or a barrel or barrels of less than 16 inches in length." 26 U.S.C. § 5845(a)(3)–(4).

- Short-barreled shotguns, defined as (1) "a shotgun having a barrel or barrels of less than 18 inches in length" or (2) "a weapon made from a shotgun if such weapon as modified has an overall length of less than 26 inches or a barrel or barrels of less than 18 inches in length." 26 U.S.C. § 5845(a)(1)–(2).

- Any other weapons, defined as "any weapon or device capable of being concealed on the person from which a shot can be discharged through the energy of an explosive, a pistol or revolver having a barrel with a smooth bore designed or redesigned to fire a fixed shotgun shell, weapons with combination shotgun and rifle barrels 12 inches or more, less than 18 inches in length, from which only a single discharge can be made from either barrel without manual reloading, and shall include any such weapon which may be readily restored to fire. Such term shall not include a pistol or a revolver having a rifled bore, or rifled bores, or weapons designed, made, or intended to be fired from the shoulder and not capable of firing fixed ammunition." 26 U.S.C. § 5845(a)(5), (e).

**B.      The Challenged NFA Provisions.**

Congress designed the NFA as "a taxing scheme," *United States v. Cox*, 906 F.3d 1170, 1179 (10th Cir. 2018), "explicitly intended to tax [its covered] weapons out of existence," *Mock*, 75 F.4th at 569. "But the NFA does more than lay taxes." *Cox*, 906 F.3d at 1179. "To carry out the taxing scheme," *id.*, it imposes "stringent restrictions and requirements" on various actions concerning its covered firearms, *Mock*, 75 F.4th at 569.

The NFA and its implementing regulations impose the following requirements challenged in this case:

- Possession. "A person" cannot "receive" or "possess[ ] a firearm" unless it is properly "registered" with ATF and the person "retain[s] proof of registration." 26 U.S.C. §§ 5841(e), 5812(b), 5861(b)–(d); *see also id.* § 5861(j).

- Transfer. "A firearm shall not be transferred" absent a "written application" to the ATF that identifies the "transferee" and provides "his fingerprints and his photograph" and any other information the ATF may require "by regulations." 26 U.S.C. §§ 5812, 5861(e); *see also* 27 C.F.R. § 479.84(a)–(b), (d). "[A]ll transferees" must notify "the chief law enforcement officer of the locality in which the transferee . . . is located" of the transfer. 27 C.F.R. § 479.84(c).

6

- <u>Making</u>. "Each . . . maker shall register" with the ATF "each firearm he . . . makes," 26 U.S.C. § 5841(a)–(c), using a "written application" to the ATF that includes "his fingerprints and his photograph" and other information the ATF may require "by regulations," *id.* § 5822; *see also* 27 C.F.R. § 479.62(a)–(b), (d); 26 U.S.C. § 5861(f). The maker must also notify "the chief law enforcement officer of the locality" in which he "is located." 27 C.F.R. § 479.84(c); 26 U.S.C. § 5861(f).

- <u>Marking</u>. "[A]nyone making a firearm shall identify each firearm, other than a destructive device, . . . made by a serial number . . . , the name of the . . . maker, and such other identification as the Secretary may by regulations prescribe." 26 U.S.C. § 5841(a). "Any person who possesses a firearm, other than a destructive device, which does not bear the serial number and other information required by subsection (a) . . . shall identify the firearm with a serial number assigned by the Secretary and any other information the Secretary may by regulations prescribe." *Id.* § 5842(b). It is unlawful for "any person" "to receive or possess a firearm which is not identified by a serial number" as the NFA requires. *Id.* § 5861(i).

"[T]h[e]se statutory restrictions have teeth" and carry "severe consequences." *Mock*, 75 F.4th at 570. The NFA imposes severe penalties on any person who transfers, receives, or even possesses a covered firearm in violation of its requirements, including imprisonment up to 10 years, fines up to $250,000 for individuals and $500,000 for organizations, and seizure and forfeiture of the firearms at issue. 26 U.S.C. §§ 5861, 5871–5872; 18 U.S.C. § 3571(b)(3), (c)(3). "As failure to comply can also be a felony, a violation may also lead to a lifetime ban on firearms ownership." *Mock*, 75 F.4th at 571 (citing 18 U.S.C. § 922(g)(1)).

Congress did not limit any of these NFA provisions to interstate commerce. They apply to all covered firearms regardless of whether those firearms traveled in interstate commerce. It therefore applies equally to a firearm an individual makes in that person's home, a purely *intra*state activity, and a firearm made by a national company and shipped to a customer across state lines, an *inter*state activity. *See, e.g.*, *United States v. Hall*, 171 F.3d 1133, 1138 (8th Cir. 1999) (determining that NFA constitutionally applied, under Congress's taxing power, to possession of

an unregistered suppressor even absent "a direct connection between interstate commerce and the alleged silencer").

## III.    The One Big Beautiful Bill Act.

The BBB, signed into law by the President on July 4, 2025, eliminated the making and transfer taxes on suppressors, short-barreled rifles, short-barreled shotguns, and NFA-defined "any other weapons," while leaving the registration requirements intact. In other words, individuals no longer have to pay taxes for making and transferring most firearms under the NFA, but the firearms are still required to be registered and are subject to the "web of regulation" that was designed to "aid[ ] enforcement" of the NFA's (now-extinct) tax. *United States v. Ross*, 458 F.2d 1144, 1145 (5th Cir. 1972). The ATF continues to enforce the NFA's registration requirements.

## IV.    The Challenged NFA Provisions Injure Plaintiffs.

Plaintiffs challenge the NFA's possession, transfer, and making requirements, which injure all Plaintiffs. *See Healthy Vision Ass'n v. Abbott*, 138 F.4th 385, 400 (5th Cir. 2025) (explaining that only "one plaintiff" needs "standing" for purposes of Article III of the Constitution).

### A.    Individual Plaintiffs and Hot Shots Custom LLC.

Plaintiffs John Jensen, Jeremy Neusch, and David Lynn Smith (together, "Individual Plaintiffs") are firearms owners. Jensen Decl. ¶ 2 [App.001]; Neusch Decl. ¶ 2 [App.005]; Smith Decl. ¶ 2 [App.009].

Plaintiff Hot Shots Custom LLC is a limited liability corporation that is a federally licensed firearms dealer under the Gun Control Act and is licensed to sell NFA items under the NFA. Hot Shots Custom Decl. ¶ 3 [App.012]. In addition to its custom gunsmithing services and sales of non-NFA firearms, Hot Shots Custom sells NFA firearms, including suppressors, short-barreled rifles, and short-barreled shotguns. Hot Shots Custom Decl. ¶ 4 [App.013]. Hot Shots Custom

8

incurs significant regulatory costs to comply with the NFA's registration requirements in selling these firearms. Hot Shots Custom Decl. ¶ 5 [App.013]. For example, the NFA imposes burdensome recordkeeping requirements on Hot Shots Custom to sell NFA-covered firearms. *Id.* In addition, Hot Shots Custom has lost sales because of the NFA's registration requirements. Hot Shots Custom Decl. ¶ 6 [App.013]. Prospective and repeat customers have declined to purchase NFA firearms because the NFA requires them to submit personally identifying information to the federal government and go through the intrusive, time-consuming registration process. *Id.* These sales to prospective and repeat customers would have occurred but for the NFA's registration scheme. *Id.* Consequently, Hot Shots Custom loses potential customers and business revenue because of the NFA's registration requirements. *Id.* If it were not a violation of federal law to do so, Hot Shots Custom would sell suppressors, short-barreled rifles, and short-barreled shotguns without complying with the challenged NFA provisions. *Id.*

Individual Plaintiffs and Hot Shots Custom's customers value their personal privacy and do not want the federal government to obtain identifying information about their personally owned firearms, including information such as their names, home addresses, photographs, dates of birth, demographic information, fingerprints, and a detailed description of their firearms, including their quantity and physical locations. Jensen Decl. ¶ 3 [App.001–02]; Neusch Decl. ¶ 3 [App.005–06]; Smith Decl. ¶ 3 [App.009–10]; *see* Hot Shots Custom Decl. ¶ 6 [App.013]. Federal law, however, currently requires that Individual Plaintiffs and Hot Shots Custom's customers provide all of this intrusive personally identifying information to the federal government for them legally to make, transfer, or receive items defined and regulated as "firearms" under the NFA through its registration requirements. *See* 26 U.S.C. §§ 5811, 5812, 5821, 5822, 5841; 27 C.F.R. §§ 479.62, 479.84. Individual Plaintiffs and Hot Shots Custom's customers object to this burdensome registration

9

requirement, which forces them to provide information to the federal government similar to that obtained from an individual arrested and charged with a crime. Jensen Decl. ¶ 4 [App.002]; Neusch Decl. ¶ 4 [App.006]; Smith Decl. ¶ 4 [App.010]; *see* Hot Shots Custom Decl. ¶ 6 [App.013]. For these reasons, Hot Shots Custom's customers have declined to purchase NFA firearms from the business, thereby causing Hot Shots Custom to lose business revenue. *See* Hot Shots Custom Decl. ¶ 6 [App.013].

Complying with the NFA's byzantine registration requirements as a precondition to lawfully making, transferring, or receiving the covered firearms imposes a significant regulatory burden on firearm owners such as Individual Plaintiffs and on NFA special occupational taxpayers like Hot Shots Custom. Jensen Decl. ¶ 5 [App.002]; Neusch Decl. ¶ 5 [App.006]; Smith Decl. ¶ 5 [App.010]; Hot Shots Custom Decl. ¶ 5 [App.013]. For example, to register a firearm regulated by the NFA, Individual Plaintiffs must spend time completing the application forms issued by the ATF and then wait for the ATF to issue an approval determination, enter their registration information, and authorize their possession of the firearm. *See* BUREAU OF ALCOHOL, TOBACCO, FIREARMS & EXPLOSIVES, OMB NO. 1140-0014, FORM 1 (5320.1): APPLICATION TO MAKE AND REGISTER A FIREARM (2022), https://perma.cc/RZ5B-5Q5Y [App.119–31]; BUREAU OF ALCOHOL, TOBACCO, FIREARMS & EXPLOSIVES, OMB NO. 1140-0014, FORM 4 (5320.4): APPLICATION FOR TAX PAID TRANSFER AND REGISTRATION OF FIREARM (2023), https://perma.cc/963W-KTYE [App.132–44]. This registration process burdens Hot Shots Custom as well. To sell firearms regulated by the NFA, Hot Shots Custom must either assist its customers with the registration forms or complete them on the customers' behalf and must keep extensive records on each NFA firearm sale. *See* Hot Shots Custom Decl. ¶ 5 [App.013].

Collecting the information required by these forms and completing them can take significant time, and Individual Plaintiffs and Hot Shots Custom must then wait what could be months for the ATF to enter their or the customers' registration information and issue an approval determination. *See Current Processing Times*, BUREAU OF ALCOHOL, TOBACCO, FIREARMS & EXPLOSIVES, https://perma.cc/XNZ7-UZUR [App.177–78]. Indeed, it took nearly six months for ATF to approve Jensen's first suppressor purchase and about seven months for ATF to approve Neusch's first suppressor purchase. Jensen Decl. ¶ 6 [App.002]; Neusch Decl. ¶ 6 [App.006]. The ATF itself has acknowledged the burdens that the NFA's registration regime imposes on lawful firearms owners, publicly stating that "registering firearms . . . under the NFA will impose a time burden." Factoring Criteria for Firearms with Attached "Stabilizing Braces," 88 Fed. Reg. 6478, 6563 (Jan. 31, 2023) (to be codified at 27 C.F.R. pts. 478, 479).

To comply with the NFA's requirements, Individual Plaintiffs must also incur costs arising from providing their fingerprints and photographs with each NFA registration application. Jensen and Neusch have in fact incurred these time and monetary costs in the past from registering suppressors with the ATF. Jensen Decl. ¶ 7 [App.003]; Neusch Decl. ¶ 7 [App.007].

Given the BBB's reduction of the NFA's excise tax for the majority of covered firearms to $0, Individual Plaintiffs plan to take a number of actions with respect to NFA-covered firearms.

Jensen wants to acquire an additional suppressor for his firearms but has declined to do so because of the challenged NFA provisions. Jensen Decl. ¶ 9 [App.003]. He wants to use suppressors with his firearms because he has firearms-related hearing loss that he wants to prevent from worsening and because he has a spinal cord–related injury and suppressors reduce recoil, thereby making it safer for him to shoot. *Id.* Jensen also wants to reconfigure a pistol that he currently lawfully owns into a short-barreled rifle because it would make it easier for him to safely

11

operate with his handicap. Jensen Decl. ¶ 10 [App.003]. Finally, Jensen wants to transfer a suppressor that he lawfully owns to his adult son (who is lawfully able to own firearms) without complying with the NFA's transfer provisions. Jensen Decl. ¶ 11 [App.003]. Jensen would take all of these actions within 30 days of the effective date of the $0 tax if it were not a violation of federal law to do so without complying with the challenged NFA provisions. Jensen Decl. ¶ 12 [App.003]. Were Jensen to take these actions without complying with those provisions, he would face arrest, prosecution, and imprisonment for felony violations of federal law. *See* 26 U.S.C. §§ 5861, 5871. Consequently, Jensen will not purchase his desired suppressor, reconfigure any of his pistols, or transfer a suppressor to his son when the $0 tax becomes effective unless it would not be a violation of federal law for him to do so without complying with the NFA's registration provisions. Jensen Decl. ¶ 12 [App.003].

Neusch wants to acquire short-barreled rifles, short-barreled shotguns, and additional suppressors but has declined to do so because of the challenged NFA provisions. Neusch Decl. ¶ 9 [App.007]. He wants to use the suppressors with his firearms because he, like Jensen, has firearms-related hearing loss that he wants to prevent from worsening. *Id.* Neusch also wants to make his own suppressors and to reconfigure a pistol that he currently lawfully owns into a short-barreled rifle. Neusch Decl. ¶ 10 [App.007]. Finally, Neusch wants to transfer a suppressor that he is in the process of lawfully acquiring to his father (who is lawfully able to own firearms) without complying with the NFA's transfer provisions. Neusch Decl. ¶ 11 [App.007]. Neusch would take all of these actions within 30 days of the effective date of the $0 tax if it were not a violation of federal law to do so without complying with the challenged NFA provisions. Neusch Decl. ¶ 12 [App.007]. Were Neusch to take these actions without complying with those provisions, he would face arrest, prosecution, and imprisonment for felony violations of federal law. *See* 26 U.S.C.

12

§§ 5861, 5871. Consequently, Neusch will not purchase his desired suppressors, short-barreled rifles, or short-barreled shotguns, make his desired suppressors, reconfigure any of his pistols, or transfer a suppressor to his father when the $0 tax becomes effective unless it would not be a violation of federal law for him to do so without complying with the NFA's registration provisions. Neusch Decl. ¶ 12 [App.007].

Smith wants to acquire suppressors for his firearms but has declined to do so because of the challenged NFA provisions. Smith Decl. ¶ 9 [App.011]. He wants to use suppressors with his firearms because he, like Jensen and Neusch, has firearms-related hearing loss that he wants to prevent from worsening. *Id.* Smith also wants to reconfigure pistols that he currently lawfully owns into short-barreled rifles. Smith Decl. ¶ 10 [App.011]. He would acquire at least one suppressor and reconfigure at least one pistol within 30 days of the effective date of the $0 tax if it were not a violation of federal law to do so without complying with the challenged NFA provisions. Smith Decl. ¶ 11 [App.011]. Were Smith to acquire a suppressor or reconfigure one of his pistols without complying with those provisions, he would face arrest, prosecution, and imprisonment for felony violations of federal law. *See* 26 U.S.C. §§ 5861, 5871. Consequently, Smith will not purchase his desired suppressors or reconfigure any of his pistols when the $0 tax becomes effective unless it would not be a violation of federal law for him to do so without complying with the NFA's registration provisions. Smith Decl. ¶ 11 [App.011].

The challenged NFA provisions injure Individual Plaintiffs and Hot Shots Custom because they are the direct object of the challenged NFA provisions, *Contender Farms, LLP v. Dep't of Agric.*, 779 F.3d 258, 264 (5th Cir. 2015); the provisions subject them to burdens that prevent them from engaging in lawful activities that they wish to engage in, *see, e.g.*, *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 181–83 (2000); and the provisions burden the

13

exercise of their constitutional rights in violation of the Second Amendment and Congress's lack of enumerated authority, *Uzuegbunam v. Preczewski*, 592 U.S. 279, 293 (2021). These injuries are "fairly traceable to the challenged federal laws, and holding the laws unconstitutional would redress the injury." *NRA v. ATF*, 700 F.3d 185, 192 n.5 (5th Cir. 2012).

For Hot Shots Custom specifically, it is additionally injured because it is the object of the challenged NFA requirements and expends time and effort to comply with those provisions. *See* Hot Shots Custom Decl. ¶ 5 [App.013]. It has also suffered a constitutional injury. *See, e.g.*, *Ill. Ass'n of Firearms Retailers v. City of Chicago*, 961 F. Supp. 2d 928, 937 (N.D. Ill. 2014). In addition, Hot Shots Custom is injured because the challenged NFA provisions deter customers from purchasing products from it, Hot Shots Custom Decl. ¶ 6 [App.013], and thus cause "a classic pocketbook injury." *Consumers' Rsch. v. FCC*, 109 F.4th 743, 753 (5th Cir. 2024), *rev'd on other grounds*, 145 S. Ct. 2482 (2025). And because the challenged NFA provisions regulate Hot Shots Custom's customers, *see* Hot Shots Custom Decl. ¶ 6 [App.013], it also asserts an Article III injury on behalf of those customers, *see, e.g.*, *Vote.Org v. Callanen*, 89 F.4th 459, 472 (5th Cir. 2023) ("Vendors are routinely accorded standing to assert the constitutional rights of customers and prospective customers"); *Reese v. ATF*, 127 F.4th 583, 590 (5th Cir. 2025) ("the right to 'keep and bear arms' surely implies the right to purchase them"); *United States v. Hicks*, 649 F. Supp. 3d 357, 360 (W.D. Tex. 2023) ("[A]ccording to the Government, Congress could throttle gun ownership without implicating Second Amendment scrutiny by just banning the buying and selling of firearms. What a marvelous, Second Amendment loophole!"), *rev'd on other grounds*, 2025 WL 2058762 (5th Cir. July 23, 2025); *Kole v. Village of Norridge*, 2017 WL 5128989, at *10 (N.D. Ill. Oct. 27, 2017) ("The founding-era sources cited by plaintiffs are more relevant. *E.g.*, Thomas Jefferson, 6 Writings 252-53 (P. Ford ed. 1895) ('Our citizens have always been free to make,

14

vend, and export arms.')."). All of these injuries are traceable to the challenged NFA provisions and would be redressed by the relief requested in this suit. *See* Hot Shots Custom Decl. ¶ 6 [App.013].

### B.    Organizational Plaintiffs.

Plaintiffs Texas State Rifle Association, FPC Action Foundation, and Citizens Committee For The Right To Keep And Bear Arms (together, "Organizational Plaintiffs") are organizations that bring this suit on behalf of their members. Each organization has associational standing. *See, e.g., Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 199 (2023). Each organization counts as members persons and/or businesses that "have standing to sue in their own right," including Individual Plaintiffs and Hot Shots Custom, who are members. *Id.*; *see* TSRA Decl. ¶ 4, 6 [App.014–15]; FPCAF Decl. ¶ 5–6 [App.017]; CCRKBA Decl. ¶ 5–6 [App.019]. The interests these organizations "seek[ ] to protect" in this litigation "are germane to [their] purpose[s]"—defending their members from unlawful firearms restrictions. *SFFA*, 600 U.S. at 199; *see* TSRA Decl. ¶ 5 [App.015]; FPCAF Decl. ¶ 3–4 [App.016–17]; CCRKBA Decl. ¶ 4 [App.019]. And neither the claims asserted nor the relief requested by the organizations require the participation of individual members because plaintiffs "seek[ ] a declaration, injunction, or some other form of prospective relief" which "if granted, will inure to the benefit of th[eir] members." *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977).

## LEGAL STANDARD

Summary judgment is appropriate when the moving party "shows that there is no genuine dispute as to any material fact" and "is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). There are no factual issues at stake in this case. Consequently, "the determinative inquiry is

15

which Party is entitled to judgment as a matter of law." *Hobby Distillers Ass'n v. Alcohol &*
*Tobacco Tax & Trade Bureau*, 740 F. Supp. 3d 509, 517 (N.D. Tex. 2024).

**ARGUMENT**

I.      **The NFA's Regulation of Untaxed "Firearms" Exceeds Congress's Constitutional Authority.**

The NFA's regulation of untaxed firearms is unconstitutional because it exceeds Congress's
constitutional authority on two separate, independent grounds. First, the NFA's regulation of
*untaxed* firearms is unconstitutional under Congress's taxing power. That should be the end of this
case. Congress passed the NFA explicitly premised on its taxing power, and under binding Fifth
Circuit precedent, this Court cannot justify the NFA on a different constitutional ground.

Second, even if the Court entertains Defendants' potential argument that the NFA is
justifiable as an exercise of Congress's Commerce Clause powers, it should reject that argument
because the NFA does not fall under any of the three categories of permissible Commerce Clause
legislation.

A.      **The NFA's Regulation of Untaxed "Firearms" Exceeds Congress's Taxing Power.**

Congress passed the NFA in 1934 specifically premised on its enumerated power to "lay
and collect Taxes." U.S. CONST. art. I, § 8, cl. 1. The Supreme Court upheld the NFA's occupational
tax on dealers against constitutional challenge in 1937, holding that the NFA was "only a taxing
measure," and thus lawful pursuant to Congress's taxing power, and that the registration provisions
were "obviously supportable as in aid of a revenue purpose." *Sonzinsky*, 300 U.S. at 513; *see also*
*Sebelius*, 567 U.S. at 567; *Cox*, 906 F.3d at 1181 ("*Sebelius* reaffirmed the NFA's constitutional
legitimacy, touting the statute's 'obviously regulatory' tax on sawed-off shotguns."); *Ross*, 458
F.2d at 1145 (explaining that "making possession of an unregistered weapon unlawful is part of
the web of regulation aiding enforcement of the [NFA's] transfer tax"). The Supreme Court has

16

consistently described the NFA as a taxing measure, explaining that it establishes "an interrelated statutory system for the taxation of certain classes of firearms," *Haynes*, 390 U.S. at 87, and that it "operates as a tax" and is "productive of some revenue," *Sonzinsky*, 300 U.S. 514.

Indeed, Congress's deliberations on the bill that would become the NFA were entirely focused on its nature as a tax. Attorney General Homer Cummings, the initial lead spokesman for the bill, explained that Congress has "no inherent police powers to go into certain localities and deal with local crime," but that "[i]t is only when we can reach those things under . . . the power of taxation, that we can act." *National Firearms Act: Hearings Before the H. Comm. on Ways & Means on H.R. 9066*, 73d Cong., 2d Sess. 8 (1934) (statement of Homer Cummings, Att'y Gen. of the United States) [hereinafter *National Firearms Act Hearings*]. Congress also knew that it lacked affirmative authority under the Commerce Clause to reach intrastate firearms activities. When the Attorney General was asked if the challenged provisions could reach an intrastate firearm transfer under the Commerce Clause, he responded: "we would get that person, if he is a criminal, under the taxing provision," because "we have no inherent police powers to go into certain localities and deal with local crime." *Id.* at 8, 23–24. Attorney General Cummings further explained that "[i]f [Congress] made a statute absolutely forbidding any human being to have a machine gun, you might say there is some constitutional question involved. But when you say '[w]e will tax the machine gun' . . . you are easily within the law." *Id.* at 19. Assistant Attorney General Joseph Keenan explained during the same hearing that the proposed law "follows the theory of taxation all the way through," and that the reason the Attorney General's office did not propose a bill that simply banned these weapons was that Congress does not have "the power to do that under the Constitution of the United States." *Id.* at 86, 100 (statement of Joseph B. Keenan, Asst. Att'y Gen. of the United States). And in responding to objections from an industry witness, a Representative

17

explained that "[i]f you take away the tax feature entirely, this bill goes out of the picture." *Id.* at 157 (statement of Rep. Samuel B. Hill).

But on July 4, 2025, the President signed into law the BBB, which set to $0.00 the NFA's former $200 making and transfer tax on all NFA-defined "firearms" except for machineguns and "destructive device[s]." BBB § 70436. The NFA as applied to non-taxed firearms, therefore, cannot be deemed a tax. After all, the essential feature of any tax is that it raises some revenue, and a $0.00 "tax" raises no revenue. *Sebelius*, 567 U.S. at 564. But the NFA's registration scheme, even as applied to untaxed firearms, was not changed and will remain in effect despite the fact that the constitutional foundation on which the NFA was based has disappeared. Because "*Sonzinsky* had upheld the NFA's registration requirements as 'solely in aid of collecting the tax,'" when the BBB "end[ed] the . . . taxation" of most NFA firearms, it thereby "also removed 'the constitutional base for those requirements—*i.e.*, the power to tax.'" *Cox*, 906 F.3d at 1182; *see also Texas*, 945 F.3d at 389–90 (holding that the Affordable Care Act's "individual mandate" could no longer be constitutional according to the Supreme Court's saving interpretation when, under a new statute, "the shared responsibility payment amount," *i.e.*, the "tax," was "set at zero"). Consequently, the NFA's registration regime is unmoored from any congressionally imposed tax, it therefore cannot be "necessary and proper" to the laying and collection of that nonexistent tax, and is thus unconstitutional.

The Fifth Circuit's opinion in *United States v. Ardoin*, 19 F.3d 177 (5th Cir. 1994), is not to the contrary. In *Ardoin*, the Fifth Circuit, in rejecting a constitutional challenge to the requirement that "machineguns" manufactured after May 19, 1986, be registered pursuant to the NFA because the ATF refused to accept applications to register or to pay the tax on those firearms, reasoned that "[t]he NFA can be upheld on the preserved, but unused, power to tax." *Id.* at 180. But unlike in

18

*Ardoin*, where Congress did not zero out the tax on machineguns in the NFA, but left the tax unchanged, declared machineguns manufactured post-1986 illegal to own, and stopped accepting registrations for those weapons, here, Congress has set the tax on the "firearms" at issue to $0.00, so the taxing power is not "preserved, but unused," but entirely unexercised. *See Texas*, 945 F.3d at 391 (distinguishing *Ardoin* on a similar basis).

> **B.      The NFA's Regulation of Untaxed "Firearms" Cannot Be Justified as an Exercise of Any Other of Congress's Enumerated Powers.**

That the NFA's regulation regime as applied to non-taxed "firearms" cannot be justified as an exercise of Congress's taxing power should be the end of this case because both the Supreme Court and Congress itself have made clear that the NFA is solely an exercise of Congress's taxing power.

*First*, the Supreme Court upheld certain portions of the NFA from constitutional challenge based on it being an exercise of Congress's taxing power and has described the NFA as "an interrelated statutory system for the taxation of certain classes of firearms." *Haynes*, 390 U.S. at 87. Even recent cases, with the benefit of the modern understanding of the Commerce Clause, have reiterated that the NFA rests on "the taxing power." *Sebelius*, 567 U.S. at 567; *Haynes*, 390 U.S. at 98 ("we have repeatedly indicated" that "the registration requirement is a valid exercise of the taxing powers"). What is more, the Supreme Court in *Sonzinsky* explicitly refused "to ascribe to Congress an attempt, under the guise of taxation, to exercise another power denied by the Federal Constitution." 300 U.S. at 514. The Fifth Circuit has described "the constitutional bedrock" of the NFA as "the power to tax." *Ross*, 458 F.2d at 1145 n.3; *United States v. Parker*, 960 F.2d 498, 500 (5th Cir. 1992).

*Second*, Congress itself has never justified the NFA as anything but an exercise of its taxing power. Congress passed the NFA explicitly premised on its taxing power and disclaimed the notion

19

that the NFA was an exercise of its Commerce Clause powers during consideration of the bill. Where Congress is "explicit about invoking its authority under" specific constitutional provisions, it "precludes consideration of" other constitutional provisions "as a basis for the" statute. *Fla. Prepaid Postsecondary Educ. Expense Bd. v. Coll. Sav. Bank*, 527 U.S. 627, 642 n.7 (1999); *see also United States v. Bird*, 124 F.3d 667, 682 n.15 (5th Cir. 1997). And Congress has been explicit about invoking its authority under the taxing power for the NFA, as evidenced by the NFA's text, legislative history, and comparison with other firearms-related laws.

For text, the NFA's introductory preamble specifies that it is an act "to tax the sale or other disposal of" "certain firearms and machineguns." Pub. L. No. 73-474, 48 Stat. 1236. Section 3, which is codified in the Internal Revenue Code, provided that "[t]here shall be levied, collected, and paid upon firearms transferred in the continental United States a tax at the rate of $200 for each firearm." *Id.* § 3(a), 48 Stat. at 1237; 26 U.S.C. §§ 5811, 5821.

For legislative history, as already explained, Congress explicitly premised its enactment of the NFA on its taxing power. There was an extended discussion of the proper tax rate and "estimate[s] of the revenue" that would be raised. *National Firearms Act Hearings*, 73d Cong., 2d Sess. 11–12. Congress's clear intent with the NFA was to impose a tax, not to exercise its Commerce Clause powers.

For comparison with other firearms-related laws, the Gun Control Act of 1968 ("GCA"), Pub. L. No. 90-618, 82 Stat. 1213 (codified as amended in scattered sections of 18 and 26 U.S.C.), is Congress's regulation of commerce in firearms, *see, e.g.*, *Polymer80, Inc. v. Garland*, 2023 WL 3605430, at *1 (N.D. Tex. Mar. 19, 2023), *not* the NFA. The fact that Congress enacted a separate statute explicitly to regulate commerce in firearms is further support for the conclusion that the NFA is solely a taxing measure.

Accordingly, Congress's explicit invocation of the taxing power to justify the NFA "precludes consideration of" any other enumerated power as the Act's basis. *Fla. Prepaid*, 527 U.S. at 642 n.7 (1999); *accord United States v. Giannini*, 455 F.2d 147, 148 (9th Cir. 1972) (holding that challenged NFA provisions "say[ ] nothing about interstate commerce" and courts should "not ascribe to Congress an intent to exercise its power under the commerce clause when it has invoked the taxing power").

### C.    The NFA's Regulation of Untaxed "Firearms" Exceeds Congress's Commerce Clause Powers.

Defendants may nevertheless argue that the NFA is a constitutional exercise of Congress's Commerce Clause powers. Even if the Court considers this argument, it should reject it.

Congress's authority under the Commerce Clause is limited to regulating interstate commerce. The Supreme Court has identified three categories of permissible Commerce Clause regulation: (1) the channels of interstate commerce; (2) the instrumentalities of interstate commerce; and (3) activities that substantially affect interstate commerce. *Lopez*, 514 U.S. at 559. The NFA does not fit into any of these categories.

#### 1.    The NFA's Regulation of Untaxed "Firearms" Cannot Be Justified as a Regulation of the Channels or Instrumentalities of Interstate Commerce.

The first two categories of Commerce Clause authority "may be quickly disposed of." *See id.* The NFA "is not a regulation of the use of the channels of interstate commerce, nor is it an attempt to prohibit the interstate transportation of a commodity through the channels of commerce; nor can [the NFA] be justified as a regulation by which Congress has sought to protect an instrumentality of interstate commerce or a thing in interstate commerce." *Id.* The intrastate possession, making, and transfer of NFA firearms, which the NFA regulates, are neither channels nor instrumentalities of interstate commerce.

**2.     The NFA's Regulation of Untaxed "Firearms" Cannot Be Justified as a Regulation of Activities that Substantially Affect Interstate Commerce.**

The challenged NFA provisions cannot be justified as regulation of intrastate commerce that substantially affects interstate commerce. First, the NFA was not enacted with "the purpose" of regulating interstate commerce. *See Bird*, 124 F.3d 667. Second, the NFA is not "part of a comprehensive regulation of 'quintessentially economic' activity." *United States v. Kebodeaux*, 687 F.3d 232, 251–52 (5th Cir. 2012) (en banc), *rev'd on other grounds*, 570 U.S. 387 (2013).

**i.     The Challenged NFA Provisions Were Not Enacted with the Purpose of Regulating Interstate Commerce.**

In *Bird*, the Fifth Circuit explained that "when Congress is regulating *inter* state commercial activity, its reason for doing so is immaterial," but where Congress regulates "purely *intra* state, noncommercial activity because of its *substantial affect* on interstate commerce, the purpose must in fact be to regulate interstate commerce." 124 F.3d at 682 n.15 (emphasis in original). That is because, the court explained, "[t]he regulation of intrastate commerce *per se*, and for its own sake, and not as a means of regulating or affecting interstate commerce, is not an 'end . . . within the scope of the constitution.'" *Id.* If a court were to attribute to Congress a different end, *i.e.*, a different "motive and purpose," it would intrude upon "matters for the legislative judgment . . . over which the courts are given no control." *Id.* Thus, "it would be a perversion of congressional authority to uphold as constitutional a federal statute that purported to be an exercise of Commerce Clause power but was for the sole purpose of reaching intrastate activity without regard to whether or how that activity would actually affect interstate commerce." *Id.*

The intrastate possession, making, and transfer of NFA firearms are non-commercial activities—the NFA applies to, for example, Individual Plaintiffs converting their lawfully owned pistols into short-barreled rifles by simply swapping out the existing barrel for a longer barrel or

22

Jensen and Neusch gifting one of their lawfully owned suppressors to a family member—so Congress's purpose in enacting the NFA must have been to regulate interstate commerce if the NFA is to be constitutional on this basis. But Congress's purpose in enacting the NFA was manifestly *not* to regulate interstate commerce. As explained above, Congress passed the NFA explicitly as a tax. During discussions on the bill, the bill's primary sponsor and other members of Congress expressly disclaimed that Congress would even have the power to enact the NFA under the Commerce Clause.

Indeed, Congress made no "findings regarding the effects upon interstate commerce of gun possession," transfer, or making. *See Lopez*, 514 U.S. at 562. The NFA does not itself contain, nor does the NFA's legislative history contain, any findings concerning the effect of the possession, making, and transfer of firearms without registration on interstate commerce, and for good reason. Proponents of the bill expressly disclaimed an intent to regulate interstate commerce through the NFA during debate. In *Hall*, the Eighth Circuit analyzed the NFA's legislative history and identified "no findings" "with respect to the effect on interstate commerce of . . . intrastate activity" related to NFA firearms. 171 F.3d at 1139–40.

The NFA also does not contain a "jurisdictional element which would ensure, through case-by-case inquiry that the firearm possession in question affects interstate commerce." *Lopez*, 514 U.S. at 561; *see Hall*, 171 F.3d at 1138–39. It applies to all covered firearms regardless of whether they traveled in interstate commerce. It therefore applies equally to a firearm an individual makes in that person's home and a firearm made by a national company and shipped to a customer across state lines. *United States v. Kagama*, 118 U.S. 375, 378–79 (1886) (rejecting argument "that the statute under consideration is a regulation of commerce" where it criminalized actions "without any reference to their relation to any kind of commerce").

23

Accordingly, because the NFA was not enacted with the purpose of regulating interstate commerce, this Court should not supply that justification to the law.

> **ii.        The Challenged NFA Provisions Are Not Part of a Comprehensive Regulation of Quintessentially Economic Activity.**

In *Gonzales v. Raich*, 545 U.S. 1 (2005), the Supreme Court upheld the marijuana-possession provisions of the Controlled Substances Act as a regulation of intrastate commerce that substantially affects interstate commerce on the ground that those provisions were "part of a comprehensive regulation of 'quintessentially economic' activity." *Kebodeaux*, 687 F.3d at 251–52. The NFA is not itself, nor is it a part of, a *comprehensive regulation* of quintessentially economic activity, so it cannot be upheld on this basis.

The NFA is not a comprehensive regulatory scheme of commerce in the firearms it covers or the market for those firearms. The Supreme Court upheld portions of the NFA under Congress's taxing power, describing the NFA as "only a taxing measure" and justifying the registration provisions as "in aid of a revenue purpose." *Sonzinsky*, 300 U.S. at 513. In other words, the challenged provisions were justified as ancillary to the tax and had no regulatory independence. *See id.* (explaining that the NFA "contains no regulation other than mere registration provisions, which are obviously supportable as in aid of a revenue purpose"); *Cox*, 906 F.3d at 1182 (recognizing that *Sonzinsky* "had upheld the NFA's registration requirements as solely in aid of collecting the tax" (internal quotation marks omitted)). Defendants should not be heard to argue that the NFA is a comprehensive regulatory scheme under the Commerce Clause when the NFA has been justified as an exercise of the taxing power by both Congress and the Supreme Court. As explained above, it is the GCA, not the NFA, that regulates commerce in firearms, and the GCA will continue to do so—both interstate and intrastate—were the NFA to be declared unconstitutional as exceeding Congress's powers. Moreover, even if Congress had desired to

24

comprehensively regulate commerce in firearms through the NFA, the Supreme Court has held that Congress cannot use its taxing power as a sham disguise for comprehensive regulation. *See, e.g.*, *Child Labor Tax Case*, 259 U.S. 20, 36–38 (1922) (declaring unconstitutional a "Child Labor Tax" by determining that it was a substantive penalty for violating a regulation, not a tax, despite Congress's use of the "tax" label).

This Court's recent decision in *Hobby Distillers Association v. Alcohol & Tobacco Tax & Trade Bureau* is instructive. In *Hobby Distillers*, plaintiffs challenged a federal law that regulated the "production of distilled spirits." 740 F. Supp. 3d at 517. The government defended the law, in part, on the ground that the Commerce Clause justified the law because distilling spirits at home for personal consumption is a commercial activity that substantially affects interstate commerce in the aggregate. *Id.* at 530–31. The court rejected this argument, determining that while the Act was a statutory scheme that governed "commerce" on its face—*i.e.*, "the interstate spirits market"— the scheme was not "the *comprehensive* kind that justifies Congressional regulation of local behavior like in *Wickard* and *Raich*." *Id.* at 532–33 (emphasis in original). The court explained that to satisfy that comprehensiveness requirement, the larger statutory scheme must "directly regulate the supply and demand of" the market, "make Congress a production manager over each distillery to inflate prices," or effect "a federal directive to either promote or eliminate a national marketplace." *Id.* at 533. Congress's regulation of spirits did not satisfy this requirement because it left "many aspects of the alcohol industry . . . untouched," including the amount of spirits that a distillery was allowed to be produce or how much market share a producer may obtain. *Id.*

Here, like the law at issue in *Hobby Distillers*, the NFA is not a *comprehensive* regulation of quintessentially economic activity because it is not part of a comprehensive regulation of firearms. The statute does "not mandate the quantity of" firearms a company may "produce" or

sell. *Id.* It simply imposes registration procedures on an otherwise unfettered market. It "does not influence how much market share" companies dealing in NFA firearms "may obtain." *Id.* "It is silent on a [gun]'s design and aesthetics absent a required" serial number. *Id.* There is no federal mandate to "promote or eliminate a national marketplace for" NFA firearms. *Id.* Under the NFA's registration scheme, "[t]here is simply no similar degree of control over the production, distribution, and consumption of [NFA firearms] as there was for wheat in *Wickard* or controlled substances in *Raich*." *Id.* (internal quotation marks omitted).

*    *    *

The Fifth Circuit's decision in *Ardoin*, 19 F.3d 177, is not to the contrary. The court's statement about the NFA being a constitutional exercise of Congress's power to regulate interstate commerce is dicta, since the explanation was unnecessary to the outcome of the case. *See id.* at 180. The court had already determined that the NFA was a constitutional exercise of Congress's taxing power and engaged in no detailed analysis similar to the above. Moreover, *Ardoin* predated the Supreme Court's opinion in *Lopez*, which reinvigorated the limits on the Commerce Clause, and this Court must therefore apply *Lopez* and the other intervening Commerce Clause precedents.

## II.    The NFA's Regulation of Suppressors and Short-Barreled Rifles Violates the Second Amendment.

Wholly apart from the NFA's constitutional infirmity in the above respects, the NFA's restrictions also constitute an unconstitutional regulatory scheme as pertains to suppressors and short-barreled rifles under the Second Amendment. Under *New York State Rifle & Pistol Association v. Bruen*, 597 U.S. 1 (2022), the Second Amendment presumptively protects the People's right to keep and bear all arms. If an item qualifies as an "arm," the Second Amendment applies to it, and the government bears the burden of proving, at a minimum, that there is a historical tradition of regulating arms to support the challenged regulatory scheme. Because

26

suppressors and short-barreled rifles are neither dangerous nor unusual, and because there is no tradition of requiring the registration and attendant regulation of protected arms, the NFA's regulatory scheme is unconstitutional under the Second Amendment with respect to suppressors and short-barreled rifles.

The Second Amendment to the United States Constitution guarantees "the right of the people to keep and bear Arms." U.S. CONST. amend. II. Under this constitutional provision, the law-abiding citizens of this Nation are guaranteed the fundamental right to keep and bear arms for defense of self and family and for all other lawful pursuits.

In *Bruen*, the Supreme Court stated the test for Second Amendment challenges: "When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." 597 U.S. at 24. The plain text of the Second Amendment "extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding." *Id.* at 28 (quoting *District of Columbia v. Heller*, 554 U.S. 570, 582 (2008)). The Supreme Court has defined "arms" under the Second Amendment broadly with a "general definition" that includes all "modern instruments that facilitate armed self-defense." *Id.*

Despite this constitutional guarantee, Congress has enacted, and Defendants enforce, an unconstitutional regulation of suppressors and short-barreled rifles.

### A.    Suppressors and Short-Barreled Rifles Are Covered by the Second Amendment's Plain Text.

The NFA's regulation of suppressors and short-barreled rifles implicates the Second Amendment's plain text. Short-barreled rifles plainly are arms under the plain text of the Second Amendment. So are suppressors: by regulating suppressors, the NFA effectively regulates

27

*suppressed firearms*, and suppressed firearms are "arms." Alternatively, suppressors facilitate armed self-defense by enhancing the effectiveness of firearms for self-defense and mitigating the hearing risks associated with using firearms. Indeed, there is no dispute among the parties on this point: the government agrees that suppressors are protected by the text of the Second Amendment. *See* Defs.' Answer to Pls.' Compl. ¶¶ 48–50, *Brown v. ATF*, No. 4:25-cv-01162 (E.D. Mo. Oct. 10, 2025), ECF No. 19 [App.489]; Gov't's Suppl. Resp. to Def.'s Pet. for Reh'g En Banc at 1, *United States v. Peterson*, No. 24-30043 (5th Cir. May 29, 2025), ECF No. 135 [hereinafter Gov't *Peterson* Br.] ("In the view of the United States, the Second Amendment protects firearm accessories and components such as suppressors.") [App.253]; *see also id.* at 2–5 [App.254–57].

Therefore, by forcing Plaintiffs (and their members) to comply with the NFA to possess suppressors and short-barreled rifles, Defendants have burdened the right to "keep and bear Arms" within the meaning of the Second Amendment's text. U.S. CONST. amend. II.

### B.    Suppressors and Short-Barreled Rifles Are Not "Dangerous and Unusual" Weapons and There Is No Historical Tradition of Requiring the Registration of Protected Arms.

Because the NFA's regulation of suppressors and short-barreled rifles burdens Plaintiffs' Second Amendment rights, "[t]o justify its regulation, the government . . . must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation." *Bruen*, 597 U.S. at 17.

Defendants cannot demonstrate any such thing. *Heller* and *Bruen* have provided the sole historical tradition that can remove an arm from the Second Amendment's protective scope—the tradition of restricting the use of dangerous and unusual weapons. *Heller*, 554 U.S. at 627; *Bruen*, 597 U.S. at 46–48. To be banned, a firearm must be "*both* dangerous *and* unusual." *Caetano v. Massachusetts*, 577 U.S. 411, 417 (2016) (Alito, J., concurring in the judgment) (emphases in original).

28

This conjunctive nature of the dangerous and unusual test follows directly from *Heller*. In that case, the Supreme Court determined that handguns are in common use and then noted that protection for commonly used weapons was "fairly supported by the historical tradition of prohibiting the carrying of 'dangerous and unusual weapons.'" *Heller*, 554 U.S. at 627. In addition to using the word "and," the Court did not undertake a separate analysis of whether modern handguns were "dangerous" under the "historical tradition" described. *Id.* Indeed, the Supreme Court has repeatedly held that firearms in common use—and thus, not unusual—are protected without any analysis of danger, *see id.*; *Bruen*, 597 U.S. at 32, 47. To be sure, the alleged "danger" of handguns was extensively briefed and highlighted by one dissenting opinion, which argued that they were "particularly dangerous." *See Heller*, 554 U.S. at 711 (Breyer, J., dissenting). But despite the fact that the Court was told handguns were used in an "extraordinary percentage of this country's well-publicized shootings, including the large majority of mass shootings," *Heller* still stopped the analysis upon concluding they were in common use. *Hanson v. District of Columbia*, 120 F.4th 223, 272 (D.C. Cir. 2024) (Walker, J., dissenting). *Bruen* also acknowledged the government's argument "that handguns" may have been "considered 'dangerous and unusual' during the colonial period" and concluded that, even if true, the point was now irrelevant because "they . . . are unquestionably in common use today." 597 U.S. at 47; *see also Caetano*, 577 U.S. at 418 (Alito, J., concurring in the judgment) ("[T]he relative dangerousness of a weapon is irrelevant when the weapon belongs to a class of arms commonly used for lawful purposes."). The direct contrast between dangerousness and common use demonstrates that alleged dangerousness standing alone cannot be a basis for restricting a common type of arm.

And in *Caetano* the Court summarily vacated a determination of the Massachusetts Supreme Judicial Court that stun guns were unprotected on the basis of that the Massachusetts

court had erred in determining that stun guns are "unusual." *See* 577 U.S. at 411–12; *see also id.* at 420 (Alito, J., concurring in judgment) (explaining that "the pertinent Second Amendment inquiry is whether stun guns are commonly possessed by law-abiding citizens for lawful purposes *today*"). The Massachusetts court had also found that stun guns were dangerous, but the Supreme Court vacated without addressing that finding. Thus, as Justice Alito observed in concurrence, the Court's per curiam opinion "recognize[d]" that the dangerous and unusual test is a "conjunctive" one. *Id*. at 417.

In any event, even if dangerousness were an independent basis for restricting arms, that would not materially change the test. That is because the question would be dangerous *compared to what*. All weapons, including firearms, are "dangerous" in the abstract. They expel projectiles at extremely fast speeds with the purpose of causing harm to the target. The definition that is more consistent with Supreme Court precedent is a comparative one. *Heller* and *Bruen* contrasted "dangerous and unusual weapons" with weapons in "common use." *Heller*, 554 U.S. at 627; *Bruen*, 597 U.S. at 47–48. The natural inference one draws from *Heller* and *Bruen* juxtaposing these categories is that "dangerous" means "dangerous when compared to commonly used weapons" (as it must be when talking about weapons). *See Bevis v. City of Naperville*, 85 F.4th 1175, 1201 n.12 (7th Cir. 2023). An arm therefore is sufficiently "dangerous" to be restricted only if it is dangerous in some distinct way that a commonly used arm is not. *See id.* at 1215 n.10 (Brennan, J., dissenting); *see also* Eugene Volokh, *Implementing the Right to Keep and Bear Arms for Self Defense: An Analytical Framework and a Research Agenda*, 56 UCLA L. Rev. 1443, 1481–82 (2009). Or, as the Ninth Circuit has formulated, whether it has "uniquely dangerous propensities" that distinguish it from common arms. *Fyock v. Sunnyvale*, 779 F.3d 991, 997 (9th Cir. 2015), *abrogated on other grounds by Bruen*, 597 U.S. 1.

The "unusual" requirement of the Supreme Court's dangerous-and-unusual test has been more explicitly fleshed out. As *Bruen* confirmed, the question courts must ask is whether ownership of the arm is "highly unusual in society at large." 597 U.S. at 47 (quoting *Heller*, 554 U.S. at 627); *see also Heller*, 554 U.S. at 627 (assuming that "sophisticated arms that are highly unusual in society at large" would not be protected). The "society" the Court is referring to is our modern one, as the Supreme Court has rejected the idea that the inquiry is pegged to "the time of the Second Amendment's enactment." *Caetano*, 577 U.S. at 412 (per curiam) (quotation marks omitted). What matters is whether the arm is "highly unusual in society" today, not whether it was in 1791 or 1868. This accords with how other rights work. *See Heller*, 554 U.S. at 582 (citing *Reno v. ACLU,* 521 U.S. 844, 849 (1997), and *Kyllo v. United States,* 533 U.S. 27, 35–36 (2001)). The principle behind the right still applies to new technologies, whether it be the internet or thermal cameras.

In short, the Supreme Court has held that only arms that are uniquely dangerous and uncommon in society at large may be banned consistent with the Second Amendment. And under *Bruen*, if a firearm cannot be banned, because it is not *both* dangerous *and* unusual, it can be regulated only if there is a historical tradition of doing so.

Suppressors and short-barreled rifles are neither dangerous nor unusual. Arms that are in common use, like those equipped with suppressors and short-barreled rifles, cannot be unusual. Nor are suppressors and short-barreled rifles dangerous. Suppressors increase the safety of a firearm and have been deemed necessary to the safest use of a firearm. Short-barreled rifles are simply a middle-ground between pistols and longer-barreled rifles: they are more accurate yet less concealable than a pistol, but less accurate yet more concealable than a longer-barreled rifle. Nor

31

is there a historical tradition that supports the NFA's comprehensive registration scheme for protected arms.

### 1.    Suppressors and Short-Barreled Rifles Are in Common Use.

***Suppressors.*** Suppressors have been broadly permitted and commonly used for over one hundred years. In 1908, Hiram Percy Maxim applied to patent a device that could be attached to a firearm to reduce gunshot noise. He dubbed his invention a "silencer." Silent Firearm, U.S. Patent No. 958,935 (filed Nov. 30, 1908), https://perma.cc/5TPE-PSZ7 [App.419–22]. Several years later, Maxim explained that he invented the device to reduce sound disturbance caused by firearms. HIRAM PERCY MAXIM, EXPERIENCES WITH THE MAXIM SILENCER 2–4 (1915), https://perma.cc/WY37-3YE2 [hereinafter MAXIM] [App.278–80]. President Theodore Roosevelt possessed a suppressor, the Maxim Silencer. Max Slowik, *Teddy Roosevelt's Suppressed 1894 Winchester*, GUNS.COM (May 18, 2012), https://perma.cc/3G38-C5XQ [App.423–25].

The common use of suppressors has continued into the modern day. Millions of suppressors are owned by Americans, in steadily increasing numbers. As of May 2021, Americans had registered nearly 2.7 million suppressors with the ATF. *See* BUREAU OF ALCOHOL, TOBACCO, FIREARMS & EXPLOSIVES, FIREARMS COMMERCE IN THE UNITED STATES: ANNUAL STATISTICAL UPDATE 2021, at 16 (2021), https://perma.cc/4WAF-QGPQ [hereinafter ATF STATISTICAL UPDATE 2021] [App.088]. As of May 2024, ATF reported over 3.5 million registered suppressors. *See* BUREAU OF ALCOHOL, TOBACCO, FIREARMS & EXPLOSIVES, FIREARMS COMMERCE IN THE UNITED STATES: STATISTICAL UPDATE 2024, at 12 (2024), https://perma.cc/DJC5-VBJZ [hereinafter ATF STATISTICAL UPDATE 2024] [App.112]. More recent ATF data indicates that by the end of 2024 there were approximately 4.5 million registered suppressors. *See* NAT'L SHOOTING SPORTS FOUND., SUPPRESSOR OWNER STUDY 7 (2025), https://perma.cc/HV5A-7APV [App.393].

And as of October 14, 2025, there were approximately 4.82 million non-government registered suppressors (approximately 4.96 million registered suppressors total). Varone Decl. Ex. A [App.022–23].

Suppressors are widely permitted throughout the United States. Forty-two states permit their citizens to possess and use suppressors. And the NFA allows individuals to make, transfer, or receive suppressors, subject to its registration requirements. *See* 26 U.S.C. §§ 5811, 5812, 5821, 5822, 5841; 27 C.F.R. §§ 479.62, 479.84.

***Short-Barreled Rifles.*** From the battle for independence through westward expansion and continuing to the present, the rifle has been a quintessential American firearm. Rifles are indisputably in common use in the United States today. Americans use rifles for, among other lawful purposes, hunting, recreational target shooting, and self-defense. *See* MODERN SPORTING RIFLE: COMPREHENSIVE CONSUMER REPORT 40–51, NAT'L SHOOTING SPORTS FOUND. (July 14, 2022), https://perma.cc/GT6M-C97D [App.345–56]. According to one national survey, as of mid-2021, Americans owned over 146 million rifles. William English, *2021 National Firearms Survey: Updated Analysis Including Types of Firearms Owned* at 20, GEO. UNIV. RSCH. PAPER NO. 4109494 (May 13, 2022), https://perma.cc/XMB6-GBC9 [App.210]. From 2013 to 2023, there were millions of rifles manufactured each year, with over 3.1 million manufactured in 2023 alone. ATF STATISTICAL UPDATE 2024, at 1 [App.073]. Short-barreled rifles, as their name implies, are just rifles with a shorter barrel, and their commonality should therefore be analyzed the same as rifles generally. *See* Joseph G.S. Greenlee, *The Tradition of Short-Barreled Rifle Use & Regulation in America*, 25 WYO. L. REV. 111, 147 (2025) [hereinafter *The Tradition of Short-Barreled Rifle Use*].

Even if the Court analyzes short-barreled rifles' commonality distinct from rifles generally, short-barreled rifles themselves are also in common use in the United States and have been since the Colonial Era. *See id.* at 113–28, 141–42. Like rifles generally, Americans use short-barreled rifles for many lawful purposes, including hunting and self-defense. *See, e.g.*, Ron Spomer, *Short Rifle Barrel Performance Advantages*, RON SPOMER OUTDOORS, https://perma.cc/3PXD-4F4P (last visited Oct. 22, 2025) [App.426–34]; *Why SBRs Are Becoming Popular for Home Defense*, SUMMERLIN ARMORY (Feb. 4, 2025), https://perma.cc/Z2XN-SJHF [App.475]. As of May 2021, there were 532,725 short-barreled rifles registered with the ATF. *See* ATF STATISTICAL UPDATE 2021, at 16 [App.088]. As of May 2024, the ATF reported that number had increased to 870,286. *See* ATF STATISTICAL UPDATE 2024, at 12 [App.112]. As of October 14, 2025, there were approximately 820,000 non-government registered short-barreled rifles (approximately 1.2 million registered short-barreled rifles total). Varone Decl. Ex. A [App.022–23].

Short-barreled rifles are also widely permitted throughout the United States. Forty-five states permit their citizens to possess and use short-barreled rifles. And the NFA allows individuals to make, transfer, or receive short-barreled rifles, subject to its registration requirements. *See* 26 U.S.C. §§ 5811, 5812, 5821, 5822, 5841; 27 C.F.R. §§ 479.62, 479.84.

**2.    Suppressors and Short-Barreled Rifles Are Not "Dangerous."**

***Suppressors.*** A suppressor is a safe, effective, and commonly used device that decreases the noise level of a gunshot. Suppressors improve the experience and use of firearms. They decrease the risk of permanent hearing damage, help protect the hearing of hunters and those nearby, reduce noise pollution from firearm discharge, make firearms training safer and more effective, increase the accuracy and ease of use of firearms by reducing felt recoil and shot flinch, and improve the effectiveness of firearms for self-defense and defense of the home. Contrary to

34

representations in movies and television, suppressors do not reduce all sound from a gunshot and are rarely used by criminals.

While suppressors are sometimes referred to as "silencers," suppressors do not silence firearms. "[T]he term 'silencer' is a misnomer, in that—despite movie fantasies—a noise suppressor reduces decibels, but does not actually 'silence' the discharge of a firearm." Stephen P. Halbrook, *Firearm Sound Moderators: Issues of Criminalization and the Second Amendment*, 46 CUMB. L. REV. 33, 36 (2016) [hereinafter *Firearm Sound Moderators*]; *see also* AMERICAN SUPPRESSOR ASSOCIATION, *The American Suppressor Association (ASA)* (YouTube, Nov. 26, 2014), https://perma.cc/7D6W-DRNS (demonstrating the use of suppressors and their decibel level reduction). The sound from a suppressed firearm "may be muffled or diminished," but "it can still be heard" easily. *Firearm Sound Moderators*, at 36. Indeed, suppressed firearms are still quite loud.

Suppressors have many common, legal uses. Firearm suppressors are commonly used for lawful purposes and very infrequently used for criminal activity. Although not required under the Second Amendment, suppressors *increase* the safety of firearm use.

First, suppressors are commonly used for hearing protection. Suppressors are one of the best and most effective forms of hearing protection for firearms use. The American Academy of Otolaryngology-Head and Neck Surgery, the National Hearing Conservation Association Task Force on Prevention of Noise-Induced Hearing Loss from Firearm Noise, the Centers for Disease Control and Prevention, and the Academy of Doctors of Audiology have all recommended the use of suppressors for hearing protection. *See Suppressors for Hearing Preservation*, AM. ACAD. OTOLARYNGOLOGY-HEAD & NECK SURGERY (Nov. 18, 2024), https://perma.cc/X4AK-4DZZ [App.460–63]; Michael Stewart et al., *NHCA Position Statement: Recreational Firearm Noise*,

NAT'L HEARING CONSERVATION ASS'N (Mar. 16, 2017), https://perma.cc/RB6V-V7JV [App.435–44]; LILIA CHEN & SCOTT E. BRUECK, NAT'L INST. FOR OCCUPATIONAL SAFETY & HEALTH, CTRS. FOR DISEASE CONTROL & PREVENTION, HHE REP. NO. 2011-0069-3140, NOISE AND LEAD EXPOSURES AT AN OUTDOOR FIRING RANGE – CALIFORNIA 5 (2011), https://perma.cc/8C62-Z42R [App.155]; SCOTT E. BRUECK ET AL., NAT'L INST. FOR OCCUPATIONAL SAFETY & HEALTH, CTRS. FOR DISEASE CONTROL & PREVENTION, HHE REP. NO. 2013-0124-3208, MEASUREMENT OF EXPOSURE TO IMPULSIVE NOISE AT INDOOR & OUTDOOR FIRING RANGES DURING TACTICAL TRAINING EXERCISES 14 (2014), https://perma.cc/UQF7-DH5Q [App.059]; Letter from Amyn Amlani, President, Acad. of Drs. of Audiology, and Stephanie Czuhajewski, Exec. Dir., Acad. of Drs. of Audiology, to Rep. Ben Cline (Jan. 15, 2025), https://perma.cc/758Z-95JC [App.276]. Because suppressors are one of the most effective hearing protection tools, police departments routinely purchase them to "[r]educ[e] potential hearing loss of officers and the public during shooting events." Joanna Putman, *Wash. PD Equips Entire Department with Silencers from Silencer Central*, POLICE1 (May 15, 2024), https://perma.cc/MD4N-8S79 [App.418]. As the Law Enforcement Management Institute of Texas concluded, "[t]o help prevent permanent hearing loss to law enforcement officers, agencies should utilize firearm sound suppressors." JAMES B. ABBOTT, TEX. OFF. ATT'Y GEN., USE OF FIREARM SUPPRESSORS BY LAW ENFORCEMENT TO PREVENT HEARING LOSS 9 (2024), https://perma.cc/FF96-5Q9J [App.035]. Likewise, "[i]n 2017 the U.S. Marines began using suppressors on service weapons" to reduce gunshot-related hearing loss. *Military-Grade Protection*, HEARING HEALTH FOUND., https://perma.cc/U369-7C2N [App.304].

This widespread support makes sense. Without the use of suppressors, "[t]he level of impulse noise generated by almost all firearms exceeds the 140 dB peak [sound pressure level]

limit recommended by [OSHA] and [NIOSH]." Michael Stewart et al., *Risks Faced by Recreational Firearm Users*, AUDIOLOGY TODAY, Mar.–Apr. 2011, at 38, 40, https://perma.cc/QS93-AVV8 [App.445, 447]. Consequently, "it is not surprising that recreational firearm noise exposure is one of the leading causes of [noise induced hearing loss] in America today." *Id.* at 40 [App.447]. With a suppressor, however, the sound of a firearm can fall within safer levels. For example, the sound of a Smith & Wesson 9mm pistol with a suppressor can be as low as 127–130 decibels. David Kopel, *The Hearing Protection Act and 'Silencers,'* VOLOKH CONSPIRACY (June 19, 2017), https://perma.cc/C5FU-T6U8 [App.272]. An AR-15 rifle with a suppressor, meanwhile, makes a noise around 132 decibels. Glenn Kessler, *Are Firearms with a Silencer 'Quiet'?*, WASH. POST (Mar. 20, 2017), https://perma.cc/9M7S-NFYH [App.267].

Second, suppressors are commonly used as a public courtesy to prevent noise pollution from lawful target shooting in neighborhoods and communities. Although suppressors do not silence gunshots, they reduce the decibel level of gunshots. In fact, this was the reason suppressors were invented. MAXIM, at 2–4 [App.278–80].

Third, suppressors are commonly used to make firearm training safer and to improve the accuracy of firearms. Suppressors reduce recoil, allowing for greater control of a firearm and improved accuracy. *See Do Suppressors Reduce Recoil?*, SILENCER SHOP (Apr. 2, 2024), https://perma.cc/9H6M-A8LU [App.179–90]. Further, using suppressors in conjunction with earmuffs or ear plugs (or in place of earmuffs or ear plugs, in instances where traditional hearing protection is not commonly used, such as self-defense or hunting) increases a firearm user's ability to hear commands and warnings, which improves the safe use of firearms at ranges and elsewhere. *See Firearm Sound Moderators*, at 34.

Fourth, suppressors are commonly used to make self-defense and defense of the home safer and more effective. If an individual must use a firearm for self-defense, suppressors reduce recoil and shot flinch, improving the accuracy of a shot. The individual may not have earmuffs or ear plugs at his or her disposal. Accordingly, a suppressor already affixed to the barrel of the firearm allows the individual to exercise self-defense or defense of the home while dramatically reducing the risk of permanent hearing loss. Further, the individual retains the ability to effectively communicate with other household members and hear outside noise or signals, which may aid in coordinating self-defense activities or contacting law enforcement.

The government agrees that suppressors "have several benefits to persons in exercising their Second Amendment rights" and "facilitate the constitutional right to keep and bear arms," including "limit[ing] the noise caused by firearms," "improv[ing] accuracy and aid[ing] in target re-acquisition by reducing recoil and muzzle rise," and "aid[ing] in target shooting." Gov't *Peterson* Br. at 4–5 [App.256–57].

Although not relevant to the constitutional inquiry, by contrast, suppressors are almost never used for criminal purposes. "Overall numbers certainly suggest that silencers are a very minor law enforcement problem." Paul A. Clark, *Criminal Use of Firearm Silencers*, 8 W. CRIM. REV. 44, 51 (2007). One study estimated the number of suppressor-related prosecutions to be just 30 to 40 cases per year out of a total of 75,000 to 80,000 federal criminal prosecutions. *Id.* And that number includes prosecutions for mere possession of the suppressor itself "where no other crime was committed." *Id.* In 2017, ATF Associate Deputy Director Ronald B. Turk confirmed that suppressors "are very rarely used in criminal shootings." RONALD TURK, BUREAU OF ALCOHOL, TOBACCO, FIREARMS & EXPLOSIVES, OPTIONS TO REDUCE OR MODIFY FIREARMS REGULATIONS 6–7 (2017), https://perma.cc/H52G-BJCT [App.469–70].

The fact that suppressors are very rarely used for criminal purposes makes sense, as suppressors are not of much use to criminals. After all, suppressed gunshots are by no means "silent." For example, the 127 decibels generated by a suppressed 9mm pistol are comparable to a firecracker or an ambulance siren. BRIAN J. FLIGOR, BETTER HEARING INST., PREVENTION OF HEARING LOSS FROM NOISE 8 (2011), https://perma.cc/NAZ3-VL46 [App.244]. Accordingly, criminals who shoot suppressed weapons can still be easily heard. Suppressors can reduce or prevent hearing damage but do not silence criminal activity.

The government also agrees that suppressors' "beneficial use is overwhelming in relation to their criminal use." Gov't *Peterson* Br. at 7 [App.259].

Although the transferring of suppressors has been regulated under the NFA's onerous registration scheme since 1934, the legislative history of the NFA does not demonstrate that Congress viewed suppressors as a dangerous or unusual weapon. The inclusion of all suppressors appears to be an accident. The original draft of the bill only regulated suppressors for firearms that were "capable of being concealed on the person." *The Power to Tax*, 25 WYO. L. REV. at 173. This made sense because concealed weapons themselves were included in the draft bill at that point in the drafting process. *Id.* Yet, without explanation, a future draft of the NFA that *removed* traditional handguns from its scope nevertheless *expanded* the class of covered suppressors from those suited for concealable weapons to all suppressors. *Id.*

***Short-Barreled Rifles.*** For short-barreled rifles, there is nothing about a short-barreled rifle that makes it more dangerous than other protected arms. A short-barreled rifle is simply an intermediate-size firearm that is more accurate, although less portable, than a handgun. A short-barreled rifle is also more portable, although somewhat less accurate, than a rifle with a longer barrel. Nor is there anything inherently dangerous about short-barreled rifles, *i.e.*, rifles with

39

barrels under 16 inches in length. *See id.* at 181; *The Tradition of Short-Barreled Rifle Use*, 25 WYO. L. REV. at 141.

Again, although irrelevant to this Court's constitutional inquiry, statistical surveys demonstrate that short-barreled rifles are rarely used by criminals. *See The Tradition of Short-Barreled Rifle Use*, 25 WYO. L. REV. at 141. For example, a survey conducted by the National Institute for Justice found that only seven of the 157 firearm criminals that they interviewed had used a short-barreled rifle. JAMES D. WRIGHT & PETER H. ROSSI, ARMED AND CONSIDERED DANGEROUS 95 tbl. 4.6 (2d ed. 2008) [App.480]. That number is lower than pistols, sawed-off shotguns, regular shotguns, and regular rifles. *Id.* [App.480].

The legislative history of the NFA itself demonstrates that Congress did not even view short-barreled rifles as particularly dangerous. *See The Tradition of Short-Barreled Rifle Use*, 25 WYO. L. REV. at 130–36. The bill that became the NFA did not originally restrict possession of short-barreled rifles. But without any mention of the barrel length of rifles in the statute, Representative Harold Knutson of Minnesota was concerned that the category of "any other firearm capable of being concealed on the person" could be interpreted to include some hunting rifles. *National Firearms Act Hearings*, 73d Cong., 2d Sess. 13 (statement of Rep. Harold Knutson). His constituents would not stand for a steep tax on popular hunting rifles. *Id.* Thus, Knutson suggested putting in an express minimum barrel length for rifles to ensure rifles with longer barrels would not be taxed. *See The Power to Tax*, 25 WYO. L. REV. at 169. The NFA's application to short-barreled rifles was thus a historical accident and not a necessary measure to keep arms away from criminals. Indeed, "no one mentioned a short-barreled rifle having any criminal use" during the Senate hearings after the tax on short-barrel rifles was added to the bill. *Id.* at 170.

### 3.    There Is No Historical Tradition Supporting the NFA's Regulatory Scheme for Protected Arms.

Because suppressors and short-barreled rifles are not dangerous and unusual weapons, they are protected by the Second Amendment. And there is no historical tradition that would support the NFA's registration scheme for suppressors, short-barreled rifles, or any other protected arm.

Defendants bear the burden of identifying a "well-established and representative historical analogue." *Bruen*, 597 U.S. at 30 (emphasis omitted). To determine whether the modern regulation and the historical analogue are "relevantly similar," the Court looks to the "how and why" of the two regulations. *Id.* at 29. Defendants will be unable to carry their burden because there is no historical tradition of requiring the registration of protected arms at all, much less punishing the failure to do so with hefty criminal penalties. *See The Tradition of Short-Barreled Rifle Use*, 25 Wyo. L. Rev. at 140–47. Here, there can be no serious claim that registration with the government, complete with fingerprinting, photo submission, potentially multi-month approval delays, and felony criminal penalties for noncompliance, *see* 26 U.S.C. § 5861(d), form part of any relevant historical tradition. The Founders did not require registration of privately owned arms.

There can be little doubt that had King George III sought to require the colonists to register all of their firearms with the crown, it would have "provoked polemical reactions by Americans invoking their rights as Englishmen to keep arms." *Heller*, 554 U.S. at 594. While the Supreme Court has posited that licensing regimes may be "designed to ensure only that those bearing arms in the jurisdiction are, in fact, law-abiding, responsible citizens," *Bruen*, 597 U.S. at 38 n.9 (internal quotation marks omitted), registration is wholly unnecessary for that purpose. Indeed, even if the NFA were held unconstitutional as applied to suppressors and short-barreled rifles, commercial suppressor and short-barreled rifle sales would still be subject to the background check requirements of the Gun Control Act. *See* 18 U.S.C. §§ 921(a)(3), 922(t). What registration does

do is allow a government to track who has arms and, therefore, registration can facilitate efforts by a government to disarm the populace. *See generally* STEPHEN P. HALBROOK, GUN CONTROL IN THE THIRD REICH: DISARMING THE JEWS AND "ENEMIES OF THE STATE" (2013). It is thus unsurprising that registration requirements "are often seen as half-a-loaf measures aimed at deterring gun ownership." *Heller v. District of Columbia*, 670 F.3d 1244, 1291 (D.C. Cir. 2011) (Kavanaugh, J., dissenting) ("*Heller II*").

Supreme Court precedent also cuts against the constitutionality of requiring registration of protected arms. In *United States v. Miller*, 307 U.S. 174, 178 (1939), the Court affirmed a prosecution for possessing an unregistered short-barreled shotgun because the Court was not presented with "any evidence tending to show" that short-barreled shotguns were protected and declined to take judicial notice that they were. But "if registration could be required for all guns, the Court could have just said so and ended its analysis; there would have been no need to go to the trouble of considering whether the gun in question was the kind protected under the Second Amendment." *Heller II*, 670 F.3d at 1294 (Kavanaugh, J., dissenting). And in *Heller*, the Supreme Court suggested that the NFA's "restrictions on machineguns … might be unconstitutional" if machineguns were protected arms. 554 U.S. at 624.

Accordingly, because suppressors and short-barreled rifles are neither dangerous nor unusual, and there is no historical tradition of requiring the registration of protected arms, the NFA's registration scheme as pertains to suppressors and short-barreled rifles is unconstitutional under the Second Amendment.

### 4.    The Fifth Circuit's Opinion in *United States v. Peterson* Does Not Require a Different Result.

In *United States v. Peterson*, 150 F.4th 644, 647 (5th Cir. 2025), the Fifth Circuit rejected a Second Amendment challenge to the NFA's application to suppressors. But it did so by construing

the NFA as a "shall-issue licensing regime" based at least in part on an alleged "conce[ssion] at oral argument." And because it construed the NFA as a shall-issue licensing regime, the Fifth Circuit applied a "presumption of constitutionality" to the NFA under *Bruen*'s footnote nine. But Plaintiffs here make no such concession, so the Court should analyze Plaintiffs' Second Amendment arguments on their own merits.

To the extent the Court deems *Peterson* controlling, Plaintiffs maintain that *Peterson* was wrongly decided and preserve the argument for the purposes of appeal. In addition, an en banc petition in *Peterson* remains pending.

## III.     Plaintiffs Are Entitled to a Permanent Injunction of the Challenged NFA Provisions.

Along with declaring the challenged NFA provisions unconstitutional, the Court should enjoin Defendants from enforcing them against Plaintiffs, Plaintiffs' customers, and Plaintiffs' members, as applicable. *See, e.g.*, *Hobby Distillers*, 740 F. Supp. 3d at 534–36 (granting permanent injunction against enforcement of unconstitutional statutory provisions).

### A.     Plaintiffs Satisfy the Permanent Injunction Factors.

A permanent injunction is warranted where a plaintiff shows "(1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006). The third and fourth factors "merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009). Plaintiffs satisfy all the factors.

Plaintiffs have suffered irreparable harm in three ways. First, "[t]he loss of" constitutional "freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod*

43

*v. Burns*, 427 U.S. 347, 373 (1976) (plurality op.); *BST Holdings, LLC v. OSHA*, 17 F.4th 604, 618 (5th Cir. 2021). Continued enforcement of the unconstitutional NFA provisions against Plaintiffs deprives them of both their right to be free from "enforcement of a federal law that congress had no power to enact" and their Second Amendment rights. *See Hobby Distillers*, 740 F. Supp. 3d at 535; *see also BST Holdings*, 17 F.4th at 617–18 (finding "irreparable harm" from "loss of constitutional freedoms" after determining regulation "likely exceed[ed] the federal government's authority under the Commerce Clause"). Second, Plaintiffs will incur "nonrecoverable compliance costs" absent an injunction because they will be forced to spend time and money to comply with the unconstitutional registration requirements. *See Airlines for Am. v. Dep't of Transp.*, 110 F.4th 672, 677 (5th Cir. 2024). Third, Hot Shots Custom will incur "economic costs" in the form of lost profits that "cannot be recovered in the ordinary course of litigation." *Rest. L. Ctr. v. Dep't of Lab.*, 66 F.4th 593, 597 (5th Cir. 2023) (internal quotation marks omitted).

Plaintiffs' injuries cannot be remedied at law through monetary damages or other relief. There is "no adequate monetary standard" to redress Plaintiffs' damages from having their constitutional rights violated. *Hobby Distillers*, 740 F. Supp. 3d at 535. Plaintiffs' compliance costs and lost profits similarly lack a legal remedy because the Government has "sovereign immunity for any monetary damages," *Wages & White Lion Invs., LLC v. FDA*, 16 F.4th 1130, 1142 (5th Cir. 2021), and are thus "unrecoverable," *id.*; *Airlines for Am.*, 110 F.4th at 677; *Rest. L. Ctr.*, 66 F.4th at 597.

The balance of the equities and the public interest also weigh in favor of a permanent injunction. The government has no legitimate interest in enforcing an unconstitutional law. *BST Holdings*, 17 F.4th at 618. And there is "generally no public interest in the perpetuation of unlawful [government] action." *Airlines for Am.*, 110 F.4th at 677.

**B.      The Scope of Relief.**

The permanent injunction should cover (i) each of the Plaintiffs; (ii) Hot Shots Customs' customers; and (iii) the Organizational Plaintiffs' individual and business members (and their customers). *See Texas v. ATF*, 700 F. Supp. 3d 556, 573 (S.D. Tex. 2023). The injunction should extend throughout the United States, and it should apply to both current members and customers and individuals who become members and customers in the future.

## CONCLUSION

Plaintiffs respectfully request that the Court grant Plaintiffs' motion for summary judgment on Count One, enter a declaratory judgment that the challenged NFA provisions and attendant regulations are unconstitutional and unenforceable as applied to the non-taxed firearms, and permanently enjoin Defendants from enforcing those provisions and regulations to the extent set forth above. Plaintiffs also request that the Court grant Plaintiffs' motion for summary judgment on Count Two, enter a declaratory judgment that the challenged NFA provisions and attendant regulations are unconstitutional and unenforceable as to suppressors and short-barreled rifles under the Second Amendment, and permanently enjoin Defendants from enforcing those provisions and regulations to the extent set forth above.

45

Dated: December 9, 2025                    Respectfully Submitted,


                                           /s/ David H. Thompson
R. Brent Cooper                            David H. Thompson*
Texas Bar No. 04783250                     Peter A. Patterson*
COOPER & SCULLY, P.C.                      Nicholas A. Varone*
900 Jackson Street, Suite 100              COOPER & KIRK, PLLC
Dallas, Texas 75202                        1523 New Hampshire Avenue, N.W.
Telephone: (214) 712-9500                  Washington, DC 20036
Telecopy: (214) 712-9540                   Tel: (202) 220-9600
brent.cooper@cooperscully.com              dthompson@cooperkirk.com
                                           ppatterson@cooperkirk.com
                                           nvarone@cooperkirk.com

                                           *Admitted *pro hac vice*

                    *Attorneys for Plaintiffs*

46

## <u>CERTIFICATE OF SERVICE</u>

On December 9, 2025, I electronically submitted the foregoing document with the Clerk of Court for the U.S. District Court, Northern District of Texas, using the Court's electronic case filing system. I hereby certify that I have served all parties electronically or by another manner authorized by Federal Rule of Civil Procedure 5(b)(2).

/s/ David H. Thompson
David H. Thompson
COOPER & KIRK, PLLC

47

2017 WL 5128989
Only the Westlaw citation
is currently available.
United States District Court,
N.D. Illinois, Eastern Division.

Tony KOLE and Ghost
Industries, LLC, Plaintiffs,
v.
VILLAGE OF NORRIDGE, Defendant.

No. 11 C 3871
|
Signed 11/06/2017

**Attorneys and Law Firms**

David G. Sigale, Law Firm of David G. Sigale,
P.C., Glen Ellyn, IL, Walter Peter Maksym, Jr.,
Attorney at Law, Chicago, IL, for Plaintiffs.

Brent O. Denzin, Daniel Joseph Bolin, Thomas
George Dicianni, Ancel, Glink, Diamond,
Bush, Dicianni & Krafthefer, P.C., Chicago, IL,
for Defendant.

**AMENDED MEMORANDUM
OPINION & ORDER**

Honorable Thomas M. Durkin, United States
District Judge

**\*1** Plaintiffs Tony Kole and Ghost Industries,
LLC sued the Village of Norridge (the
"Village") for impeding plaintiffs' attempts to
operate a licensed gun store in the Village.
Plaintiffs raise a variety of constitutional
claims pursuant to 42 U.S.C. § 1983,
including for violations of the Second and
Fourteenth Amendments (Count I), violations
of Fourteenth Amendment substantive due
process (Count II), violations of the dormant
commerce clause (Count III), violations of the
First Amendment (Count IV), and violations
of the Fourteenth Amendment right to equal
protection of the law (Count VIII). Plaintiffs
also seek declaratory relief under the Illinois
Constitution (Count V) and claim that the
Village retaliated against them for asserting
their Second and Fourteenth Amendment rights
(Counts VI and VII).

Several months after this Court denied in
part a motion to dismiss plaintiffs' claims
and a few weeks after the Court entered a
temporary restraining order to preserve the
status quo, the Village amended its weapons
dealer ordinance from an outright ban (with a
time-limited exception for plaintiffs) to a set
of zoning requirements. Plaintiffs sought to
enjoin enforcement of the amended ordinance,
and this Court held a preliminary injunction
hearing. When the Court was about to rule on
plaintiffs' motion for a preliminary injunction,
the Village again amended its weapons dealer
ordinance to make the zoning requirements less
restrictive.

Plaintiffs do not challenge the legality of the
most recent ordinance, and they have stopped
pursuing the possibility of operating a gun store
in the Village. They therefore no longer make
facial constitutional challenges to the Village's
ordinances or request injunctive relief. R. 226
at 3. Instead, they make as-applied challenges
to the prior ordinances and to an agreement
they signed with the Village, and they seek
damages for the time period those ordinances
and agreement were in effect. *Id.*

Kole v. Village of Norridge, Not Reported in Fed. Supp. (2017)
2017 WL 5128989

Case 2:25-cv-00223-Z    Document 26    Filed 12/10/25    Page 59 of 100    PageID 1535

Plaintiffs and the Village have filed cross-motions for summary judgment. R. 191; R. 196. Plaintiffs seek summary judgment on Counts I, III, IV (in part), VI, and VII only. R. 196; R. 206 at 2. The Village seeks summary judgment on all claims. R. 191; R. 195. The Court ordered the parties to file summary judgment motions on liability only as an initial matter, leaving the issue of damages for another day.

For the reasons explained below, the Court denies both parties' motions for summary judgment on Counts I, IV (in part), VI, and VII. The Court grants the Village's motion for summary judgment on the remaining counts.

### Background [1]

[1]     The Court cites the Village's Statement of Material Facts (R. 190) as "DSMF ¶ ___," plaintiffs' Response (R. 220) as "PR ¶ ___," plaintiffs' Statement of Material Facts (R. 197) as "PSMF ¶ ___," the Village's Response (R. 219) as "DR ¶ ___," and plaintiffs' Response to the Village's Statement of Additional Material Facts (R. 236) as PR-DAF ¶ ___. The exhibits filed in support of plaintiffs' Statement of Material Facts are cited as P-Ex ___.

**\*2**   Although most of the material facts in this case are undisputed, several fact disputes remain as set forth below. In July 2010, Kole organized Ghost Industries, a firearm sales business engaged in interstate commerce. DR ¶¶ 3, 4; PR ¶¶ 4-5, 8. Kole originally told the Village he planned to operate an online-only business and to lease office space "for administrative purposes only." PR ¶¶ 9, 12. In an August 11, 2010 email, the Village's engineer and building commissioner Brian Gaseor advised Kole to "check our ordinance for Weapons Dealers" and informed him that "[l]ots 'B-3' GENERAL BUSINESS DISTRICT and 'C' COMMERCIAL DISTRICT could accommodate your office." R. 238 at 9; PSMF ¶ 8.

After communicating with Gaseor, Kole entered into a one-year lease on October 1, 2010 for a property in the Village. DR ¶ 6; PR ¶ 13. That rental property would have needed to be renovated before it could be used as a retail space. PR ¶ 13. The lease allowed for mutual cancellation on or before December 31, 2010 if Kole "failed to obtain a Federal Firearms License ['FFL']" as long as he "exercised due diligence" in the attempt. P-Ex 7 ¶ 9.

Regulations give the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") the right to perform an inspection before issuing an FFL. PR ¶ 13. When Kole was en route to an ATF inspection for his FFL, he received a call from the ATF investigator cancelling it. DR ¶ 7; P-Ex. 16 at 31. The parties dispute whether the Village had a hand in the cancellation, with Kole testifying that it did. DR ¶ 7.

Following the cancellation, Kole spoke with Gaseor and reminded him that Kole leased an office based on the Village's representations about zoning and the Village's weapons dealer ordinance. DR ¶ 8. Kole and his attorney then had numerous communications with the Village's attorney Mark Chester. DR ¶ 9;

Kole v. Village of Norridge, Not Reported in Fed. Supp. (2017)

2017 WL 5128989

Case 2:25-cv-00223-Z    Document 26    Filed 12/10/25    Page 60 of 100    PageID 1536

PR ¶ 15. Chester explained to Kole that the Village's weapons dealer ordinance was written in 1972 in response to a request by Kmart, and "everyone had forgotten the ordinance existed until Kole came along." DR ¶ 10; PR ¶ 10.

### A. The Agreement

On November 30, 2010, Kole and the Village entered into an Agreement whereby the Village would issue Kole a weapons dealer business license subject to a number of terms and conditions. PR ¶ 21; DR ¶ 11. Agreement negotiations involved several back-and-forth letters between Kole and Chester. PR ¶¶ 16-20. Kole's attorney was involved in this exchange and approved at least one version of the Agreement. PR ¶ 17.

The Agreement's terms and conditions included:

- Plaintiffs could not deliver firearms or ammunition to any recipient at the premises (*i.e.*, there could be no retail sales);

- All deliveries from the premises had to be sent in unmarked packaging for used firearms and in the original packaging for new firearms;

- Plaintiffs could not store firearms or ammunition on the premises overnight or for more than 12 hours a day, and any inventory had to be disabled by a locking device or secured in a locked cabinet;

- Plaintiffs could not maintain a sales or retail display of firearms or ammunition on the premises;

- Plaintiffs could not post exterior signage advertising their location to the public or indicating that they sell firearms and must comply with limits on interior signage;

- Plaintiffs' officers and employees had to submit to fingerprinting and annual criminal background checks, at the Village's expense;

- Plaintiffs had to install and maintain a video surveillance system;

*3 • Plaintiffs had to abide by monthly limits on the quantity of firearms and ammunition received at the premises and a limit on the quantity of firearms and ammunition that may be on the premises at any one time; and

- Plaintiffs had to allow one random and two scheduled inspections of the premises per month.

P-Ex. 8.

The Agreement provided that "Norridge will renew Ghost's License twice annually provided that Ghost remains in compliance with this Agreement and to exempt Ghost from any change in its business license ordinances and rules in any amendments Norridge may make to its Code of Ordinances." PR ¶ 13. The Agreement explained that "in the event that Norridge repeals its Weapons Dealer Ordinance within thirty six months of the execution of the Agreement, Norridge will exempt Ghost from the repeal during that period." P-Ex. 8.

Fact disputes remain as to whether, and to what degree, Kole negotiated the Agreement

with the Village under economic duress or unwillingly because it was the only way he could get a weapons dealer license. He was undisputedly unemployed at the time and had already signed a lease. PR ¶¶ 7, 13; DR ¶¶ 6, 8. He testified that he was "[u]nder duress" because he was "unemployed," "had a small amount of savings," and "was investing all of [his] savings into this business venture." P-Ex 15 at 61; DR ¶ 11. He testified that he would not have agreed to any Agreement terms if he was not under such duress. P-Ex 15 at 62.

But Kole also was represented by counsel during the Agreement negotiations, and, as the Village emphasizes, at one point Kole sent a letter to Chester with suggested terms, many of which closely resemble those in the Agreement. PR ¶ 16 ("I [Kole] am restating the negotiable terms that the Company would like to reach an agreement with the Village.... Please contact me at your earliest convenience so that we can schedule a meeting to discuss the terms of an agreement and allow the Company to address the Village's concerns with regard to ensuring that the safety of the community is the top priority of the Company."). Among those terms were agreements not to "post or erect any signage" and to "sell the majority of firearms and ammunition to Nonlaw enforcement personnel through internet and direct sales." PR ¶¶ 16 & 22. The Village also points out that other Agreement terms were requirements in plaintiffs' lease, and plaintiffs had the opportunity to cancel that lease prior to December 31, 2010 if, with due diligence, they were unable to obtain an FFL. PR ¶ 22; R. 238 at 10. The Village further notes that plaintiffs have not quantified the degree of savings Kole had invested at the time. DR ¶ 11.

### B. The 2011 Ordinance

On February 9, 2011, the Village revised its weapons dealer ordinance. DR ¶ 17; PR ¶ 23. The 2011 Ordinance limited the number of weapons business licenses in the Village to one (*i.e.*, the license issued to plaintiffs) through April 30, 2013. P-Ex. 10. The Ordinance stated that "the one current Village weapons dealers licensee has agreed that it will cease doing business in the Village no later than April 30, 2013." P-Ex. 10. The Ordinance further provided that it would terminate weapons business licenses altogether as of April 30, 2013. P-Ex. 10.

**\*4** Kole testified that sometime in 2011, after operating for about six months to a year, he realized that he wanted to shift his business model to a retail sales business with outside signage and advertising in order to increase revenue, which he could not do pursuant to the Agreement. DR ¶ 16; PR ¶ 24. In June 2011, plaintiffs filed this lawsuit challenging the 2011 Ordinance and the conditions imposed by the Agreement. R. 1.

In March 2013, Kole began working again in his former job as an elevator constructor. PR ¶ 39. He hired an independent contractor to operate Ghost Industries on a part-time basis. PR ¶ 39. A month later, in April 2013, this Court granted in part and denied in part a motion to dismiss, finding, among other things, that plaintiffs had stated a valid Second Amendment claim challenging the Agreement and 2011 Ordinance. R. 79.

As of April 30, 2013, the status of plaintiffs' weapons dealer license was uncertain. The

2011 Ordinance, by its terms, terminated all weapons dealer licenses in the Village as of April 30, 2013. P-Ex. 10. The 2011 Ordinance further stated that plaintiffs "agreed" to "cease doing business in the Village no later than April 30, 2013." P-Ex. 10. Under the Agreement, however, "Norridge ... exempt[ed] Ghost from the repeal" of its prior ordinance for 36 months (*i.e.*, from November 30, 2010 through November 30, 2013). P-Ex. 8. On November 27, 2013, this Court granted plaintiffs' motion for a temporary restraining order allowing plaintiffs to remain in business and preserving the status quo while this case was pending. R. 108.

### C. The 2013 Ordinance

On December 11, 2013, a few weeks after this Court granted plaintiffs' motion for a TRO, the Village again revised its weapons dealer ordinance. The 2013 Ordinance contained zoning restrictions rather than a limitation on weapons business licenses. DR ¶ 20; PR ¶ 32. The 2013 Ordinance prohibited gun stores from operating "within one thousand feet (1,000') of the property boundary of any: a) public or private nursery, elementary, or secondary school; b) childcare facility; c) government building; d) public park, playground, playing field, forest preserve, or other recreational area; or (e) place of religious worship." P-Ex. 11 § 22-362. It further provided that a "licensee hereunder may locate its business as a special use in the Village's B-3 General Business District, subject to the requirements of the Zoning Ordinance of the Village of Norridge, as amended." P-Ex. 11 § 22-364(G).

These restrictions undisputedly left only 0.57% of the total Village land area including roads available to locate a gun store (or 0.76% of the total Village land area excluding roads). DR ¶ 23 & P-Exs. 12, 16. More than half (62.61%) of the Village's total land area is zoned for residential use, and 10.32% is zoned for commercial use. PR ¶ 32.

The property Kole was leasing for his online sales business did not meet the 2013 Ordinance's requirements. DR ¶ 22; PR ¶ 14. He began to look for available space for a retail store, including using a feature on the Village's website that would tell him if a selected location met the 2013 Ordinance's requirements. DR ¶ 22.

Unless Kole first obtained a zoning variance, the 2013 Ordinance restricted potential locations for a gun store to one strip mall with two potential rental units available. DR ¶¶ 24-25; P-Ex. 16 at 54-55, 192-96, 238; P-Ex. 14 at ¶ 10; P-Ex. 15 at 73. Kole called the leasing agent of those two rental units multiple times, but she never called him back. DR ¶ 25. As of February 9, 2016, these rental units were still vacant. DR ¶ 25. Kole found one potential rental space for a retail store with a landlord who was initially agreeable, but that space did not meet the zoning requirement. DR ¶ 26.

**\*5** As of August 8, 2014, Ghost was operating on a limited basis, DR ¶ 30, Kole let his rental lease lapse at his original location. DR ¶ 32; PR ¶ 7. After that, plaintiffs' only sales were from Kole's personal collection. DR ¶ 34.

The parties dispute the reason for Ghost's decline. Kole claims the reason he began operating on a limited basis was because he did not have a retail storefront, which reduced his

Kole v. Village of Norridge, Not Reported in Fed. Supp. (2017)

2017 WL 5128989

Case 2:25-cv-00223-Z    Document 26    Filed 12/10/25    Page 63 of 100    PageID 1539

profitability. P-Ex 15 at 96-97, 101. He points out that his two main distributors revoked his credit lines because they required a physical storefront. DR ¶ 30; P-Ex 15 at 97; P-Ex 16 at 69-70; P-Exs. 20-21. Without these credit lines, Kole's business options were limited, including because he could not purchase from a distributor until he took a payment from a customer. DR ¶ 31.

The Village disputes that the lack of a retail storefront "caused Plaintiffs to not have the resources to remain a viable business." DR ¶ 30. The Village points to plaintiffs' decent profits from its online business: $64,053 in 2011, $141,162 in 2012, and $136,450 in 2013. PR ¶¶ 26-28. The Village claims the reason for plaintiffs' limited operations and decline in 2014 was that Kole had returned to work as a full-time elevator constructor in March 2013. DR ¶ 30. And the Village notes that Kole's creditors never accommodated his online business model. DR ¶ 30.

On August 18, 2014, this Court held a preliminary injunction hearing to determine whether to enjoin the 2013 Ordinance. At that hearing, the Village's engineer and building commissioner Gaseor testified that it was "Correct" that "literally then, the only area [plaintiffs] could move into without having a zoning variance is that [strip mall] area we spoke of." P-Ex. 16 at 195. Gaseor testified that it would be possible for plaintiffs to apply for a zoning variance, but no one had ever tried to do so for a gun store to his knowledge, and so he had no basis for knowing what would happen if plaintiffs did. DR ¶ 26 & P-Ex 16 at 190-9. And Gaseor testified that plaintiffs could not apply for a zoning variance without first obtaining a

lease agreement or demonstrating an intent to purchase the property in question. P-Ex 16 at 228. Gaseor also acknowledged at the hearing that he is not "aware of any studies, any data, regarding any negative effects of gun stores." DR ¶ 26.

### D. The 2014 Ordinance

On December 10, 2014, prior to this Court's ruling on plaintiffs' preliminary injunction motion, the Village again amended its weapons dealer ordinance. PR ¶ 41. The 2014 Ordinance added more zoning districts for weapons dealers to locate (B-2, B-3, B-5, and C districts as opposed to just C districts under the 2013 Ordinance). PR ¶ 41. The 2014 Ordinance also reduced the distancing requirement to within 500 feet of a sensitive site. PR ¶ 41.

In mid-2015, Kole attempted to re-lease his old premises, but the owner did not agree. DR ¶ 35. As of August 2016, Ghost was out of business and Kole's LLC for Ghost involuntarily dissolved. DR ¶ 36.

### Standard

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The Court considers the entire evidentiary record and must view all of the evidence and draw all reasonable inferences from that evidence in the light most favorable to the nonmovant. *Ball v. Kotter*, 723 F.3d 813, 821 (7th Cir. 2013). To defeat

Kole v. Village of Norridge, Not Reported in Fed. Supp. (2017)

2017 WL 5128989

summary judgment, a nonmovant must produce more than "a mere scintilla of evidence" and come forward with "specific facts showing that there is a genuine issue for trial." *Harris N.A. v. Hershey*, 711 F.3d 794, 798 (7th Cir. 2013). Ultimately, summary judgment is warranted only if a reasonable jury could not return a verdict for the nonmovant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

**\*6** Where the parties have filed cross-motions for summary judgment, the Court applies this standard to each motion separately in order to determine whether there is a genuine dispute of material fact and whether judgment should be entered as a matter of law. *Marcatante v. City of Chicago,* 657 F.3d 433, 438-39 (7th Cir. 2011). In ruling on each cross-motion for summary judgment, the Court draws inferences in favor of the party against whom the motion under consideration is made. *Siliven v. Ind. Dep't of Child Servs.,* 635 F.3d 921, 925 (7th Cir. 2011).

**Analysis**

**I. Standing**

The Village begins by challenging plaintiffs' standing. The Village claims it is entitled to summary judgment on all of plaintiffs' claims because plaintiffs are no longer bringing facial challenges, and they lack standing to bring as-applied challenges to the constitutionality of the repealed 2011 and 2013 Ordinances and the expired Agreement. "An as-applied challenge is one that charges an act is unconstitutional as applied to a plaintiff's specific activities even though it may be capable of valid application to others." *Surita v. Hyde*, 665 F.3d 860, 875 (7th Cir. 2011).

The Seventh Circuit decided standing issues in the First Amendment context that are very similar to those here in *Six Star Holdings, LLC v. City of Milwaukee*, 821 F.3d 795 (7th Cir. 2016). And, as the Seventh Circuit's Second Amendment decision in *Ezell v. City of Chicago*, 651 F.3d 684 (7th Cir. 2011) ("*Ezell I*"), showed, analogizing to the First Amendment context is appropriate in Second Amendment cases. *See id.* at 697, 701-02; *id.* at 703 ("[b]orrowing from the [Supreme] Court's First Amendment doctrine" to determine standard of review for Second Amendment challenges); *id.* at 706-07 ("we and other circuits have already begun to adapt First Amendment doctrine to the Second Amendment context").

In *Six Star*, the court held that plaintiffs had standing to bring as-applied First Amendment challenges to repealed ordinances that prevented plaintiffs from opening adult entertainment clubs in Milwaukee. 821 F.3d at 803. The *Six Star* court began with settled standing principles. "Article III standing 'requires the litigant to prove that he has suffered [1] a concrete and particularized injury [2] that is fairly traceable to the challenged conduct, and [3] is likely to be redressed by a favorable decision.' " *Id.* at 801 (quoting *Hollingsworth v. Perry*, 133 S. Ct. 2652, 2661 (2013)). "As the party invoking federal jurisdiction," a plaintiff "bears the burden of establishing these elements." *Id.* (quotation marks omitted). "At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, but at summary judgment, the plaintiff must set forth by affidavit or other evidence specific facts"

supporting standing. *Id.* at 801-02 (quotation marks and alterations omitted).

The *Six Star* plaintiff "alleged—and a jury ultimately found—that it refrained from protected speech" of opening an adult entertainment club "in response to the City's unconstitutional ordinances." *Id.* at 803. The Seventh Circuit found that "[t]his describe[d] an injury-in-fact sufficient to support standing." *Id.* And the injury-in-fact was "fairly traceable to the unconstitutional ordinances" because the plaintiff "alleged that, but for the ordinances, it would have engaged in protected speech" by opening such a club, "and a jury ultimately found this to be true." *Id.* Turning to the third element of standing, the *Six Star* court found that "[d]amages redress the harm ... by replacing the lost profits [plaintiff] would have earned if it had been able to open its club at the planned time." *Id.* The Court finds *Six Star*'s reasoning with respect to each standing element to be directly applicable here.

 **\*7 Injury-in-fact.** Like in *Six Star*, plaintiffs in this case have set forth specific facts that satisfy the first standing element of injury-in-fact. As further discussed below in addressing plaintiffs' Second and Fourteenth Amendment claims, plaintiffs have produced evidence that "in response to" the Ordinances and Agreement, they "refrained from protected" conduct of opening a retail gun store to fulfill Village residents' right to acquire firearms under the Second Amendment. *See id.*; *see also, e.g.*, *Ezell I*, 651 F.3d at 696 (firing-range facilities supplier had injury-in-fact sufficient to support standing because it was "harmed by the firing-range ban and [wa]s also permitted to act[ ] as [an] advocate[ ] of the rights of

third parties who seek access to its services") (quotation marks omitted); *Teixeira v. County of Alameda*, 2017 WL 4509038, at \*6 (9th Cir. Oct. 10, 2017) (en banc) ("Teixeira, as the would-be operator of a gun store, thus has derivative standing to assert the subsidiary right to acquire arms on behalf of his customers").

The Village claims plaintiffs did not suffer any injury-in-fact with respect to the 2011 Ordinance because it never applied to them. It is true that the Agreement exempted plaintiffs from the 2011 Ordinance for 36 months, and by the time the 36 months ended, this Court had entered a TRO preserving the status quo. But *Six Star* shows that lack of enforcement of an ordinance against a plaintiff is not dispositive of standing. The *Six Star* court explained that a plaintiff could satisfy the injury-in-fact requirement by bringing a "pre-enforcement challenge" if "the threat of enforcement" of the repealed licensing ordinance when it was in effect "caused injury that was 'actual or immediate, not conjectural or hypothetical.' " *Six Star*, 821 F.3d at 802 (quoting *Susan B. Anthony List v. Driehaus*, 134 S. Ct. 2334, 2341 (2014)). This Court already determined when denying the Village's motion to dismiss that the 2011 Ordinance posed an actual and immediate threat. It found that "Plaintiffs' professed 'fear' that the [2011] Ordinance w[ould] be applied against them" was "hardly speculative" where the Agreement's exemption was set to expire on November 30, 2013. R. 79 at 16. "And by eliminating the one remaining weapons dealer business license," as of April 30, 2013, "the [2011] Ordinance clearly target[ed] Plaintiffs." *Id. Six Star* shows that the real threat of enforcement of the

2011 Ordinance against plaintiffs constitutes an injury-in-fact for standing purposes.

The Village also argues that plaintiffs do not have an injury-in-fact based on the 2013 Ordinance. The Village claims plaintiffs never made concrete plans to operate a retail sales business in the Village, making the "threat of enforcement" of the 2013 Ordinance "conjectural or hypothetical." R. 195 at 6 (quoting *Six Star*, 821 F.3d at 802). But, as further discussed below, the undisputed evidence shows that plaintiffs did make plans to open a retail gun store while the 2013 Ordinance was in effect, including trying unsuccessfully to obtain a lease at the two rental properties available under the 2013 Ordinance.

**Fairly Traceable.** Turning to the second element of standing, plaintiffs also have produced evidence "that, but for" combination of the Ordinances and the Agreement, they "would have engaged in protected" conduct of opening a retail gun store. *See Six Star*, 821 F.3d at 803. As explained below, the Court finds a disputed issue of material fact as to whether and for what time period this was true. But, as in *Six Star*, this evidence is sufficient at the summary judgment stage to show that plaintiffs' injury-in-fact was "fairly traceable" to the challenged ordinances. *See id.*

The Village argues that the second element of standing is not satisfied with respect to the Agreement in particular. It claims that plaintiffs' alleged harms are not fairly traceable to the Village because all of the Agreement's terms were self-imposed. The Village cites evidence that Kole originally intended to operate an online-only business as reflected in the Agreement, that many of the Agreement terms were suggested by Kole, and that others were already required by Kole's landlord. But there is also evidence that at the time the Agreement was negotiated, Kole had already signed a lease and invested in the business, and the Village was holding up the process. It is not clear from the summary judgment record what exactly transpired in negotiations between Kole and the Village, and in particular whether Kole volunteered the terms suggested in his letter to Chester or whether the Village demanded them as necessary conditions to giving Kole a weapons dealer license.

**\*8** The Court therefore finds disputed issues of material fact as to whether the Agreement was negotiated under economic distress and its terms coerced. If it was, then a reasonable jury could determine that the Agreement violated the "unconstitutional conditions" doctrine, which "prevent[s] the government from achieving indirectly what the Constitution prevents it from achieving directly." *See Planned Parenthood of Ind., Inc. v. Comm'r of Ind. State Dep't of Health*, 699 F.3d 962, 986 (7th Cir. 2012). The doctrine "prevents the government from awarding or withholding a public benefit for the purpose of coercing the beneficiary to give up a constitutional right or to penalize his exercise of a constitutional right." *Id.* Plaintiffs have set forth sufficient evidence that harms caused by the Agreement were unconstitutional conditions fairly traceable to the Village to satisfy the second element of standing.

**Redressability.** Turning to the third element of standing, although the Court has deferred the question of damages, it finds that the

"damages" plaintiffs seek would "redress the harm" suffered in the form of any lost profits plaintiffs are able to prove. *See Six Star, 821 F.3d at 803*. Accordingly, plaintiffs have standing to bring their as-applied challenges to the Agreement, the 2011 Ordinance, and the 2013 Ordinance. [2]

2    Nor does the fact that the challenged Ordinances are repealed moot plaintiffs' damages claims. As the *Six Star* court held, the repeal of challenged ordinances does not moot the case if plaintiffs continue to pursue damages. 821 F.3d at 799 ("Once the ordinances were repealed, the plaintiffs dropped their requests for injunctive relief but continued to pursue damages. The latter request saves the case from mootness.").

## II. Count I—Second and Fourteenth Amendment

Plaintiffs and the Village cross-move for summary judgment on plaintiffs' Second and Fourteenth Amendment claims in Count I. Second and Fourteenth Amendment jurisprudence has evolved significantly in recent years. In *District of Columbia v. Heller*, 554 U.S. 570 (2008), the Supreme Court struck down the District of Columbia's ban on the possession of handguns. The Supreme Court concluded that the Second Amendment codifies a preexisting "individual right to possess and carry weapons in case of confrontation." *Id.* at 592. Two years later in *McDonald v. City of Chicago*, 561 U.S. 742 (2010), the Court held that the Fourteenth Amendment due process clause incorporates against states the Second Amendment right to possess a handgun in the home for self-defense.

These opinions left open many questions, including the level of scrutiny to apply to firearm regulations. The *Heller* Court "specifically excluded rational-basis review." *Ezell I, 651 F.3d at 701*. But it also made clear that certain gun control measures would pass constitutional scrutiny. *See Heller, 554 U.S. at 626-27* ("nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms"); *see also McDonald, 561 U.S. at 786* ("repeat[ing] those assurances" from *Heller*).

In *Ezell I*, the Seventh Circuit set forth a two-part framework to resolve Second Amendment cases. Incorporated within that framework is a determination of the rigor of judicial review the Court will apply. "The threshold question is whether the regulated activity falls within the scope of the Second Amendment." *Ezell v. City of Chicago, 846 F.3d 888, 892 (7th Cir. 2017)* ("*Ezell II*"). "This is a textual and historical inquiry; if the government can establish that the challenged law regulates activity falling outside the scope of the right as originally understood, then 'the regulated activity is categorically unprotected, and the law is not subject to further Second Amendment review.' " *Id.* (quoting *Ezell I, 651 F.3d at 703*).

**\*9** If the regulated activity is not outside the scope of the Second Amendment, "then

Kole v. Village of Norridge, Not Reported in Fed. Supp. (2017)

2017 WL 5128989

Case 2:25-cv-00223-Z    Document 26    Filed 12/10/25    Page 68 of 100    PageID 1544

there must be a second inquiry into the strength of the government's justification for restricting or regulating the exercise of Second Amendment rights." *Ezell I*, 651 F.3d at 703. This inquiry evaluates "the regulatory means the government has chosen and the public-benefits end it seeks to achieve." *Id.* "[T]he rigor of this judicial review will depend on how close the law comes to the core Second Amendment right and the severity of the law's burden on the right." *Id.* "Severe burdens on the core right of armed defense requires a very strong public-interest justification and a close means-end fit; lesser burdens, and burdens on activity lying closer to the margins of the right, are more easily justified." *Ezell II*, 846 F.3d at 892. "In all cases the government bears the burden of justifying its law under a heightened standard of scrutiny." *Id.*

### A. Step 1

"The relevant time period for the first-step historical analysis" for purposes of both the Second and Fourteenth Amendments "is 1791." *Ill. Ass'n of Firearms Retailers v. City of Chicago*, 961 F. Supp. 2d 928, 935 (N.D. Ill. 2014) (citing *Moore v. Madigan*, 702 F.3d 933, 935 (7th Cir. 2012)). And the defendant "bears the burden of first establishing that the [ordinances] regulate[ ] activity generally understood in 1791 to be *un*protected by the Second Amendment." *Id.* at 936.

In *Illinois Association of Firearms Retailers*, a court in this district considered a challenge to a City of Chicago ordinance banning virtually all sales and transfers of firearms in the City. *See id.* at 936-37. Like in that case, the challenged Ordinances and Agreement heavily regulate firearms sales and transfers within the Village.

That means the Village specifically "bears the burden of demonstrating that firearms sales and transfers are categorically outside the scope of the Second Amendment as it was understood in 1791." *See id.* at 937.

Recent case law appears to foreclose the Village's argument that the regulated conduct in this case falls outside the scope of the Second Amendment. And even if it did not, the sources the Village cites do not meet its burden.

### 1. Recent Case Law

Addressing a firing-range ban in *Ezell I* and later a set of firing-range zoning restrictions in *Ezell II*, the Seventh Circuit reasoned that the "core individual right of armed defense" as generally understood in 1791 "include[d] a corresponding right to acquire and maintain proficiency in firearm use," because "the core right to possess firearms for protection 'wouldn't mean much without the training and practice that make it effective.' " *Ezell II*, 846 F.3d at 892 (quoting *Ezell I*, 651 F.3d at 704). Analogizing to *Ezell I* in its recent en banc decision in *Teixeira*, the Ninth Circuit explained that "[a]s with purchasing ammunition and maintaining proficiency in firearms use, the core Second Amendment right to keep and bear arms for self-defense 'wouldn't mean much' without the ability to acquire arms." *Teixeira*, 2017 WL 4509038, at *6 (quoting *Ezell I*, 651 F.3d at 704). This is also what the Tennessee Supreme Court observed back in 1871: "[t]he right to keep arms, necessarily involves the right to purchase them." *Andrews v. State*, 50 Tenn. 165, 178 (1871). And it is what the district court

Kole v. Village of Norridge, Not Reported in Fed. Supp. (2017)
2017 WL 5128989

Case 2:25-cv-00223-Z    Document 26    Filed 12/10/25    Page 69 of 100    PageID 1545

determined in *Illinois Association of Firearms Retailers*: "the right to keep and bear arms for self-defense under the Second Amendment ... must also include the right to *acquire* a firearm, although that acquisition right is far from absolute." 961 F. Supp. 2d at 930. Both the courts in *Teixeira* and *Illinois Association of Firearms Retailers* in turn found that the right to acquire firearms is directly implicated by laws directly or functionally banning firearm sales in a given area. *See id.*; *Teixeira*, 2017 WL 4509038, at *6.

This Court agrees with the courts in *Teixeira* and *Illinois Association of Firearms Retailers* that the Second Amendment right to keep and bear arms for self-defense necessarily includes the right to acquire a firearm, and that this right is implicated by local laws directly or functionally banning firearm sales. This conclusion plainly follows from the Seventh Circuit's reasoning in *Ezell I* and *II*.

### 2. The Village's Evidence

 **\*10** In any event, the Village has not met its burden to show that the regulated conduct falls outside the scope of the Second Amendment. The Village—like the City of Chicago in *Illinois Association of Firearms Retailers*, 961 F. Supp. 2d at 937—points to a few state statutes prohibiting the sale of certain firearms that were enacted more than 50 years after 1791 but before the Fourteenth Amendment. R. 195 at 10-11. The Village also points to many post-Fourteenth Amendment state bans on firearm sales. *Id.* at 11-12. Because of the timing of their enactment, "[t]hese statutes are ... not very compelling historical evidence for

how the Second Amendment was historically understood." *Ill. Ass'n of Firearms Retailers,* 961 F. Supp. 2d at 937. The founding-era sources cited by plaintiffs are more relevant. *E.g.*, Thomas Jefferson, 6 Writings 252-53 (P. Ford ed. 1895) ("Our citizens have always been free to make, vend, and export arms."); CURWEN, SOME CONSIDERATIONS ON THE GAME LAWS 54 (1796) ("What law forbids the veriest pauper, *if he can raise a sum sufficient for the purchase of it*, from mounting his Gun on his Chimney Piece, with which he may not only defend his Personal Property from the Ruffian, but his Personal Rights, from the invader of them.") (emphasis added). And regardless, "citation to a few isolated statutes ... 'fall[s] far short' of establishing that gun sales and transfers were historically unprotected by the Second Amendment." *Ill. Ass'n of Firearms Retailers*, 961 F. Supp. 2d at 937 (quoting *Ezell I,* 651 F.3d at 706).

The Village also cites prohibitions on firearm possession and carrying in sensitive places prior to 1791 and through today. R. 195 at 8-20. Citing language from *Heller* recognizing that such "laws prohibiting the carrying of firearms in sensitive places" are "presumptively lawful," 554 U.S. at 626-27 & n.26, the Village argues that "commercial arms sales in sensitive places are categorically unprotected" under the Second Amendment. R. 225 at 15. But the Seventh Circuit in *Ezell II* rejected this very argument—*i.e.*, that distancing requirements from sensitive places are "essentially immune from challenge under *Heller*." 846 F.3d at 894. The Court finds that the Village's evidence of longstanding restrictions on firearm *possession* in sensitive places does not show that "firearms *sales and transfers* are categorically outside

Kole v. Village of Norridge, Not Reported in Fed. Supp. (2017)
2017 WL 5128989

Case 2:25-cv-00223-Z    Document 26    Filed 12/10/25    Page 70 of 100    PageID 1546

the scope of the Second Amendment as it was understood in 1791." *See Ill. Ass'n of Firearms Retailers*, 961 F. Supp. 2d at 937 (emphasis added).

Finally, the Village points to state and federal licensing requirements for firearms dealers, explaining that even though these requirements "are of 20th century vintage, their prevalence establishes them as longstanding regulations that do not impinge upon the right protected by the Second Amendment." R. 195 at 12-14. Like the Fourth Circuit in *United States v. Hosford*, 843 F.3d 161 (4th Cir. 2016), however, this Court finds the "condition or qualification" of obtaining a license for firearm dealing —a "longstanding condition or qualification on the commercial sale of arms" under *Heller* (554 U.S. at 626-27 & n.26)—to be completely distinct from "a functional ban on firearm acquisition." *Hosford*, 843 F.3d at 166 (distinguishing licensing requirements in that case from functional ban in *Illinois Association of Firearms Retailers*). Indeed, plaintiffs "do not contest" that licensing requirements and other "laws imposing conditions and qualifications on the commercial sale of arms are presumable acceptable"—they instead challenge what they claim was a ban (in the 2011 Ordinance and Agreement) and a functional ban (in the 2013 Ordinance) on firearm acquisition in the Village. R. 206 at 8.[3]

3    As Judge Tallman reasoned in his partial concurrence and partial dissent in *Teixeira*, "Justice Scalia's footnote in *Heller*" about presumptions of unlawfulness "could not have been addressing county ordinances meant

to restrict firearm acquisition and possession as much as a local government can get away with." 2017 WL 4509038, at *18. Like Judge Tallman found in *Teixeira* and as further set forth below, the record here shows evidence of "animus" of the Village toward plaintiffs. *Id.* For this reason as well, the Court finds that the "ordinance[s] do[ ] not fall within the *Heller* categories and do[ ] not earn its presumption of lawfulness." *Id.*

**\*11** Because the Village's "proffered historical evidence fails to establish that governments banned gun sales and transfers at the time of the Second Amendment's enactment," the Court "move[s] on to the second step of the inquiry." *See Ill. Ass'n of Firearms Retailers*, 961 F. Supp. 2d at 937.

**B. Step 2**

The second inquiry functions as a sliding scale. "Severe burdens on the core right of armed defense require a very strong public-interest justification and a close means-end fit; lesser burdens, and burdens on activity lying closer to the margins of the right, are more easily justified." *Ezell II*, 846 F.3d at 892.

The Seventh Circuit in *Moore* established that "the breadth of restriction," and thus the degree of means-end fit required, "is not just a function of *what* is affected, but also *who* is affected." *Ill. Ass'n of Firearms Retailers*, 961 F. Supp. 2d at 936 (citing *Moore*, 702 F.3d at 940). "So *Moore* ultimately looked to two factors on the sliding scale to fashion the level of scrutiny: how much activity was regulated (a blanket prohibition on gun carriage and not a lesser

Kole v. Village of Norridge, Not Reported in Fed. Supp. (2017)
2017 WL 5128989

Case 2:25-cv-00223-Z    Document 26    Filed 12/10/25    Page 71 of 100    PageID 1547

burden on armed self-defense), and who was regulated (law-abiding citizens and not people with criminal records)." *Id.* "[T]he quantity and persuasiveness of the evidence required to justify each ordinance varies depending on how much it affects the core Second Amendment right to armed self-defense and on whose right it affects." *Id.*

### 1. Standard of Scrutiny

To determine the appropriate level of scrutiny in this case, the Court needs to look no further than the Seventh Circuit's decisions in *Ezell I* and *II*. Like the firing-range ban in *Ezell I*, the 2011 Ordinance "*prohibit[ed]*" "the law-abiding, responsible citizens" of the Village from participating in "an important corollary to the meaningful exercise of the core right to possess firearms for self-defense" by acquiring firearms in the Village. 651 F.3d at 708 (quotation marks omitted). It is true that the Agreement gave plaintiffs a 36-month grace period to operate an online-only business. But the Agreement prevented plaintiffs from operating a retail sales business, and it had an expiration date after which plaintiffs would be subject to the full ban of the 2011 Ordinance.

The *Ezell II* decision indicates that the Agreement and its burdens on Second Amendment rights should be evaluated "in tandem" and "as a package" with the 2011 Ordinance. *See* 846 F.3d at 894. Operating in tandem, the Agreement and the 2011 Ordinance prevented anyone in the Village from walking into a store and legally purchasing a firearm for self-defense. Because they effectively operated as a gun-store ban much like the firing-

range ban in *Ezell I*, the 2011 Ordinance and Agreement require "a strong public-interest justification" and a close means-end fit—*i.e.*, a showing "more rigorous" than intermediate scrutiny "if not quite 'strict scrutiny.'" 651 F.3d at 708; *see also Ill. Ass'n of Firearms Retailers*, 961 F. Supp. 2d at 938 (regulations that "prevent the acquisition of firearms within Chicago" were "substantial burdens that deserve[d] more stringent scrutiny than intermediate scrutiny"). [4]

[4]    Plaintiffs argue that the 2011 Ordinance "transcends levels of scrutiny and is unconstitutional on its face." R. 206 at 8. The Court declines to go that far. In both *Moore* and *Ezell I*, even though the ordinances effectively amounted to total bans, the Seventh Circuit did not categorically reject the bans, but instead gave the government a chance to justify them and evaluated the empirical strengths of that justification. *Moore*, 702 F.3d at 937-40; *Ezell I*, 651 F.3d at 689-90. The Court will do the same here.

**\*12** Just as the 2011 Ordinance and Agreement are analogous to the firing-range ban addressed in *Ezell I*, the 2013 Ordinance is analogous to the firing-range zoning restrictions addressed in *Ezell II*. The *Ezell II* Court made clear that all of an ordinance's requirements must be evaluated as "a single regulatory package" to determine whether the ordinance is "carefully drafted to serve actual public interests while at the same time making" an exercise of Second Amendment rights "practicable" in the municipality at issue. 846 F.3d at 894. "The combined effect of the

manufacturing-district classification and the distancing restriction" in *Ezell II* left "only about 2.2% of the city's total acreage even theoretically available to site a shooting range (10.6% of the total acreage currently zoned for business, commercial, and manufacturing use)." *Id.* The Seventh Circuit found that these zoning regulations "severely burdened Second Amendment rights," meaning that the City was required "to establish a close fit between the challenged zoning regulations and the actual public benefits they serve—and to do so with actual evidence, not just assertions." *Id.*

It is undisputed that the combined effect of the zoning classification and the distancing restriction in the 2013 Ordinance left an even smaller percentage—0.57% of the Village acreage including roads and 0.76% excluding roads—available for gun stores than the 2.2% of acreage available for firing ranges in *Ezell II*. *See id.* And in that area, Kole could not find a single location available to rent. DR ¶ 23 & P-Exs. 12, 16. This is far from the "reasonable opportunity for protected activity" with "an ample amount of land area available" that the Village claims. R. 225 at 20.

Nor does the evidence demonstrate that obtaining a zoning variance was a realistic possibility. Gaesor testified that no one had ever tried to obtain a variance for a gun store to his knowledge, and so he had no basis for knowing what would happen if plaintiffs did. DR ¶ 26 & P-Ex 16 at 190-9. And Gaseor testified that plaintiffs could not apply for a zoning variance without first obtaining a lease agreement or demonstrating an intent to purchase property. P-Ex 16 at 228. Analogizing to the First Amendment context as the Seventh Circuit

found appropriate in *Ezell I*, the possibility of exercising a constitutional right "must be more than 'merely theoretically available'—'it must be realistic as well.' " *Horina v. City of Granite City, Ill.*, 538 F.3d 624, 635 (7th Cir. 2008) (quoting *Gresham v. Peterson*, 225 F.3d 899, 906 (7th Cir. 2000)). Under the 2013 Ordinance, exercising a Second Amendment right to acquire a firearm for self-defense in the Village was not a realistic possibility.

It is for this reason that the Village's attempts to analogize to the zoning regulations addressed by the Ninth Circuit in *Teixeira* fail. In *Teixeira*, Alameda County adopted a "500-foot from sensitive area" distancing restriction (much like the less restrictive, 500-foot parameter in the 2014 Ordinance that plaintiffs do not challenge (R. 206 at 19)). *See* 2017 WL 4509038 at *2-3. And exhibits attached to the plaintiff's complaint demonstrated that under this restriction, "Alameda County residents [could] freely purchase firearms within the County." *Id.* at *6-7. "As of December 2011, there were ten gun stores in Alameda County," and "[i]n fact, Alameda County residents c[ould] purchase guns approximately 600 feet away from the proposed site of Teixeira's planned store, at a Big 5 Sporting Goods Store." *Id.* at *7. The Ninth Circuit therefore found that "Teixeira did not adequately allege in his complaint that Alameda County residents [could] not purchase firearms within the County as a whole, or within the unincorporated areas of the County in particular." *Id.* at *6. The *Teixeira* court explicitly distinguished *Ezell II* as "involv[ing] an entirely different situation with regard to the availability of a gun-related service to county residents," where the regulations " 'though not

Kole v. Village of Norridge, Not Reported in Fed. Supp. (2017)
2017 WL 5128989

Case 2:25-cv-00223-Z    Document 26    Filed 12/10/25    Page 73 of 100    PageID 1549

on their face an outright prohibition on gun ranges, nonetheless severely restrict[ed] the right of Chicagoans to train in firearm use at a range.' " *Id.* at *7 (quoting *Ezell II*, 846 F.3d at 894).

**\*13** Unlike in *Teixeira* where an Alameda County resident could purchase a firearm 600 feet away from the plaintiff's planned store, the 2013 Ordinance meant that no Village resident could purchase firearms from a storefront anywhere in the Village. First categorically and then functionally, the Village prohibited any retail gun store from operating in its boundaries between February 2011 and December 2014.

Thus, just as in *Ezell I*, a burden higher than intermediate scrutiny applies to the 2011 Ordinance and Agreement, and just as in *Ezell II*, a burden higher than intermediate scrutiny applies to the 2013 Ordinance. "Stated differently, the [Village] must demonstrate that" firearm acquisition from a licensed firearm retail store in the Village "creates such genuine and serious risks to public safety" that the Ordinances are "justified." *Ezell I*, 651 F.3d at 709; *accord Ill. Ass'n of Firearms Retailers*, 961 F. Supp. 2d at 940 ("the City must demonstrate that otherwise legitimate gun sales and transfers create such genuine and serious risks to public safety that prohibiting them within Chicago is justified").

### 2. The Village's Justifications

The Village cites two objectives that it claims justified the 2013 Ordinance and the combination of the 2011 Ordinance and the Agreement. First, the Village claims a compelling interest in public safety served by reducing weapons possession in sensitive places. In support, the Village points to the Gun Free School Zones Act, which restricts weapons possession within 1,000 feet of school grounds. 18 U.S.C. § 921(a)(25). It points to evidence that in the United States generally, 283 people were killed and 330 people were wounded in mass shootings in schools, government buildings, and religious buildings since 1982. PR-DAF ¶ 2. It also cites: (1) a study of school shootings from 1986 through 1990 finding that a sizeable number of incidents occurred around school buildings; (2) a study showing that homicide is the second leading cause of death of youths ages 5-18; (3) a study showing that 69% of homicides committed at school in the United States between 1994 and 1999 were committed with a firearm; (4) a study showing that student perpetrators purchased the firearms used in 9.6% of school-associated homicide events from 1992 through 1999; and (5) a study finding that 54% of schools within 17 square miles of D.C. had experienced at least one burst of gunfire within 1,000 feet. R. 195 at 22.

Second, the Village claims a compelling interest in reducing crime. It points to evidence that between 2012 and 2015, federal firearms licensees in Illinois reported theft or loss of 1,247 firearms. PR-DAF ¶ 3. It cites a statistic that between 2009 and 2013, local weapons dealers sold more than 3,173 firearms later recovered in crimes in Chicago, with 12% of those firearms moving from a local retailer to a crime scene in less than three years. PR-DAF ¶¶ 4-5. And it cites a 2004 study of inmates in correctional facilities showing that licensed

gun dealers were the source of handguns for 11.4% of those incarcerated. R. 195 at 24.

Public safety and reducing crime are certainly important public interests. *See, e.g.*, *Ezell II, 846 F.3d at 895* ("preventing crime" is an "important public concern[ ]"). But just as in *Ezell I* and *II*, the Village has done little to show the "close fit" between these interests and the means employed (*i.e.*, the 2011 and 2013 Ordinances and the Agreement, which resulted in an effective prohibition on retail gun stores in the Village).

 **\*14** As in *Ezell I*, the Village cites "no data or expert opinion" regarding the impact of the types of restrictions imposed on firearm *sales and acquisition* (as opposed to firearm *possession*) on crime rates and public safety. *See* 651 F.3d at 709. And like in *Ezell II*, the Village "has provided no evidentiary support for" its claims that limiting gun stores to certain "districts and distancing them from" "sensitive places" like schools and places of worship, would in fact "reduc[e] the[ ] risks" it identifies. *See* 846 F.3d at 895. To the contrary, as in *Ezell II*, the Village's "*own witness*[ ] testified to the lack of evidentiary support for these assertions." 846 F.3d at 895 (emphasis in original); *see* DR ¶ 26 (Gaseor testified at the preliminary injunction hearing that he was not "aware of any studies, any data, regarding any negative effects of gun stores").

There is another flaw in the Village's argument. The Village would have the Court independently evaluate the 1000-foot buffer from schools in the 2013 Ordinance and find it constitutional based on the Gun Free School Zones Act, which prohibits possession of weapons within 1000 feet of schools. R. 195 at 28. The Village then would have the Court separately address the zoning requirements in the 2013 Ordinance. *Id.* at 29-30. But as *Ezell II* makes clear, the Court must consider all of the conditions imposed by the 2013 Ordinance "*in tandem*" to determine whether they are "carefully drafted to serve actual public interests while at the same time making [acquiring firearms] practicable" in the Village. 846 F.3d at 894 (emphasis added). And here, considered in tandem, the 2013 Ordinance's conditions clearly did not make acquiring firearms practicable.

Nor is it an "answer ... that plenty of gun [stores] were located in the neighboring suburbs," even close ones. *Ill. Ass'n of Firearms Retailers*, 961 F. Supp. 2d at 938. As plaintiffs properly explain, this justification by the Village amounts to a "not in my backyard" rationale that courts have consistently rejected. As "[i]n the First Amendment context, ... 'one is not to have the exercise of his liberty of expression in appropriate places abridged on the plea that it may be exercised in some other place.' " *Ezell I*, 651 F.3d at 697 (quoting *Schad v. Borough of Mt. Ephraim,* 452 U.S. 61, 76–77 (1981)). "[T]his reasoning makes sense, because if all cities and municipalities can prohibit gun sales and transfers within their own borders, then all gun sales and transfers may be banned across a wide swath of the country if this principle is carried forward to its natural conclusion." *Ill. Ass'n of Firearms Retailers*, 961 F. Supp. 2d at 939. "[T]he fact that [Village residents] may travel outside the [Village] to acquire a firearm does not bear on the validity of the ordinance *inside* the [Village]." *Id.*

Kole v. Village of Norridge, Not Reported in Fed. Supp. (2017)

2017 WL 5128989

For these reasons, the Village has not established the required means-end fit between the challenged regulations and its justifications. The Village appeared to recognize as much when, just as this Court was about to rule on plaintiffs' motion for a preliminary injunction, the Village enacted the 2014 Ordinance that still incorporates a distancing restriction from sensitive places but is significantly less restrictive.

### 3. Fact Issues Bearing on Plaintiffs' As-Applied Challenges

**2011 Ordinance and Agreement.** The Village further argues that even if the 2011 Ordinance was facially unconstitutional, it was not unconstitutional as applied to plaintiffs because prior to the time that the 2011 Ordinance was repealed in December 2013, the Agreement exempted plaintiffs. And the Village argues that the Agreement was not unconstitutional as applied to plaintiffs because it was voluntary.

As explained above, however, the Agreement's constitutionality as applied to plaintiffs depends on the disputed factual issue of whether and to what extent it was coerced. If it was a coerced condition, then its restrictions preventing plaintiffs from operating a retail gun store would be unconstitutional just like the ban in the 2011 Ordinance. If it was not coerced, on the other hand, then the Agreement would constitute a valid waiver of Kole's constitutional rights. The Agreement was negotiated by the parties, Kole was represented by counsel during those negotiations, and, aside from the disputed issue of coercion, there

has been no showing of unequal bargaining power between Kole and the Village. *See Leonard v. Clark*, 758 F. Supp. 616, 619 (D. Or. 1991), *aff'd,* 12 F.3d 885 (9th Cir. 1993) ("a party is deemed to have voluntarily and knowingly waived its constitutional rights through a contract where 1) the parties to the contract have bargaining equality; 2) the parties have negotiated the terms of the contract; and 3) the waiving party is advised by competent counsel") (citing *Erie Tel., Inc. v. City of Erie*, 853 F.2d 1084, 1097 (3d Cir. 1988); *GLF Const. Corp. v. Dallas Area Rapid Transit*, 546 Fed.Appx. 429, 430 (5th Cir. 2013) ("a strong public policy favoring freedom of contract allows contracting parties to waive statutory, or even constitutional rights").

 **\*15** The 2011 Ordinance's constitutionality as applied to plaintiffs depends in part on the Agreement's constitutionality. If the jury finds the Agreement non-coerced, then the Village is correct that plaintiffs would not have an as-applied claim under the 2011 Ordinance because they would have entered into a voluntary Agreement that exempted them from the 2011 Ordinance for its entire duration.

If the jury finds the Agreement to be coerced such that it was an unconstitutional condition, by contrast, the Court finds disputed issues of material fact as to the constitutionality of the combination of the 2011 Ordinance and Agreement as applied to plaintiffs. As the Seventh Circuit found in *Six Star,* the plaintiff could bring an as-applied, "pre-enforcement challenge" to a repealed ordinance even if it never applied for a license under that ordinance based on an injury caused by "the threat of enforcement." 821 F.3d at 802. The

district court in *Six Star* "put the questions of causations and damages before a jury" to determine whether plaintiff would have opened a "gentlemen's club ... but for the existence of the" ordinances at issue. *Id.* at 801. The plaintiff in *Six Star* "suffer[ed] an injury from the unconstitutional ordinances" where "a jury ultimately found ... that it refrained from protected [conduct] in response to the City's unconstitutional ordinances." *Id.* at 803.

The fact that plaintiffs did not in fact attempt to open a retail gun store under the 2011 Ordinance and Agreement is not dispositive of their as-applied challenge if the 2011 Ordinance and Agreement together caused plaintiffs to refrain from protected conduct. Whether the 2011 Ordinance and Agreement in fact caused plaintiffs to refrain from protected conduct depends in part on the Agreement's voluntariness and also on Kole's credibility in testifying that he had an intent to open a retail gun store at some point in 2011, which in turn is a question for the jury. *See, e.g.*, *Darchak v. City of Chicago Bd. of Educ.*, 580 F.3d 622, 633 (7th Cir. 2009) ("intent and credibility" should "go to a jury unless no rational factfinder could draw the contrary inference") (quotation marks omitted).

The Court thus finds genuine issues of material fact as to whether plaintiffs refrained from opening a retail store as a result of the Agreement and the 2011 Ordinance prior to the time the 2011 Ordinance expired. If so, then the questions of the period of time for which this was true and plaintiffs' resulting damages also are questions for the jury. *See, e.g.*, *Six Star*, 821 F.3d at 803 (causation satisfied if jury finds that "but for the ordinances, [plaintiff] would have

engaged in protected speech," and "[d]amages redress the harm that [plaintiff] suffered by replacing the lost profits [plaintiff] would have earned if it had been able to open its club at the planned time").

**2013 Ordinance.** The as-applied inquiry is easier with respect to the 2013 Ordinance. The undisputed facts show that at least for some period of time, the 2013 Ordinance functionally restricted plaintiffs' intent to open a retail gun store in the Village. The length of time for which that was true and the resulting damages are questions for the jury that depend in part on disputed issues of fact as to why plaintiffs stopped operating in August 2014. *See Six Star*, 821 F.3d at 803.

### III. Count II—Substantive Due Process

Only the Village moves for summary judgment on Count II, plaintiffs' substantive due process claim. As the court in *Second Amendment Arms v. City of Chicago*, 135 F. Supp. 3d 743 (N.D. Ill. 2015), found when addressing a substantially similar substantive due process claim to plaintiffs', "where another Amendment 'provides an explicit textual source of constitutional protection against [the alleged] source of physically intrusive government conduct, that Amendment, not the more generalized notion of substantive due process, must be the guide for analyzing [the] claims.' " *Id.* at 763 (quoting *Graham v. Connor*, 490 U.S. 386, 395 (1989)). Like in *Second Amendment Arms*, "the right to sell firearms is a Second Amendment concern, and the right to display firearms falls under the protections of the First Amendment. As such, this portion of Plaintiff's substantive due process challenge is dismissed,

Kole v. Village of Norridge, Not Reported in Fed. Supp. (2017)

2017 WL 5128989

Case 2:25-cv-00223-Z    Document 26    Filed 12/10/25    Page 77 of 100    PageID 1553

as Plaintiff must pursue these theories under his First and Second Amendment claims." *Id.*

**\*16** Plaintiffs also claim a violation of their "right to their livelihood of choice." R. 226 at 33. But the facts underlying this claim are the same as those underlying their Second Amendment claim—*i.e.*, a challenge to "the effective ban on opening a constitutionally-protected firearms store within the Defendant's municipal limits." R. 226 at 33. As the *Second Amendment Arms* court found, this "right to earn his livelihood" component of plaintiffs' substantive due process claim is likewise "a Second Amendment claim in Fourteenth Amendment [substantive due process] clothing, and thus the Second Amendment must be 'the guide for analyzing' " it. 135 F. Supp. 3d at 764 (quoting *Graham*, 490 U.S. at 395). The Court therefore grants the Village's motion for summary judgment on Count II.

## IV. Count III—Dormant Commerce Clause

Both plaintiffs and the Village seek summary judgment on plaintiffs' dormant commerce clause claim in Count III. The Constitution generally gives Congress the power to regulate interstate commerce. U.S. Const. Art. I, § 8 ("The Congress shall have power ... To regulate Commerce ... and among the several States."). Although the commerce clause does not expressly limit state power over interstate commerce, courts have long recognized that in certain circumstances, state and local laws imposing substantial burdens on interstate commerce are not allowed. "This 'negative' aspect of the Commerce Clause is often referred to as the 'Dormant Commerce Clause' and is invoked to invalidate overreaching

provisions of state regulation of commerce." *Alliant Energy Corp. v. Bie,* 330 F.3d 904, 911 (7th Cir. 2003).

Under the dormant commerce clause, state and local laws are generally analyzed under a two-tier approach. The first step is to determine whether the law "regulates evenhandedly with only 'incidental' effects on interstate commerce, or discriminates against interstate commerce." *Oregon Waste Sys., Inc. v. Dep't of Envtl. Quality,* 511 U.S. 93, 99 (1994) (quoting *Hughes v. Oklahoma,* 441 U.S. 322, 336 (1979)). A law is discriminatory if it involves "differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter." *Id.* Plaintiffs do not argue that the 2011 and 2013 Ordinances and the Agreement are discriminatory under this step.

Instead, plaintiffs argue that under the second step, the 2011 and 2013 Ordinances and the Agreement "unconstitutionally burden interstate commerce with no local purpose (except an improper political purpose)." R. 226 at 35. The second step applies a balancing test from *Pike v. Bruce Church, Inc.,* 397 U.S. 137 (1970):

> Where the statute regulates even-handedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld *unless the burden imposed on such commerce is clearly excessive in relation to the*

*putative local benefits.* If a legitimate local purpose is found, then the question becomes one of degree. And the extent of the burden that will be tolerated will of course depend on the nature of the local interest involved, and on whether it could be promoted as well with a lesser impact on interstate activities.

*Id.* at 142 (citation omitted, emphasis added). The Seventh Circuit has explained that "a plaintiff has a steep hill to climb" to meet this standard, *Midwest Title Loans, Inc. v. Mills,* 593 F.3d 660, 665 (7th Cir. 2010) (quotation marks omitted), and has likened it to "normal rational-basis" review. *Nat'l Paint & Coatings Ass'n v. City of Chicago,* 45 F.3d 1124, 1131-32 (7th Cir. 1995).

Plaintiffs do not show how the Agreement and the 2011 and 2013 Ordinances burden interstate commerce. *See Pike*, 397 U.S. at 142. In any event, any burden on interstate commerce is not "clearly excessive in relation to the putative local benefits" in this case. *Id.* Plaintiffs claim that the Village's only motivation was political, and "dislike of guns is not a legitimate [local] interest." R. 226 at 35. In support of their claim of political motivation, plaintiffs cite an alleged statement by Chester to Kole that the Village president and trustees were concerned about their "political careers" suffering "should something ever happen" as a result of Kole's gun store. But this statement is inadmissible hearsay. *See* DR ¶ 10. And even if it was

admissible, this single statement does not show, as plaintiffs claim, that the Village acted "for solely political reasons" (R. 226 at 36) and had no legitimate purpose for its actions.

 **\*17** Indeed, to the contrary, the Village has cited interests in public safety and crime prevention, and it has cited statistical evidence in support. The Court has already found these to be important local interests. Although the Court did not find this evidence sufficient to satisfy a higher than intermediate scrutiny standard for purposes of Second and Fourteenth Amendment review, the Court does find that it satisfies the standard akin to "normal rational-basis" review from *Pike.*

### V. Count IV—First Amendment

Plaintiffs seek summary judgment on the portion of their First Amendment claim in Count IV challenging the Agreement's exterior sign prohibition. R. 235 at 19. Defendants seek summary judgment on plaintiffs' First Amendment challenge to both the Agreement's exterior sign prohibition and its weapons display prohibition. This Court already dismissed plaintiffs' First Amendment claim regarding the Agreement's weapons display prohibition as a matter of law. R. 79 at 28-29. So the record is clear, however, the Court grants the Village's motion for summary judgment on that claim for the same reasons set forth in the motion to dismiss ruling. *See id.*

The First Amendment protects commercial speech but "accords a lesser protection to commercial speech than to other constitutionally guaranteed expression." *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of New York,* 447 U.S. 557, 562-63

Kole v. Village of Norridge, Not Reported in Fed. Supp. (2017)
2017 WL 5128989

Case 2:25-cv-00223-Z    Document 26    Filed 12/10/25    Page 79 of 100    PageID 1555

(1980). Restrictions on commercial speech are analyzed under a form of "intermediate" scrutiny. *Florida Bar v. Went For It, Inc.,* 515 U.S. 618, 623 (1995). In *Central Hudson,* the Supreme Court established a four-part test for analyzing restrictions on commercial speech:

> At the outset, we must determine whether the expression is protected by the First Amendment. [1] For commercial speech to come within that provision, it at least must concern lawful activity and not be misleading. [2] Next, we ask whether the asserted governmental interest is substantial. If both inquiries yield positive answers, we must determine whether [3] the regulation directly advances the governmental interest asserted, and [4] whether it is not more extensive than is necessary to serve that interest.

447 U.S. at 566.

In its motion to dismiss opinion, the Court found that plaintiffs' challenge to the Agreement's restriction on exterior signage to promote Ghost's internet sales business survived the first prong of the *Central Hudson* test. R. 79 at 29-30. The Agreement broadly prohibited "any exterior signage indicating to the public that its offices are located on the Premises or indicating the business of Ghost (*i.e.*, weapons sales)." R. 115-3 ¶ 4. Thus, for example, the Agreement prohibited plaintiffs from posting exterior signs even referring potential customers to their internet site. As a result, "the limit on exterior signage does concern at least some lawful activity." R. 79 at 29.

The next question is whether the asserted government interest is substantial. *Cent. Hudson*, 447 U.S. at 566. The Village says the restrictions serve "aesthetic interests." R. 238 at 20; R. 225 at 19. In a case considering regulations that distinguish between on-site and off-site signage, the Seventh Circuit determined that an "interest[ ] in ... aesthetics" qualifies as a "substantial municipal goal[ ]." *Lavey v. City of Two Rivers*, 171 F.3d 1110, 1114 (7th Cir. 1999). Accordingly, the Village has asserted a substantial government interest under the second prong.

As in *Lavey*, the restriction's constitutionality thus turns on the third and fourth prongs of the *Central Hudson* test. Under those prongs, the Supreme Court has "invalidated commercial speech regulations because the underinclusiveness of the restriction made the fit between the regulation's goals and the restrictions not sufficiently close." *Id.* (discussing *City of Cincinnati v. Discovery Network,* 507 U.S. 410 (1993)). "In *Discovery Network*, the Court struck down a city ordinance that prohibited commercial handbills while allowing newspapers displayed on newsracks. The Court determined that this underinclusiveness ... revealed the absence of a sufficient fit between these restrictions and the ordinance's safety and aesthetic

goals." *Id.* Similarly in *Ballen v. City of Redmond*, 466 F.3d 736 (9th Cir. 2006), the Ninth Circuit upheld a determination that a commercial signage ordinance was an impermissible restriction on commercial speech where it contained ten categories of content-based exceptions. The Ninth Circuit held that "[t]he City ... failed to show how the exempted signs reduce vehicular and pedestrian safety or besmirch community aesthetics any less than the prohibited signs." *Id.* at 743.

 **\*18** Here, the Village has not provided any record support linking its stated interest in aesthetics to the Agreement's exterior signage prohibition. It has not shown why allowing interior signs but not exterior signs furthered that interest or that it imposed similar restrictions on any other companies. Based on the (underdeveloped) summary judgment record on this issue, the Court finds genuine issues of material fact as to whether the Agreement's restriction on signage for plaintiffs' business is really a content-based, "underinclusive[ ]" condition that fails the *Central Hudson* test. *See Lavey*, 171 F.3d at 1114.

In sum, the Court grants the Village's motion for summary judgment with respect to the weapons display portion of plaintiffs' First Amendment claim, and denies both plaintiffs' and the Village's motions for summary judgment with respect to the exterior signage portion of the claim.

## VI. Count V—Declaratory Judgment, Illinois Constitution

Plaintiffs have abandoned all of their Illinois Constitution claims in Count V except their claim under Article I, Section 22 (Illinois' version of the Second Amendment), and they do not move for summary judgment on their Article I, Section 22 claim. R. 226 at 40-41. But the Village does move for summary judgment on Count V.

In the remaining portion of Count V, Plaintiffs seek declaratory judgments under Article I, Section 22 of the Illinois Constitution. Because the challenged Ordinances and Agreement are no longer in effect, however, plaintiffs' claims for declaratory judgment are moot. *E.g., Markadonatos v. Village of Woodridge*, 760 F.3d 545, 546 (7th Cir. 2014) ("the ordinance has been repealed and the repeal moots the plaintiff's request for declaratory and injunctive relief"); *Roehl v. City of Naperville*, 857 F. Supp. 2d 707, 710–11 (N.D. Ill. 2012) ("claim for declaratory relief is moot" when challenged ordinance has been repealed). Although plaintiffs' damages claims are not moot for the reasons explained in n.2 above, plaintiffs do not sue for damages under the Illinois Constitution, and for good reason: "Illinois courts will not entertain a suit for *damages* under the Illinois constitution." *E.g., Klein v. Village of Mettawa*, 2014 WL 1661631, at \*4 (N.D. Ill. Apr. 25, 2014) (declaratory relief claim under the Illinois Constitution was moot). The Court therefore grants the Village's motion for summary judgment on plaintiffs' claim under Article I, Section 22 of the Illinois Constitution.

## VII. Counts VI and VII—Retaliation
Plaintiffs and the Village cross-move for summary judgment on plaintiffs' claims for

retaliation for exercising their rights under the Second (Count VI) and Fourteenth (Count VII) Amendments.

As an initial matter, the Village contests whether a retaliation claim can arise under the Second Amendment. It points out that plaintiffs cite no authority recognizing a retaliation claim under the Second Amendment and instead rely on First Amendment retaliation cases. As the Eastern District of Kentucky recently reasoned, however, "although § 1983 retaliation claims have traditionally been brought based on First Amendment activities, when 'certain provisions of the Constitution define individual rights with which the government generally cannot interfere—actions taken pursuant to those rights are protected by the Constitution.' " *Horn v. City of Covington*, 2015 WL 4042154, at *8 (E.D. Ky. July 1, 2015) (quoting *Thaddeus–X v. Blatter*, 175 F.3d 378, 386 (6th Cir. 1999)). The Second Amendment guarantees precisely such an "individual right." *Heller*, 554 U.S. at 592. On this basis, the *Horn* court recognized a Second Amendment retaliation claim. 2015 WL 4042154, at *8-9. Like the Eastern District of Kentucky in *Horn*, this Court finds it appropriate to apply First Amendment retaliation doctrine in the Second Amendment context (as the Court already did in its motion to dismiss opinion, R. 79). *See also Ezell I*, 651 F.3d at 697, 701-03, 706-07 (borrowing from First Amendment doctrine in Second Amendment case).

**\*19** Borrowing from First Amendment doctrine, a Second Amendment retaliation claim has three elements: plaintiffs (1) "engaged in a constitutionally protected activity"; (2) "suffered a deprivation that would likely deter protected activity in the future"; and (3) "a causal connection between the two." R. 79 at 33 (citing *Watkins v. Kasper*, 599 F.3d 791, 794 (7th Cir. 2010)).

This Court already has found that plaintiffs "engaged in constitutionally protected activity" under the Second and Fourteenth Amendments (with fact issues remaining as to the time period in which they did so and the amount of damages sustained). The Village claims plaintiffs cannot show the required causal connection between plaintiffs' conduct and any deprivation because "the Village obviously acted because its 1972 Ordinance was out of date, not because Plaintiffs sought to exercise their Second Amendment rights." R. 238 at 21-22. The Village says the Agreement was voluntary and the Ordinances were a result of the Village's independent "stud[y]" of its "weapons dealer regulations under a new regime of gun rights." R. 238 at 21.

The Court finds that the Village's motive is far from "obviously" neutral based on the facts in the record. To the contrary, a reasonable jury could find that the Village acted with animus toward plaintiffs. The facts show, for example, that the Village's 1972 weapons dealer ordinance lay dormant for nearly 40 years until plaintiffs asked for a weapons dealer license. When plaintiffs did, the Village negotiated a strict Agreement with plaintiffs regarding the conditions under which they could operate—an Agreement that a reasonable jury could find coerced. The Village then enacted the 2011 Ordinance putting a time-limit on plaintiffs' firearms dealer license. And later, in apparent response to events in this lawsuit, the Village enacted the 2013 Ordinance that

appeared less restrictive but in fact made it functionally impossible for plaintiffs to open a retail gun store in the Village. In light of these facts, a reasonable jury could find that the 2011 and 2013 Ordinances were enacted and the Agreement insisted upon in retaliation for plaintiffs' constitutionally protected conduct (*i.e.*, a "causal connection") and this was a "deprivation that would likely deter protected activity in the future." *See* R. 79 at 33. The Court therefore finds genuine issues of material fact on plaintiffs' retaliation claims in Counts VI and VII.[5] *See Darchak,* 580 F.3d at 633 ("intent" should "go to a jury unless no rational factfinder could draw the contrary inference").

[5]     As plaintiffs acknowledge, they will not be able to achieve a "double recovery for their damages" on their Count I claims and their Count VI and VII retaliation claims. R. 226 at 43.

## VIII. Count VIII—Equal Protection

Plaintiffs "are no longer pursuing their equal protection claim." R. 226 at 43. Accordingly, the grants the Village's motion for summary judgment on that claim.

## Conclusion

For the foregoing reasons, the Court denies the Village's and plaintiffs' cross-motions for summary judgment (R. 191; R. 196) on plaintiffs' Second and Fourteenth Amendment claims in Count I and plaintiffs' corresponding retaliation claims in Counts VI and VII. The Court also denies the Village's and plaintiffs' cross-motions for summary judgment on plaintiffs' First Amendment claim regarding the exterior signage prohibition in Count IV.

**\*20** The Court grants the Village's motion for summary judgment (R. 191) with respect to plaintiffs' remaining claims: Count II (substantive due process); Count III (dormant commerce clause); Count V (declaratory judgment under the Illinois Constitution); and Count VIII (equal protection).

## All Citations

Not Reported in Fed. Supp., 2017 WL 5128989

**End of Document**                      © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Polymer80, Inc. v. Garland, Not Reported in Fed. Supp. (2023)

2023 WL 3605430

Case 2:25-cv-00223-Z    Document 26    Filed 12/10/25    Page 83 of 100    PageID 1559

2023 WL 3605430
Only the Westlaw citation
is currently available.
United States District Court,
N.D. Texas, Fort Worth Division.

POLYMER80, INC., Plaintiff,
v.
Merrick GARLAND, et al., Defendants.

Civil Action No. 4:23-cv-00029-O
|
Signed March 19, 2023

**Attorneys and Law Firms**

Dennis Daniels, Bradley Arant Boult Cummings LLP, Dallas, TX, James W. Porter, Pro Hac Vice, Bradley Arant Boult Cummings LLP, Birmingham, AL, Marc A. Nardone, Pro Hac Vice, Bradley Arant Boult Cummings LLP, Washington, DC, for Plaintiff.

Jeremy S. B. Newman, Daniel M. Riess, Martin M. Tomlinson, Taisa M. Goodnature, US Department of Justice - Civil Division, Washington, DC, for Defendants.

**OPINION & ORDER ON POLYMER80, INC.'S MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

Reed O'Connor, UNITED STATES DISTRICT JUDGE

**\*1** Before the Court are Plaintiff Polymer80, Inc.'s Motion for Temporary Restraining Order and Preliminary Injunction (ECF No. 14) and Brief in Support (ECF No. 15), filed March 7, 2023; Defendant's Response (ECF No. 20), filed March 9, 2023; and Plaintiff's unopposed Motion for Leave to File Reply in Excess of Page Limit and Reply (ECF No. 26), filed March 26, 2023. Because there is good cause and the motion is unopposed, the Court **GRANTS** Plaintiff's motion to file an overlength brief (ECF No. 26). Having considered the parties' briefing and applicable law, the Court **GRANTS** Plaintiff's motion for leave to file an overlength brief (ECF No. 26) and for a temporary restraining order and preliminary injunction (ECF No. 14). Because it is not a jurisdictional issue relating to this Court's power to adjudicate the instant motion, the Court **RESERVES** ruling on the issue of venue raised in Defendant's response and pending Motion to Dismiss Complaint for Improper Venue or, in the Alternative, to Transfer Venue (ECF No. 12), filed March 7, 2023.

## I. INTRODUCTION

### a. Statutory & Regulatory Background

The Gun Control Act of 1968 regulates firearms in interstate commerce. 18 U.S.C. § 921 ("GCA" or "the Act"). Among other things, the Act requires manufacturers and dealers of firearms to have a federal firearms license. *Id.* § 923(a). Dealers must also conduct background checks before transferring firearms to someone without a license, and they must keep records of firearm transfers. *Id.* §§ 922(t), 923(g)(1)(A).

Polymer80, Inc. v. Garland, Not Reported in Fed. Supp. (2023)
2023 WL 3605430

Case 2:25-cv-00223-Z    Document 26    Filed 12/10/25    Page 84 of 100    PageID 1560

The Act defines the term "firearm" four different ways: "(A) any weapon (including a starter gun) which will or is designed to or may readily be converted to expel a projectile by the action of an explosive; (B) the frame or receiver of any such weapon; (C) any firearm muffler or firearm silencer; or (D) any destructive device." *Id.* § 921(a)(3). But "[s]uch term does not include an antique firearm." *Id.* Congress delegated authority to administer and enforce the Act to the Attorney General. *Id.* § 926(a). The Attorney General, in turn, delegated that authority to the Director of the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"). 28 C.F.R. § 0.130(a).

In 1968, ATF promulgated a rule interpreting the phrase "frame or receiver." The rule defined the "frame or receiver" of a firearm as "[t]hat part of a firearm which provides housing for the hammer, bolt or breechblock, and firing mechanism, and which is usually threaded at its forward portion to receive the barrel." Commerce in Firearms and Ammunition, 33 Fed. Reg. 18,555, 18,558 (Dec. 14, 1968) (codified at 26 C.F.R. § 178.11). In the decades since, ATF's definition of "frame or receiver" remained in place until the recent promulgation of the Final Rule. And the agency has not made any indication that it was changing course with respect to its interpretation of the Act.[1] Indeed, on three occasions in the last eight years, ATF confirmed that Polymer80's products are not "firearms" for purposes of the GCA.[2]

[1]    *See, e.g.*, Gov't's Mot. to Dismiss, *California v. ATF*, No. 3:20-cv-06761, 2020 WL 9849685 (N.D. Cal. Nov. 30, 2020) ("Congress has chosen to exclude firearm parts from the scope of the GCA, including parts that could be assembled with a homemade receiver and frame to make a firearm.").

[2]    Pl.'s Br. 6–7, ECF No. 15; Pl.'s App. 140–56, ECF No. 16, Classification Letter, Bureau of Alcohol, Tobacco, Firearms & Explosives (Jan. 18, 2017) (determining Polymer80's PF940C pistol blank frame is not a firearm); Pl.'s App. 130–148, ECF No. 16, Classification Letter, Bureau of Alcohol, Tobacco, Firearms & Explosives (Nov. 2, 2015) (determining Polymer80's Glock-type GC9 pistol frame blank and Warrhogg receiver blank are not firearms); and Pl.'s App. 158–59, ECF No. 16, Classification Letter, Bureau of Alcohol, Tobacco, Firearms & Explosives (Feb. 3, 2015) (determining Polymer80's AR-15 pattern receiver blank is not a firearm).

**\*2** However, in April 2022, ATF published a Final Rule changing, among other things, the 1968 definition of "frame or receiver." *See* Definition of "Frame or Receiver" and Identification of Firearms, 87 Fed. Reg. 24,652 (Apr. 26, 2022) (codified at 27 C.F.R. pts. 447, 478, and 479). The Rule took effect on August 24, 2022. ATF split the phrase into two parts, assigning the term "frame" to handguns and the term "receiver" to any firearm other than a handgun, such as rifles and shotguns. *See* 27 C.F.R. § 478.12(a)(1), (a)(2). ATF then defined the terms "frame" and "receiver" along the same lines as the 1978 rule, though with updated, more precise technical terminology.[3] But ATF did not stop there.

Polymer80, Inc. v. Garland, Not Reported in Fed. Supp. (2023)
2023 WL 3605430

Case 2:25-cv-00223-Z    Document 26    Filed 12/10/25    Page 85 of 100    PageID 1561

3    The two terms are defined as follows:

>   (1) The term "frame" means the part of a handgun, or variants thereof, that provides housing or a structure for the component (i.e., sear or equivalent) designed to hold back the hammer, striker, bolt, or similar primary energized component prior to initiation of the firing sequence, even if pins or other attachments are required to connect such component (i.e., sear or equivalent) to the housing or structure.

>   (2) The term "receiver" means the part of a rifle, shotgun, or projectile weapon other than a handgun, or variants thereof, that provides housing or a structure for the primary component designed to block or seal the breech prior to initiation of the firing sequence (i.e., bolt, breechblock, or equivalent), even if pins or other attachments are required to connect such component to the housing or structure.

27 C.F.R. § 478.12(a).

Rather than merely updating the terminology, ATF decided to regulate *partial* frames and receivers. Under the new Final Rule, "[t]he terms 'frame' and 'receiver' shall include a partially complete, disassembled, or nonfunctional frame or receiver, including a frame or receiver parts kit, that is designed to or may readily be completed, assembled, restored, or otherwise converted to function as a frame or receiver." *Id.* § 478.12(c). But "[t]he terms

shall not include a forging, casting, printing, extrusion, unmachined body, or similar article that has not yet reached a stage of manufacture where it is clearly identifiable as an unfinished component part of a weapon (e.g., unformed block of metal, liquid polymer, or other raw material)." *Id.* When determining whether an object is a frame or receiver, the ATF Director is not limited to looking only at the object. "When issuing a classification, the Director may consider any associated templates, jigs, molds, equipment, tools, instructions, guides, or marketing materials that are sold, distributed, or possessed with the item or kit ...." *Id.* To determine whether an object may "readily" be converted into a firearm, ATF may consider relevant factors such as (1) time, (2) ease, (3) expertise, (4) equipment, (5) parts availability, (6) expense, (7) scope, and (8) feasibility. *Id.* § 478.11. The Final Rule also amends ATF's definition of "firearm" to include weapon parts kits. The ATF's new definition of "firearm" "shall include a weapon parts kit that is designed to or may readily be completed, assembled, restored, or otherwise converted to expel a projectile by the action of an explosive." *Id.*

In the months since the Final Rule was published, on December 27, 2022, ATF issued informal guidance to industry members, identifying specific manufacturers of frame and receiver blanks and particular products that ATF considered subject to the Final Rule ("Open Letter").[4] The same day, and without having received a classification request, ATF sent a letter to Polymer80 identifying several of the company's products as "firearms" for purposes of the GCA and the Final Rule, even when those items are sold separately and not

Polymer80, Inc. v. Garland, Not Reported in Fed. Supp. (2023)
2023 WL 3605430

Case 2:25-cv-00223-Z    Document 26    Filed 12/10/25    Page 86 of 100    PageID 1562

in a kit ("Polymer80 Letter").[5] Less than two weeks later, Polymer80 filed this lawsuit and sought to intervene in a related lawsuit.[6]

[4]  Pl.'s App. 108–17, ECF No. 16, Open Letter to All Firearm Licensees 1, Bureau of Alcohol, Tobacco, Firearms & Explosives (Dec. 27, 2022) (identifying "partially complete Polymer80 ... striker-fired semiautomatic pistol frames, including, but not limited to, those sold within parts kits" as "frames" and, therefore, "firearms" for purposes of the GCA).

[5]  Pl.'s App. 119–28, Letter to Polymer80, Bureau of Alcohol, Tobacco, Firearms & Explosives (Dec. 27, 2022); Kelly Decl. ¶ 12, Pl.'s App. 4–5, ECF No. 16.

[6]  Compl., ECF No. 1; Pl.'s Mot. to Intervene, *Vanderstok*, No. 4:22-CV-00691-O (N.D. Tex. Jan. 9, 2023).

### b. Procedural Background

**\*3**  The Court is currently addressing challenges to ATF's Final Rule in *Vanderstok v. Garland*, No. 4:22-CV-00691-O (N.D. Tex. filed Aug. 11, 2022). Though the *Vanderstok* plaintiffs did not raise all of the same claims as Polymer80, they raised some identical claims, including that the Final Rule exceeds the lawful scope of ATF's statutory authority under the GCA.[7] That case was filed in early August, after the Final Rule was announced on April 26, 2022 and before it took effect on August 24, 2022. Within a week of filing suit, the *Vanderstok* plaintiffs moved for a nationwide injunction.[8] The Court denied that request for relief on September 2, 2022.[9]

[7]  Compl., *Vanderstok*, No. 4:22-CV-00691-O (N.D. Tex. Aug. 11, 2022) (claiming the Final Rule was issued in excess of ATF's statutory jurisdiction and authority (Count I)); Pl.'s Compl. 31, ECF No. 1 (same).

[8]  Mot. for Prelim. Inj., *Vanderstok*, No. 4:22-CV-00691-O (N.D. Tex. Aug. 18, 2022).

[9]  Opinion & Order, *Vanderstok*, No. 4:22-CV-00691-O (N.D. Tex. Sept. 2, 2022).

In the weeks and months following that September decision, Polymer80 "attempted in good faith to comply with the Final Rule."[10] But after receiving the Open Letter and Polymer80 Letter from ATF in December 2022 and learning it would be "forced ... to discontinue sales of unfinished-frame kits *and* unfinished frames as they are currently designed," Polymer80 sought to intervene in the *Vanderstok* litigation as other successful intervenors had.[11] Simultaneously, Polymer80 filed its own lawsuit.[12] Six weeks later on March 7, 2023, Polymer80 filed the instant TRO and sought an expedited briefing schedule, which the Court granted.[13] Earlier that day, the Government filed a motion to dismiss or transfer based on improper venue and sought its own expedited briefing schedule.[14] On March 12, 2023, the Court denied the Government's motion to expedite on grounds that the motion to dismiss or transfer

Polymer80, Inc. v. Garland, Not Reported in Fed. Supp. (2023)
2023 WL 3605430

Case 2:25-cv-00223-Z    Document 26    Filed 12/10/25    Page 87 of 100    PageID 1563

identified no emergency and did not challenge anything running to the merits of the case or ability to hear it, such as the Court's subject matter jurisdiction. [15]

[10]    Kelley Decl. ¶ 14, Pl.'s App. 5, ECF No. 16.

[11]    Kelley Decl. ¶ 15, Pl.'s App. 6, ECF No. 16 (emphasis added); Pl.'s Reply 18, ECF No. 26-1; *see generally Vanderstok,* No. 4:22-CV-00691-O (N.D. Tex. filed Aug. 11, 2022).

[12]    Compl., ECF No. 1.

[13]    Pl.'s Mot., ECF No. 14; Pl.'s Mot. to Expedite, ECF No. 17; Order, ECF No. 18.

[14]    Def.'s Mot. to Dismiss, ECF No. 12; Def.'s Mot. to Expedite, ECF No. 19.

[15]    Order, ECF No. 22.


### c. The Parties

Plaintiff Polymer80, Inc. is a commercial enterprise that "manufactures, markets, and distributes firearms, non-firearm products such as receiver blanks (partially complete, disassembled, or nonfunctional frames), and other innovative products, components and accessories," such as jigs, tools, and associated parts kits. [16] Polymer80's core business is selling these items, which are subject to the Final Rule. [17] For years, and based on ATF's representations that the company's products were not "firearms," Polymer80 structured "its business model," "invested capital," and

lawfully sold receiver blanks directly to consumers throughout the country and in this district. [18] After Final Rule was promulgated, and in a good faith effort to comply with the Rule, Polymer80 stopped selling its receiver blanks with accompanying jigs. [19] However, ATF's Open Letter and Polymer80 Letter make clear that even selling blanks separately is violative of the Final Rule. [20] The inability to sell receiver blanks or parts kits has "caused profound economic harm to Polymer80 and threaten[s] its very existence as a going concern." [21] Without immediate relief, Polymer80 estimates it "can survive as a corporate entity for perhaps as little as three weeks." [22]

[16]    Compl. 1–2, ECF No. 1.

[17]    Kelley Decl. ¶ 5, Pl.'s App. 3, ECF No. 16.

[18]    *Id.* ¶ 9.

[19]    *Id.* ¶ 14.

[20]    *Id.*

[21]    *Id.* ¶ 16.

[22]    *Id.* (dated Mar. 7, 2023).

**\*4** Plaintiff has sued the Attorney General, Department of Justice, ATF, and the ATF Director over the Final Rule and its implementation of the regulation. [23] Plaintiff now asks the Court to enter a temporary restraining order ("TRO") and enjoin Defendants from enforcing or otherwise implementing (e.g., through informal guidance

Polymer80, Inc. v. Garland, Not Reported in Fed. Supp. (2023)
2023 WL 3605430

Case 2:25-cv-00223-Z    Document 26    Filed 12/10/25    Page 88 of 100    PageID 1564

letters or otherwise) the Final Rule against Plaintiff. [24]

[23]    Compl. 5–6, ECF No. 1.

[24]    Pl.'s Mot. 1, ECF No. 14.

Plaintiff attacks ATF's Final Rule and subsequent guidance letters as unlawful in several respects: (1) that "ATF has exceeded its statutory authority by creating and implementing a new definition of 'firearm' [that] contradicts the plain language of the Gun Control Act" and that ATF's attempts to implement the regulation are arbitrary and capricious;[25] (2) that the Final Rule violates Polymer80's First Amendment rights because the regulation "is a content-based restriction on protected speech" that cannot pass strict scrutiny;[26] (3) that the Final Rule in conjunction with the ATF letters violate Polymer80's Second Amendment rights by regulating constitutionally protected conduct "in a way that is inconsistent with the Nation's historical tradition of firearm regulation" contrary to Supreme Court precedent;[27] and (4) that the Final Rule in conjunction with the ATF letters violate Polymer80's Fifth Amendment rights because (i) they "effectuate a regulatory taking without just compensation" and (ii) deny due process as impermissibly vague.[28] The parties have briefed the issues and the motion is ripe for review.

[25]    Pl.'s Mot. 2, ECF No. 14; Pl.'s Br. 13, ECF No. 15.

[26]    Pl.'s Br. 14, ECF No. 15.

[27]    *Id.* at 16 (analyzing *New York State Rifle & Pistol Ass'n, Inc. v. Bruen,* 142 S. Ct. 2111 (2022)).

[28]    *Id.* at 18–21.

## II. LEGAL STANDARDS

The decision to grant or deny injunctive relief is committed to the district court's discretion. *See Miss. Power & Light Co. v. United Gas Pipe Line,* 760 F.2d 618, 621 (5th Cir. 1985). To establish entitlement to a preliminary injunction, the movant must demonstrate: (1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable harm; (3) that the balance of hardships weighs in its favor; and (4) that the issuance of the preliminary injunction will not disserve the public interest. *Daniels Health Servs., L.L.C. v. Vascular Health Scis., L.L.C.,* 710 F.3d 579, 582 (5th Cir. 2013). The last two factors merge when the government is the opposing party. *Nken v. Holder,* 556 U.S. 418, 435 (2009). "A [temporary restraining order] is simply a highly accelerated and temporary form of preliminary injunctive relief, which requires that the party seeking such relief establish the same four elements for obtaining a preliminary injunction." *Greer's Ranch Café v. Guzman,* 540 F.Supp.3d 638, 644–45 (N.D. Tex. 2021) (O'Connor, J.) (cleaned up).

Upon determining that a party is entitled to injunctive relief, a court must also decide the appropriate scope of that prospective injunction. "[T]he scope of injunctive relief is dictated by the extent of the violation established[.]" *Califano v. Yamasaki,* 442 U.S. 682, 702 (1979). And because it is considered an extraordinary remedy, an injunction "should

Polymer80, Inc. v. Garland, Not Reported in Fed. Supp. (2023)
2023 WL 3605430

Case 2:25-cv-00223-Z    Document 26    Filed 12/10/25    Page 89 of 100    PageID 1565

be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 756 (1994) (cleaned up). As movant, the party seeking relief bears the burden of proving all four elements of the preliminary injunction. *Nichols v. Alcatel USA, Inc.*, 532 F.3d 364, 372 (5th Cir. 2008); *Miss. Power & Light Co.*, 760 F.2d at 621.

## III. ANALYSIS

### A.

**\*5** Because the Government claims improper venue, the Court will briefly address (but not resolve) the issue as a threshold matter. As noted above, the Government moved to dismiss this action based on improper venue and, after Plaintiff filed its TRO, moved to expedite the venue briefing. The Court denied the Government's motion to expedite. Order, ECF No. 22.[29] In its Order the Court noted that, unlike Plaintiff's demonstrated need for emergency relief, the Government "offered no equivalent existential reason why the Court should consider its venue motion on an expedited basis." *Id.* at 1.

[29] Rather than accept that decision, the Government apparently attempts an end-run around the Court's previous Order by incorporating its venue arguments in its response to the TRO. Def.'s Br. 8–11, ECF No. 25.

Specifically, the Government claims improper venue based on the fact that Plaintiff cannot show that a "substantial" part of the events giving rise to its claim occurred in this district. 28 U.S.C. § 1391(e)(1). Because Plaintiff avers that it routinely transacts business in and attends sales events in the Northern District of Texas (i.e., it has some connection to this venue), the dispute is whether the events giving rise to the instant lawsuit that occurred within this district are substantial *enough*. As the Court previously held, that question requires further analysis that need not be rushed to the top of the Court's docket, ahead of the numerous cases (including several other requests for emergency relief) currently pending, given that it does not implicate the Court's *jurisdictional* authority. *Bywaters v. United States*, 196 F.R.D. 458, 464 (E.D. Tex. 2000) ("Venue does not relate to the power to adjudicate, but to the place where that power is to be exercised and 'is a concept oriented around the convenience of the litigants and the court system.' ") (quoting *Jones v. United States*, 407 F. Supp. 873, 876 (N.D. Tex. 1976)).

Moreover, the Government did not then—nor does it now—cite any binding authority dictating that this Court *must* resolve a non-subject matter jurisdictional venue motion before it addresses Plaintiff's motion for emergency relief. *Id.* at 1–3. The Court will address the Government's venue motion in due course. But for the reasons discussed, it will not expedite consideration of that issue and, accordingly, **RESERVES** ruling on the venue question in the interim.

### B.

#### 1. Substantial Likelihood of Success on the Merits

Polymer80, Inc. v. Garland, Not Reported in Fed. Supp. (2023)
2023 WL 3605430

Case 2:25-cv-00223-Z    Document 26    Filed 12/10/25    Page 90 of 100    PageID 1566

To show a substantial likelihood of success on the merits, Polymer80 need not show it is entitled to summary judgment on its claim, but must present a prima facie case. *Daniels Health Servs.*, 710 F.3d at 582. Polymer80 has met that burden with respect to at least one of its claims—that the Final Rule exceeds the scope of ATF's statutory authority—and has, therefore, satisfied "arguably the most important" of the four preliminary injunction factors. *Tesfamichael v. Gonzales*, 411 F.3d 169, 176 (5th Cir. 2005).

The Administrative Procedure Act ("APA") instructs courts to "hold unlawful and set aside agency action ... found to be ... in excess of statutory jurisdiction, authority, or limitations." 5 U.S.C. § 706(2)(C). Plaintiff contends that ATF's Final Rule, and its implementation of the regulation, exceeds the agency's statutory authority under the plain language of the GCA "because its redefinition of 'frame or receiver' and treatment of parts kits are inconsistent with the [Act's] plain language." [30] Plaintiff is correct. [31]

[30] Pl.'s Br. 13, ECF No. 15; Compl. 32–33, ECF No. 1.

[31] This Court has already determined that the Final Rule likely exceeds ATF's statutory authority and incorporates its prior reasoning here. Opinion & Order 6–16, *Vanderstok*, No. 4:22-CV-00691-O (N.D. Tex. Sept. 2, 2022).

### a. Parts that *may become* receivers are not receivers.

**\*6** The text of the Gun Control Act resolves this motion. When "the statute's language is plain, 'the sole function of the courts is to enforce it according to its terms.' " *United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 241 (1989) (citation omitted). The Court "begin[s] with the assumption that the words were meant to express their ordinary meaning." *United States v. Kaluza*, 780 F.3d 647, 659 (5th Cir. 2015) (citation and internal quotation marks omitted). But when a statute "includes an explicit definition," the Court " 'must follow that definition,' even if it varies from a term's ordinary meaning." *Digital Realty Tr., Inc. v. Somers*, 138 S. Ct. 767, 776 (2018) (citation omitted). "Statutory language 'cannot be construed in a vacuum. It is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme.' " *Sturgeon v. Frost*, 577 U.S. 424, 438 (2016) (citation omitted).

Congress carefully defined its terms in the Gun Control Act. The primary definition of "firearm" in the Act contains three parts: "any weapon (including a starter gun) which [1] will or [2] is designed to or [3] may readily be converted to expel a projectile by the action of an explosive." 18 U.S.C. § 921(a)(3)(A). Under this primary definition, a firearm is first and foremost a *weapon*. Underscoring that point, Congress explicitly named starter guns in the definition because starter guns are not obviously weapons. Then, because weapon parts also are not "weapons," Congress created a secondary definition covering specific weapon parts: "the frame or receiver of any such weapon." *Id.* § 921(a)(3)(B). Congress did not cover all weapon parts—only frames and receivers. And *only* the frames and receivers "of any

Polymer80, Inc. v. Garland, Not Reported in Fed. Supp. (2023)
2023 WL 3605430

Case 2:25-cv-00223-Z    Document 26    Filed 12/10/25    Page 91 of 100    PageID 1567

such weapon" that Congress described in the primary definition.

Congress did not define the phrase "frame or receiver," so the words receive their ordinary meaning. *See Kaluza*, 780 F.3d at 659. In the Final Rule, ATF interprets the phrase as two separate parts. ATF says the "term 'frame' means the part of a handgun ... that provides housing or a structure for the component (i.e., sear or equivalent) designed to hold back the hammer, striker, bolt, or similar primary energized component prior to initiation of the firing sequence." 27 C.F.R. § 478.12(a)(1). ATF defines "receiver" similarly, though it says the term refers to a "rifle, shotgun, or projectile weapon other than a handgun." *Id.* § 478.12(a)(2).

But the Final Rule did not merely update ATF's terminology. ATF added an entirely new section expanding its jurisdiction to include "partially complete, disassembled, or nonfunctional frame[s] or receiver[s]." *Id.* § 478.12(c). ATF now claims authority to regulate parts that are "designed to or may readily be completed, assembled, restored, or otherwise converted to function as a frame or receiver." *Id.* The parts must be "clearly identifiable as an unfinished component part of a weapon." *Id.* In deciding whether something is a partially complete frame or receiver, ATF may consider other materials such as molds, instructions, and marketing materials "that are sold, distributed, or possessed with the item or kit." *Id.*

The Final Rule's redefinition of "frame or receiver" conflicts with the statute's plain meaning. The definition of "firearm" in the Gun Control Act does not cover all firearm parts. It covers specifically "the frame or receiver of any such weapon" that Congress defined as a firearm. 18 U.S.C. § 921(a)(3)(B). That which *may become* a receiver is not itself a receiver. Congress could have included firearm parts that "may readily be converted" to frames or receivers, as it did with "weapons" that "may readily be converted" to fire a projectile. But it omitted that language when talking about frames and receivers. "[W]hen Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Collins v. Yellen*, 141 S. Ct. 1761, 1782 (2021) (citation and internal quotation marks omitted). Likewise, when Congress uses a phrase in one part of a definition and excludes that phrase from another part of the very same definition, courts should give effect to Congress's deliberate exclusion.

**\*7** Congress excluded other adjectives that ATF adds to its definition. The Final Rule covers "disassembled" and "nonfunctional" frames and receivers. 27 C.F.R. § 478.12(c). Congress's definition does not. Again, compare the language in Congress's primary definition of "firearm" to its secondary definition covering frames and receivers. The primary definition of "firearm" includes any "weapon" that "is designed to" fire a projectile. 18 U.S.C. § 921(a)(3)(A). That language covers disassembled, nonfunctional, and antique firearms because they are "designed" to fire projectiles even if they are practically unable to do so. But Congress wanted to exclude antiques, so it explicitly said the "term does

Polymer80, Inc. v. Garland, Not Reported in Fed. Supp. (2023)
2023 WL 3605430

Case 2:25-cv-00223-Z    Document 26    Filed 12/10/25    Page 92 of 100    PageID 1568

not include an antique firearm," once again demonstrating awareness of the scope of the language it chose. *Id.* § 921(a)(3). In contrast, Congress did not choose to cover firearm parts that are "designed" to be frames or receivers—that is, incomplete, nonfunctional frames or receivers. "That omission is telling," particularly when Congress used that more expansive terminology in the same definition. *Collins*, 141 S. Ct. at 1782.

ATF's new definition of "frame or receiver" in 27 C.F.R. § 478.12(c) is facially unlawful. By comparison, the Final Rule includes definitions of "frame" and "receiver" in § 478.12(a) that appear to be consistent with the statute. This further highlights that the Final Rule's expansion of authority in § 478.12(c) to firearm parts that are *not yet* frames or receivers goes beyond Congress's definition. In other words, § 478.12(a) describes the full scope of frames and receivers that are consistent with the statutory scheme. ATF's expansion in § 478.12(c), on the other hand, covers *additional* parts that are "designed to or may readily be completed, assembled, restored, or otherwise converted to function as a frame or receiver." 27 C.F.R. § 478.12(c). But Congress intentionally omitted that language from the definition. Section 478.12(c) is thus facially unlawful because it describes only parts that Congress intentionally excluded from its definition of "firearm." It is purely an expansion of authority beyond the statutory language. That the firearm part is "designed" to be or may one day become a frame or receiver does not change the fact that, in that moment, it is not "the frame or receiver of any such weapon." 18 U.S.C. § 921(a)(3)(B).

Defendants' counterarguments are unpersuasive. First, Defendants urge the Court to reject its own prior reasoning and adopt "the persuasive reasoning of other decisions denying preliminary relief to plaintiffs challenging the [Final] Rule."[32] Having reviewed those decisions, the Court is not persuaded by the fairly cursory statutory analysis of *Morehouse Enters v. ATF*, or by the decision in *Div. 80, LLC v. Garland*, which did not address the merits of plaintiff's claim.[33] In this Court's view, the *Morehouse* court's analysis does not reflect "the level of rigor that usually accompanies statutory interpretation," *In re Harris*, 988 F.3d 239, 241 (5th Cir. 2021) (Oldham, J., concurring), because it does not meaningfully engage Congress' precise treatment of particular statutory terms (i.e., "weapons" versus "firearms").[34] "[T]he regulatory goals of the Gun Control Act were narrow[ ]: the Act ensured that '*weapons* [were] distributed through regular channels and in a traceable manner and [made] possible the prevention of sales to undesirable customers and the detection of the origin of particular *firearms*.' " *New York v. Burger*, 482 U.S. 691, 713 (1987) (emphases added) (alterations in original) (citing *United States v. Biswell*, 406 U.S. 311, 315–16 (1972)). When Congress sought to regulate *parts* of weapons, it did so meticulously.

[32]    Def.'s Br. 12, ECF No. 25 (citing *Morehouse Enters. v. ATF*, No. 3:22-CV-116, 2022 WL 3597299 (D.N.D. Aug. 23, 2022) *appeal docketed*, *Arizona v. ATF*, No. 22-2812 (8th Cir.) and *Div. 80, LLC v. Garland*, No. 3:22-

Polymer80, Inc. v. Garland, Not Reported in Fed. Supp. (2023)
2023 WL 3605430

Case 2:25-cv-00223-Z    Document 26    Filed 12/10/25    Page 93 of 100    PageID 1569

CV-148, 2022 WL 364854 (S.D. Tex. Aug. 23, 2022)).

33    *Morehouse Enters. v. ATF*, No. 3:22-CV-116, 2022 WL 3597299, at *5–6 (D.N.D. Aug. 23, 2022) *appeal docketed*, *Arizona v. ATF*, No. 22-2812 (8th Cir.) (dedicating four paragraphs to interpretive arguments that the Court addressed at length in *Vanderstok*); *Div. 80, LLC v. Garland*, No. 3:22-CV-148, 2022 WL 364854, at *6 (S.D. Tex. Aug. 23, 2022) ("Because [plaintiff] failed to establish [irreparable harm], the court need not address its likelihood of success on the merits.").

34    *See, e.g., Morehouse Enters.*, at *5–6 ("[T]he GCA itself defines 'firearm' as 'any weapon (including a starter gun) which will or is designed to or may readily be converted to expel a projectile by the action of an explosive[.]' 18 U.S.C. § 921(a)(3)(A).... Congress defined 'firearm' more broadly than simply a fully operational weapon, as the statute expressly includes items that 'may readily be converted to expel a projectile.' ").

**\*8**    Second, Defendants contend that the Court's reasoning in *Vanderstok* is inapplicable in this case because, there, "the Court concluded that the Rule's amended definition of 'frame or receiver' likely exceeded ATF's statutory authority because it would 'regulate a component as a "frame or receiver" even after ATF determines that the component in question is *not* a frame or receiver.' "[35] Defendants argue this case is different because, in its Open Letter and Polymer80 Letter,

ATF *did* conclude that Polymer80's products are "frames" and therefore "firearms" for purposes of the GCA.[36] Indeed, "[n]owhere in either letter does ATF determine these products are not frames."[37] But the facts are not as straightforward as Defendants suggest. Importantly, ATF issued its December 2022 letters characterizing Polymer80's products as "firearms" in the midst of ongoing litigation over its Final Rule and entirely unprompted, not because Plaintiff had submitted a request for classification of its products. Even more importantly, ATF *had*, on multiple occasions in the preceding years, previously determined that Polymer80's receiver blanks are *not* firearms for purposes of the GCA.[38] In short, the Court sees no reason to depart from earlier reasoning with respect to the Final Rule.

35    Def.'s Br. 13, ECF No. 25 (emphasis in original) (quoting Opinion 10, *Vanderstok*, No. 4:22-CV-00691-O (N.D. Tex. Sept. 2, 2022)).

36    *Id.*

37    *Id.*

38    See note 2 *supra*.

**b. A weapon parts kit is not a firearm.**

Plaintiff is also likely to succeed on its claim that the Final Rule unlawfully treats weapon parts kits as firearms. The Final Rule contains its own definition of "firearm," notwithstanding that the GCA already defines the term. Under the Final Rule, "[t]he term shall include a weapon parts kit that is designed to or may readily be completed, assembled, restored, or otherwise converted to expel a

Polymer80, Inc. v. Garland, Not Reported in Fed. Supp. (2023)
2023 WL 3605430

Case 2:25-cv-00223-Z    Document 26    Filed 12/10/25    Page 94 of 100    PageID 1570

projectile by the action of an explosive." 27 C.F.R. § 478.11 (definition of "firearm"). That language conflicts with the statute's definition of "firearm."

Despite Defendants' arguments to the contrary, ATF has no general authority to regulate weapon parts.[39] But the Final Rule grants ATF that general authority by copying language used throughout the statutory definition. It takes phrases like "designed to" and "may readily be converted" and "assembled" from various places in the statute, cobbling them together to form ATF's own definition of "firearm." Those terms may add a patina of credibility to the drafting, but they tarnish Congress's carefully crafted definition. More importantly, they unlawfully expand ATF's authority beyond the boundaries set by the Act.

[39]    Def.'s Br. 15, ECF No. 25.

Under § 921(a)(3)(B), the only firearm parts that fall under ATF's purview are "the frame or receiver of any such weapon" that Congress defined as a firearm. 18 U.S.C. § 921(a)(3)(B). But the Final Rule regulates weapon parts kits that are "designed to or may readily be completed, assembled, restored, or otherwise converted to expel a projectile by the action of an explosive." 27 C.F.R. § 478.11. The statute covers "any *weapon*" that is "designed to" or "may readily be converted to" fire a projectile. 18 U.S.C. § 921(a)(3)(A) (emphasis added). Congress's definition does not cover weapon *parts*, or aggregations of weapon parts, regardless of whether the parts may be readily assembled into something that may fire a projectile.[40]

[40]    Def.'s Br. 14–15, ECF No. 25.

The statutory context repeatedly confirms that Congress intentionally chose not to regulate "weapon" parts generally. As further evidence, look to § 921(a)(4)(C), which does allow for the regulation of "parts." But it allows for the regulation only of parts of "destructive devices"—one of the four statutory sub-definitions of "firearm." *Id.* § 921(a)(3)(D). The term "destructive device" is defined as "any explosive, incendiary, or poison gas," such as a bomb, grenade, mine, or similar device. *Id.* § 921(a)(4)(A). The definition of "destructive device" also includes "any type of weapon" that "may be readily converted to, expel a projectile by the action of an explosive or other propellant, and which has any barrel with a bore of more than one-half inch in diameter." *Id.* § 921(a)(4)(B). For example, suppose a manufacturer tried to sell a parts kit to make a homemade grenade. ATF could regulate that parts kit because it can regulate "any combination of parts either designed or intended for use in converting any device into" a grenade, from which a grenade "may be readily assembled." *Id.* § 921(a)(4)(C). Likewise for bombs, rockets, missiles, and other destructive devices. But commonly sold firearms such as 9mm pistols or .223 rifles do not fall under the specialized definition of "destructive devices," so weapon parts kits for those firearms cannot be properly regulated as components of "destructive devices." *Id.* § 921(a)(4).

**\*9** In sum, the Gun Control Act's precise wording demands precise application. Congress *could have* described a firearm as "any combination of parts" that would produce a weapon that could fire a projectile. It used

Polymer80, Inc. v. Garland, Not Reported in Fed. Supp. (2023)
2023 WL 3605430

Case 2:25-cv-00223-Z    Document 26    Filed 12/10/25    Page 95 of 100    PageID 1571

that language elsewhere in the definition. *Id.* § 921(a)(4)(C). Congress could have described a firearm as any part "designed" to be part of a weapon. It used that language too. *Id.* § 921(a)(3)(A), (a)(4)(C). Congress could have described a firearm as a set of parts that "may be readily assembled" into a weapon, as it did for "destructive device." *Id.* § 921(a)(4)(C). Congress could have written all those things, and the very definition of "firearm" demonstrates that Congress knew the words that would accomplish those ends.[41] But Congress did not regulate firearm parts as such, let alone parts kits that are "designed to or may readily be completed, assembled, restored, or otherwise converted to expel a projectile by the action of an explosive." 27 C.F.R. § 478.11.

[41]    Congress's definition of "machine gun" elsewhere in the U.S. Code is a great example of a definition would fit the kind of rule ATF has in mind:

> The term "machinegun" means any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger. The term shall also include the frame or receiver of any such weapon, *any part* designed and intended solely and exclusively, or *combination of parts* designed and intended, for use in converting a weapon into a machinegun, *and any combination of parts from which a machinegun can be assembled* if such parts are in the possession or under the control of a person.

26 U.S.C. § 5845(b) (emphases added); *see also Buckeye Check Cashing, Inc. v. Cardegna,* 546 U.S. 440, 448 (2006) ("Our more natural reading is confirmed by the use of the word 'contract' elsewhere in the United States Code ....").

\* \* \* \*

For the reasons discussed, the Court stands by its earlier reasoning and finds that Plaintiff has demonstrated a strong likelihood of success on the merits of its claims that the Final Rule—specifically, 27 C.F.R. §§ 478.11, 478.12(c)—exceeds the scope of ATF's authority under the Gun Control Act. Because it has satisfied this element with its APA claim, the Court need not address the merits of its remaining claims.

## 2. Substantial Threat of Irreparable Harm

In the Fifth Circuit, a harm is considered "irreparable only 'if it cannot be undone through monetary remedies.' " *Dennis Melancon, Inc. v. City of New Orleans,* 703 F.3d 262, 279 (5th Cir. 2012) (quoting *Interox Am. v. PPG Indus., Inc.,* 736 F.2d 194, 202 (5th Cir.1984)). A showing of economic loss is usually insufficient to establish irreparable harm because damages may be recoverable at the conclusion of litigation. *Janvey v. Alguire,* 647 F.3d 585, 600 (5th Cir. 2011). However, "an exception exists where the potential economic loss is so great as to threaten the existence of the movant's business." *Atwood Turnkey Drilling, Inc. v. Petroleo Brasileiro, S.A.,* 875 F.2d 1174, 1179 (5th Cir. 1989). And where costs are not recoverable because the government-defendant enjoys sovereign

Polymer80, Inc. v. Garland, Not Reported in Fed. Supp. (2023)
2023 WL 3605430

Case 2:25-cv-00223-Z    Document 26    Filed 12/10/25    Page 96 of 100    PageID 1572

immunity from monetary damages, as is the case here, irreparable harm is generally satisfied. *See Wages & White Lion Invs., L.L.C. v. FDA*, 16 F.4th 1130, 1142 (5th Cir. 2021).

Plaintiff alleges that it continues to suffer irreparable harm in the form of unrecoverable compliance costs and—within days of this Order—is threatened with having to dissolve its business if its economic losses continue unabated. [42] Defendants contest Plaintiff's alleged injury on grounds that it purportedly waited eleven months to seek an injunction and that any harm Polymer80 is suffering is purely "self-inflicted." [43] The Court disagrees.

[42] Pl.'s Br. 21–22, ECF No. 15.

[43] Def.'s Br. 22–24, ECF No. 25.

Because Defendants in this case are entitled to sovereign immunity, and therefore not liable for damages, Plaintiff's economic injuries cannot be recovered. Moreover, Plaintiff alleges that its business enterprise faces certain dissolution if the Court does not provide immediate relief from compliance with the Final Rule. In this way also, Polymer80's harm "threaten[s] the existence of [its] business," and is therefore irreparable for purposes of injunctive relief. *Atwood*, 875 F.2d at 1179. Notably, Defendants do not contest the assertion that the company's dissolution will likely result. [44]

[44] *See* Def.'s Br. 23–24, ECF No. 25.

**\*10** Importantly, irreparable harm need not be financial in nature. Even "alleged" deprivations of constitutional or procedural rights may justify injunctive relief. *See, e.g., Opulent Life*

*Church v. City of Holly Springs, Miss.*, 697 F.3d 279, 294–97 (5th Cir. 2012) (finding irreparable harm where plaintiffs "alleged" violations of constitutional rights on grounds that "[t]he loss of [constitutional] freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury") (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)); *see also Louisiana v. Horseracing Integrity & Safety Auth. Inc.*, No. 6:22-CV-01934, 2022 WL 2960031, at \*13 (W.D. La. July 26, 2022) (finding irreparable harm where plaintiffs alleged action in excess of statutory authority and APA violations). Plaintiff's Complaint alleges deprivations of both constitutional and procedural rights. For this reason, Plaintiff need not cure its economic harm by simply opting to comply with a regulation that is likely unlawful, as Defendants suggest. [45]

[45] *Id.*

The Court is unpersuaded by Defendants' argument that Plaintiff's harm is "self-inflicted" and therefore does not constitute irreparable harm. [46] For this, Defendants' rely on the Fifth Circuit's decision in *State v. Biden*, 10 F.4th 538, 558 (5th Cir. 2021). [47] In that case, the Fifth Circuit indicated that "self-inflicted" injuries do not qualify as irreparable harm. *Biden*, 10 F.4th at 558.

[46] Def.'s Br. 23–24.

[47] *Id.*

But the facts in *Biden* are distinguishable from the facts of this case. There, the plaintiffs (two states) sued the defendants (several federal government actors, including DHS) over the

Polymer80, Inc. v. Garland, Not Reported in Fed. Supp. (2023)
2023 WL 3605430

Case 2:25-cv-00223-Z    Document 26    Filed 12/10/25    Page 97 of 100    PageID 1573

latter's suspension of a prior presidential administration's immigration program. *Id.* at 543–46. The states prevailed in the district court and DHS was required to resume the program. *Id.* Thereafter, DHS sought an emergency stay pending appeal, which required it to make a showing of irreparable harm. *Id.* at 545. Among other things, DHS tried to substantiate its irreparable injury by claiming it had already begun administratively winding down the program and that requiring it to resume would inflict a great degree of harm. *Id.* at 558. The Fifth Circuit rejected this argument. *Id.* It found that DHS's decision, in the middle of ongoing litigation, to terminate and unwind the program—and its attempt to use this decision to support a showing of irreparable harm—was a "self-inflicted" harm that severely undermined its claim for emergency relief. *Id.* In the court's view, DHS could have avoided this injury by simply waiting for resolution of the underlying legal dispute before winding down the program. *Id.*

By contrast, Polymer80 stopped selling its products in response to the Government's Final Rule and subsequent guidance letters, which it claims violate its statutory and constitutional rights. Thus, Polymer80 faces irreparable injury whatever course it takes—suffer economic injury or comply with a regulation it alleges the Government has no authority to enforce. For this reason, and because Defendants' contrary arguments overlook clear Fifth Circuit precedent identifying such injuries as irreparable harm, the Court is satisfied that Polymer80's alleged injuries are indeed irreparable and are not self-inflicted.

Finally, while Defendants claim Plaintiff waited nearly a year to seek relief, this suggested timeline is exaggerated. Whether a period of delay militates against a finding of irreparable harm turns on the facts of the particular case. *See, e.g.*, *ADT, LLC v. Cap. Connect, Inc.*, 145 F. Supp. 3d 671, 699 (N.D. Tex. 2015) (finding an eight-month delay reasonable); *Wireless Agents, L.L.C. v. T-Movile USA, Inc.*, No. 3:05-CV-0094-D, 2006 WL 1540587, at *3 (N.D. Tex. June 6, 2006) (finding a year's delay unreasonable). Plaintiff initially thought its interests would be protected by a possible nationwide injunction that was pending in *Vanderstok*, a lawsuit that commenced before the Final Rule took effect.[48] When it learned in September 2022 that its interests would not be protected by an injunction in that case, Plaintiff made good faith efforts to comply with the regulation.[49] However, upon receiving the guidance letters from ATF in late December 2022, Plaintiff learned its business model was no longer viable.[50] Less than two weeks later, Plaintiff sought to intervene in the *Vanderstok* case and simultaneously filed the instant lawsuit. Six weeks thereafter, Plaintiff sought this TRO. On these facts, the Court finds that Plaintiff's purported delay does not weigh against a finding of irreparable harm and finds this element is satisfied.

[48]    Pl.'s Reply 18, ECF No. 26-1.

[49]    *Id.*

[50]    Def.'s Br. 24–25, ECF No. 25.

### 3. Balance of Hardships & the Public Interest

Polymer80, Inc. v. Garland, Not Reported in Fed. Supp. (2023)
2023 WL 3605430

Case 2:25-cv-00223-Z    Document 26    Filed 12/10/25    Page 98 of 100    PageID 1574

**\*11** Next, the Court must weigh the equities and the public interest, which "merge" when the Government is a party. *Nken*, 556 U.S. at 435. Defendants assert a public interest in "preventing individuals from obtaining and using in criminal activity unserialized firearms that cannot be traced by law enforcement," an interest that it contends an injunction will thwart.[51] Meanwhile, Plaintiffs assert the public interest in ensuring the Government abides by its statutory and constitutional obligations.[52] There is undoubtedly "an overriding public interest [in] ... an agency's faithful adherence to its statutory mandate." *Jacksonville Port Auth. v. Adams*, 556 F.2d 52, 59 (D.C. Cir. 1977). And "[t]he public interest is served when administrative agencies comply with their obligations under the APA." *N. Mariana Islands v. United States*, 686 F. Supp. 2d 7, 21 (D.D.C. 2009). Nor do Defendants dispute that the core of Plaintiff's clientele base is comprised of law-abiding citizens who wish to engage in the lawful conduct of manufacturing personal firearms— conduct that has been lawful for the last half-century. Moreover, Defendants concede that their asserted public interest can be adequately protected by excluding from any relief persons prohibited from possessing firearms under 18 U.S.C. § 922(g), as the Court has done in crafting similarly situated manufacturer's relief.[53]

[51]  *See* Defs.' Resp. 43, ECF No. 41.

[52]  Pl.'s Reply 20, ECF No. 26-1.

[53]  Def.'s Br. 25, ECF No. 25; *see, e.g.*, Order 1–2, *Vanderstok*, No. 4:22-CV-00691-O (N.D. Tex. Oct. 3, 2022).

While both parties claim valid public interests, on balance, the equities and public interest weigh in favor of Plaintiff. Any injury to Defendants is further outweighed by Plaintiff's strong likelihood of success on the merits of its statutory interpretation claim. *See Freedom From Religion Found., Inc. v. Mack*, 4 F.4th 306, 316 (5th Cir. 2021). Finally, the Court will tailor the scope of the temporary restraining order and preliminary injunction with careful attention to avoid further upsetting the balance of these competing public interests.

\* \* \* \*

In sum, Polymer80, Inc. has shown it is entitled to preliminary injunctive relief. Having considered the arguments, evidence, and law, the Court holds that the relevant factors weigh in favor of a preliminary injunction. When ordering injunctive relief, the Court is obligated to state "specifically" and "in reasonable detail ... the act or acts restrained or required" under the injunction. Fed. R. Civ. P. 65(d)(1)(b). Accordingly, the Court preliminarily **ENJOINS** Defendants and their officers, agents, servants, and employees are enjoined from implementing or enforcing against Polymer80, Inc. or its customers, in any manner, the provisions in 27 C.F.R. § 478.11 and 478.12 that this Court has determined are likely unlawful. In keeping with the relief this Court has afforded to other similarly situated manufacturers, the Court also extends the injunction to Polymer80's customers, who must be willing to transact business with Polymer80 without fear of criminal liability, in order for

Case 2:25-cv-00223-Z    Document 26    Filed 12/10/25    Page 99 of 100    PageID 1575

Polymer80's relief to be effective. The Court defines "customers" as: individuals or entities who purchase directly from Polymer80 any product classified as a "firearm" under 27 C.F.R. § 478.11 or § 478.12(c). This definition does not include persons prohibited from possessing firearms by 18 U.S.C. § 922(g).

## IV. CONCLUSION

For the reasons discussed, the Court **GRANTS** Plaintiff's motion for leave to file an overlength brief (ECF No. 26) and for a temporary restraining order and preliminary injunction (ECF No. 14). The Court **ORDERS** that Defendants and their officers, agents, servants, and employees are enjoined from implementing or enforcing against Polymer80, Inc. or its customers, in any manner, the provisions in 27 C.F.R. § 478.11 and 478.12 that this Court has determined are likely unlawful. The Court waives the security requirement of Fed. R. Civ. P. 65(c). *Kaepa, Inc. v. Achilles Corp.*, 76 F.3d 624, 628 (5th Cir. 1996).

**SO ORDERED** this **19th day** of **March, 2023**.

**All Citations**

Not Reported in Fed. Supp., 2023 WL 3605430

---

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

2025 WL 2058762
Only the Westlaw citation
is currently available.
United States Court of Appeals, Fifth Circuit.

UNITED STATES of
America, Plaintiff—Appellant,
v.
Deonte Kyrique HICKS,
Defendant—Appellee.

No. 23-50030
|
Summary Calendar
|
FILED July 23, 2025

Appeal from the United States District Court for the Western District of Texas, USDC No. 6:21-CR-60-1

Before Graves, Willett, and Wilson, Circuit Judges.

## Opinion

Per Curiam: [*]

[*]   This opinion is not designated for publication. See 5th Cir. R. 47.5.

**\*1** The Government appeals the dismissal of Deonte Kyrique Hicks's indictment. The district court held that the statute underlying the indictment, 18 U.S.C. § 922(n), is facially unconstitutional under the Second Amendment in light of *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1 (2022). The Government now seeks summary disposition or, in the alternative, an extension of time to file its brief.

Because Hicks opposes summary disposition and has not conceded that controlling precedent forecloses his position, we decline to grant the Government's motion. *See Groendyke Transp., Inc. v. Davis*, 406 F.2d 1158, 1162 (5th Cir. 1969); *Khan v. Garland*, No. 21-60372, 2021 WL 5227077, at \*1 (5th Cir. Nov. 9, 2021). Even so, the Government is correct that the district court's dismissal runs afoul of *United States v. Quiroz*, 125 F.4th 713, 717-25 (5th Cir. 2025), *petition for cert. filed* (U.S. May 29, 2025) (No. 24-7342). In light of *Quiroz*, no further briefing is necessary. *See United States v. Bailey*, 924 F.3d 1289, 1290 (5th Cir. 2019).

We therefore DENY the Government's motion for summary disposition, REVERSE the district court's dismissal order, and REMAND for further proceedings. The Government's alternative motion for an extension of time to file a brief is DENIED AS MOOT.

## All Citations

Not Reported in Fed. Rptr., 2025 WL 2058762

---

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.