**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION**

JOHN JENSEN, *et al*.,

        *Plaintiffs*,

v.

BUREAU OF ALCOHOL, TOBACCO,
FIREARMS AND EXPLOSIVES, *et al*.,

        *Defendants.*

No. 2:25-cv-223-Z

**BRIEF OF BRADY CENTER TO PREVENT GUN VIOLENCE, EVERYTOWN FOR GUN SAFETY, AND GIFFORDS LAW CENTER TO PREVENT GUN VIOLENCE AS *AMICI CURIAE* IN SUPPORT OF DEFENDANTS**

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ............................................................................................ ii

INTEREST OF AMICI CURIAE ...................................................................................1

ARGUMENT ................................................................................................................1

I.     Congress—Relying on Its Taxing Power and the Commerce Clause—Enacted the NFA to Address Acute Public Safety Risks Posed by Particularly Dangerous and Easily Concealable Weapons ..............................................................................2

II.    NFA Items Are Especially Dangerous Weapons and Devices that Continue to Pose a Significant Threat to Public Safety .......................................................................4

III.   National Firearms Act Registration Requirements Facilitate Lawful Possession While Reducing the Risks of Criminal Misuse of NFA Items ...........................7

IV.   Through the 2025 Amendments to the NFA, Congress Preserved the NFA's Registration System, Which Plays an Important Role in Firearms Regulation ...............10

V.    The NFA Forms Part of a Longstanding, Comprehensive Scheme Regulating Dangerous Weapons and Is a Valid Exercise of Congress's Commerce Clause Authority and Taxing Power ..............................................................................12

     A.    The NFA is part of a comprehensive regulatory scheme and registration requirements are a valid exercise of Commerce Clause authority........................ 12

     B.    Registration requirements for NFA items remain a valid exercise of Congress's Taxing Power ......................................................................... 14

CONCLUSION............................................................................................................16

i

# TABLE OF AUTHORITIES

Page(s)

## CASES

*United States v. Hamzeh*, 986 F.3d 1048 (7th Cir. 2021) ....................................................5

*United States v. Rush*, 130 F.4th 633 (7th Cir. 2025) .......................................................6

*N.Y. State Rifle & Pistol Ass'n v. Bruen,* 597 U.S. 1 (2022) ............................................8

*United States v. Kenney*, 91 F.3d 884 (7th Cir. 1996) ................................................12, 13

*Gonzales v. Raich,* 545 U.S. 1 (2005)..........................................................................12, 14

*United States v. Rybar*, 103 F.3d 273 (3d Cir. 1996)......................................................12

*United States v. Stewart*, 451 F.3d 1071 (9th Cir. 2006) ................................................12

*United States v. Lopez*, 514 U.S. 549 (1995).................................................................13

*United States v. Morrison*, 529 U.S. 598 (2000) ...........................................................13

*United States v. Kahriger*, 345 U.S. 22 (1953), *overruled on different grounds by Marchetti v. United States*, 390 U.S. 39 (1968)...................................................14

*Sonzinsky v. United States*, 300 U.S. 506 (1937)................................................14, 15, 16

*California Bankers Ass'n v. Shultz*, 416 U.S. 21 (1974)..................................................15

*CIC Servs., LLC v. IRS*, 593 U.S. 209 (2021)...............................................................15

*Haynes v. United States*, 390 U.S. 85 (1968)................................................................15

*M'Culloch v. Maryland*, 17 U.S. 316 (1819)................................................................15

*NFIB v. Sebelius*, 567 U.S. 519 (2012)........................................................................15

*United States v. Sanchez*, 340 U.S. 42 (1950) ..............................................................15

## STATUTES, RULES, AND REGULATIONS

Pub. L. No. 73-474, § 1(a) .............................................................................................3

Pub. L. No. 90-618...................................................................................................3, 4, 11

26 U.S.C. §§ 5801–5872................................................................................................4, 12

27 C.F.R. § 479.85 ..........................................................................................................7

27 C.F.R. § 479.63 ........................................................................................................7

26 U.S.C. § 5822 ...........................................................................................................7

26 U.S.C. § 5861(d) ....................................................................................................7, 9

26 U.S.C. § 5841 .....................................................................................................7, 9, 11

26 U.S.C. § 5812 .....................................................................................................7, 8, 11

27 C.F.R. § 478.124 .....................................................................................................8

Ill. Comp. Stat. 65/5(a) ................................................................................................8

18 U.S.C. § 922 ...................................................................................................8, 10, 12, 13

26 U.S.C. § 5801 .....................................................................................................8, 11, 14

27 C.F.R. § 479.84 ....................................................................................................11

26 U.S.C. § 5842(b) ...................................................................................................11

Pub. L. 119-21 § 70436 ..............................................................................................11

Pub. L. No. 119-21, § 70436(d), 139 Stat. 72, 248 (2025) ..........................................11

26 U.S.C. § 5845(a)(7) ...............................................................................................13

18 U.S.C. § 921(a)(3)(C) ............................................................................................13

## OTHER AUTHORITIES

73 Cong. Rec. 11,400 (1934) ......................................................................................2

H.R. Rep. No. 73-1780 (1934) .....................................................................................2

*National Firearms Act: Hearings on H.R. 9066 Before the House Comm. on Ways
    & Means*, 73d Cong., 2d Sess. 6 (1934) (Statement of Att'y Gen. Homer
    Cummings) ..............................................................................................................2

S. Rep. No. 73-1444 (1934) .........................................................................................2

*National Firearms Act: Hearings on H.R. 9066 Before the H. Comm. on Ways
    and Means*, 73d Cong. 96-98 (1934) .....................................................................3

Christopher Dorner, National Policing Institute, *Police Under Attack: Southern
    California Law Enforcement Response to the Attacks* 14 (2015) ...........................5

Gun Industry Accountability, *Silencers: A Threat to Public Safety* (May 12, 2025), https://gunindustryaccountability.org/issue/silencers-a-threat-to-public-safety........................................................................................5, 6

Anthony R. Harris et al., *Murder and Medicine: The Lethality of Criminal Assault 1960-1999*, 6 Homicide Stud. 128 (2002) ..........................................................6

Jonathan P. Meizoso et al., *Effect of Time to Operation on Mortality for Hypotensive Patients with Gunshot Wounds to the Torso: The Golden 10 Minutes*, 81 J. Trauma & Acute Care Surg. 685 (2016) ....................................................6

**INTEREST OF AMICI CURIAE**

Amici curiae are three nonprofit organizations dedicated to reducing gun violence through education, research, and advocacy.  Amici have a substantial interest in ensuring that the Constitution is construed properly to allow democratically elected officials to address gun violence and to protect the interests of all Americans in living safe and secure lives in their communities.  Numerous courts, including the Supreme Court, have cited the briefs of amici on issues involving firearms regulations and constitutional principles concerning the ownership and use of firearms.

Brady Center to Prevent Gun Violence is the nation's longest-standing nonpartisan, nonprofit gun violence prevention organization.  Everytown for Gun Safety (officially, Everytown for Gun Safety Action Fund) is the largest gun violence prevention organization in the United States, with millions of supporters across all fifty states.  Giffords Law Center to Prevent Gun Violence is a survivor-led gun violence prevention organization headed by former Congresswoman Gabrielle Giffords.  All three organizations work to reduce gun violence in American communities by promoting and defending prevention laws, reforming the gun industry, and educating the public on responsible gun ownership.

**ARGUMENT**

When Congress enacted the National Firearms Act ("NFA") and the President signed it into law, Congress determined that silencers, short-barreled shotguns, short-barreled rifles, and machine guns represented especially dangerous weapons that pose a distinct threat to public safety because they are easily concealable and exceptionally lethal.  To address those risks, Congress—acting under its Commerce Clause authority and taxing power—created a comprehensive regulatory framework that permits lawful possession while imposing registration and related requirements to better trace these weapons, deter their use in violent crimes, and

1

prevent their diversion into the illicit market. When Congress later adjusted certain NFA tax provisions, it deliberately preserved that framework, recognizing the ongoing harm these weapons have caused, including their use in mass shootings, terrorist attacks, and other violent crimes. All of this falls well within Congress's constitutional authority.[1]

## I.    Congress—Relying on Its Taxing Power and the Commerce Clause—Enacted the NFA to Address Acute Public Safety Risks Posed by Particularly Dangerous and Easily Concealable Weapons.

Enacted in 1934, the NFA was Congress's first major federal effort to address a rapidly escalating national crisis: the rise of Prohibition-era organized violence and the ease with which criminal organizations obtained unusually dangerous, easily concealable weapons. *See, e.g.*, 73 Cong. Rec. 11,400 (1934). As contemporaneous Congressional reports explained, the NFA aimed to curb "the growing frequency of crimes of violence in which people are killed or injured by the use of dangerous weapons" by depriving violent criminal groups of their "most dangerous weapon[s]." H.R. Rep. No. 73-1780, at 1 (1934); S. Rep. No. 73-1444, at 1-2 (1934).

Congress concluded that short-barreled shotguns, short-barreled rifles, machine guns, silencers, and certain other concealable weapons and devices (hereinafter, "NFA items") posed a distinct threat to public safety. A short-barreled shotgun, for example, was described during hearings as "one of the most dangerous and deadly weapons," prized because it could be concealed beneath a coat yet deliver devastating force at close range. *National Firearms Act: Hearings on H.R. 9066 Before the House Comm. on Ways & Means*, 73d Cong., 2d Sess. 6 (1934) (Statement of Att'y Gen. Homer Cummings). This Act likewise subjected silencers (or

---

[1] This brief addresses Congress's affirmative authority to enact and enforce the NFA. The challenged provisions also comport with the Second Amendment for the reasons set out in the federal defendants' brief and in the amicus brief filed by Democracy Forward and the Institute for Constitutional Advocacy and Protection. *See* Defs' Br. at 27-32; Br. of Amici Curiae Democracy Forward and Institute for Constitutional Advocacy and Protection at 17-25.

"mufflers") to the statute's regulations, regardless of the weapon for which they were designed. *See* Pub. L. No. 73-474, § 1(a).

Congress did not seek to regulate ordinary rifles or handguns but rather to isolate and track weapons associated with notorious violent criminals and their organizations. To address those risks, Congress adopted a regulatory scheme that involved both taxation and registration requirements. The NFA taxed the making, transfer, and importation[2] of covered firearms. It also created a centralized federal registry—now the National Firearms Registration and Transfer Record ("NFRTR")—and required registration of every NFA item not under the control of the United States.

Although Congress ultimately emphasized the sufficiency of the taxing power as authority to secure the bill's passage, it also recognized the Commerce Clause as another basis for the legislation. From the outset, the government explained that it was proceeding under "two powers," invoking the Commerce Clause to address the reality that armed criminals "pass rapidly from State to State," *id.*, and that the "rapid[]" interstate movement of these weapons "ha[d] become a real menace to the law-abiding people of this country." 73 Cong. Rec. 11,400 (1934) (statement of Rep. Robert L. Doughton). During the legislative debate, the draft bill was changed to remove a provision requiring interstate-transport permits, which resulted in broad agreement that the taxation power alone could be a sufficient constitutional basis. *National Firearms Act: Hearings on H.R. 9066 Before the H. Comm. on Ways and Means*, 73d Cong. 96–98 (1934) (statement of Joseph B. Keenan, Assistant Att'y Gen.). However, Congress never

---

[2] While the original 1934 Act permitted importation subject to a tax, the Gun Control Act of 1968 amended the statute to generally prohibit the practice. *See* Pub. L. No. 90-618, tit. II, § 201, 82 Stat. 1230 (codified at 26 U.S.C. § 5844). Today, items covered by the Act may be imported only for narrow exceptions, such as government use, scientific research, or as sales samples for dealers.

3

indicated in any way that the Commerce Clause was not a valid basis for the statute, nor did it otherwise foreclose reliance on that source of authority. Congress therefore did not view the NFA as a mere revenue measure. Rather, it understood the Act as a valid exercise of overlapping constitutional powers: the authority to impose and enforce taxes and the authority to regulate a growing interstate market in dangerous weapons and the criminal activity it enabled.

The NFA was recodified as 26 U.S.C. §§ 5801–5872 through the Gun Control Act of 1968—legislation expressly premised on Congress's Commerce Clause authority. *See* Pub. L. No. 90-618, § 101, 82 Stat. 1213 (1968) (providing that the Gun Control Act was enacted to address the "widespread traffic in firearms moving in or otherwise affecting interstate or foreign commerce"). The Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") administers the statute, collects the special occupational tax on manufacturers, importers, and dealers, and maintains the NFRTR—now an electronic database designed for efficient tracking, verification, and enforcement. Through this combined tax-and-registration structure, the NFA continues to function as Congress intended: as a tool to regulate and mitigate the harm caused by weapons that were designed for war, that have historically posed acute risks to public safety, and that are not typically possessed by law-abiding citizens for lawful purposes.

## II. NFA Items Are Especially Dangerous Weapons and Devices that Continue to Pose a Significant Threat to Public Safety.

Nearly a century after its enactment, the NFA remains a vital measure to protect the public from exceptionally dangerous weapons and other such devices. NFA items continue to present unique, heightened risks to public safety that distinguish them from standard firearms and accessories. If anything, advances in firearm technology and the firearms marketplace have only reinforced the concerns that animated the 1934 Congress.

4

A silencer, or suppressor, attaches to a firearm's barrel to trap expanding gas and reduce the acoustic intensity of a gunshot.  Proponents of deregulation, including the plaintiffs, often portray these devices as benign accessories intended solely to protect shooters' hearing or reduce noise pollution at gun ranges.  But because silencers reduce noise, they have also been used by mass murderers, terrorists, and assassins.  Silencers have been used in murders and mass shootings—including the 2019 Virginia Beach Municipal Center attack and the 2024 killing of UnitedHealthcare CEO Brian Thompson—and they continue to appear in terrorist and violent-extremist plots.  In one such case, a man's plan to attack a Masonic center in Milwaukee depended on acquiring silencers.  *See United States v. Hamzeh*, 986 F.3d 1048, 1054 (7th Cir. 2021).  As the defendant in that case admitted, without a silencer, "you will be exposed from the beginning."  Campaign for Gun Industry Accountability, *Silencers: A Threat to Public Safety* (May 12, 2025), https://gunindustryaccountability.org/issue/silencers-a-threat-to-public-safety.  That statement captures, in plain terms, the public safety concern that led Congress to regulate silencers.

The sound of a gunshot can alert bystanders to imminent danger, prompt 911 calls, and help law enforcement and medical responders locate victims quickly.  Silencers undermine that function by design.  A quieter or muffled report makes it less likely that neighbors will recognize gunfire, especially in dense or noisy environments.  *See, e.g.*, Christopher Dorner, National Policing Institute, *Police Under Attack: Southern California Law Enforcement Response to the Attacks* 14 (2015) (chronicling that an assailant's use of a suppressor prevented neighbors in a parking garage from recognizing over a dozen shots from a high-powered pistol as gunfire).  That delay can slow emergency response and hinder officers and medics in pinpointing an

unfolding incident. *See, e.g.*, *id.* at 20 (explaining that the use of a silencer initially kept officers from realizing they were under fire while responding to a mass shooting).

These delays matter. Trauma research consistently shows that survival after a shooting depends on how quickly a victim receives care. *See, e.g.*, Jonathan P. Meizoso et al., *Effect of Time to Operation on Mortality for Hypotensive Patients with Gunshot Wounds to the Torso: The Golden 10 Minutes*, 81 J. Trauma & Acute Care Surg. 685 (2016). Improvements in EMS response times and trauma systems have driven down homicide rates even when and where levels of violence remain high. Anthony R. Harris et al., *Murder and Medicine: The Lethality of Criminal Assault 1960-1999*, 6 Homicide Stud. 128, 128–29 (2002). Any feature that reduces detection and lengthens the interval before help arrives erodes those life-saving gains.

Short-barreled rifles and shotguns pose a different but equally serious set of risks. These weapons occupy a dangerous middle ground in firearm physics: they combine high-velocity power, similar to that of a long gun, with concealability closer to that of a handgun. This concealability adds "little—if any—functionality" for lawful purposes such as hunting or home defense, but is highly valued by those planning surprise criminal attacks. *United States v. Rush*, 130 F.4th 633, 637 (7th Cir. 2025). The history of mass shootings in America underscores this danger. Short-barreled shotguns and rifles have been used in some of the nation's most devastating incidents, including the Columbine High School massacre in 1999, the Washington Navy Yard shooting in 2013, and the Santa Fe High School shooting in 2018. In each case, the perpetrator exploited the weapon's reduced size to conceal it and transport it into a public space before unleashing destructive power similar to a long gun.

Taken together, these realities confirm the policy choices made by Congress: silencers and short-barreled rifles and shotguns continue to pose a distinct and extreme threat to public

safety.  The NFA's modest, targeted requirements represent a measured response to these enduring risks—preserving lawful access for responsible owners while making it harder for the violent criminals who value these weapons' stealth and concealability to obtain them.

### III.    National Firearms Act Registration Requirements Facilitate Lawful Possession While Reducing the Risks of Criminal Misuse of NFA Items.

The NFA's registration framework does not prohibit items regulated by the Act.  The statute is designed to distinguish responsible owners from those who would use them for criminal activities.  By requiring registration, the NFA provides law-abiding citizens a pathway to obtain these items while erecting barriers against those who would misuse them.  This dual function—providing access for the lawful and imposing obstacles for the lawless—remains the Act's core design.

In states where NFA items are lawful under state law, ordinary citizens may acquire them through a straightforward federal process.  Individuals who wish to manufacture such a firearm must file an application, pay the applicable tax (where required), and await approval; those purchasing from a dealer follow a similar process.  26 U.S.C. §§ 5812, 5822.  In either case, the applicant provides identifying information, fingerprints, and a photograph and undergoes a background check.  26 U.S.C. §§ 5812(a), 5822; 27 C.F.R. §§ 479.63, 479.85.  Once approved, the item is registered in the NFRTR, and the owner may lawfully possess and use it, subject to other applicable laws.  26 U.S.C. §§ 5841, 5861(d).

Far from being an insurmountable burden, this objective process requires an individual to take appropriate steps before possessing an especially dangerous type of weapon or accessory. The requirements mirror familiar features of other firearms-related and licensing regimes: a one-time application, a modest fee, and a background check to confirm legal eligibility.  *See, e.g.*, 27 C.F.R. § 478.124; 18 U.S.C. § 922(t)(1); 430 Ill. Comp. Stat. 65/5(a); *see also N.Y. State*

7

*Rifle & Pistol Ass'n v. Bruen,* 597 U.S. 1, 38–39 n.9 (2022) (finding that objective, shall-issue licensing schemes—typically involving an application, background check, and fee—are generally constitutionally permissible). They do not require a showing of "need" or subjective discretion by licensing officials. In practice, the system functions as a screening and recordkeeping mechanism focused on a narrow class of particularly dangerous weapons and accessories.

These registration requirements serve critical regulatory and public safety functions. First, they are critical to enforcing the statute's tax provisions. Under the NFA, manufacturers and dealers of covered firearms must pay a Special Occupational Tax ranging from $500 to $1,000 per year. 26 U.S.C. § 5801. The registry ensures compliance by recording every transfer, enabling the government to track weapon flows and identify when a purported "hobbyist" is actually operating as a dealer and evading tax obligations.

Second, the same features that make NFA items accessible to law-abiding applicants serve as a deterrent to those who seek to misuse or traffic them. The registration requirements are integral to the broader regulatory scheme—including the Gun Control Act of 1968—and ensure the heightened vetting that Congress deemed necessary for unusually dangerous weapons. Unlike standard firearms regulated solely under the Gun Control Act, a transferee must submit photographs and fingerprints and await ATF verification of their background and specific approval before taking possession. 26 U.S.C. § 5812. Crucially, this rule applies to every transaction, including private sales, thereby significantly reducing opportunities for criminals and straw purchasers to evade detection when seeking to acquire unusually dangerous weapons.

The result is a system built on three essential components: traceability, deterrence, and illicit market control.

i. *Traceability*.  The NFRTR ensures that these dangerous items are tracked from manufacture to possession and can be easily identified in law enforcement investigations.  *See generally* 26 U.S.C. § 5841.  The NFRTR provides a continuous record of each registered NFA item.  Manufacturers and makers must register the firearm at the point of creation.  *Id.* § 5841(b), (c).  Each subsequent transfer—whether from manufacturer to wholesaler, wholesaler to dealer, or dealer to individual owner—must be federally approved and recorded in the registry.  *Id*. § 5841(b).  Possessors must maintain proof of registration. *Id.* § 5841(e).

This system of serial numbers, registration, and documented transfers gives law enforcement a powerful investigative tool.  When a registered NFA item is recovered at a crime scene, investigators can quickly trace its chain of custody back to the manufacturer, dealer, and last lawful registrant.  That ability facilitates identification of traffickers, detection of theft or diversion patterns, and prosecution of those who falsify applications or traffic in unregistered items.  In short, traceability raises the cost of illicit use or transfer and increases the likelihood that serious misuse will be detected and punished.

ii. *Deterrence*.  The requirement to submit fingerprints and photographs and undergo a background check deters straw purchasing and criminal acquisition.  Under the NFA, an applicant must provide biometric identifiers and sufficient personal information for a meaningful background check.  Federal law criminalizes false statements in this process, possession of an unregistered NFA item, and unlawful transfers.  *See* 26 U.S.C. § 5861(d), (e), (l).  This deters illegal acquisition in at least two ways.  First, the requirements discourage individuals prohibited from possessing firearms from applying.  Second, they reduce the appeal of straw purchasing.  A straw purchaser cannot lawfully obtain an NFA item for a third party without creating a detailed

record linking the weapon to the purchaser, reinforced by biometric identifiers.  This logically increases the risk and cost of such schemes.

*iii. Illicit Market Control.* Finally, the registration requirements safeguard the integrity of the market by preventing the diversion of these dangerous items into illicit channels.  Because every transfer must be approved and recorded, a lawful owner cannot simply sell a short-barreled shotgun to a stranger in a parking lot without committing a serious felony.  This works to confine items covered by the Act to a community of law-abiding, registered owners and ensures that the lawful supply of NFA items flows through a network of regulated entities with strong incentives to comply with federal law.  These measures constrain the size and permeability of the illicit market and reduce the likelihood that such weapons will leak from lawful dealers and owners into criminal hands.

The NFA is also integral to enforcing the broader regulatory scheme that includes other gun laws, such as the Gun Control Act of 1968.  While the Gun Control Act regulates the commerce of NFA items (as well as other firearms and ammunition)—requiring licenses for those "engaged in the business" of selling and manufacturing such weapons and limiting transfers to private individuals, §§ 922(a)(4), (b)(4)—it provides no mechanism to track these weapons and instead relies on NFA requirements.  By requiring registration of every NFA item, the Act enables law enforcement to distinguish lawful weapons from illegal contraband, thereby supplying the practical means to enforce the Gun Control Act's prohibitions.

**IV.    Through the 2025 Amendments to the NFA, Congress Preserved the NFA's Registration System, Which Plays an Important Role in Firearms Regulation.**

The 2025 Amendments to the NFA, passed by Congress and signed into law by President Trump in 2025, reduced to zero the excise tax on certain devices regulated under the NFA, but

left all NFA regulatory provisions—including registration requirements—unchanged.  See Pub. L. No. 119-21, § 70436(d), 139 Stat. 72, 248 (2025).

Specifically, the 2025 Amendments lowered the excise tax for items covered by the Act from $200 to $0 per device.  *See* Pub. L. No. 119-21 § 70436; 26 U.S.C. § 5811(a)(1).  Congress did not remove these devices from the NFA's scope or eliminate the registration and background check requirements that apply to them.  *See* Pub. L. No. 119-21 § 70436; 26 U.S.C. § 5812.  Accordingly, registration and background checks for NFA items were expressly retained by Congress through its passage of the 2025 Amendments.  Even with the excise tax reduced to $0, individuals still must file ATF Form 1 or Form 4, submit fingerprints and photographs, undergo a background check, and await ATF approval before taking possession of any regulated items.  *See* 26 U.S.C. §§ 5812, 5841(c); 27 C.F.R. § 479.84.

The NFA's remaining provisions continue to govern all items governed by the Act, with the central registry serving as the backbone of that enforcement scheme.  Section 5841 requires the government to maintain a comprehensive record of each covered firearm and its lawful possessor.  This registration system is essential to enforcing the Act's substantive mandates: it enables the government to verify that manufacturers obtain authorization before making or transferring weapons, *see* 26 U.S.C. §§ 5822, 5841(c); it ensures the traceability of firearms by requiring every covered item to bear a unique and unalterable serial number, *id.* § 5842(b); and it allows the government to enforce the statute's strict prohibitions on the importation of firearms for non-government use, *id.*  § 5844.  Taken together, these provisions preserve the government's ability to identify the origin and legality of any NFA weapon moving in commerce.

V.    **The NFA Forms Part of a Longstanding, Comprehensive Scheme Regulating Dangerous Weapons and Is a Valid Exercise of Congress's Commerce Clause Authority and Taxing Power.**

    A.    **The NFA is part of a comprehensive regulatory scheme and registration requirements are a valid exercise of Commerce Clause authority.**

The NFA's registration requirements are a valid exercise of Congress's Commerce Clause authority, including as applied to purely intrastate commerce. Items covered by the Act are fungible goods traded in a national market. They are designed, manufactured, and transferred in interstate commerce, and Congress has enacted a comprehensive scheme—through the NFA and the Gun Control Act—that regulates their manufacture, import, transfer, and possession across that market. *See* 18 U.S.C. §§ 921 *et seq.*; 26 U.S.C. §§ 5801-5872. Under *Gonzales v. Raich*, Congress must be able to regulate local possession and intrastate production and sale of fungible goods to effectively regulate the broader interstate market. 545 U.S. 1, 17 (2005). That includes, as here, authority to impose registration requirements that ensure uniform enforcement of the federal framework across states.

Indeed, courts have applied *Raich* to uphold similar regulations, including 18 U.S.C. § 922(o)'s prohibition on machine gun possession, reasoning that mere possession of a machine gun can "substantially affect interstate commerce" because any machine gun may at any time "enter the interstate market and affect supply and demand." *United States v. Stewart*, 451 F.3d 1071, 1077-78 (9th Cir. 2006). In other words, because a machine gun could enter interstate commerce even if it has not yet crossed state lines, Congress could reasonably treat regulation of machine gun possession as inseparable from its authority to control interstate trade in machine guns. *See United States v. Rybar*, 103 F.3d 273, 281–82 (3d Cir. 1996); *United States v. Kenney*, 91 F.3d 884, 891 (7th Cir. 1996). Possession of a machine gun, therefore, is not "purely local or

12

noncommercial" activity; rather, it represents conduct with clear consequences for interstate trade and thus falls well within Congress's Commerce Clause power to regulate. *Id*. at 891.

The NFA's registration requirements fall within Congress's authority for the same reason: the Act's central purpose is to ensure that the interstate market for particularly dangerous weapons can be monitored and controlled, lawful transfers can be tracked, and diversion into illicit markets can be curtailed. To achieve that end, the NFA requires designated firearms to be registered in the NFRTR, and it criminalizes unregistered possession. *See* 26 U.S.C. § 5841(d); 18 U.S.C. § 921(a)(3)(C). This mandate applies even to firearms manufactured or possessed wholly within a single state, because effective oversight of the national market depends on comprehensive registration. If Congress could not regulate intrastate possession, it would create a loophole undermining regulation of the interstate market. The NFA's registration and transfer requirements thus rest on the same principle as § 922(o)'s prohibition on machine guns: possession cannot be severed from the broader interstate market, and regulation of intrastate possession is essential to preserving the effectiveness of the federal scheme.

Moreover, unlike the non-economic statutes struck down in *United States v. Lopez*, 514 U.S. 549 (1995) or *United States v. Morrison*, 529 U.S. 598 (2000), the NFA is economic in nature and forms part of a broader federal regulatory scheme governing the manufacture, transfer, and possession of firearms across state lines. The NFA regulates the commodities themselves—firearms—by controlling how they are made, sold, and tracked. In other words, it governs the economic enterprise of manufacturing and transferring firearms. This places the NFA squarely within Congress's power to regulate economic activity, distinguishing it from statutes that police non-economic conduct like those at issue in *Morrison* and *Lopez*. Unlike the "brief, single-subject

13

statute" at issue in *Lopez*, the NFA is "a comprehensive framework for regulating the production, distribution, and possession" of particularly dangerous weapons. *Raich*, 545 U.S. at 24.

### B. Registration requirements for NFA items remain a valid exercise of Congress's Taxing Power.

In addition to resting on solid Commerce Clause authority, the NFA's registration requirements remain a valid exercise of Congress's taxing power for two reasons.

First, the Act remains a revenue-producing statute that registration helps enforce. As the government's brief persuasively establishes, even though Congress reduced certain making and transfer taxes to zero, the statute continues to raise revenue elsewhere: it requires manufacturers and dealers of items covered by the Act to pay a special occupational tax. *See* 26 U.S.C. § 5801(a). It also continues to impose making and transfer taxes on other NFA items, such as machine guns and destructive devices, which generate revenue. The Act's registration requirements are essential to securing this federal revenue. They ensure that commercial enterprises and individuals cannot evade the taxes that remain in force. Because the statute as a whole unquestionably produces revenue—even as applied to the items at issue here—Congress's decision to set specific rates to zero does not alter the Act's essential character. The recordkeeping provisions remain valid because they operate "in aid of a revenue purpose." *Sonzinsky v. United States*, 300 U.S. 506, 513 (1937).

Second, Congress has broad authority to set tax rates, including reducing them to zero, without invalidating a statute as a tax law. *See generally United States v. Kahriger*, 345 U.S. 22, 28 (1953) ("It is axiomatic that the power of Congress to tax is extensive[.] . . . As is well known, the constitutional restraints on taxing are few."), *overruled on different grounds by Marchetti v. United States*, 390 U.S. 39 (1968). The Supreme Court has never required that every component of a tax scheme generate revenue; to the contrary, it has traditionally deferred to Congress whether

a measure is a tax so long as it retains the structural features of one. *Sonzinsky*, 300 U.S. at 513–14. Nor does a tax cease to be valid merely because "it regulates, discourages, or even definitely deters the activities taxed." *See United States v. Sanchez*, 340 U.S. 42, 44 (1950) (cleaned up). This principle applies even if "the revenue obtained is obviously negligible or the revenue purpose of the tax may be secondary." *Id.* (internal citation omitted). Accordingly, Congress's decision to set certain rates to zero—while preserving the registration requirements and the statutory structure codified in the Internal Revenue Code—does not alter the statute's constitutional character.

Finally, the registration and recordkeeping requirements are valid under the Necessary and Proper Clause because they are "incidental" to this tax system. Congress has the authority "to enact provisions 'incidental to [an enumerated] power, and conducive to its beneficial exercise.'" *NFIB v. Sebelius*, 567 U.S. 519, 559 (2012) (noting that the Necessary and Proper Clause gives the Legislative Branch "authority to enact provisions 'incidental to [an enumerated] power, and conducive to its beneficial exercise.'" (quoting *M'Culloch v. Maryland*, 17 U.S. 316, 418 (1819)); *see also, e.g.*, *CIC Servs., LLC v. IRS*, 593 U.S. 209, 212 (2021) (Congress has given the "IRS [] broad power to require the submission of tax-related information that it believes helpful in assessing and collecting taxes" (citing *California Bankers Ass'n v. Shultz*, 416 U.S. 21, 26 (1974))).

In sum, the NFA as a whole still raises revenue, Congress left the tax structure in place, and Congress may require recordkeeping before making or transferring a covered article to ensure the integrity of the tax base. *Cf. Haynes v. United States*, 390 U.S. 85, 87, 95 (1968) (describing the NFA as "an interrelated statutory system for the taxation of certain classes of firearms"). Thus, the registration provisions are legitimate regulatory measures "in aid of a revenue purpose." *Sonzinsky*, 300 U.S. at 513.

15

**CONCLUSION**

For these reasons, this Court should grant summary judgment for the defendants.

Dated: December 22, 2025

/s/ Matthew G. Olsen

Matthew G. Olsen[†] (D.C. Bar No. 425240)
Joshua A. Geltzer[†] (D.C. Bar No. 1018768)
WILMER CUTLER PICKERING HALE AND DORR LLP
2100 Pennsylvania Ave., NW
Washington, DC 20037
Phone: (202) 663-6000
Fax: (202) 663-6363
matthew.olsen@wilmerhale.com
joshua.geltzer@wilmerhale.com

[†] *Motion for admission pro hac vice forthcoming.*

Respectfully submitted,

/s/ Valerie S. Mosman[*]

Valerie A. Mosman (TX Bar No. 00796127)
THE SLOAN FIRM
3500 Maple Ave Ste #1200
Dallas, TX 75219-3937
(214) 550-3233
vmosman@sloanfirm.com

[*] *Signed with consent per LR 11.1(d).*

16