**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION**

| | | |
|---|---|---|
| JOHN JENSEN; JEREMY NEUSCH; DAVID LYNN SMITH; HOT SHOTS CUSTOM LLC; TEXAS STATE RIFLE ASSOCIATION; FPC ACTION FOUNDATION; and CITIZENS COMMITTEE FOR THE RIGHT TO KEEP AND BEAR ARMS, | § § § § § § § | |
| *Plaintiffs*, | § § | No. 2:25-cv-00223 |
| v. | § § | **ORAL ARGUMENT REQUESTED** |
| BUREAU OF ALCOHOL, TOBACCO, FIREARMS AND EXPLOSIVES; DANIEL P. DRISCOLL, in his official capacity as Acting Director of the Bureau of Alcohol Tobacco, Firearms and Explosives; UNITED STATES DEPARTMENT OF JUSTICE; and PAMELA J. BONDI, in her official capacity as Attorney General of the United States, | § § § § § § § § § | |
| *Defendants*. | § § | |

**PLAINTIFFS' COMBINED REPLY MEMORANDUM OF LAW IN FURTHER
SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND
MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT**

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ..................................................................................... iii

INTRODUCTION .................................................................................................. 1

SUBJECT-MATTER JURISDICTION ................................................................... 3

ARGUMENT .......................................................................................................... 4

I.   Plaintiffs Have Article III Standing to Challenge the NFA's Regulation of Untaxed AOWs. ............................................................................................. 4

II.  The NFA's Regulation of Untaxed "Firearms" Is Not a Valid Exercise of Congress's Taxing Power. ................................................................................. 5

III. The NFA's Regulation of Untaxed "Firearms" Cannot Be Justified as an Exercise of Any Other of Congress's Enumerated Powers .............................. 15

IV.  The NFA's Regulation of Untaxed "Firearms" Exceeds Congress's Commerce Clause Powers. ................................................................................ 21

    A.   The *Salerno* Standard Does Not Defeat Plaintiffs' Commerce Clause Challenge. ............................................................................................... 22

    B.   The NFA's Regulation of Untaxed "Firearms" Cannot Be Justified as a Regulation of the Instrumentalities of Interstate Commerce. ................ 25

    C.   The NFA's Regulation of Untaxed "Firearms" Cannot Be Justified as a Regulation of Activities that Substantially Affect Interstate Commerce. .............. 25

        1.   The Challenged NFA Provisions Were Not Enacted with the Purpose of Regulating Interstate Commerce. ....................................... 26

        2.   The Challenged NFA Provisions Are Not Part of a Comprehensive Regulation of Quintessentially Economic Activity. ................................ 27

V.   The NFA's Regulation of Suppressors and Short-Barreled Rifles Violates the Second Amendment. .................................................................................... 33

    A.   Suppressors and Short-Barreled Rifles Are Covered by the Second Amendment's Plain Text. ...................................................................... 33

    B.   Suppressors and Short-Barreled Rifles Are Not "Dangerous and Unusual Weapons." .............................................................................................. 34

    C.   There Is No Historical Tradition Supporting the Challenged NFA Provisions' Registration Requirements for Protected Arms. ..................... 37

    D.   The Fifth Circuit's Opinion in *United States v. Peterson* Does Not Compel a Different Result. ....................................................................... 40

VI.  This Court Should Grant Plaintiffs All The Relief That They Request. ........... 41

A.    This Court May Enjoin Enforcement Against Hot Shots Custom's Customers. ........................................................................................................42

B.    This Court May Enjoin Enforcement Against The Organizational Plaintiffs' Members' Customers. ......................................................................................46

C.    This Court Should Grant Relief To All Of The Organizational Plaintiffs' Members. ..............................................................................................................46

CONCLUSION ...........................................................................................................................49

# TABLE OF AUTHORITIES

<u>**Cases**</u>                                                                                                         <u>**Page(s)**</u>

*Anderson v. City of New Orleans*,
    38 F.4th 472 (5th Cir. 2022)......................................................................33

*Barr v. Am. Ass'n of Pol. Consultants, Inc.*,
    591 U.S. 610 (2020)...............................................................................49

*Barrett v. United States*,
    423 U.S. 212 (1976)...............................................................................20

*Bezet v. United States*,
    714 F. App'x 336 (5th Cir. 2017)......................................................8, 9, 13

*Bond v. United States*,
    572 U.S. 844 (2014)...............................................................................13

*Caetano v. Massachusetts*,
    577 U.S. 411 (2016)...............................................................................34

*California v. Texas*,
    593 U.S. 659 (2021)................................................................................5

*Child Labor Tax Case*,
    259 U.S. 20 (1922)..................................................................10, 14, 17

*CIC Servs., LLC v. IRS*,
    593 U.S. 209 (2021)................................................................................3

*Citizens for a Clean Env't, LLC v. Aitkin Agri-Peat, Inc.*,
    2025 WL 2597347 (D. Minn. Sep. 8, 2025) ..............................................4, 5

*Department of Commerce v. New York*,
    588 U.S. 752 (2019)...............................................................................43

*District of Columbia v. Heller*,
    554 U.S. 570 (2008)...............................................................34, 36, 37, 41

*FDA v. All. for Hippocratic Med.*,
    602 U.S. 367 (2024)...............................................................................47

*Fla. Prepaid Postsecondary Educ. Expense Bd. v. Coll. Sav. Bank*,
    527 U.S. 627 (1999)...............................................................................18

*Free Enter. Fund v. PCAOB*,
    561 U.S. 477 (2010)................................................................................3

*Gonzales v. Raich*,
    545 U.S. 1 (2005)...................................................................27, 28, 29, 30

*Haynes v. United States*,
    390 U.S. 85 (1968)...............................................................................8, 15

*Heller v. District of Columbia*,
    670 F.3d 1244 (D.C. Cir. 2011).............................................................35, 38

*Hobby Distillers Ass'n v. Alcohol Tobacco Tax & Trade Bureau*,
  740 F. Supp. 3d 509 (N.D. Tex. 2024) ..................................................6, 7, 12, 29, 30, 32

*Hunt v. Wash. State Apple Advert. Comm'n*,
  432 U.S. 333 (1977) ..................................................................................................47, 48

*Hunter v. United States*,
  73 F.3d 260 (9th Cir. 1996) ................................................................................................9

*In re Trade-Mark Cases*,
  100 U.S. 82 (1879) ............................................................................................................24

*Lane v. United States*,
  612 F. Supp. 3d 659 (N.D. Tex. 2020) ......................................................................14, 17

*Market Synergy Grp., Inc. v. Department of Labor*,
  2016 WL 6948061 (D. Kan. Nov. 28, 2016) ...............................................................44, 45

*Miss. ex rel. Hood v. AU Optronics Corp.*,
  571 U.S. 161 (2014) ..........................................................................................................19

*Mock v. Garland*,
  75 F.4th 563 (5th Cir. 2023) .............................................................................................31

*Nigro v. United States*,
  276 U.S. 332 (1928) ..........................................................................................................10

*N.Y. State Rifle & Pistol Ass'n v. Bruen*,
  597 U.S. 1 (2022) ...........................................................................................2, 34, 37, 38, 40

*NFIB v. Sebelius*,
  567 U.S. 519 (2012) .......................................................................................................6, 15

*SAS Inst., Inc. v. Iancu*,
  584 U.S. 357 (2018) ..........................................................................................................20

*Second Amend. Found., Inc v. ATF*,
  702 F. Supp. 3d 513 (N.D. Tex. 2023) ..............................................................................40

*Sonzinsky v. United States*,
  300 U.S. 506 (1937) ..............................................................................................5, 7, 15, 21, 27

*Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*,
  600 U.S. 181 (2023) ..........................................................................................................48

*TransUnion LLC v. Ramirez*,
  594 U.S. 413 (2021) ............................................................................................................4

*Texas v. United States*,
  945 F.3d 355 (5th Cir. 2019) ..................................................................................5, 13, 17

*Trump v. CASA*,
  606 U.S. 831 (2025) ....................................................................................................46, 47

*UAW v. Brock*,
  477 U.S. 274 (1986) ..........................................................................................................48

iv

*United States Association of Reptile Keepers, Inc. v. Jewell*,
103 F. Supp. 3d 133 (D.D.C. 2015) ...................................................................45

*United States v. Aiken*,
974 F.2d 446 (4th Cir. 1992) ...........................................................................9

*United States v. Ardoin*,
19 F.3d 177 (5th Cir. 1994) .................................................................15, 16, 17

*United States v. Bird*,
124 F.3d 667 (5th Cir. 1997) ..............................................................18, 25, 26

*United States v. Carmel*,
548 F.3d 571 (7th Cir. 2008) ...........................................................................9

*United States v. Cox*,
906 F.3d 1170 (10th Cir. 2018) .................................................................5, 40

*United States v. Danks*,
221 F.3d 1037 (8th Cir. 1999) .......................................................................23

*United States v. Dodge*,
61 F.3d 142 (2d Cir. 1995) ...............................................................................9

*United States v. Doremus*,
249 U.S. 86 (1919) ...........................................................................................9

*United States v. Freed*,
401 U.S. 601 (1971) .......................................................................................13

*United States v. Gresham*,
118 F.3d 258 (5th Cir. 1997) ....................................................................8, 13

*United States v. Hale*,
978 F.2d 1016 (8th Cir. 1992) .......................................................................18

*United States v. Hall*,
171 F.3d 1133 (8th Cir. 1999) ..............................................................9, 18, 26

*United States v. Houston*,
103 F. App'x 346 (10th Cir. 2004) ................................................................18

*United States v. Jones*,
976 F.2d 176 (4th Cir. 1992) ..............................................................9, 17, 18

*United States v. Kebodeaux*,
570 U.S. 387 (2013) ................................................................................25, 26

*United States v. Kebodeaux*,
687 F.3d 232 (5th Cir. 2012) ..........................................................25, 26, 27

*United States v. Kenney*,
91 F.3d 884 (7th Cir. 1996) ...........................................................................32

*United States v. Kirk*,
105 F.3d 997 (5th Cir. 1997) .................................................................16, 31, 32

*United States v. Knutson*,
    113 F.3d 27 (5th Cir. 1997) ........................................................................32

*United States v. Lopez*,
    2 F.3d 1342 (5th Cir. 1993) ................................................................13, 20

*United States v. Lopez*,
    514 U.S. 549 (1995) ...............................................13, 23, 26, 27, 29

*United States v. Luna*,
    165 F.3d 316 (5th Cir. 1999) ....................................................................32

*United States v. Matthews*,
    438 F.2d 715 (5th Cir. 1971) ......................................................................8

*United States v. Miller*,
    2023 WL 6300581 (N.D. Tex. Sep. 27, 2023) .................................40

*United States v. Miller*,
    307 U.S. 174 (1939) ............................................................................35, 36

*United States v. Morrison*,
    529 U.S. 598 (2000) ....................................................................................28

*United States v. Oba*,
    448 F.2d 892 (9th Cir. 1971) ....................................................................13

*United States v. Parker*,
    960 F.2d 498 (5th Cir. 1992) ................................................................16, 19

*United States v. Pearson*,
    8 F.3d 631 (8th Cir. 1993) ........................................................................18

*United States v. Peterson*,
    161 F.4th 331 (5th Cir. 2025) ................................................................40, 41

*United States v. Rahimi*,
    602 U.S. 680 (2024) ....................................................................................37

*United States v. Ridlehuber*,
    11 F.3d 516 (5th Cir. 1993) ........................................................................8

*United States v. Robinson*,
    2025 WL 870981 (11th Cir. Mar. 20, 2025) .........................................40

*United States v. Ross*,
    458 F.2d 1144 (5th Cir. 1972) .......................................5, 8, 15, 16, 19

*United States v. Rush*,
    130 F.4th 633 (7th Cir. 2025) ..................................................................40

*United States v. Rybar*,
    103 F.3d 273 (3d Cir. 1996) ......................................................................32

*United States v. Solis*,
    124 F.3d 192 (5th Cir. 1997) ....................................................................16

*United States v. Wilson*,
    440 F.2d 1068 (6th Cir. 1971) ........................................................18

*Wages & White Lion Invs., LLC v. FDA*,
    16 F.4th 1130 (5th Cir. 2021) ........................................................42

*Wickard v. Filburn*,
    317 U.S. 111 (1942) ..............................................................16, 28

## **Constitutional Provisions**

U.S. CONST.
    art. I, § 8, cl. 1 ..............................................................................5

## **Statutes**

18 U.S.C. § 922(o) ................................................................................16

26 U.S.C.
    § 5801 ..............................................................................6, 7
    § 5801(a) ..............................................................................7
    § 5802 ..............................................................................7
    § 5811 ..............................................................................7
    § 5811(a) ..........................................................................19
    § 5812 ..............................................................7, 18, 19, 28
    § 5812(b) ........................................................................28
    § 5821 ..............................................................................7
    § 5821(a) ..........................................................................19
    § 5822 ..........................................................................7, 19
    § 5841 ..............................................................7, 18, 19
    § 5841(a) ........................................................................28
    § 5841(b) ........................................................................28
    § 5841(c) ........................................................................28
    § 5841(e) ........................................................................28
    § 5842 ............................................................................28
    § 5845(a) ........................................................................36
    § 5848(a) ....................................................................12, 13
    § 5852(c) ..........................................................................8
    § 5852(d) ..........................................................................8
    § 5861(b) ........................................................................28
    § 5861(c) ........................................................................28
    § 5861(d) ........................................................................28
    § 5861(e) ........................................................................28
    § 5861(f) ........................................................................28
    § 5861(j) ....................................................................19, 20
    § 5861(k) ....................................................................19, 20
    § 7421 ..............................................................................3
    § 7852(a) ........................................................................49

The National Firearms Act of 1934, Pub. L. No. 73-474, 48 Stat. 1236 ....................1, 18

The Federal Firearms Act of 1938, Pub. L. No. 75-785, 52 Stat. 1250 ........................................20

The One Big Beautiful Bill Act, Pub. L. No. 119-21, 139 Stat. 72 (2025)................................1, 5

## **Other Authorities**

BUREAU OF ALCOHOL, TOBACCO, FIREARMS & EXPLOSIVES, FIREARMS COMMERCE IN
    THE UNITED STATES: ANNUAL STATISTICAL UPDATE 2024 (2024),
    https://perma.cc/DJC5-VBJZ................................................................................................23

David B. Kopel & Joseph G.S. Greenlee, *The "Sensitive Places" Doctrine*,
    13 CHARLESTON L. REV. 205 (2018) .............................................................................39

*National Firearms Act: Hearings on H.R. 9066 Before the H. Comm. on Ways & Means*,
    73d Cong., 2d Sess. (1934) ......................................................................................19, 20

Peter A. Patterson, *Facial Confusion: Lower Court Misapplication of the Facial/As-Applied
    Distinction in Second Amendment Cases*, HARV. J. L. & PUB. POL'Y PER CURIAM
    (Oct. 27, 2025) ........................................................................................................23, 24

S. Rep. No. 73-1444 (1934) ..............................................................................................20

S. Rep. No. 90-1097 (1968) ..............................................................................................31

## INTRODUCTION

When Congress passed the National Firearms Act of 1934 ("NFA"), Pub. L. No. 73-474, 48 Stat. 1236 (codified as amended at 26 U.S.C. §§ 5801–5872), it did so based explicitly on its power to lay and collect taxes. This is confirmed by the NFA's text, structure, legislative history, comparison with other firearms related laws, and numerous decisions interpreting the NFA. In fact, during consideration of the NFA, a primary sponsor of the bill expressly disclaimed that the NFA provisions challenged here were premised on any power but the taxing power, explaining that "it was based on taxes all the way through." Recently, however, with the enactment of the One Big Beautiful Bill Act ("OBBB"), Pub. L. No. 119-21, 139 Stat. 72 (2025), into law, Congress zeroed out the taxes on certain classes of firearms covered by the NFA. Consequently, the registration provisions in the NFA that were enacted solely in support of the collection of the taxes on those classes of firearms have lost their constitutional tether, cannot be justified based on any other congressional power, and are thus unconstitutional, both facially and as-applied to Plaintiffs.

Faced with this straightforward interpretation supported by text, structure, history, and precedent, the Government attempts to justify the NFA's registration requirements for the zero-tax classes of firearms by arguing that those requirements are in aid of the collection of a different tax in a different part of the Act: the special occupational tax that dealers and manufacturers of NFA firearms must pay in order to engage in their business. But the special occupational tax is a different tax supported by a different registration requirement: the requirement for businesses to register with the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") to sell or manufacture NFA items. The *firearms registration requirements* challenged here support the collection of the now-zero *firearms taxes*, whereas the *business registration requirements* not at issue here support the collection of the *special occupational tax*. The Court should not accept the Government's

tortured interpretation of the NFA that attempts to connect disparate parts of the statute that are plainly different taxes and different registration requirements.

That the challenged NFA provisions can no longer be justified as in aid of Congress's exercise of its taxing power should be the end of this case, but as predicted, the Government argues that the NFA can be independently justified as an exercise of Congress's Commerce Clause powers. The Government's arguments should fail at the start, however, because this Court should not supply a justification to the NFA that Congress itself never intended, as demonstrated by the NFA's text, structure, and history. But even if the Court does consider whether the challenged NFA provisions are a valid exercise of Congress's Commerce Clause powers, it should determine that they are not, because they are neither a regulation of the instrumentalities of interstate commerce nor a regulation of intrastate activities that have a substantial effect on interstate commerce.

Wholly apart from the challenged NFA provisions' unconstitutionality in the above respects, they violate the fundamental right to keep and bear arms enshrined in the Second Amendment with respect to suppressors and short-barreled rifles. Under the test established by *New York State Rifle & Pistol Association v. Bruen*, 597 U.S. 1 (2022), the possession and use of suppressors and short-barreled rifles constitutes conduct within the plain text of the Second Amendment's protection of "arms." Thus, suppressors and short-barreled rifles are protected by the Second Amendment unless the Government can show that they are dangerous and unusual weapons, which it has not done and which it cannot do. The Government's only recourse, therefore, is to show that requiring the registration of protected arms is consistent with the Nation's history of firearm regulation, which it also has not done and cannot do. Plaintiffs presented significant evidence (despite not having the burden to do so) that suppressors and short-barreled rifles are in common use (*i.e.*, not unusual) and that they are not particularly dangerous compared to other

firearms. Plaintiffs also argued that there is no relevant history of federal or state governments requiring the registration of protected arms. In response, the Government unpersuasively analogizes to inapposite precedent, attempts to stretch a case explicitly confined to its facts to this case, and all but abandons its burden to prove that suppressors and short-barreled rifles are dangerous and unusual and that there is a historical tradition of regulating them in the manner akin to the NFA provisions challenged here.

Accordingly, the Court should grant Plaintiffs' motion for summary judgment and deny the Government's motion for summary judgment.

## SUBJECT-MATTER JURISDICTION

This Court has subject-matter jurisdiction over all claims for relief pursuant to 28 U.S.C. § 1331 because Plaintiffs' claims arise under the laws of the United States. Plaintiffs seek equitable relief to prevent federal officers and entities from acting unconstitutionally. *See Free Enter. Fund v. PCAOB*, 561 U.S. 477, 491 n.2 (2010). This Court has jurisdiction to grant the declaratory relief sought, pursuant to 28 U.S.C. § 2201, and additional relief pursuant to 28 U.S.C. §§ 2202, 2412. The Anti-Injunction Act, 26 U.S.C. § 7421, does not bar this suit because it challenges the NFA only with respect to untaxed items. Furthermore, and accordingly, it seeks not to restrain the collection or assessment of any tax but instead to restrain information-gathering and other requirements that previously were meant to support the now-defunct tax regime. The suit therefore is not brought "for the purpose of restraining the assessment or collection of any tax." 26 U.S.C. § 7421(a); *see also CIC Servs., LLC v. IRS*, 593 U.S. 209, 211 (2021). The Government does not contest these points. *See* Mem. in Opp'n to Pls.' Mot. for Summ. J. & in Supp. of Defs.' Mot. for Summ. J. (Dec. 19, 2025), ECF No. 29 ("Govt. MSJ").

## ARGUMENT

I.    **Plaintiffs Have Article III Standing to Challenge the NFA's Regulation of Untaxed AOWs.**

The Government contends that no Plaintiff has standing to challenge the NFA's regulation of the making, transferring, or possession of AOWs. *See* Govt. MSJ at 7–8. To establish standing, a plaintiff must show "(i) that he suffered an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021). Per the supplemental declarations that Plaintiffs file herewith, Plaintiff John Jensen wants to acquire a smooth-bore pistol that qualifies as "any other weapon" under the NFA without complying with the challenged NFA provisions, Jensen Suppl. Decl. ¶¶ 4–5 [Suppl. Appx.002]; Plaintiff Jeremy Neusch wants to both acquire and make smooth-bore pistols that qualify as "any other weapon" under the NFA without complying with the challenged NFA provisions, Neusch Suppl. Decl. ¶¶ 4–5 [Suppl. Appx.004]; Plaintiff David Lynn Smith wants to acquire a Marble Game Getter that qualifies as "any other weapon" under the NFA and both acquire and make smooth-bore pistols that qualify as "any other weapon" under the NFA without complying with the challenged NFA provisions, Smith Suppl. Decl. ¶¶ 4–5 [Suppl. Appx.005–06]; and Plaintiff Hot Shots Custom LLC would sell firearms that qualify as "any other weapon" under the NFA without complying with the challenged NFA provisions, Hot Shots Custom Suppl. Decl. ¶ 5 [Suppl. Appx.008]. Plaintiffs have declined to take these actions, however, because of the NFA provisions being challenged in this case. Jensen Suppl. Decl. ¶¶ 4–5 [Suppl. Appx.002]; Neusch Suppl. Decl. ¶¶ 4–5 [Suppl. Appx.004]; Smith Suppl. Decl. ¶¶ 4–5 [Suppl. Appx.005–06]; Hot Shots Custom Suppl. Decl. ¶ 5 [Suppl. Appx.008]. This Court may consider these supplemental declarations, *see Citizens for a Clean Env't, LLC v. Aitkin Agri-Peat, Inc.*, 2025 WL 2597347, at

*10 (D. Minn. Sep. 8, 2025) (collecting authorities), and they plainly establish Plaintiffs' standing to challenge the NFA's regulation of AOWs.

## II.    The NFA's Regulation of Untaxed "Firearms" Is Not a Valid Exercise of Congress's Taxing Power.

Congress passed the NFA explicitly premised on its enumerated power to "lay and collect Taxes." U.S. CONST. art. I, § 8, cl. 1. The Supreme Court upheld the NFA's occupational tax on dealers and its attendant occupational registration requirement against constitutional challenge, holding that the NFA was "only a taxing measure," and thus lawful pursuant to Congress's taxing power, and that the occupational registration requirements were "obviously supportable as in aid of a revenue purpose," namely, "the annual tax." *Sonzinsky v. United States*, 300 U.S. 506, 513–14 (1937); *see also NFIB v. Sebelius*, 567 U.S. 519, 567 (2012); *United States v. Cox*, 906 F.3d 1170, 1181 (10th Cir. 2018) ("*Sebelius* reaffirmed the NFA's constitutional legitimacy, touting the statute's 'obviously regulatory' tax on sawed-off shotguns."); *United States v. Ross*, 458 F.2d 1144, 1145 (5th Cir. 1972) (explaining that "making possession of an unregistered weapon unlawful is part of the web of regulation aiding enforcement of the [NFA's] transfer tax"). But the OBBB zeroed out the NFA's making and transfer taxes on all NFA-defined "firearms" except for machineguns and "destructive device[s]." OBBB § 70436. "Now that the [tax] amount is set at zero," *Texas v. United States*, 945 F.3d 355, 390 (5th Cir. 2019), *rev'd and remanded sub nom. on other grounds*, *California v. Texas*, 593 U.S. 659 (2021), the NFA's firearm registration requirements cannot "be justified under Congress's taxing power," *Texas*, 945 F.3d at 389. Consequently, as Plaintiffs' opening brief explained, the NFA's registration regime as applied to untaxed firearms is unmoored from any congressionally imposed tax and it therefore cannot be "necessary and proper" to the laying and collection of that nonexistent tax. The NFA's registration

regime is thus unconstitutional. *See* Amend. Mem. of L. in Supp. of Pls.' Mot. for Summ. J. at 16–19 (Dec. 10, 2025) ("Pls.' MSJ"); *contra* Govt. MSJ at 27–28.

The Government agrees that "Congress's taxing power" was the "constitutional source" for the NFA and that the OBBB "zeroed out the NFA's making and transfer taxes on short-barreled rifles and shotguns, suppressors, and AOWs." Govt. MSJ at 9. But the Government disagrees that these facts render the challenged NFA provisions unconstitutional, instead arguing that the challenged registration provisions support the collection of a different tax imposed in a different provision of the NFA: the annual special occupational tax on businesses that import, manufacture, or deal in NFA firearms. *Id.* (citing 26 U.S.C. § 5801); *see also* Br. of City of Baltimore et al. as *Amici Curiae* in Supp. of Defs. at 6–7 (Jan. 8, 2026) ("Balt. Amicus"), ECF No. 49 (similar); Br. of Brady Ctr. to Prevent Gun Violence et al. as *Amici Curiae* in Supp. of Defs. at 8 (Jan. 8, 2026) ("Brady Ctr. Amicus"), ECF No. 55. But the challenged firearm registration requirements do not support collection of the special occupational tax—they supported the collection of the now-zero taxes on making and transfer of covered firearms. The special occupational tax is instead supported by the NFA's occupational registration requirement. 26 U.S.C. § 5802. Consequently, the challenged NFA firearm registration provisions cannot be justified based on Congress's taxing power or as regulations in aid of the collection of the special occupational tax.

Because "the taxing power does not give Congress the same degree of control over individual behavior [as the commerce power]," *Sebelius*, 567 U.S. at 573, "it follows that Congress cannot rely on a 'reasonable' or 'rational' connection to an existing tax to regulate *every* individual behavior occurring before that tax obligation becomes effective." *Hobby Distillers Ass'n v. Alcohol Tobacco Tax & Trade Bureau*, 740 F. Supp. 3d 509, 529 (N.D. Tex. 2024). Instead, when Congress enacts regulations to support its taxes, "the applicable standard" is whether the regulations "are

6

needful and 'plainly adapted' to executing" the taxes. *Id.* (quoting *McCulloch v. Maryland*, 4 Wheat. 316, 324–25, 421 (1819)). Here, the challenged NFA firearm registration requirements are not needful and plainly adapted to executing the special occupational tax.

First, the challenged NFA firearm registration provisions, *e.g.*, 26 U.S.C. §§ 5812, 5822, 5841, are not plainly adapted to collecting the special occupational tax because they correspond solely to and are designed solely to facilitate collection of the firearm transfer and making taxes, 26 U.S.C. §§ 5811, 5821. The firearm registration requirements ensure that the making and/or transfer taxes are paid whenever a covered making or transfer occurs. By contrast, 26 U.S.C. § 5801 requires "every importer, manufacturer, and dealer in firearms" "engaging in business" to pay annually a special occupational tax. 26 U.S.C. § 5801(a). Collection of this tax is supported by the occupational registration requirement that mandates "each importer, manufacturer, and dealer in firearms" to "register with" ATF. *Id.* § 5802. The Supreme Court in *Sonzinsky* held that this occupational registration requirement was "obviously" in aid of the "annual tax," *i.e.*, the special occupational tax. 300 U.S. at 513–14; *contra* Govt. MSJ at 9 (incorrectly implying that *Sonzinsky* interpreted *all* of the NFA's registration requirements as supporting the collection of *all* of the different NFA taxes). Indeed, *Sonzinsky* expressly stated that "each tax" in the NFA "is on a different activity and is collectible independently of the other," and thus the Court could limit its focus to the occupational tax and its associated occupational-registration requirement and not "inquire whether the *different* tax levied by section 3"—*i.e.*, the transfer tax—*and the regulations pertaining to it* are valid." *Sonzinsky*, 300 U.S. at 512 (emphasis added). In other words, the Supreme Court has confirmed what is plain on the face of the NFA—the registration scheme challenged here pertains to the now-nonexistent transfer and making taxes, not to the special occupational tax.

7

Further separating the registration provisions pertaining to the making and transfer taxes from the provisions relating to the occupational tax, the NFA specifically exempts business that pay the occupational tax from paying the making tax and from paying the transfer tax on transfers to other businesses that pay the occupational tax. 26 U.S.C. § 5852(c), (d); Decl. of Stephen Albro ¶ 25 (Dec. 15, 2025) ("Albro Decl.") [App'x in Supp. of Defs.' Mot. for Summ. J. at App.0187 (Dec. 19, 2025), ECF No. 30 ("Govt. App'x")]; *see also Haynes v. United States*, 390 U.S. 85, 88 (1968) (explaining that "[s]eparate taxes are imposed on the making and transfer of [NFA] firearms by persons other than those obliged to pay the occupational taxes").

The NFA's statutory design is thus that the *occupational registration requirements* facilitate the collection of the *occupational tax*, and the *firearm registration requirements* facilitate the collection of the *firearm making and transfer taxes*. Despite this clear statutory design, however, the Government argues that the *firearm making and transfer taxes* facilitate the *occupational tax*. Govt. MSJ at 9. But that interpretation distorts the straightforward statutory scheme and belies logic, since the occupational tax is a flat annual tax that does not depend on the number of firearms made or sold. And each of the cases that the Government cites in support of its position in fact confirms *Plaintiffs'* position that the *firearm registration requirements* are in aid of the *firearm making and transfer taxes*. *See, e.g.*, *United States v. Gresham*, 118 F.3d 258, 263 (5th Cir. 1997) ("the registration requirement . . . is 'part of the web of regulation aiding enforcement of the transfer tax'" (quoting *Ross*, 458 F.2d at 1146)); *United States v. Ridlehuber*, 11 F.3d 516, 526 (5th Cir. 1993) ("'a transfer tax and registration as an aid in collection of that tax'" (quoting *Ross*, 458 F.2d at 1145)); *United States v. Matthews*, 438 F.2d 715, 717 (5th Cir. 1971) ("the registration requirement was . . . designed to aid the collection of tax on any future transfer of the registered item"); *Bezet v. United States*, 714 F. App'x 336, 341 (5th Cir. 2017) ("Section 5821 taxes the

making" and "§ 5822 establishes registration and application requirements for making"); *Hunter v. United States*, 73 F.3d 260, 262 (9th Cir. 1996) (determining that "requiring those who possess machine guns to register them is in aid of the taxing power even if the government no longer taxes possession" because "knowing the chain of possession of a firearm would help the government determine who made it," and the making of machineguns "continues to be taxed"); *United States v. Aiken*, 974 F.2d 446, 448–49 (4th Cir. 1992) (similarly tying together the firearm registration requirements with the firearm transfer and making taxes); *United States v. Jones*, 976 F.2d 176 (4th Cir. 1992) (same); *United States v. Carmel*, 548 F.3d 571, 578–79 (7th Cir. 2008) (same); *United States v. Hall*, 171 F.3d 1133, 1142 (8th Cir. 1999) (same); *United States v. Dodge*, 61 F.3d 142, 146 (2d Cir. 1995) (same). None of the Government's cases even obliquely support the position that the *firearm registration requirements* facilitate the collection of the *occupational tax*.

In particular, the Government points to *United States v. Doremus*, 249 U.S. 86 (1919), and its analysis of the Harrison Anti-Narcotics Control Act of 1914 ("Harrison Act") as "instructive" for how the Court should interpret the NFA. Govt. MSJ at 9–10. The Harrison Act, as originally enacted and as considered in *Doremus*, imposed an annual tax on businesses that sold drugs and required those businesses to register with the Government and only sell to customers with a certain form issued by the Government or valid prescriptions. The Supreme Court upheld these requirements as necessary and proper to the valid exercise of Congress's taxing power because "they tend to keep the traffic aboveboard and subject to inspection by those authorized to collect the revenue." *Doremus*, 249 U.S. at 94.

But *Doremus* has no bearing on the proper interpretation of the relationship between the NFA's firearm registration provisions and the special occupational tax. Assuming for the sake of argument that the Harrison Act's order-form requirement could be construed as in support of the

9

$1 occupational tax under the specific text and structure of the Harrison Act as originally adopted, the Harrison Act did not go as far as the NFA in regulating the items it covered because it did not require the registration of all transactions in those items with the government. Moreover, the 5–4 *Doremus* decision upholding the original version of the Harrison Act is at the outer limit of the government's taxing authority under the Supreme Court's cases. The Supreme Court shortly thereafter curtailed and reigned in that authority in the *Child Labor Tax Case*, 259 U.S. 20, 36–38 (1922), declaring unconstitutional a "Child Labor Tax" by determining that it was a substantive penalty for violating a regulation, not a tax, despite Congress's use of the "tax" label. *See also id.* at 38 (explaining that Congress cannot constitutionally enact "a detailed measure of complete regulation of [a] subject" and justify it as an exercise of the taxing power merely by "enforc[ing] it by a so-called tax upon departures from it"). By the time Congress passed the NFA in 1934, the Harrison Act had been amended to tax transactions in narcotics and thus, as the Supreme Court held in *Nigro v. United States*, 276 U.S. 332, 353–54 (1928), any "doubt" that the Harrison Act's order-form requirements were a "subterfuge" to enforce a substantive penalty by calling it a tax was "removed by the change whereby what was a nominal tax before was made a substantial one." The NFA was more closely designed after *that* version of the Harrison Act, which did not rely on dealer taxes alone to support documentation of transactions.

The Government nevertheless insists that the firearm registration requirements help the ATF to ensure that "any qualified manufacturer, distributor, or dealer that is associated with the relevant firearm has paid their special occupational tax" and "provide ATF with necessary information to determine whether an individual should be licensed and paying the special occupational tax." Govt. MSJ at 12. In other words, the Government argues that the firearm registration provisions assist in the collection of the special occupational tax because by tracking

those registrations, the Government can determine who should have paid the special occupational tax and whether they did so. But, as explained above, the simple fact is that the firearm registration provisions *do not correspond* with the occupational tax provision based on the NFA's text and structure. Even if the Government's theory were plausible as a matter of reality—and it is not, as will be explained next—it does not change the fact that the NFA's text and structure itself do not support the theory.

And the Government's theory of anti-circumvention is *not* plausible as a matter of reality. For the Government's theory to work, a business would need to be making and/or transferring large amounts of NFA firearms and lawfully registering those makings and/or transfers but *not* paying the special occupational tax. It blinks reality to suggest that a business taking the necessary steps to register makings and/or transfers would not also pay the special occupational tax if required. Furthermore, under the Government's anti-circumvention theory, tracking firearm registrations would not be plainly adapted to the supposed special occupational tax collection purpose because the vast majority of NFA firearms—98.5% of short-barreled shotguns; 97% of AOWs; 88% of short-barreled rifles; and 87.5% of suppressors—are made and transferred by qualified manufacturers already within the special occupational tax scheme. *See* Albro Decl. ¶ 29 [Govt. App'x at App.0188]. The Government thus impliedly concedes that the firearm registration requirements would allegedly inform (but not definitively require) collection of the special occupational tax in only 1% to 12% of NFA transactions. The firearm registration requirements are thus not plainly adapted to collecting the special occupational tax.

Second, the challenged NFA firearm registration provisions are not plainly adapted to collecting the special occupational tax because they regulate persons who are not subject to the special occupational tax. Again, as the Government itself explains, 88% to 99% of NFA

transactions are made by businesses that already pay the special occupational tax. And despite theorizing that firearm registrations could help ATF determine who must pay the special occupational tax and whether the special occupational tax has been paid, the Government provides no concrete examples of special occupational tax circumvention or investigations into circumvention.

The Government made a similar anti-circumvention argument in *Hobby Distillers*, maintaining that two federal statutes regulating the location of distilled spirits plants are "valid uses of the taxing power because they ensure protection of, and reduce fraud upon, the tax revenue generated on distilled spirits." 740 F. Supp. 3d at 523. The court rejected that argument, determining that because some distilled spirits plants may never be obligated to pay the tax on distilled spirits, yet the statutes nevertheless regulated the location of those stills, the statutes were "not 'needful' nor 'proper' to 'carry [the taxing power] into execution.'" *Id.* at 529 (quoting U.S. CONST. art. I, § 8, cl. 18). That is because "Congress cannot criminalize the conduct of a person to whom its enumerated taxing power does not yet apply." *Id.* Applying that reasoning here, the firearm registration requirements are not needful or proper to carrying into effect the special occupational tax because the registration requirements apply to a *vast majority* of transfers and makings that would not trigger the obligation to pay the special occupational tax.

Third, the challenged NFA firearm registration provisions are not plainly adapted to collecting the special occupational tax because the NFA prohibits the use of firearms registration information in criminal prosecutions. Section 5848(a) provides:

> No information or evidence obtained from an application, registration, or records required to be submitted or retained by a natural person in order to comply with any provision of this chapter or regulations issued thereunder, shall . . . be used, directly or indirectly, as evidence against that person in a criminal proceeding with respect to a violation of law occurring prior to or concurrently with the filing of the

application or registration, or the compiling of the records containing the information or evidence.

26 U.S.C. § 5848(a). Consequently, the NFA itself prohibits the Government from using the firearms registration information for the exact purpose that the Government asserts here, namely, the assessment, collection, and enforcement of the special occupational tax. *Contra* Govt. MSJ at 12; *see United States v. Oba*, 448 F.2d 892, 895 (9th Cir. 1971) (explaining that "the prophylactic language of 26 U.S.C. § 5848(a)" "reject[s] the contention . . . that compliance with the transfer provision . . . is an open invitation to the prosecutorial agencies of government"); *United States v. Freed*, 401 U.S. 601, 606 (1971) (describing Section 5848 as a "statutory barrier against us[ing]" NFA registration information "in a prosecution for prior or concurrent offenses").

Fourth, the Government's construction of the NFA would upset the constitutional balance between federal and state power by transferring the states' general police power to the federal government. "In our federal system, the National Government possesses only limited powers; the States and the people retain the remainder." *Bond v. United States*, 572 U.S. 844, 854 (2014). "The States have broad authority to enact legislation for the public good"—what the Supreme Court has often called a "police power." *Id.* (internal quotation marks omitted). "The Federal Government, by contrast, has no such authority and 'can exercise only the powers granted to it.'" *Id.* (quoting *McCulloch*, 4 Wheat. at 405). Congress enacted the NFA's firearm registration requirements in aid of the making and transfer taxes on those firearms. *See Gresham*, 118 F.3d at 263; *Bezet*, 714 F. App'x at 341. The OBBB eliminated those taxes by setting them to $0.00. If Congress could expand its regulatory power under the taxing clause "through a two-step process of first taxing [an activity] and then eliminating the tax while retaining the prohibition," *Texas*, 945 F.3d at 391, the constitutional design of "a national government of limited and enumerated powers" would be abolished, *see United States v. Lopez*, 2 F.3d 1342, 1345 (5th Cir. 1993), *aff'd*, 514 U.S. 549 (1995).

The Government's resort to justifying the firearms registration provisions as in aid of the collection of the special occupational tax does not alter this analysis. Under the Government's reasoning, Congress could impose a tax on a business and then extensively regulate every customer or item that could ever theoretically be connected to the business. For example, if Congress imposed an annual $100 tax on bakeries, everyone in the country could be compelled to register with the Government every time they used a bread maker to prepare a family dinner or made a sandwich for a friend, all to ensure that they are not unlawfully engaging in the business of being a bakery without paying the bakery tax. What is more, this registration requirement could be extended to making a sandwich for a friend, as the NFA registration scheme is not limited to transfers between special occupational taxpayers. Under this regime, Congress's regulatory power would be virtually unlimited and would defy "the Tenth Amendment and the structure of the Constitution." *Lane v. United States*, 612 F. Supp. 3d 659, 660 (N.D. Tex. 2020). Congress cannot use its taxing power as a sham disguise for comprehensive regulation. *See, e.g.*, *Child Labor Tax Case*, 259 U.S. at 36–38 (declaring unconstitutional a "Child Labor Tax" by determining that it was a substantive penalty for violating a regulation, not a tax, despite Congress's use of the "tax" label). Consequently, the Government's theory cannot prevail and the firearms registration provisions cannot be seen as a "proper" means to effectuating the collection of the special occupational tax.

Accordingly, the challenged NFA provisions are not a tax themselves and are no longer "necessary and proper" to the laying and collection of the taxes on the making and transfer of the untaxed NFA firearms, and are thus unconstitutional.

III.    **The NFA's Regulation of Untaxed "Firearms" Cannot Be Justified as an Exercise of Any Other of Congress's Enumerated Powers.**

That the challenged NFA provisions as applied to untaxed NFA firearms cannot be justified as an exercise of Congress's taxing power nor as necessary and proper to an exercise of that taxing power should be the end of this case. As Plaintiffs have explained, both the Supreme Court and Congress itself have made clear that the challenged NFA provisions are *solely* an exercise of Congress's taxing power. Pls.' MSJ at 19–21. The Government, however, disagrees, arguing that the challenged NFA provisions not only can be justified as an exercise of Congress's Commerce Clause powers—an argument that Plaintiffs will address in the next section—but that Congress did justify the challenged NFA provisions as an exercise of Congress's Commerce Clause powers. *See* Govt. MSJ at 13–27. The Government is wrong.

First, the Government argues that "neither *Sonzinsky* nor *Haynes* stand for the proposition that the NFA is *solely* an exercise of Congress's taxing power." *Id.* at 22. The Supreme Court and the Fifth Circuit disagree. *Sonzinsky* explained that "on its face" the occupational tax and occupational registration provisions of the NFA were "*only* a taxing measure." 300 U.S. at 513 (emphasis added); *see also Haynes*, 390 U.S. at 98 ("the registration requirement is a valid exercise of the taxing powers"); *Sebelius*, 567 U.S. at 567 ("valid exercise of the taxing power"); *Ross*, 458 F.2d at 1145 & n.3 (holding "power to tax" is NFA's "constitutional bedrock").

Unable to escape this precedent, the Government resorts to cherry-picking quotes out of context from the Fifth Circuit's decision in *United States v. Ardoin*, 19 F.3d 177 (5th Cir. 1994). Govt. MSJ at 26. In *Ardoin*, a case that predated the Supreme Court's opinion in *Lopez* and thus did not apply its reasoning, the Fifth Circuit recognized that the basis for the NFA's requirement of the registration of machineguns was "the taxing power." 19 F.3d at 180. It then mused, in dicta unnecessary to the conclusion the court just reached, that the regulation of machineguns in the

NFA "could" also be upheld "under Congress's power to regulate interstate commerce." *Id.* Indeed, a few years after *Ardoin*, the Fifth Circuit treated the issue of whether the NFA could be justified under the Commerce Clause as an open issue. *See United States v. Solis*, 124 F.3d 192 (5th Cir. 1997).

What is more, *Ardoin*'s dicta about a potential Commerce Clause justification for the NFA's registration requirements pertained only to "the regulation of machineguns." *Id.* The Commerce Clause analysis for machineguns may be different from any purported Commerce Clause analysis for the untaxed NFA firearms at issue here. Congress has banned private possession of machineguns manufactured after 1986. *See* 18 U.S.C. § 922(o). Some courts have therefore determined that the regulation of machineguns in the NFA can be justified under the Commerce Clause as a freeze of the entire national market in machineguns. *See United States v. Kirk*, 105 F.3d 997, 1001 (5th Cir. 1997) (per curiam) (op. of Higginbotham, J.); *id.* at 1014 (op. of Jones, J.). In this way, courts have treated regulation of machineguns as more akin to the regulation of wheat in *Wickard v. Filburn*, 317 U.S. 111 (1942), because both policies regulate the supply and demand of the item, *Kirk*, 105 F.3d at 1013–14 (op. of Jones, J.). *Ardoin* made no such determination concerning the untaxed, non-machinegun firearms at issue here. Instead, *Ardoin* made clear that NFA registration outside the machinegun context is an exercise of "the taxing power." 19 F.3d at 180. The Fifth Circuit has plainly held that for application of the NFA to non-machinegun firearms, "'the constitutional bedrock . . . is 'the power to tax' rather than 'the commerce power.'" *United States v. Parker*, 960 F.2d 498, 500 (5th Cir. 1992) (quoting *Ross*, 458 F.2d at 1143 & n.3).

Baltimore also contends that *Ardoin* is controlling because purportedly here, like in *Ardoin*, the "power to tax" is allegedly "preserved, but unused." Balt. Amicus at 7–8 (quoting *Ardoin*, 19

F.3d at 180). Baltimore is wrong. Unlike in *Ardoin*, where Congress did not zero out the tax on the relevant firearms at issue in that case—the ATF simply stopped accepting registrations for them due to them becoming illegal to own—here, Congress has indeed set the tax on the firearms at issue to $0.00, so the taxing power is not "preserved, but unused," but entirely unexercised. *See Texas*, 945 F.3d at 391 (distinguishing *Ardoin* on a similar basis). Baltimore's further argument that "setting the tax rate at $0" is "no different" than "offering an exemption from the tax" for an item must be rejected because it ignores the fact that only in the latter circumstance is Congress exercising its taxing power. *Contra* Balt. Amicus at 8–9. If it were otherwise—if Congress could "exercise" its taxing power by imposing a $0 tax on an item and then impose an extensive regulatory regime to accompany that "tax"—Congress's regulatory power would be virtually unlimited and in conflict with the Tenth Amendment and the Constitution's structure. *See Lane*, 612 F. Supp. 3d at 660; *Child Labor Tax Case*, 259 U.S. at 38; *see also Texas*, 945 F.3d at 391 (rejecting argument that Congress "could prohibit conduct that exceeds its commerce power through a two-step process of first taxing it and then eliminating the tax while retaining the prohibition"); *contra* Brady Ctr. Amicus at 14–15. Neither does Congress's ability to grant temporary relief from a tax change this analysis, *contra* Balt. Amicus at 9–10, because the tax power is being exercised, the tax is simply not being collected for a specified period.

The Government's out-of-circuit citations fare no better. Like *Ardoin*, *Jones* concerned machineguns. 976 F.2d at 184. What is more, the machineguns had traveled interstate. *See id.* While this should not have made a difference when whether the machineguns had traveled interstate was not a relevant fact under the statute, it at a minimum cannot support a holding that the NFA is valid as applied to firearms that have not traveled interstate. The language in *Jones* concerning the Commerce Clause is also dicta unnecessary to the outcome of the case because the

17

court had already determined that the NFA was a constitutional exercise of Congress's taxing power. *Id.* at 183–84. The Government's two Eighth Circuit cases—*United States v. Pearson*, 8 F.3d 631 (8th Cir. 1993), and *United States v. Hale*, 978 F.2d 1016 (8th Cir. 1992)—both involved machineguns and predated the Supreme Court's decision in *Lopez*, 514 U.S. 549. After *Lopez*, the Eighth Circuit departed from these earlier cases and held that a conviction for the possession of an unregistered suppressor "cannot be sustained under the commerce clause." *Hall*, 171 F.3d at 1140. The Sixth Circuit's decision in *United States v. Wilson*, 440 F.2d 1068, 1069 (6th Cir. 1971) (per curiam), also predated *Lopez* and relied primarily on "the taxing power." And the Tenth Circuit's unpublished decision in *United States v. Houston*, 103 F. App'x 346, 350 (10th Cir. 2004), invoked the taxing power in its holding and avoided a definitive ruling on the Commerce Clause.

Second, the Government argues that Congress may legislate under more than one enumerated power and did so with the NFA. Govt. MSJ at 22. But whether Congress *can* legislate under more than one enumerated power is beside the point. The question is *what* enumerated power or powers *did* Congress legislate under in the NFA. And as Plaintiffs explained in their opening brief, Congress was explicit about invoking solely its authority under the taxing power for the challenged NFA provisions, as evidenced by the text, structure, legislative history, and comparison with other firearms-related laws. *See* Pls.' MSJ at 19–21. Where Congress is "explicit about invoking its authority under" specific constitutional provisions, it "precludes consideration of" other constitutional provisions "as a basis for the" statute. *Fla. Prepaid Postsecondary Educ. Expense Bd. v. Coll. Sav. Bank*, 527 U.S. 627, 642 n.7 (1999); *see also United States v. Bird*, 124 F.3d 667, 682 n.15 (5th Cir. 1997).

For text, the NFA's introductory preamble specifies that it is an act "to tax the sale or other disposal of" "certain firearms and machineguns." Pub. L. No. 73-474, 48 Stat. 1236. In line with

that purpose, the challenged NFA provisions impose requirements on those who "receive," "possess," or "transfer[ ]" covered firearms, 26 U.S.C. §§ 5812, 5841, to facilitate "a tax" on "each firearm transferred," *id.* § 5811(a); *accord Parker*, 960 F.2d at 500 (explaining that "making possession of an unregistered weapon unlawful is part of the web of regulation aiding enforcement of the transfer tax provision" (quoting *Ross*, 458 F.2d at 1145)). Similarly, the challenged NFA provisions impose requirements on those who "make a firearm," 26 U.S.C. § 5822, to facilitate "a tax" on "the making of a firearm," *id.* § 5821(a).

For structure, as previously explained, the NFA clearly sets up a system whereby the *firearm registration requirements* correspond with the *firearm making and transfer* taxes. In other parts of the NFA, Congress did explicitly reference activities in foreign or interstate commerce. *See id.* § 5861(j), (k). But rather than support the Government's contention that the entire NFA must therefore be concerned with such commerce, these provisions demonstrate that Congress knew how to invoke its Commerce Clause powers and "act[ed] intentionally and purposely" when it "omit[ted]" such an invocation in other provisions "of the same Act." *Miss. ex rel. Hood v. AU Optronics Corp.*, 571 U.S. 161, 169 (2014).

For legislative history, Congress's deliberations on the bill that would become the NFA were generally focused on its nature as a tax. *See* Pls.' MSJ at 17–18. Although the Government points to a few statements concerning a prior version of the bill that referenced the Commerce Clause, *see* Govt. MSJ at 23–24, the bill was later amended to rely exclusively on Congress's taxing power in relevant part. *See, e.g.*, *National Firearms Act: Hearings on H.R. 9066 Before the H. Comm. on Ways & Means*, 73d Cong., 2d Sess. 86 (1934) (statement of Joseph B. Keenan, Asst. Att'y Gen. of the United States) [hereinafter *National Firearms Act Hearings*] (explaining that "the bill as originally drafted exercised two powers, one under the taxation clause and the other

19

under the commerce clause," but "[u]nder the bill as now submitted, *it follows the theory of taxation all the way through*" (emphasis added)). There are two minor exceptions to that general focus on the taxing power. *Contra* Govt. MSJ at 23–24; Balt. Amicus at 11; Brady Ctr. Amicus at 3–4. Congress "employ[ed] the interstate and foreign commerce power to regulate interstate shipment of firearms and to prohibit and regulate the shipment of firearms into the United States." S. Rep. No. 73-1444, at 2 (1934) [Govt. App'x at App.0179]; *see* 26 U.S.C. § 5861(j), (k). Again, those provisions support Plaintiffs' arguments. "If Congress had wanted to" employ the Commerce Clause in support of the challenged NFA provisions, "it knew exactly how to do so." *SAS Inst., Inc. v. Iancu*, 584 U.S. 357, 364 (2018). Outside of those two provisions, however, the NFA was premised on the taxing power "all the way through." *National Firearms Act Hearings* at 86 (statement of Joseph B. Keenan, Asst. Att'y Gen. of the United States).

For comparison with other firearms-related laws, the fact that Congress enacted entirely separate laws to regulate commerce in firearms, first the Federal Firearms Act of 1938 ("FFA") and subsequently its descendent the Gun Control Act of 1968 ("GCA"), further supports the conclusion that the NFA was solely a taxing measure. Unlike the NFA, every substantive provision of the FFA contained an interstate commerce hook. *See* Pub. L. No. 75-785, § 2(a), 52 Stat. 1250 (1938) (prohibiting activities "in interstate or foreign commerce"). And in 1968, Congress "enlarged and extended" the FFA with the GCA, *see Barrett v. United States*, 423 U.S. 212, 220 (1976), while leaving the tax-based NFA separate. As the Fifth Circuit has explained, the GCA "has no roots or antecedent in the National Firearms Act" and "is in no way related or tied to taxation or any character of registration or reporting" required by the NFA. *Lopez*, 2 F.3d at 1349. Consequently, any attempt by the Government to use the history and development of the GCA to inform the basis for the NFA is meritless. *Contra* Govt. MSJ at 14–15; Balt. Amicus at 11–14;

Brady Ctr. Amicus at 4. Comparing the GCA with the NFA confirms what should be obvious—it is the GCA, and not the NFA, that represents Congress's exercise of its purported Commerce Clause authority with respect to firearms.

Third, the Government argues that "Congress need [not] expressly state in the NFA that it was exercising its authority under the Commerce Clause for the Court to uphold it on those grounds." Govt. MSJ at 23. While that may be true, it is irrelevant. As the Government concedes, "[a] court must be able to discern a basis for Congress's exercise of an enumerated power." *Id.* (quoting *United States v. Park*, 938 F.3d 354, 363 (D.C. Cir. 2019)). And as just explained, the NFA's text, structure, and legislative history and a comparison with other firearms-related laws make clear that Congress's taxing power is the only discernible constitutional basis for the challenged NFA provisions. This Court should thus not "ascribe to Congress an attempt, under the guise of taxation, to exercise another power." *Sonzinsky*, 300 U.S. at 514.

## IV.    The NFA's Regulation of Untaxed "Firearms" Exceeds Congress's Commerce Clause Powers.

Despite the NFA's text, structure, legislative history, and comparison with other firearms-related laws making clear that Congress relied solely on its taxing power as the constitutional basis for the challenged NFA provisions, as predicted, the Government argues that, nevertheless, "the challenged NFA requirements and prohibitions fit comfortably within Congress's power under the Commerce Clause." Govt. MSJ at 13. As explained above, the Court should not accept the Government's invitation to ascribe to Congress an exercise of a power that it did not exercise in the NFA. For this reason, the purported fact that most NFA firearms are "distributed and sold interstate," *id.* at 14, does not change the analysis, because Congress was not exercising its Commerce Clause powers through the challenged NFA provisions.

But even if the Court considers the Government's arguments, they each fail. First, Plaintiffs need not show that all of the conduct regulated by the NFA could not be reached by Congress under the Commerce Clause. *Contra id.* at 14–15. Second, under the proper analytical framework per *Lopez*, the challenged NFA firearms registration requirements are not a regulation of the instrumentalities of interstate commerce. *Contra id.* at 13–16. And third, the challenged NFA firearms registration requirements are not a regulation of activities that substantially affect interstate commerce. *Contra id.* at 16–22.

## A.    The *Salerno* Standard Does Not Defeat Plaintiffs' Commerce Clause Challenge.

The Government asserts that Plaintiffs lodge only a facial Commerce Clause challenge, and it says that means Plaintiffs must establish that the challenged NFA provisions exceed Congress's power in all their applications. *Id.* at 16 (citing, *inter alia*, *United States v. Salerno*, 481 U.S. 739, 745 (1987)). It further contends that, at least some of the time, the NFA regulates "persons and things in interstate commerce." *Id*. According to the Government, *these* applications of the challenged requirements are unquestionably valid, which dooms Plaintiffs' (supposedly) facial-only Commerce Clause challenge. For several reasons, that is wrong.

To begin, it is not clear what the Government means when it says that Plaintiffs lodge a facial-only challenge. In fact, Plaintiffs challenge specific NFA requirements as applied to specific firearms, and they expressly challenge those requirements both facially and as applied. Compl. ¶ 86 (Oct. 9, 2025), ECF No. 1.

In any event, the distinction between facial and as-applied challenges cannot do the work the Government asks of it. To be sure, in *Salerno* the Court said that statutes generally are not facially unconstitutional if they have constitutional applications, but the Government has not established that the challenged provisions of the NFA have any constitutional applications. Indeed,

if this Court were to uphold the challenged requirements on the ground that some of the *conduct* they regulate could be reached by valid Commerce Clause legislation, it would directly contravene the Supreme Court's decision in *Lopez*.

*Lopez* involved a Commerce-Clause challenge to the Gun-Free School Zones Act, which prohibited any individual from knowingly possessing any firearm in a school zone. 514 U.S. at 551. The Court held that the Act was "invalid" because it exceeded Congress's power under the Commerce Clause. *See id*. at 552. Importantly, the Court noted that the Act would have been constitutional if Congress had limited its application to firearms that "have an explicit connection with or effect on interstate commerce." *Id*. at 562; *see also, e.g.*, *United States v. Danks*, 221 F.3d 1037, 1039 (8th Cir. 1999) (upholding the Act after Congress limited its reach to firearms bearing some connection with interstate commerce). Many of the firearms that are sold in the United States are imported or sold outside their state of manufacture, *see, e.g.*, BUREAU OF ALCOHOL, TOBACCO, FIREARMS & EXPLOSIVES, FIREARMS COMMERCE IN THE UNITED STATES: ANNUAL STATISTICAL UPDATE 2024 at 5–7 (2024), https://perma.cc/DJC5-VBJZ [Amend. App'x to Pls.' Mot. for Summ. J.: Vol. I at Appx.105–07 (Dec. 10, 2025), ECF No. 27 ("App'x Vol. I")], which means Congress had the power to reach at least some of the conduct regulated by the Act. If the Government's logic were right, the Court should not have held that the Act was invalid.

Yet that is exactly what the Court did. *See Lopez*, 514 U.S. at 552 (affirming that the Act was "invalid as beyond the power of Congress under the Commerce Clause" (internal quotation marks omitted)). By doing so, the Court made clear the relevant fact was that the original Gun-Free School Zones Act prohibited possession of *all* firearms within a school zone, regardless of whether they bore a connection to interstate commerce. For that reason, the Act itself was not a valid exercise of Congress's Commerce Clause authority, even though some or much of the

conduct it regulated could have been reached by valid Commerce Clause legislation. *See* Peter A. Patterson, *Facial Confusion: Lower Court Misapplication of the Facial/As-Applied Distinction in Second Amendment Cases* at 4–5, HARV. J. L. & PUB. POL'Y PER CURIAM (Oct. 27, 2025).

*Lopez* was no aberration; its approach was grounded in well over a century of precedent. Take *In re Trade-Mark Cases*. There, the Court invalidated a conviction under universal trademark legislation on the ground that the legislation exceeded Congress's authority. *See In re Trade-Mark Cases*, 100 U.S. 82, 91–92 (1879). The Attorney General argued that the Commerce Clause at least empowered Congress to establish and regulate trademarks used in commerce with foreign nations and among the several States. On his telling, the trademark legislation at issue should have been "held valid in that class of cases, if no further." *Id*. at 98. The Court disagreed. It acknowledged that, "when one part of a statute is valid and constitutional, and another part is unconstitutional and void, the court may enforce the valid part where they are distinctly separable so that each can stand alone." *Id*. But the statute at issue did not distinguish between trademarks connected to interstate or foreign commerce and those used purely intrastate. To apply the statute to only some trademarks, the Court reasoned, would be to rewrite it. And it held that it had no power to do that. *Id*. at 99.

These cases establish the principle that, in a facial challenge to Congress's authority under the Commerce Clause, the question is not whether the law could conceivably sweep in some conduct that Congress has the power to regulate. The question is instead whether the law is limited *on its face* to conduct that Congress has the power to regulate. The challenged NFA provisions plainly are not so limited—they apply indiscriminately to firearms that have or have not traveled in interstate commerce, with nothing in the statute to distinguish one from the other. That means the Government's objection to Plaintiffs' "facial" challenge fails.

24

Even if all that were wrong, it would not "be the end" of Plaintiffs' Commerce Clause challenge. *Contra* Govt. MSJ at 16. That is because, as explained, Plaintiffs expressly challenge the pertinent NFA requirements as applied, including as applied to their purely intrastate conduct. Compl. ¶ 96. *Salerno* certainly has nothing to say about *that* aspect of Plaintiffs' challenge.

###### B.    The NFA's Regulation of Untaxed "Firearms" Cannot Be Justified as a Regulation of the Instrumentalities of Interstate Commerce.

Viewed under this proper analytical framework per *Lopez*, without an interstate commerce hook, the challenged NFA firearms registration requirements are not a regulation of the instrumentalities of interstate commerce. *Contra* Govt. MSJ at 13–16. Again, the NFA applies to possession, transfers, and makings, without regard to whether those activities occur interstate. Consequently, the Government's insistence that the NFA regulates the "persons" and the "things" in the interstate NFA firearms market is simply incorrect and must be rejected.

###### C.    The NFA's Regulation of Untaxed "Firearms" Cannot Be Justified as a Regulation of Activities that Substantially Affect Interstate Commerce.

Again, because Congress was not exercising its Commerce Clause powers through the challenged NFA provisions, the question of whether the challenged NFA provisions can be justified as a regulation of activities that substantially affect interstate commerce is inapposite. The Court should not impute to Congress an exercise of a power that it did not exercise in the challenged portions of the NFA.

But if the Court does consider the question, the challenged NFA provisions cannot be justified as a regulation of intrastate commerce that substantially affects interstate commerce. First, the challenged NFA provisions were not enacted with "the purpose" of regulating interstate commerce. *See Bird*, 124 F.3d 667. Second, the challenged NFA provisions are not "part of a comprehensive regulation of 'quintessentially economic' activity." *United States v. Kebodeaux*,

25

687 F.3d 232, 251–52 (5th Cir. 2012) (en banc), *rev'd on other grounds*, 570 U.S. 387 (2013). The Government's arguments to the contrary fail.

### 1.    The Challenged NFA Provisions Were Not Enacted with the Purpose of Regulating Interstate Commerce.

The Fifth Circuit has held that "when Congress is regulating *inter*state commercial activity its reason for doing so is immaterial," but where Congress regulates "purely *intra*state, noncommercial activity because of its *substantial affect* on interstate commerce, the purpose must in fact be to regulate interstate commerce." *Bird*, 124 F.3d at 682 n.15 (emphasis in original); *see* Pls.' MSJ at 22. As Plaintiffs have explained, the intrastate possession, making, and transfer of NFA firearms are not inherently commercial activities, so Congress's purpose in enacting the challenged NFA provisions must have been to regulate interstate commerce if the NFA is to be constitutional on this basis. Pls.' MSJ at 22–23. But as Plaintiffs have also explained and reiterated, the Supreme Court and Congress itself have made clear that the challenged NFA provisions are *solely* an exercise of Congress's taxing power, so it cannot be the case that Congress's purpose in enacting them was to regulate interstate commerce. *See* Part III, *supra*. Instead, Congress's purpose was to enact a tax. Further buttressing this conclusion is the fact that Congress made no findings regarding the effects of intrastate possession, transfer, and making of NFA firearms upon interstate commerce, *see Hall*, 171 F.3d at 1139–40; *contra* Govt. MSJ at 26–27, and the fact that the NFA does not contain an interstate jurisdictional hook that would ensure that the NFA firearm possession, transfer, or making affects interstate commerce, *see Lopez*, 514 U.S. at 561; *Hall*, 171 F.3d at 1138–39; *contra* Govt. MSJ at 26–27. Plaintiffs do not contend that these two factors are dispositive, *contra* Govt. MSJ at 26–27, but simply that they reinforce the conclusion that Congress's purpose in the NFA and the challenged NFA provisions was to enact a tax, not to regulate interstate commerce.

26

Accordingly, because the challenged NFA provisions were not enacted with the purpose of regulating interstate commerce, they cannot be justified as a regulation of intrastate commerce that substantially affects interstate commerce.

**2.    The Challenged NFA Provisions Are Not Part of a Comprehensive Regulation of Quintessentially Economic Activity.**

In *Gonzales v. Raich*, 545 U.S. 1 (2005), the Supreme Court upheld the marijuana-possession provisions of the Controlled Substances Act as a regulation of intrastate commerce that substantially affects interstate commerce on the ground that those provisions were "part of a comprehensive regulation of 'quintessentially economic' activity." *Kebodeaux*, 687 F.3d at 251–52. Plaintiffs have demonstrated why the challenged NFA provisions are not themselves, nor a part of, a comprehensive regulation of quintessentially economic activity, so they cannot be upheld as a valid exercise of Congress's Commerce Clause powers on this basis. *See* Pls.' MSJ at 24–26.

In response, the Government essentially concedes Plaintiffs' argument, admitting that the NFA generally seeks "to curtail armed crime," Govt. MSJ at 3, to "stem the criminal misuse of [NFA] weapons," *id.* at 4, and to avoid the "diversion" of "weapons which are peculiarly susceptible of criminal use" "into illicit channels," *id.* at 18–19; *see also* Brady Ctr. Amicus at 9–10. These goals have nothing to do with interstate commerce, which is why Congress added the firearm making and transfer taxes to what would have otherwise been an unconstitutional exercise of police power reposed in the States but "denied by the Federal Constitution." *Sonzinsky*, 300 U.S. at 514. Without the taxes, the challenged NFA provisions form "a criminal statute that by its terms that has nothing to do with 'commerce' or any sort of economic enterprise." *Lopez*, 514 U.S. at 561.

The Government nevertheless insists that the challenged NFA provisions regulate firearms, and firearms are part of a market. Govt. MSJ at 17–20; *see also* Balt. Amicus at 13; Brady Ctr.

27

Amicus at 12–14. But again, the challenged NFA provisions regulate the making, transfer, and possession of untaxed firearms without any broader regulation of the firearms market. Consequently, challenged NFA provisions cannot be justified as a regulation of activity that "substantially affect[s] interstate commerce." *United States v. Morrison*, 529 U.S. 598, 609 (2000).

*Raich* and *Wickard* illustrate why. In *Raich*, the Supreme Court determined that the Controlled Substances Act was constitutional as applied to the intrastate manufacture, distribution, or possession of marijuana because the Act sought "to control the supply and demand of controlled substances in both lawful and unlawful drug markets" by "eliminating commercial transactions in the interstate market in their entirety." *Raich*, 545 U.S. at 19. Regulating purely intrastate growing of marijuana was necessary to accomplish that goal because "leaving home-consumed marijuana outside federal control" would "affect price and market conditions" and thus exert "a substantial effect on supply and demand in the national market for" marijuana. *Id.* Likewise, in *Wickard*, the Supreme Court declared constitutional, as a valid exercise of Congress's Commerce Clause powers, its effort "to increase the market price of wheat and to that end to limit the volume thereof that could affect the market." 317 U.S. at 128. That effort required intrastate regulation because, as the Supreme Court observed, "[i]t can hardly be denied that a factor of such volume and variability as home-consumed wheat would have a substantial influence on price and market conditions." *Id.*

The challenged NFA provisions are nothing like the statutes at issue in *Raich* and *Wickard* because they do not regulate the supply and demand of the market in NFA firearms. Instead, the challenged provisions regulate the firearms *themselves*, requiring registration when they are made, 26 U.S.C. §§ 5841(a)–(c), 5842, 5861(f), transferred, *id.* §§ 5812, 5861(e), or possessed, *id.* §§ 5841(e), 5812(b), 5861(b)–(d). The challenged provisions do not seek to alter the NFA firearms'

28

price, restrict their supply, or otherwise change any "market conditions." *Raich*, 545 U.S. at 19. Rather, at bottom they seek to track who currently *possesses* an NFA firearm, which may make sense in the context of tracking whether the possessor has paid necessary taxes, but which is disconnected from any regulation of the market in firearms.

The distinction between regulating a commodity itself versus the market in that commodity is a critical distinction under *Raich* and *Wickard*. Under the Commerce Clause, Congress is limited to the "regulation of the interstate market in [a] commodity." *Id.* at 18. Congress does not have the power to regulate commodities themselves. In *Wickard* and *Raich*, Congress was not endeavoring to regulate wheat or marijuana themselves, but was regulating the markets for those items, restricting their supply to reach desired market outcomes (a specific market price in *Wickard* and the elimination of the market altogether in *Raich*). Without regulation of an interstate market, the challenged NFA provisions cannot "substantially affect interstate commerce." *Lopez*, 514 U.S. at 559.

This is the point the court made in *Hobby Distillers* when it explained that congressional regulation of intrastate activity is constitutional only where it "serves a comprehensive market regulation and is needed to make that regulation effective." 740 F. Supp. 3d at 532; *contra* Govt. MSJ at 24–25 (quibbling with the use of the term "comprehensive"). The statutes at issue in *Hobby Distillers* affected many "facet[s] of the interstate alcohol market," including by requiring business permits and imposing labeling requirements. *Hobby Distillers*, 740 F. Supp. 3d at 533 (emphasis omitted). But the statutory scheme was not a comprehensive regulation of the underlying market itself because it did not "directly regulate the supply and demand of alcohol" or seek to "promote or eliminate a national marketplace for alcohol." *Id.* The court observed that there was no "degree of control over the 'production, distribution, and consumption' of alcohol as there was for wheat

29

in *Wickard* or controlled substances in *Raich*." *Id.* The same reasoning applies with equal force to the challenged NFA provisions.

The Government argues that "failing to regulate the *intrastate*" making, transfer, and possession of NFA firearms "'would leave a gaping hole' in the NFA by creating an unregulated sub-market in unregistered NFA firearms" that could be "diver[ted] into illicit channels." Govt. MSJ at 18 (quoting *Raich*, 545 U.S. at 22); *see also* Brady Ctr. Amicus at 13. The problem with the Government's position, however, is that what the *Raich* Court was referring to by the "gaping hole in the [Controlled Substances Act]," 545 U.S. at 22, was the "impact on the market," *id.* at 20. Here, the Government is not asserting a hole in its ability to regulate interstate commerce, but a hole in its power to police criminal activity unmoored from the regulation of interstate commerce, a power Congress does not have. Because the challenged NFA provisions are not part of a comprehensive regulation of the supply, demand, price, or other economic conditions of NFA firearms in the interstate market, the existence of an unregistered class of intrastate NFA firearms does not substantially affect interstate commerce. Indeed, invalidating the challenged provisions of the NFA altogether with respect to the untaxed items would not leave a hole in the commercial regulation of the affected items, because the GCA would continue to perform that function. The function of the challenged provisions essentially was scaffolding in support of the making and transfer taxes; now that those taxes have been eliminated, the scaffolding remains standing but without anything to support.

The Government theorizes that the NFA's registration requirements do indeed affect supply and demand, Govt. MSJ at 18, but that argument ignores that the challenged NFA provisions do not seek to *regulate* supply and demand. If such a minor, incidental effect on supply and demand were enough to pass constitutional muster, then *Lopez* should have been decided differently

because limiting the conditions under which firearms may be possessed (*e.g.*, in school zones) *might* make it less desirable to own a firearm and thus marginally decrease demand. Indeed, *every* criminal law has *some* conceivable effect on the supply and demand for *something* (*e.g.*, a ban on marijuana might decrease the demand for lighters). But that effect on supply and demand only matters if the law's aim is to regulate the underlying market. Here, the challenged NFA registration requirements are not regulations of the underlying market.

The Government points to a single sentence in the legislative history for the GCA as supposed evidence that the NFA was designed to regulate interstate commerce, but not only did the GCA postdate the NFA by over 30 years, but the Government also mischaracterizes the sentence. *Contra* Govt. MSJ at 18–19. The committee report states that the NFA "has long been the vehicle for removing from commerce weapons which are peculiarly susceptible to criminal use." S. Rep. No. 90-1097, at 255 (1968). But that was to distinguish the tax-based NFA from the FFA's "regulation of commerce in firearms." *Id.* The NFA's means of "removing from commerce" NFA firearms was its now-zero firearms tax. *See Mock v. Garland*, 75 F.4th 563, 569 (5th Cir. 2023) ("Although th[e] financial burden is not particularly onerous today, in 1934, when the NFA was enacted, the tax was explicitly intended to tax these weapons out of existence."); *contra* Balt. Amicus at 1–5 (in arguing that the NFA was "adopted to regulate 'weapons likely to be used for criminal purposes,'" ignoring that the NFA's means for doing so was through taxation, not free-floating registration requirements). Without the tax, the challenged NFA registration provisions do not remove any firearms from commerce; they instead impose registration requirements unmoored from any comprehensive market regulation.

The Government again cites cases involving machineguns as purported support for its position, Govt. MSJ at 19–20, but again, machineguns are regulated differently than the untaxed

NFA firearms. Congress has "froze[n] in place the market in machineguns." *Kirk*, 105 F.3d at 1001 (op. of Higginbotham, J.). Consequently, machinegun regulation perhaps is akin to the comprehensive market regulations in *Raich* and *Wickard*. The machinegun ban is "a demand-side measure to lessen the stimulus that prospective acquisition would have on the commerce in machine guns" that "effectuate[s]" the total market "freez[e]" on "the number of legally possessed machine guns." *United States v. Knutson*, 113 F.3d 27, 30 (5th Cir. 1997). Congress has thus regulated the market for machineguns by "directly regulat[ing] the supply and demand" as "part of a federal directive to" freeze in place "a national marketplace for" machineguns. *Hobby Distillers*, 740 F. Supp. 3d at 533. Congress has done nothing of the sort for the untaxed NFA firearms. The Government's other machinegun cases fare no better. *See, e.g.*, *United States v. Kenney*, 91 F.3d 884, 890 (7th Cir. 1996) (regulating "possession of a machine gun is much like the possession of wheat in *Wickard*" because it helped "freez[e] the number of legally possessed machine guns at 1986 levels"); *United States v. Rybar*, 103 F.3d 273, 283 (3d Cir. 1996) (explaining that the machinegun ban is a "demand-side measure to lessen the stimulus that prospective acquisition would have on the commerce in machine guns"); *United States v. Luna*, 165 F.3d 316, 319–22 (5th Cir. 1999) (upholding stolen-firearm prohibition that was limited to firearms "shipped or transported in, interstate or foreign commerce" and noting it was part of "larger regulation of economic activity," *i.e.*, "eradicating" market for "stolen firearms").

\*     \*     \*

Accordingly, the challenged NFA provisions cannot be justified as an exercise of Congress's Commerce Clause powers. For the same reasons, the challenged NFA provisions cannot be "necessary and proper" to an unconstitutional attempt to exercise Congress's Commerce Clause powers. *Contra* Govt. MSJ at 27–28.

V.    **The NFA's Regulation of Suppressors and Short-Barreled Rifles Violates the Second Amendment.**

Plaintiffs established that the challenged NFA provisions also constitute an unconstitutional regulatory scheme as applied to suppressors and short-barreled rifles under the Second Amendment: possession of suppressors and short-barreled rifles plainly falls within the textual scope of the right to keep and bear "arms" under the Second Amendment, suppressors and short-barreled rifles are not "dangerous and unusual weapons" that would remove them from Second Amendment protection, and there is no historical basis for requiring the registration of protected arms. Pls.' MSJ at 26–43. In opposition, the Government utterly fails to satisfy its burden to demonstrate that the NFA's registration requirements are consistent with this Nation's history of firearm regulation, presenting three unpersuasive arguments that can be easily rejected.

A.    **Suppressors and Short-Barreled Rifles Are Covered by the Second Amendment's Plain Text.**

There is no dispute between the parties that the plain text of the Second Amendment covers possession of suppressors and short-barreled rifles. Pls.' MSJ at 27–28; *see* Govt. MSJ at 28–33; *see also* Defs.' Answer to Pls.' Compl. ¶¶ 48–50, *Brown v. ATF*, No. 4:25-cv-01162 (E.D. Mo. Oct. 10, 2025), ECF No. 19 [Amend. App'x to Pls.' Mot. for Summ. J.: Vol. II at Appx.489 (Dec. 10, 2025), ECF No. 27-1 ("App'x Vol. II")]; Gov't's Suppl. Resp. to Def.'s Pet. for Reh'g En Banc at 1–5, *United States v. Peterson*, No. 24-30043 (5th Cir. May 29, 2025), ECF No. 135 [App'x Vol. II at Appx.253–57].[1]    Consequently, the challenged NFA registration requirements burden

---

[1] Baltimore's argument that suppressors are not covered by the plain text of the Second Amendment, Balt. Amicus at 17–20, therefore, must be rejected. *See Anderson v. City of New Orleans*, 38 F.4th 472, 481 (5th Cir. 2022) (explaining that "an issue waived by appellant cannot be raised by amicus curiae"). In any event, Plaintiffs have explained why suppressors are arms: the NFA effectively regulates *suppressed firearms*, and suppressed firearms are "arms"; and suppressors facilitate armed self-defense by enhancing the effectiveness of firearms for self-defense and mitigating the hearing risks associated with using firearms. Pls.' MSJ at 27.

Plaintiffs' Second Amendment rights, and the Government, "[t]o justify its regulation, . . . must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation." *Bruen*, 597 U.S. at 17.

### B.    Suppressors and Short-Barreled Rifles Are Not "Dangerous and Unusual Weapons."

The Government has utterly failed to satisfy its burden to demonstrate that the NFA's registration requirements as applied to suppressors and short-barreled rifles are consistent with this Nation's historical tradition of firearm regulation. *Heller* and *Bruen* have provided the sole historical tradition that the Court has reasoned may remove an arm from the Second Amendment's protection: the Court-identified tradition of restricting the use of dangerous and usual weapons. *District of Columbia v. Heller*, 554 U.S. 570, 627 (2008); *Bruen*, 597 U.S. at 46–48. But suppressors and short-barreled rifles are not "*both* dangerous *and* unusual." *Caetano v. Massachusetts*, 577 U.S. 411, 417 (2016) (Alito, J., concurring in the judgment) (emphases in original), and the Government's weak arguments to the contrary fail to persuade.

Plaintiffs presented significant evidence that suppressors and short-barreled rifles are in common use today, with hundreds of thousands of Americans lawfully possessing short-barreled rifles and millions of Americans lawfully possessing suppressors. Pls.' MSJ at 32–34; *contra* Balt. Amicus at 18. Plaintiffs also demonstrated that suppressors and short-barreled rifles are not "dangerous" in the proper sense of dangerous compared to other protected firearms (*e.g.*, handguns). Pls.' MSJ at 34–40. In response, the Government contends that suppressors and short-barreled rifles *are* dangerous, but essentially the only reasoning it provides is that suppressors and short-barreled rifles are purportedly "uniquely susceptible to criminal misuse." Govt. MSJ at 31. Plaintiffs have already established why the Government is wrong on this dangerousness point— the overwhelming evidence is that suppressors are safe, effective, and commonly used devices that

decrease the noise level of a gunshot and are recommended by numerous professional organizations for the safest use of firearms; short-barreled rifles are simply a firearm that is larger than a pistol, yet more accurate, but shorter than a rifle, yet less accurate, *contra* Brady Ctr. Amicus at 6; and neither suppressors nor short-barreled rifles are commonly used by criminals. Regardless, the Government presents *no* argument to contradict Plaintiffs' point that suppressors and short-barreled rifles are in common use today. Indeed, the Government's reasoning runs headlong into *Heller*'s reasoning about handguns, which are overwhelmingly the firearm used by criminals, yet were held to be fully protected under the Second Amendment and not bannable as dangerous and unusual weapons. In other words, if *any* type of firearm could be characterized as particularly susceptible to criminal misuse, it would be handguns, and yet the Supreme Court in *Heller* held that they are protected by the Second Amendment because they are in common use for lawful purposes. *Cf. Heller v. District of Columbia*, 670 F.3d 1244, 1290 (D.C. Cir. 2011) ("*Heller II*") (Kavanaugh, J., dissenting) ("[I]f we are constrained to use D.C.'s rhetoric, we would have to say that *handguns* are the quintessential 'assault weapons' in today's society; they are used far more often than any other kind of gun in violent crimes."); *contra* Brady Ctr. Amicus at 5 (noting a few purported examples of suppressors being used in crimes).

The Government claims that *United States v. Miller*, 307 U.S. 174 (1939), and *Heller* foreclose Plaintiffs' Second Amendment claim as it pertains to short-barreled rifles. Govt. MSJ at 28–29.[2] According to the Government, *Miller* "upheld the NFA's regulation of short-barreled

---

[2] Baltimore further claims that *Miller* forecloses Plaintiffs' Second Amendment claim as it pertains to suppressors because, supposedly, "[l]ike short-barreled shotguns," suppressors are "attractive to criminals while adding little—if any—functionality to the firearm for lawful use." Balt. Amicus at 18. Baltimore is wrong. Plaintiffs presented significant evidence that suppressors are commonly used for lawful purposes, such as hearing protection, to make self-defense more effective and safe, to make firearm training safer, and to improve the accuracy of firearms, and very infrequently used for criminal activity, Pls. MSJ at 34–39, and thus that suppressors'

shotguns," *Heller* did not disturb that holding, and this holding "applies equally to short-barreled rifles," because they are not "materially distinguishable from the short-barreled shotguns addressed in *Miller* and *Heller*." *Id.* The Government presents absolutely no evidence that short-barreled shotguns and short-barreled rifles are materially indistinguishable, and such a contention defies reality. Short-barreled shotguns and short-barreled rifles are plainly different types of firearms, and no amount of *ipse dixit* handwaving by the Government can change that fact. The NFA itself distinguishes between them and sets different minimum barrel lengths for each. 26 U.S.C. § 5845(a). Even if there were some reason to treat short-barreled smooth-bore firearms differently than smooth-bore firearms that are not short-barreled—and the Government does not identify a reason—that reasoning would not apply to treating short-barreled rifled-bore firearms (like short-barreled rifles) because handguns (a short-barreled rifled-bore firearm) are not only constitutionally protected under *Heller*, but are the "*quintessential* self-defense weapon." *See Heller*, 554 U.S. at 629 (emphasis added).

Furthermore, the *Miller* Court did not definitively hold that short-barreled shotguns are unprotected by the Second Amendment but simply determined that "it is not within judicial notice that this weapon is any part of the ordinary military equipment or that its use could contribute to the common defense." 307 U.S. at 178. In other words, neither Miller, who did not file a brief nor appear at oral argument, *Heller*, 554 U.S. at 623, nor the Government provided a robust historical discussion of short-barreled shotguns and their commonality or dangerousness upon which the Court could determine that short-barreled shotguns were protected. This is why *Heller* cautioned lower courts on *Miller*'s limited scope: "[i]t is particularly wrongheaded to read *Miller* for more

beneficial, lawful use is overwhelming in relation to any purported criminal use, *contra* Brady Ctr. Amicus at 5–6.

than what it said." *Id.*; *see also id.* ("*Miller* stands only for the proposition that the Second Amendment right, whatever its nature, extends only to certain types of weapons.").

And even if *Miller* (in 1939) foreclosed protection for short-barreled shotguns (and it did not), and even if *Miller*'s reasoning extended to short-barreled rifles (and it also does not), that would not resolve this case. For, as *Bruen* makes clear, the relevant question is whether short-barreled rifles are "in common use *today*." 597 U.S. at 47 (emphasis added). Thus, it does not matter whether short-barreled rifles were in common use in 1939 any more than it mattered in *Bruen* whether handguns were in common use in the Seventeenth Century. *See id*. The focus must be on the present. To hold otherwise and deny that modern weapons can become popular among modern Americans would leave Second Amendment rights "trapped in amber" and "would be as mistaken as applying the protections of the right only to muskets and sabers." *United States v. Rahimi*, 602 U.S. 680, 691–92 (2024); *contra* Balt. Amicus at 19.

 Consequently, suppressors and short-barreled rifles are *not* both dangerous and unusual, so the Second Amendment's protective scope fully applies and the Government must prove that there is a historical tradition supporting the NFA's registration requirements for them.

### C.     There Is No Historical Tradition Supporting the Challenged NFA Provisions' Registration Requirements for Protected Arms.

There is no historical tradition that would support the NFA's registration scheme for suppressors, short-barreled rifles, or any other protected arm. Pls.' MSJ at 41–42. It is the Government's burden to identify a "well-established and representative historical analogue," *Bruen*, 597 U.S. at 30 (emphasis omitted), but it has failed to do so.

The Government's first purported historical analogue is that "American legislatures have long prohibited the carrying of dangerous and unusual weapons." Govt. MSJ at 30 (cleaned up);

*see also* Balt. Amicus at 23. But those regulations have no relevance here. As Plaintiffs have explained, suppressors and short-barreled rifles are not dangerous and unusual.

The Government next contends that the NFA's registration requirements fit into the purported historical tradition that "many states have long regulated the size of firearms." Govt. MSJ at 30. But bans or taxes on "pocket pistols" are not analogous to requiring the registration of protected arms and punishing the failure to do so with felony criminal penalties. It is simply a fact that the Founders did not require registration of privately owned arms. As then-Judge Kavanaugh explained in *Heller II*, "registration of lawfully possessed guns is not 'longstanding.' Registration . . . has not been traditionally required in the United States and, indeed, remains highly unusual today." 670 F.3d at 1291 (Kavanaugh, J., dissenting). Indeed, "registration requirements are often seen as half-a-loaf measures aimed at deterring gun ownership," *id.*, and they facilitate the ability of governments to confiscate arms. And the fact that the Supreme Court held that handguns are fully protected by the Second Amendment belies any notion that this Nation has a historical tradition of being able to regulate firearms based on whether they are easily concealable.

Baltimore—not the Government to satisfy its burden—raises several other purported historical analogues. Since the Government does not rely on these purported analogues, the Court should not consider them. But even if it does, they fail to carry the Government's burden. First, Baltimore contends that laws regulating the length of militia members' firearms are relevant to justifying the NFA's registration scheme for suppressors, short-barreled rifles, or any other protected arm. But these laws are not "relevantly similar," *Bruen*, 597 U.S. at 29, because they applied specifically to militia members, not to the public in general like the NFA.

Second, Baltimore contends that Founding-era militia musters support the NFA's registration provisions, but that analogy fails. Militia inspections were episodic, localized, and

concerned with readiness, not control. Musters did not require individuals to register their arms with a centralized authority, provide invasive personally identifying biometric data, submit to background checks, await approval, or face criminal penalties for prior possession of uninspected weapons. *See* David B. Kopel & Joseph G.S. Greenlee, *The "Sensitive Places" Doctrine*, 13 CHARLESTON L. REV. 205, 232–34 (2018) (explaining that Founding-era laws assumed lawful private possession and did not authorize government preapproval). Militia inspections presupposed a preexisting right to privately possess arms—they were not a mechanism for gatekeeping ownership or disarmament. The challenged NFA registration provisions, by contrast, are a tool of exclusion and criminal enforcement, backed by severe felony penalties. No Founding-era law imposed comparable burdens or conditions.

Third, that States may have purportedly imposed taxes on personally held firearms, restricted where and to whom individuals could sell firearms, enacted surety laws to prevent firearm use for violence, or prohibited firearm use in certain areas does not support the challenged NFA *registration* provisions. *Contra* Balt. Amicus at 22–23. Baltimore does not explain how any of these supposed historical analogues have anything to do with the NFA's requirement to register the possession, transfer, or manufacture of every firearm that it covers.

Having no meritorious fact-based counterargument to Plaintiffs' overwhelming evidence, the Government turns to relying on courts that have found that suppressors and short-barreled rifles are dangerous and unusual weapons. Govt. MSJ. at 32–33. As an initial matter, it is the Government's burden to establish that suppressors and short-barreled rifles are dangerous and unusual weapons. In light of the evidence Plaintiffs have presented, citation to court decisions that do not undercut that evidence cannot carry the Government's burden.

And contrary to *Bruen*'s textual and historical framework, these courts cited by the Government simply interest-balanced suppressors and short-barreled rifles out of the Second Amendment's scope, appealing to amorphous notions of "dangerousness" and deciding what firearms the "people" ought to prefer. *See, e.g.*, *United States v. Rush*, 130 F.4th 633, 637 (7th Cir. 2025) (opining that short-barreled rifles have "little – if any . . . lawful use"); *United States v. Robinson*, 2025 WL 870981, at *2–5 (11th Cir. Mar. 20, 2025) (finding the supposed "dangerousness" of these weapons constitutionally significant); *Cox*, 906 F.3d at 1185 (opining that short-barreled rifles are "dangerous," "concealab[le]," and "unusual" (internal quotation marks omitted)); *Second Amend. Found., Inc. v. ATF*, 702 F. Supp. 3d 513, 536–37 (N.D. Tex. 2023) (opining that short-barreled rifles are "dangerous and unusual"); *United States v. Miller*, 2023 WL 6300581, at *1–4 (N.D. Tex. Sep. 27, 2023) (same). But these decisions fall into the same "judge-empowering interest-balancing" regime that *Heller* and *Bruen* repudiated. *Bruen*, 597 U.S. at 22 (cleaned up). As the Supreme Court has explained, judges are ill-equipped "to make difficult empirical judgments about the costs and benefits of firearms restrictions, especially given their lack of expertise in the field." *Id.* at 25 (cleaned up). These uninformed decisions demonstrate nothing about whether suppressors and short-barreled rifles are in common use today—only what a handful of modern judges think of these firearms. Thus, the cases are both not binding and unpersuasive.

### D.    The Fifth Circuit's Opinion in *United States v. Peterson* Does Not Compel a Different Result.

The Government argues that the Fifth Circuit has already determined that "the NFA's regulation of suppressors is 'presumptively lawful,' like the shall-issue licensing schemes that the Supreme Court addressed in [*Bruen*]." Govt. MSJ at 29 (quoting *United States v. Peterson*, 161 F.4th 331, 339–40 (5th Cir. 2025)); *see also* Balt. Amicus at 16–17. The Government is wrong.

In *Peterson*, the Fifth Circuit rejected what it characterized as an as-applied challenge to the NFA's registration requirement for suppressors but, like the Supreme Court in *Miller*, "decide[d] only that Peterson has failed to 'develop any argument' or record to show that the NFA is unconstitutional as applied to him." *Peterson*, 161 F.4th at 341–42; *see also id.* at 334 (determining that "Peterson's as-applied challenge fails on this record"); *id.* at 339 (explaining that "Peterson's failure to make any showing . . . is dispositive"). The Fifth Circuit "d[id] not foreclose the possibility that another litigant may successfully challenge the NFA's requirements." *Id.* at 341.

Like *Miller*, it would be "particularly wrongheaded to read [*Peterson*] for more than what it said." *Heller*, 554 U.S. at 623. The record before the panel was "devoid of any facts" relevant to the court's inquiry. *Peterson*, 161 F.4th at 340. Moreover, Peterson did "not cite *Bruen* at all." *Id.* Instead, Peterson argued an interest-balancing standard "that *Bruen* overruled almost two years before his appeal was lodged." *Id.*

*Peterson* therefore does not foreclose Plaintiffs' challenge to the NFA's registration requirements for suppressors here.

## VI.    This Court Should Grant Plaintiffs All The Relief That They Request.

Plaintiffs seek a remedy tailored to redress their injuries: an injunction prohibiting the enforcement of the challenged NFA regulations against: (i) themselves; (ii) Hot Shots Custom's customers; (iii) the associational plaintiffs' members; and (iv) those members' customers. The Government argues that no Plaintiff has shown irreparable harm from the AOW regulations. But Plaintiffs' supplemental declarations establish that the challenged regulations have prevented Plaintiffs Jensen, Neusch, and Smith from acquiring AOWs; Plaintiffs Neusch and Smith from making AOWs; and Plaintiff Hot Shots Custom from selling AOWs. *See* Part I, *supra* (detailing supplemental declarations). All of that amounts to irreparable harm. Indeed, for most of these

harms, the Government effectively concedes as much. It does not contest that Plaintiffs are irreparably harmed by the requirements that prevent them from acquiring suppressors or making short-barreled rifles. *See, e.g.*, Jensen Decl. ¶¶ 9–10, 12 [App'x Vol. I at Appx.003]. It follows that Plaintiffs are irreparably harmed by the requirements that prevent them from acquiring or making AOWs. And while the Government takes issue with Plaintiffs' proposed injunction on several additional grounds, none persuades.

### A.     This Court May Enjoin Enforcement Against Hot Shots Custom's Customers.

The Government says that this court cannot enjoin enforcement of the challenged NFA provisions—namely, the registration requirements—against Hot Shots Custom's customers. On the Government's telling, Hot Shots Custom has not demonstrated that the application of these requirements to its customers causes it irreparable harm. *See* Govt. MSJ at 34–35. But Hot Shots Custom has explained the registration requirements cost it sales because they deter its customers from purchasing NFA firearms. *See* Pls.' MSJ at 8–15 (citing Hot Shots Custom Decl. ¶ 6 [App'x Vol. I at Appx.013]). That is an irreparable harm. *See Wages & White Lion Invs., LLC v. FDA*, 16 F.4th 1130, 1142 (5th Cir. 2021) (monetary harm caused by the government is generally irreparable because the costs are unrecoverable).

The Government does not dispute—and therefore concedes—that an unrecoverable monetary harm is irreparable, but it nonetheless contends that Hot Shots Custom's irreparable harm argument fails. The Government first asserts that Hot Shots Custom's declaration is conclusory. *See* Govt. MSJ at 34. But it does not explain what else Hot Shots Custom needed to say to establish that the challenged NFA provisions cost it sales. And while the Government observes that the declaration is comparable to the declaration of another firearms dealer in another case, *see id.*, that

is hardly remarkable because the challenged provisions affect all NFA firearms dealers in the same way.

The Government next argues that Hot Shots Custom's theory fails because the challenged provisions do not *directly* foreclose sales of NFA firearms. Its theory runs like this: Hot Shots Custom's customers can purchase NFA firearms as long as they comply with the registration requirements. That means the requirements do not cost Hot Shots Custom any sales—only the "independent choices" of Hot Shots Custom's customers to refrain from purchasing NFA firearms in light of those requirements. *See id.* at 35.

This theory cannot be squared with Supreme Court precedent. In *Department of Commerce v. New York*, 588 U.S. 752, 766–67 (2019), the Court considered the question whether States could obtain an injunction requiring the government to remove a citizenship question from the census. The States asserted that the question would deter noncitizens from responding to the census, which would, in turn, injure the States by (among other things) diminishing their political representation and causing them to lose federal funds. *Id*. at 766. The Court acknowledged that this harm depended on "the independent action of third parties," *id*. at 767, but it nonetheless held that the harm was cognizable. It did so because the harm did not "rest on mere speculation about the decisions of third parties" but rather "on the predictable effect of Government action" on those decisions. *Id*. at 768.

While that was a case about standing, there is no basis for concluding that the causation standard is any different in the context of determining whether a plaintiff has suffered irreparable harm. And Hot Shots Custom's theory of irreparable harm likewise rests "on the predictable effect of Government action on the decisions of third parties." *Id*. The NFA requires individuals to spend time and money disclosing intrusive information to the government before purchasing an NFA

43

firearm. It then requires them to wait—sometimes months—for government approval before they may consummate a purchase. *See, e.g.*, Jensen Decl. ¶ 6 [App'x Vol. I at Appx.002]. Common sense makes clear that these requirements cause individuals to refrain from purchasing NFA firearms, including from Hot Shots Custom. If there were any doubt, it would be erased by the individual plaintiffs' declarations. *See id*. ¶¶ 3–9 [App'x Vol. I at Appx.001–03] (explaining that he has declined to purchase NFA firearms because of the NFA's registration requirements); Neusch Decl. ¶¶ 3–9 [App'x Vol. I at Appx.005–07] (same); Smith Decl. ¶¶ 3–9 [App'x Vol. I at Appx.009–11] (same). That means this case is the irreparable-harm equivalent to *Department of Commerce v. New York*; the dealers' harm is caused by the registration requirements.

The Government's argument to the contrary makes little sense. In fact, it follows from the Government's position that a dealer could *never* establish irreparable harm from a requirement on consumers short of an outright purchase ban. *See* Govt. MSJ at 35 (arguing that there is no irreparable harm because "nothing in the NFA prevents prospective customers from purchasing any of Hot Shots Custom's products"). For example, suppose the NFA imposed a firearm registration fee of one million dollars. While such a requirement would surely prevent all or most sales of NFA firearms, it would theoretically remain open to consumers to pay the fee and purchase NFA firearms. So, on the Government's theory, a dealer could not challenge the fee; its lost sales would flow only from consumers' independent choices not to pay the fee. That cannot be right.

The Government cites many cases in support of its far-fetched theory, but nearly all of them stand for a proposition that Plaintiffs do not contest: that irreparable harm cannot be established on the basis of sheer speculation. Consider *Market Synergy Group, Inc. v. Department of Labor*, 2016 WL 6948061 (D. Kan. Nov. 28, 2016). That case involved a rule that prohibited insurance companies from compensating independent agents for selling certain of their products unless they

44

opted into a new program with more stringent requirements. *See id*. at *3–4. The plaintiff—a company that served as a liaison between insurance companies and independent agents—alleged that its business model depended on independent agents receiving compensation from insurance companies, and that the rule would therefore cause its revenues to fall by 80%. *Id*. at *29. The court dismissed this allegation as conjecture. It explained that, if insurance companies opted into the new program, the rule would not harm the plaintiff's business at all. *See id*. And the plaintiff could only speculate about whether insurance companies would do so. *Id*. at *30. For *that* reason, the court rejected the plaintiff's theory. *Id*. at *30–31.

But as explained, Plaintiffs' assertions of irreparable harm are not speculative at all. And courts have found irreparable harm in cases involving non-speculative indirect effects. Consider *United States Association of Reptile Keepers, Inc. v. Jewell*, 103 F. Supp. 3d 133 (D.D.C. 2015). In that case, the plaintiff sought an injunction against an agency rule that banned the interstate transportation of certain reptiles. *Id*. at 138. It alleged that the rule caused its members irreparable economic harm by foreclosing them from selling reptiles across state lines. *Id*. The Government argued—citing many of the same cases that it cites here—that the members' harms were speculative and indirect because they were caused by the independent decisions of persons in the keepers' States not to buy reptiles. *See id*. at 162. The court rejected that argument because the asserted harms, though indirect, were not speculative. It explained the members asserted that the rule had *already* cost them sales at the time of the suit, and that economic logic plainly supported these assertions. *See id*.

So too here. Hot Shots Custom has stated that the registration requirements have already cost it sales. *See* Hot Shots Custom Decl. ¶ 6 [App'x Vol. I at Appx.013]. And that assertion is supported by economic logic, which makes clear that imposing burdensome regulations on the

purchase of a good will reduce sales of that good. That means Hot Shots Custom's theory is not speculative at all. It has therefore established irreparable harm.

### B.    This Court May Enjoin Enforcement Against The Organizational Plaintiffs' Members' Customers.

The Government next protests that this court cannot enjoin enforcement of the challenged provisions against the Organizational Plaintiffs' members' customers because no case holds that an organization may "seek and obtain relief on behalf of its members' customers." Govt. MSJ at 35–36. But the Organizational Plaintiffs do not seek relief on behalf of their dealer-members' customers; they seek relief on behalf of their dealer-members. As noted, the NFA's registration requirements harm dealers by deterring their customers from purchasing NFA firearms. *See* Part VI.A, *supra* (explaining how these requirements harm Hot Shots Custom). To redress that harm, the injunction must prohibit enforcement of the registration requirements against the dealers' customers. In other words, the proposed injunction is necessary to provide complete relief to the Organizational Plaintiffs' dealer-members. This court unquestionably has power to afford complete relief. *See Trump v. CASA*, 606 U.S. 831, 852–53 (2025). And while it is true that the proposed injunction would benefit the members' customers, that is no problem because it would do so only incident to redressing the dealers' injuries. *See id.* at 851 (noting that party-specific injunctions may incidentally benefit non-parties). In short, the Government's argument proceeds from the premise that the Organizational Plaintiffs seek non-party relief. But they do not, so the Government's argument must be rejected.

### C.    This Court Should Grant Relief To All Of The Organizational Plaintiffs' Members.

The Government finally contends that this Court should grant relief only to "the members of the advocacy groups that the groups have chosen to identify and who have standing to challenge the NFA's regulations." Govt. MSJ at 36. On its telling, an injunction granting relief to all of the

46

Organizational Plaintiffs' members would "end-run" three limits on the scope of permissible relief. *Id*. The Government is wrong on each score.

*First*, the Government contends that the Organizational Plaintiffs' proposed injunction would flout "associational standing requirements." *Id*. But the Government does not (and could not) dispute that the Organizational Plaintiffs satisfy the requirements for associational standing. Instead, it argues that, although the Organizational Plaintiffs have established associational standing, they may seek relief only on behalf of those of its members who have separately established standing in their own right. The Supreme Court's associational standing doctrine, however, "permits [an] association to seek relief for its *entire membership*" if even "a single member" has suffered an injury. *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 399 (2024) (Thomas, J., concurring) (emphasis added). That means each of the association's members need not establish standing to obtain the benefit of the relief. Indeed, in explaining that injunctive relief granted to organizations satisfies Article III's redressability requirement, the Court has simply assumed—*i.e.*, has not demanded proof—that the relief "will inure to the benefit of those members of the association actually injured." *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977) (quotation marks omitted; emphasis added). Moreover, an association has standing to sue on behalf of its members only if "the relief requested" does not "require the participation of individual members in the lawsuit." *Id.* Yet to obtain relief under the Government's rule, the association's individual members would have to establish standing. In other words, they would have to participate in the lawsuit. That cannot be right.

*Second*, the Government contends that the proposed injunction would run afoul of the Supreme Court's decision in *CASA*. *See* Govt. MSJ at 36. But *CASA* held only that courts may not grant so-called "universal injunctions" in specific circumstances. *See* 606 U.S. at 845–47. The

Organizational Plaintiffs do not seek a universal injunction; they seek an injunction prohibiting enforcement of the challenged requirements against their own members. *CASA* did nothing to disturb the many cases holding that this kind of relief is permissible. *See, e.g.*, *Hunt*, 432 U.S. at 342.

*Third*, the Government contends that the proposed injunction would undermine the requirements for class certification set forth in Rule 23 of the Federal Rules of Civil Procedure. Govt. MSJ at 36. But in *UAW v. Brock*, 477 U.S. 274 (1986), the Supreme Court made clear that associational suits are an *alternative* to class certification. In that case, a union sought relief for its members from the government's narrow interpretation of a statute that provided benefits for workers adversely affected by imports. *See id*. at 277. The government, resisting the union's request, argued that "members of an association who wish to litigate common questions of law or fact against the same defendant be permitted to proceed only pursuant to the class-action provisions of Federal Rule of Civil Procedure 23." *Id*. at 288. The Court rejected this argument and "reaffirm[ed]" the viability of associational suits. *Id*. at 290. It observed that associational suits are "advantageous both to the individuals represented and to the judicial system as a whole." *Id*. at 289. And it rejected the government's argument that Rule 23's safeguards were necessary to safeguard plaintiffs' interests. Associations, the Court explained, are generally equipped to "represent adequately the interests of all their injured members." *Id*. at 290. In light of *Brock*, the Government's argument that associational suits undermine Rule 23 is untenable. Indeed, the Court recently affirmatively applied its associational standing precedents without suggesting that they are somehow suspect. *See Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 199–201 (2023).

48

Against all that, the Government asserts that it would make some practical sense to limit the injunction to identified members. *See* Govt. MSJ at 36 (noting that this would "appropriately leave[ ] the breadth of the remedy the groups can receive in their own hands"). But the Supreme Court has adopted no such limit, and the Government's contention that a rule makes sense is no basis for disregarding binding precedent. This Court should therefore grant Plaintiffs all the relief they request.[3]

## CONCLUSION

Plaintiffs respectfully request that the Court grant Plaintiffs' motion for summary judgment on Count One, enter a declaratory judgment that the challenged NFA provisions and attendant regulations are unconstitutional and unenforceable as applied to the non-taxed firearms, and permanently enjoin the Government from enforcing those provisions and regulations to the extent set forth in Plaintiffs' pleadings. Plaintiffs further request that the Court grant Plaintiffs' motion for summary judgment on Count Two, enter a declaratory judgment that the challenged NFA provisions and attendant regulations are unconstitutional and unenforceable as to suppressors and short-barreled rifles under the Second Amendment, and permanently enjoin the Government from

---

[3] Baltimore suggests that instead of declaring the challenged NFA provisions and attendant regulations as unconstitutional as applied to the non-taxed firearms, the Court should instead declare as unconstitutional Congress's initial decision to zero out the taxes on those firearms if it would cause the challenged NFA provisions to be unconstitutional. Balt. Amicus at 14–16. But Congress's decision to zero out those taxes is not unconstitutional—Congress is not constitutionally required to tax firearms—and no party to this case has argued otherwise. As Plaintiffs have demonstrated, what is unconstitutional are the challenged NFA provisions and attendant regulations. That forecloses Baltimore's proposed severing remedy. Under severability doctrine, "the Court invalidates and severs *unconstitutional provisions* from the remainder of the law." *Barr v. Am. Ass'n of Pol. Consultants, Inc.*, 591 U.S. 610, 627 (2020) (plurality op.) (emphasis added). The Internal Revenue Code's severability clause is in accord: "If any provision of this title . . . *is held invalid* . . . the remainder of the title, and the application of such provision to other persons or circumstances, shall not be affected thereby." 26 U.S.C. § 7852(a) (emphasis added). No party in this case argues that Congress's decision to set the relevant tax at $0.00 is unconstitutional.

enforcing these provisions and regulations to the extent set forth in Plaintiffs' pleadings. Finally,

Plaintiffs also request that the Court deny the Government's motion for summary judgment.


Dated: January 19, 2026                      Respectfully Submitted,


                                             /s/ David H. Thompson
                                             David H. Thompson*
R. Brent Cooper                              Peter A. Patterson*
Texas Bar No. 04783250                       Nicholas A. Varone*
COOPER & SCULLY, P.C.                         COOPER & KIRK, PLLC
900 Jackson Street, Suite 100                1523 New Hampshire Avenue, N.W.
Dallas, Texas 75202                          Washington, DC 20036
Telephone: (214) 712-9500                    Tel: (202) 220-9600
Telecopy: (214) 712-9540                     dthompson@cooperkirk.com
brent.cooper@cooperscully.com                ppatterson@cooperkirk.com
                                             nvarone@cooperkirk.com

                                             *Admitted *pro hac vice*

                                             *Attorneys for Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

On January 19, 2026, I electronically submitted the foregoing document with the Clerk of Court for the U.S. District Court, Northern District of Texas, using the Court's electronic case filing system. I hereby certify that I have served all parties electronically or by another manner authorized by Federal Rule of Civil Procedure 5(b)(2).

/s/ David H. Thompson
David H. Thompson
COOPER & KIRK, PLLC